2022-1807

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

THE GOVERNMENT OF QUÉBEC, MARMEN INC.,
MARMEN ÉNERGIE INC., MARMEN ENERGY CO.,
THE GOVERNMENT OF CANADA,

Plaintiffs-Appellants

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendants-Appellees

THE GOVERNMENT OF ONTARIO,

Defendant

Appeal from the United States Court of International Trade
in Nos. 1:20-CV-00168-GSK, 1:20-CV-00170-GSK, and 1:20-CV-00172-GSK,
Judge Gary S. Katzmann

# BRIEF OF PLAINTIFFS-APPELLANTS THE GOVERNMENT OF QUÉBEC, MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., AND THE GOVERNMENT OF CANADA

**NON-CONFIDENTIAL VERSION**

Matthew J. Clark
ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC 20006
(202) 857-6000
Counsel to the Government of Québec

Jay C. Campbell
White & Case LLP
701 13th Street NW
Washington, DC 20005
(202) 626-3600
Counsel to Marmen

Joanne E. Osendarp
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8349
Counsel to the Government of Canada

August 25, 2022

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1807

**Short Case Caption** Government of Quebec v. US

**Filing Party/Entity** Marmen Inc., Marmen Energie Inc., and Marmen Energy Co.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/25/2022

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Marmen Inc. | | |
| Marmen Energie Inc. | | |
| Marmen Energy Co. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| White & Case LLP | Jay Charles Campbell | |
| Ron Kendler | Allison J.G. Kepkay | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1807

**Short Case Caption** Government of Québec v. US

**Filing Party/Entity** Government of Québec

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/25/2022

Signature: /s/ Nancy A. Noonan

Name: Nancy A. Noonan

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Government of Québec | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| Aman Kakar | Terminated: 08/24/2022 | |
| Leah N. Scarpelli | | |
| John A. Gurtunca | Terminated: 8/24/2022 | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Natan Pinchas Lyons Tubman | | |
| | | |
| | | |

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1807

**Short Case Caption** Government of Quebec v. US

**Filing Party/Entity** Government of Canada

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 8/25/2022

Signature: /s/ Joanne Osendarp

Name: Joanne Osendarp

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Government of Canada | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Conor Gilligan | McDermott Will & Emery, LLP | Did not appear in the originating Court, but is appearing in this Court. |
| Timothy Hruby | McDermott Will & Emery, LLP | Terminated 8/19/2022 |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted in footnote 1 of page 10 identifies the value of select Marmen sales invoices. The material omitted on page 11 identifies Marmen's account numbers. The material omitted on page 13 identifies Marmen's sales values used to calculate its sales denominator. The material omitted on pages 19, 20, and 28 identifies the amount of a tax credit that Marmen claimed and additional taxes that Marmen owed. The Addendum to this brief contains the non-confidential version of the U.S. Court of International Trade opinion that is, in part, the subject of this appeal. The U.S. Court of International Trade deleted from its opinion certain material determined to be confidential, pursuant to the protective order of the U.S. Department of Commerce in the underlying administrative review.

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 5

I. PROCEDURAL OVERVIEW ........ 5

II. COMMERCE'S DECISION TO REJECT THE AUDITOR'S EXCHANGE RATE ADJUSTMENT ........ 6

A. Marmen's Accounting of USD Sales Revenue in the Normal Course of Business and the Auditor's Exchange Rate Adjustment ........ 7

B. Marmen's Reporting of USD Revenue in the CVD Investigation ........ 7

C. Marmen's Records Prepared to Support the Auditor's Exchange Rate Adjustment at Verification ........ 8

D. Commerce's On-Site Verification of Marmen's Questionnaire Responses ........ 10

E. Commerce's Verification Report ....12

F. Marmen's Case Brief ....13

G. Commerce's *Final Determination* and the CIT's Opinion ....14

III. CLASS 1 DEPRECIATION FOR MANUFACTURING BUILDINGS ....15

A. Description of Capital Cost Allowance for Class 1 Assets ....15

B. Commerce's *Final Determination* ....17

B. The CIT's Opinion ....18

IV. QUÉBEC GASPÉSIE TAX CREDIT ....19

A. Description of the GASPÉTC ....19

B. Commerce's *Final Determination* and the CIT's Opinion ....20

V. QUÉBEC'S ON-THE-JOB-TRAINING TAX CREDIT ....21

A. Description of Québec's On-the-Job-Training Tax Credit ....21

B. Commerce's *Final Determination* ....22

C. The CIT's Opinion ....23

SUMMARY OF THE ARGUMENT ....25

ARGUMENT ....31

I. STANDARD OF REVIEW ....31

II. COMMERCE'S DECISION TO EXCLUDE THE AUDITOR'S EXCHANGE RATE ADJUSTMENT FROM THE SALES DENOMINATOR IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW ....31

A. Commerce's Verification Report Contradicts Its Decision To Reject the Auditor's Exchange Rate Adjustment .......................... 32

B. Commerce's Decision To Reject the Auditor's Exchange Rate Adjustment Is Inconsistent with Its Longstanding Practice and Statutory Obligation ................................................ 37

III. THE 10 PERCENT CLASS 1 DEPRECIATION DEDUCTION FOR MANUFACTURING BUILDINGS IS NOT COUNTERVAILABLE ........................................................................ 42

A. The Class 1 Depreciation Deduction for Manufacturing Buildings Did Not Provide a Countervailable Benefit .................. 42

1. Commerce Erred in Evaluating the Nature and Structure of the CCA for Class 1 Assets ............................. 42

2. Commerce and the CIT failed to Properly Interpret and Apply Commerce's Direct Tax Benefit Regulation ............ 46

3. The CIT Inappropriately Applied a "*Chevron*" Analysis to Commerce's Interpretation of 19 C.F.R. § 351.509(a)(1) ....................................................................... 48

B. Commerce's Finding that the Class 1 Depreciation Deduction for Manufacturing Buildings Provided a Financial Contribution Is Unsupported by Substantial Evidence and Not in Accordance with the Law ......................................................... 49

1. The Governments of Canada and Québec Did Not Forego Revenue that Was Otherwise Due ........................... 49

a. Commerce Must Take a Foreign Government's Tax System as It Finds It ..................................................... 50

b. Undisputed Record Evidence Conclusively Establishes that the Depreciation Deduction at Issue Does Not Deviate from the Norms of Canada's Tax System ........................................................................... 53

2. Commerce Failed to Address Evidence Fairly Detracting from Its Conclusion .......................................... 54

3. Commerce's Construction of 19 U.S.C. § 1677(5)(D)(ii) Is Not in Accordance with the Law ............ 56

IV. THE DIRECT TAXES BENEFIT REGULATION REQUIRED COMMERCE TO CALCULATE THE GASPÉTC BENEFIT USING BOTH THE AMOUNT OF THE TAX CREDIT CLAIMED AND THE ADDITIONAL TAXES PAID AS A RESULT OF THE PROGRAM ....................57

V. COMMERCE MISINTERPRETED THE "LIMITED IN NUMBER" LANGUAGE IN THE *DE FACTO* SPECIFICITY STATUTORY PROVISION AND UNLAWFULLY DETERMINED THAT THE ON-THE-JOB-TRAINING PROGRAM WAS *DE FACTO* SPECIFIC ....................62

A. The Text and Structure of the Statute Unambiguously Require the *De Jure* Analysis to Inform the *De Facto* Analysis of the "Limited Number" Statutory Provision ....................64

B. Commerce's Interpretation of "Limited in Number" as Not Incorporating Its *De Jure* Analysis Contradicts the Statement of Administrative Action....................66

C. The *Charming Betsy* Canon of Statutory Interpretation Also Supports the View That the *De Jure* Analysis Should Inform the "Limited in Number" Analysis Under the *De Facto* Determination....................68

D. Commerce's Interpretation of the Statute Improperly Requires Near Universal Application and Use to Be Non-Specific....................71

E. Commerce's Interpretation of the Statute as Allowing a Percentage Test to Determine Whether Users Were Limited in Number Is Inconsistent with Congressional Intent....................73

F. Commerce Did Not Stay Within the Bounds of its Statutory Authority When Comparing the Users of the On-The-Job-Training Program with All Tax Filers....................76

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ....................79

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*AK Steel Corp. v. United States*,
192 F.3d 1367 (Fed. Cir. 1999) ....................73, 75

*Allegheny Ludlum Corp. v. United States*,
367 F.3d 1339 (Fed. Cir. 2004) ....................68

*Am. Silicon Techs. v. United States*,
334 F.3d 1033 (Fed Cir. 2003) ....................31

*APEX Exps. v. United States*,
777 F.3d (Fed. Cir. 2015) ....................56

*Auer v. Robbins*,
519 U.S. 452 (1997)....................48, 49

*Bethlehem Steel Corp. v. United States*,
223 F.Supp.2d 1372 (Ct. Int'l Trade 2002) ....................51

*Bethlehem Steel Corp. v. United States*,
590 F. Supp. 1237 (Ct. Int'l Trade 1984) ....................51, 75

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
352 F.Supp.3d 1316 (Ct. Int'l Trade 2018) ....................76

*Chevron, U.S.A., Inc. v. N.R.D.C.*,
467 U.S. 837 (1984)....................passim

*City of Arlington v. FCC*,
569 U.S. 290 (2013)....................76

*Consol. Bearings Co. v. United States*,
348 F.3d 997 (Fed. Cir. 2003) ....................40

*Consol. Edison Co. v. Labor Bd.*,
305 U.S. 197 (1938)....................36

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989)....................64

*Delverde, SrL v. United States*,
202 F.3d 1360 (Fed. Cir. 2000) ....................64

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020)....................55

*Federal-Mogul Corp. v. United States*,
63 F.3d 1572 (Fed. Cir. 1995) ....................68

*Gourmet Equip. Corp. v. United States*,
24 C.I.T. 572 (2000) ....................38

*Gov't of Québec v. United States*,
567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) ....................2

*Gov't of Sri Lanka v. United States*,
308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ....................51

*Heino v. Shinseki*,
683 F.3d 1372 (Fed. Cir. 2012) ....................64

*JTEKT Corp. v. United States*,
642 F.3d 1378 (Fed. Cir. 2011) ....................31

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)....................48, 58, 62

*Lasko Metal Prods. Inc. v. United States*,
43 F.3d 1442 (Fed. Cir. 1994) ....................41

*Linyi Chengen Imp. & Exp. Co.*,
391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019)....................32

*Luigi Bormioli Corp. v. United States*,
304 F.3d 1362 (Fed. Cir. 2002) ....................69

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 ....................47

*NMB Singapore Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009) ....................55

*POSCO v. United States*,
296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ....................................................41

*PPG Indus., Inc. v. United States*,
978 F.2d 1232 (Fed. Cir. 1992) ..........................................................................77

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012)...............................................................................................64

*Royal Thai Gov't v. United States*,
502 F. Supp. 2d 1334 (Ct. Int'l Trade 2007) ....................................................43

*Royal Thai Government v. United States*,
341 F. Supp. 2d 1315 (Ct. Int'l Trade 2004),
*aff'd in part, rev'd in part on other grounds & remanded*,
436 F.3d 1330 (Fed. Cir. 2006) ..........................................................................75

*SeAH Steel VINA Corp. v. United States*,
182 F. Supp. 3d 1316 (Ct. Int'l Trade 2016) ....................................................40

*SeAH Steel VINA Corp. v. United States*,
269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017) ....................................................39

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001) ..........................................................................43

*United States v. Menasche*,
348 U.S. 528 (1955)..............................................................................................77

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)..............................................................................................37

*Usinor, Beautor, Haironville, Sollac Atlantique, Sollace Lorraine v. United States*,
342 F. Supp. 2d 1267 (Ct. Int'l Trade 2004) ....................................................53

*Viraj Group v. United States*,
476 F.3d 1349 (Fed. Cir. 2007) ..........................................................................31

## STATUTES AND REGULATIONS

19 U.S.C. § 1671b(b)(4) ...............................................................................37, 41

19 U.S.C. § 1677(5) ....................62

19 U.S.C. § 1677(5)(A)....................5, 58

19 U.S.C. § 1677(5)(B)....................5, 58

19 U.S.C. § 1677(5)(D)....................50, 62

19 U.S.C. § 1677(5)(D)(ii)....................passim

19 U.S.C. § 1677(5)(E) ....................58, 62

19 U.S.C. § 1677(5A) ....................5

19 U.S.C. § 1677(5A)(D)....................passim

19 U.S.C. § 1677(5A)(D)(i)....................passim

19 U.S.C. § 1677(5A)(D)(ii)....................45, 66, 67

19 U.S.C. § 1677(5A)(D)(iii)....................passim

19 U.S.C. § 1677(5A)(D)(iii)(I)....................passim

19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV) ....................74

19 U.S.C. § 1677(5A)(D)(iv)....................45

19 U.S.C. § 1677(6) ....................20, 57, 61, 62

19 U.S.C. § 1677m(i)....................8, 10, 11, 12

19 U.S.C. § 3512(d) ....................67

28 U.S.C. § 1295(a)(5)....................2

28 U.S.C. § 1581(c) ....................2

19 C.F.R. § 351.307(c)....................35

19 C.F.R. § 351.501 ....................58

19 C.F.R. § 351.503(a)....................59, 61

19 C.F.R. § 351.503(e)....................20, 57, 60

19 C.F.R. § 351.509(a)(1) ....................passim

19 C.F.R. § 351.525(a) ....................6, 41

19 C.F.R. § 351.525(b)(6)(ii) ....................7

**ADMINISTRATIVE DETERMINATIONS**

*Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*,
71 Fed. Reg. 67098 (Dep't Commerce Nov. 20, 2006) ....................39

*Chrome-Plated Lug Nuts from Taiwan* (final results 1996-1997 review),
64 Fed. Reg. 17314 (Dep't Commerce Apr. 9, 1999) ....................38

*Countervailing Duties*,
63 Fed. Reg. 65348 (Dept. Commerce Nov. 25, 1998) ....................passim

*Fresh Cut Flowers from Mexico*) (final results 1991-1992 review),
60 Fed. Reg. 49569 (Dep't Commerce Sept. 26, 1995 ....................38

*Utility Scale Wind Towers from Canada*,
85 Fed. Reg. 40245 (Dep't Commerce July 6, 2020) ....................2

**MISCELLANEOUS**

Agreement on Subsidies and Countervailing Measures, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14 ("SCM Agreement") ....................50

CAMBRIDGE DICTIONARY,
https://dictionary.cambridge.org/us/dictionary/english/limited ....................72

DICTIONARY.COM,
https://www.dictionary.com/browse/spot-check ....................33

*Economic Depreciation and Retirement of Canadian Assets: A Comprehensive Empirical Study* ("*StatCan Study*") ....................16, 19

*How to Depreciate Property*,
I.R.S. Pub. 946 (2019) ....................15

OXFORD LEXICO,
https://www.lexico.com/definition/spot_check ....................32

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act*,
H.R. Rep. No. 103-316, at 930 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 ............................................passim

*United States - Measures Affecting Trade in Large Civil Aircraft (Second Complaint), Recourse to Article 21.5 of the DSU by the European Union*,
WTO Doc. WT/DS353/AB/RW ¶ 5.240 (adopted Apr. 12, 2019) ..................70

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiffs-Appellants, the Government of Québec, Marmen Inc., Marmen Énergie Inc., Marmen Energy Co., and the Government of Canada, make the following statement:

1. No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2. No other action pending before the United States Court of International Trade may be directly affected by the Court's disposition of this appeal.

# JURISDICTIONAL STATEMENT

The consolidated actions filed by Plaintiffs-Appellants the Government of Québec, Marmen Inc., Marmen Énergie Inc., Marmen Energy Co., and the Government of Canada (collectively, "Canadian Parties" or "Appellants") before the United States Court of International Trade ("CIT"), *The Government of Québec et al. v. United States*, Consol. Ct. No. 20-00168, which resulted in this appeal, contested certain aspects of the U.S. Department of Commerce's ("Commerce") final countervailing duty ("CVD") determination in *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40245 (Dep't Commerce July 6, 2020) (final CVD determ.) ("*Final Determination*"); Appx147-149. The CIT had exclusive jurisdiction over the Canadian Parties' complaints under 28 U.S.C. § 1581(c). This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

On March 18, 2022, the CIT issued the final decision from which this appeal was taken. *See Gov't of Québec v. United States*, 567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022); Appx39-56. The Canadian Parties timely filed their notice of appeal on May 16, 2022.

## STATEMENT OF THE ISSUES

1. Was Commerce's decision to exclude an independent auditor's exchange rate adjustment from the calculation of Marmen Inc.'s and Marmen Énergie Inc.'s (collectively, "Marmen") combined sales denominator supported by substantial evidence and otherwise in accordance with law, when Commerce's decision clashes with its verification report; contravenes the agency's longstanding practice of relying on audited financial statements; and violates the agency's statutory obligation to calculate the countervailable subsidy rate as accurately as possible?

2. Did Commerce err in concluding that the 10 percent depreciation deduction for Class 1 buildings primarily used for manufacturing or processing ("Class 1 manufacturing buildings") conferred a countervailable benefit and a financial contribution to Marmen within the meaning of 19 C.F.R. § 351.509(a)(1) and 19 U.S.C. § 1677(5)(D)(ii), respectively?

3. Did Commerce misinterpret the plain language of 19 C.F.R. § 351.509(a)(1) when it calculated Marmen Énergie Inc.'s benefit from Québec's Gaspésie tax credit without accounting for both the reduced tax liability and the extra taxable income reported on the same tax return for the same tax credit program?

4. Did Commerce apply 19 U.S.C. § 1677(5A)(D)(iii)(I) in a manner that is consistent with Congressional intent when it found Québec's On-the-Job-Training

Tax Credit Program to be *de facto* specific simply by comparing the number of users to the total number of tax filers and by ignoring the text and structure of the statute, which require the *de jure* specificity determination to inform the *de facto* specificity determination?

# STATEMENT OF THE CASE

## I. PROCEDURAL OVERVIEW

Under the CVD statute, a countervailable subsidy exists if (1) a government has directly or indirectly provided a "financial contribution"; (2) a "benefit" is thereby conferred upon the recipient (*i.e.*, the respondent); and (3) the subsidy is "specific" to an enterprise, industry, or group of such enterprises or industries. *See* 19 U.S.C. § 1677(5)-(5A).

In response to a CVD petition filed by the Wind Tower Trade Coalition ("Petitioner"), Commerce initiated CVD investigations of utility scale wind towers from Canada, Indonesia, and Vietnam on July 29, 2019. *See* Appx361-366. Commerce selected Marmen Inc. and Marmen Énergie Inc. ("Marmen Énergie"), affiliated companies with wind tower facilities in Québec, as mandatory respondents for Canada. During the investigation, Marmen, the Government of Canada, and the Government of Québec submitted complete responses to all Commerce requests for information, including the initial CVD questionnaire and multiple supplemental questionnaires.

From February 17, 2020, through February 20, 2020, Commerce officials conducted verification of Marmen's questionnaire responses at Marmen Inc.'s offices in Trois-Rivières, Québec. *See* Appx8654.

Commerce issued an affirmative final CVD determination on June 29, 2020, assigning Marmen a final subsidy rate of 1.18%. *See* Appx148. Subsequently, on August 5, 2020, Commerce corrected Marmen's final subsidy rate to 1.13% in light of a ministerial error. *See* Appx150-152.

The Canadian Parties appealed Commerce's final CVD determination to the CIT, raising four issues: (1) Commerce's decision to exclude an independent auditor's exchange rate adjustment from the calculation of Marmen's sales denominator; (2) Commerce's decision to countervail the additional depreciation for manufacturing buildings under Canada's and Québec's tax systems; (3) Commerce's benefit calculation for Québec's Gaspésie tax credit; and (4) Commerce's determination that Québec's On-the-Job-Training Tax Credit is *de facto* specific. The CIT entered judgment affirming Commerce's CVD determination in all respects on March 18, 2022, and the Canadian Parties commenced their appeal to this Court on May 16, 2022.

## II. COMMERCE'S DECISION TO REJECT THE AUDITOR'S EXCHANGE RATE ADJUSTMENT

Commerce calculates a subsidy rate for a given government program by dividing (1) the amount of the benefit allocated to the one-year period of investigation ("POI") (here, calendar year 2018) by (2) the respondent's relevant sales value during the POI. *See* 19 C.F.R. § 351.525(a). Here, because Marmen Inc. and Marmen Énergie both produce the subject merchandise, wind towers,

Commerce used Marmen Inc.'s and Marmen Énergie's combined sales (minus intercompany sales between them) as the sales denominator. *See* Appx113; 19 C.F.R. § 351.525(b)(6)(ii).

### A. Marmen's Accounting of USD Sales Revenue in the Normal Course of Business and the Auditor's Exchange Rate Adjustment

Marmen Inc. and Marmen Énergie prepare their financial statements with all values expressed in Canadian dollars ("CAD"). *See* Appx2702-2704 (Marmen Inc.'s 2018 financial statement at note 2), Appx2810-2811 (Marmen Énergie's 2018 financial statements at note 2). In 2018 (the POI) and prior years, both companies' practice was to leave U.S. dollar ("USD") sales revenue untranslated (*i.e.*, not converted to CAD) in their general ledgers. *See* Appx8655, Appx8677. Subsequently, at year's end, their independent auditor, Deloitte, would convert the USD revenue to CAD for presentation in Marmen Inc.'s and Marmen Énergie's financial statements. *See* Appx8091-8142 (reconciliations of reported sales values to year-2018 financial statements showing the auditor's adjustment to translate USD sales revenue recorded in Marmen Inc.'s and Marmen Énergie's general ledgers to CAD).

### B. Marmen's Reporting of USD Revenue in the CVD Investigation

In response to Commerce's CVD questionnaire, Marmen reported Marmen Inc.'s and Marmen Énergie's total POI sales figures (net of intercompany transactions) as recorded in the companies' general ledgers. *See* Appx8088-8090.

Consequently, Marmen's total sales value was reported in mixed currencies – comprising both CAD-denominated and USD-denominated sales. In addition, however, Marmen submitted worksheets reconciling the companies' general ledger sales values (comprising CAD and USD sales) to the total revenue figures in the companies' financial statements (expressed entirely in CAD). *See* Appx8092, Appx8118. Both worksheets included the "exchange rate adjustment" made by Deloitte at year-end to translate USD sales revenue recorded in the general ledger to CAD. *See id.* (rows labeled "Year End auditor adjustment in GL 40000 for Gain(loss) exchange rate"). Moreover, on December 18, 2019, shortly after issuance of Commerce's preliminary CVD determination, Marmen filed a letter explaining that the auditor's exchange rate adjustments must be incorporated to express Marmen's sales denominator entirely in CAD, the same currency in which Marmen received any countervailable benefits. *See* Appx8434-8941.

### C. Marmen's Records Prepared to Support the Auditor's Exchange Rate Adjustment at Verification

Information reported to Commerce in a CVD investigation is subject to verification (which is akin to an audit). *See* 19 U.S.C. § 1677m(i). On February 7, 2020, Commerce sent Marmen an agenda for the verification of Marmen's questionnaire responses, instructing Marmen to gather all "necessary information . . . prior to the verifiers' arrival." Appx8542. Accordingly, in advance of verification,

Marmen prepared documentation to support the auditor's USD-CAD exchange rate adjustments for calendar year 2018, the POI.

For each company, Marmen Inc. and Marmen Énergie, Marmen prepared detailed lists (organized by general ledger account) of the hundreds of USD transactions building to Marmen Inc.'s and Marmen Énergie's total USD sales values for 2018. *See* Appx8592-8594, 8597, 8605-8606 (Marmen Inc. sales; limited to the pages Commerce's verifiers included in the administrative record), Appx8644-8647 (Marmen Énergie sales; limited to the pages Commerce's verifiers included in the administrative record). Marmen also prepared support for the exchange rate used by the auditor to convert the companies' USD-sales revenues to CAD, and a worksheet to support the auditor's calculation of the exchange rate adjustments applied to present Marmen Inc.'s and Marmen Énergie's total sales revenues in one currency, CAD, in their year-2018 financial statements. *See* Appx8589-8591 (Marmen Inc. sales), Appx8641-8642 (Marmen Énergie sales).

In all but a handful of instances, the USD-sale listings for each general ledger account showed that the currency for each transaction was USD. For one Marmen Inc. general ledger account, however, the USD-sale listing indicated that ***all three*** invoices (encompassing four sales transactions) recorded in the account were issued in Euro. *See* Appx8593. For ***another*** Marmen Inc. general ledger account, the listing included ***one*** invoice issued in Euro. *See* Appx8597, Appx8605, Appx8638

(although Commerce's verifiers did not include the relevant page showing this in the administrative record). Combined, these four invoices accounted for ***less than 0.2%*** of the total value of Deloitte's USD-CAD exchange rate adjustment for Marmen Inc.[1] Meanwhile, Marmen Énergie's USD-sales listing showed that each transaction was denominated in USD.

### D. Commerce's On-Site Verification of Marmen's Questionnaire Responses

During verification, Marmen presented the USD-sales listings to Commerce. *See* Appx8679 ("We next discussed the sales accounts that Marmen Inc. identified as needing to be converted to USD."), Appx8685.

For Marmen Inc., the Commerce verifiers reviewed the company's USD-sales listing and noted the three invoices recorded in one general ledger account as issued in Euro. *See* Appx8679-8680. Commerce reviewed the invoices and payment documentation for these invoices, and found that one invoice was paid in CAD, while the other two invoices were paid in Euro. *See id.* The verifiers also noted the other Marmen Inc. general ledger account showing one invoice issued in Euro, and confirmed the sale was paid in Euro. *See* Appx8680. Commerce then "reviewed all of the sales accounts and confirmed there were ***no additional Euro coded sales***." *Id.*

[1] That is, the total value of the four invoices ([ Price ] + [ Price ] + [ Price ] + [ Price ]) = [ Price ]) divided by the total USD sales value recorded in Marmen Inc.'s general ledger ([Sales Value ]) equals 0.17%. *See* Appx8590, Appx8624, Appx8636-8638.

(emphasis added). Lastly, Commerce conducted a spot-check of Marmen Inc.'s USD-sales listing, selecting invoices at random, and "confirmed that the payments were made in USD." *Id.* ("We then selected the following accounts and invoices and confirmed that the payments were made in USD . . . ."); *see also* Appx8679 ("We reviewed another invoice in account [ Account Number ] that was classified in USD and noted that it was paid in USD. We reviewed another invoice in account [Account No. ] and confirmed that it was paid in USD.").

Commerce's verification team also examined the auditor's exchange rate adjustment for Marmen Énergie. Marmen Énergie recorded USD revenue in one general ledger account. *See* Appx8642, Appx8644-8647 (Marmen Énergie sales); Appx8685. The Commerce verifiers reviewed this account "and confirmed that all sales were listed as US dollar sales." Appx8685. Commerce's verification team then performed a spot-check, randomly selecting certain "invoices from this account and requested the payment documentation to confirm that these were paid in US dollars{,}" and identified no discrepancies. *Id.*

Commerce completed the verification of Marmen's questionnaire responses early on the fourth day. *Compare* Appx8652 (noting that the verification was conducted from February 17, 2020, through February 20, 2020) *with* Appx8542 ("Yasmin Bordas, Tyler Weinhold, and Moses Song will conduct the verification from February 17, 2020, through February 21, 2020 in Trois-Rivières, Canada.").

In doing so, the Commerce verifiers did not indicate any dissatisfaction or that Marmen had failed to address any of the issues or questions raised during the proceeding.

### E. Commerce's Verification Report

Commerce's verifiers issued the Verification Report on April 16, 2020, nearly two months after the conclusion of verification in Québec. *See* Appx8654. The Verification Report includes a "Summary of Findings," described as "an illustrative list of issues and factual observations that arose during the course of {Commerce's} verification." Appx8655. Commerce provides the Summary of Findings "as a convenience in order to better aide the parties' preparation of comments before Commerce." *Id.* The first item listed in Commerce's Summary of Findings is labeled "**U.S. Dollar Sales in the General Ledger and in Marmen's Reported Total Sales Values**." *Id.* The Summary of Findings indicates that the auditor's exchange rate adjustment is necessary to convert Marmen's USD sales to CAD for the sales denominator: "The currency adjustments ***required to convert USD sales***

***to CAD values*** were made in the '***Year End auditor adjustment*** in GL 40000 for Gain(loss) exchange rate' figures . . . ." *Id.* (emphasis added).

### F. Marmen's Case Brief

Marmen submitted its case brief in the CVD investigation on May 6, 2020. Marmen included a worksheet illustrating the calculation of the sales denominator in CAD, with citations to the relevant verification exhibits.

| Marmen Inc. | Currency | 2018 | | Source |
|---|---|---|---|---|
| FOB Sales Value per General Ledger (GL 40000) | CAD/USD | [ Sales Value ] | a | Ex. VE-12 (at page 2) (restated value) |
| Less: Discounts on Payments | CAD | [ Discounts ] | b | Ex. VE-12 (at page 2) |
| Plus: Exchange rate conversion on USD sales (auditor adj.) | CAD | [ Exchange Rate Conversion ] | c | Ex. VE-12 (at page 2) |
| Less: Intercompany sales to Marmen Energie | CAD | [ Intercompany Sales ] | d | Ex. VE-4 (at page 2); Verif. Report at 34 |
| Sales to 3rd Parties | CAD | [ Sales Value ] | e=a-b+c-d | |

| Marmen Énergie Inc. | Currency | 2018 | | Source |
|---|---|---|---|---|
| FOB Sales Value per General Ledger (GL 40000) | CAD/USD | [ Sales Value ] | f | Ex. VE-13 (at page 2) (restated value) |
| Less: Discounts on Payments | CAD | [ Discounts ] | g | Ex. VE-13 (at page 2) |
| Plus: Exchange rate conversion on USD sales (auditor adj.) | CAD | [ Exchange Rate Conversion ] | h | Ex. VE-13 (at page 2) |
| Less: Intercompany sales to Marmen Inc. | CAD | [ Intercompany Sales ] | i | Ex. VE-4 (at page 15); Verif. Report at 34 |
| Sales to 3rd Parties | CAD | [ Sales Value ] | j=f-g+h-i | |

| Combined Sales Value | Currency | 2018 | |
|---|---|---|---|
| Marmen Inc. (minus sales to Marmen Énergie Inc.) | CAD | [ Sales Value ] | e |
| Marmen Énergie Inc. (minus sales to Marmen Inc.) | CAD | [ Sales Value ] | j |
| Marmen - Total Sales Value | CAD | [ Sales Value ] | k=e+j |

*See* Appx8748. For each company, Marmen Inc. and Marmen Énergie, Marmen (1) started with the company's total POI sales value recorded in the general ledger (comprising both CAD and USD sales); (2) added the exchange rate adjustment used by the auditor to convert USD revenue to CAD for presentation in the companies' year-2018 financial statements; and (3) deducted intercompany sales (using the CAD value that was verified). *See id.*

### G. Commerce's *Final Determination* and the CIT's Opinion

Commerce did not include "Marmen's auditor's {exchange rate} adjustment in the sales denominators used for the final determination." Appx116. Commerce explained that, because it "found multiple improperly identified and improperly converted euro and CAD values in the calculation of the auditor's adjustment at verification, . . . the auditor's adjustment is unverified and unreliable." *Id.* According to Commerce, "Commerce officials discovered these currency identification and conversion errors as a result of spot-checking Marmen's records during verification." Appx115. "As the purpose of these checks was to sample and spot check the transactions in Marmen's books and records to determine whether Marmen's auditor's adjustment was accurate and reliable, we conclude that the auditor's adjustment was not accurate or reliable." Appx116. Commerce also rejected Deloitte's exchange rate adjustment for Marmen Énergie without explanation.

By virtue of Commerce's decision to reject an independent auditor's adjustment, Marmen's final subsidy rate changed from *de minimis* (less than 1.00%) to above *de minimis* (at 1.13%). Consequently, Commerce issued an affirmative final CVD determination.

On appeal, the CIT in affirmed Commerce's decision to reject the auditor's adjustment, but failed to account for the contradictory information reported by Commerce's verifiers in the Verification Report. *See* Appx48-49.

## III. CLASS 1 DEPRECIATION FOR MANUFACTURING BUILDINGS

### A. Description of Capital Cost Allowance for Class 1 Assets

Canada, like the United States, allows taxpayers to take certain deductions from gross income when calculating taxable income, including deductions for the depreciation of assets used in a taxpayer's business. Appx2513; *see also How to Depreciate Property*, I.R.S. Pub. 946 (2019); Appx8037–8038 ({Canada} Income Tax Regulation ("ITR"), C.R.C c. 945, Pt. XI, Division I, Section 1100).

In Canada, depreciation deductions are called "Capital Cost Allowances," or "CCAs." Appx2513. Assets are grouped into different asset classes based on the type of asset, which are then assigned applicable depreciation rates, based on the useful life of assets in the Class. The CCA at issue here is based on a 10 percent depreciation rate available for manufacturing buildings, a subclass of assets within Class 1. *See* Appx2514.

As shown in the table below, the CCA for Class 1 assets provides different depreciation rates for three different categories of buildings, each reflecting the rate at which the different buildings decrease in value.

| Building Type | Depreciation Rate |
|---|---|
| Residential Buildings | 4% |
| Non-Residential Buildings – 90 percent of floor space is used for manufacturing or processing | 10% |
| Non-Residential Buildings – 90 percent of floor space is used for a non-residential purpose such as retail establishments. | 6% |

Prior to implementing these three separate rates, the Class 1 CCA was calculated at a single four percent depreciation rate. Appx2514. The breakout into three subclasses followed an empirical study conducted by Canada's official government statistics agency, Statistics Canada, entitled, *Economic Depreciation and Retirement of Canadian Assets: A Comprehensive Empirical Study* ("*StatCan Study*"), which concluded that the four percent depreciation deduction "substantially underestimated" the rate at which buildings used for non-residential purposes actually depreciated. Appx2555. Specifically, the *StatCan Study* found that:

> The proposed geometric depreciation rates for buildings are, on average, almost triple the {previous} official rates used by {Statistics Canada}. The increases are across the board with Office Buildings and Shopping Centres depreciating close to 6.0% per year and Manufacturing Plants depreciating at 10.0%.

Appx2550 (emphases and footnote omitted). Subsequently, the Government of Canada released its budget plan for 2007 ("2007 Budget Plan"), which cited the *StatCan Study* as the basis for proposing the current CCA structure for Class 1 buildings. *See* Appx2513–2520. The 2007 Budget Plan specifically stated that

"{a}vailable evidence on the useful lives of buildings suggests that the ***current provisions do not reflect the useful life of manufacturing or processing buildings*** and other non-residential buildings." Appx2514 (emphasis added). The 2007 Budget Plan thus proposed "that the CCA for buildings used for manufacturing or processing in Canada for goods for sale or lease be increased to 10 per cent." Appx2514.

### B. Commerce's *Final Determination*

Without addressing the evidence discussed above or citing evidence to the contrary, Commerce found that the 10 percent depreciation deduction conferred a countervailable benefit based on the difference between the four percent and 10 percent CCA (*i.e.*, depreciation) rates. *See* Appx98. Commerce also found it relevant that Marmen had to claim the 10 percent depreciation rate on a Schedule 8 form filed with its tax return, Appx98 – even though depreciation deductions for all classes of assets, not just the 10 percent depreciation rate for Class 1 manufacturing buildings, must be claimed on Schedule 8. *See* Appx2841, Appx2851–2854, Appx2856–2858.

With regard to the financial contribution element, Commerce summarily concluded that the "difference between the {four percent and 10 percent} deductions represents the forgoing of revenue otherwise owed." Appx99. In doing so,

Commerce failed to respond to the Canadian Parties' arguments explaining the empirical basis for the different depreciation rates. *See, e.g.*, Appx8758–8760.

### B. The CIT's Opinion

On appeal, the CIT concluded that neither the statutory nor regulatory provisions in question "unambiguously" required the interpretation offered by the Canadian Parties. *See* Appx54–56. Therefore, citing *Chevron, U.S.A., Inc. v. N.R.D.C.*, 467 U.S. 837 (1984), the CIT deferred to Commerce's interpretation of the provisions, finding them to be reasonable. Appx55.

The CIT found that Commerce's benefit determination was supported by substantial evidence, and "that it was correct to compare the {10 percent depreciation rate} to the treatment of the whole of Class 1 assets that applies to those who cannot elect more advantageous treatment." Appx56. The CIT also excused Commerce's "declining to directly engage with" the *StatCan Study* because "where a taxpayer can opt-in to more favorable treatment, it is reasonable for Commerce to confine its analysis to the comparisons provided for by law." Appx56.

With respect to financial contribution, the CIT concluded that the "statute's 'foregoing or not collecting revenue that is otherwise due' language does not provide an exception for programs which attempt to reflect (successfully or not) the economic reality of depreciation." Appx55 (quoting 19 U.S.C. § 1677(5)(D)(ii)).

The CIT did not otherwise address the merits of the Canadian Parties' arguments that the 10 percent deduction did not constitute a financial contribution.

## IV. QUÉBEC GASPÉSIE TAX CREDIT

### A. Description of the GASPÉTC

The Tax Credit Promoting Employment in Gaspésie and Certain Maritime Regions of Québec ("GASPÉTC") was introduced to encourage job creation in certain economically challenged regions, including the region where Marmen Énergie operates. *See* Appx2182. To be eligible for the tax credit, an entity must carry out a recognized business in specific sectors of activity. Marmen Énergie's wind tower manufacturing activity qualified for the tax credit. *Id.* The tax credit is valued at 15 percent of the eligible wages paid to eligible employees. *Id.* The tax credit can be claimed annually on the tax return, and the prior year's tax credit from the same program must be reported as taxable income. *Id.* Therefore, while the GASPÉTC is applied to reduce income tax payable, it is also considered taxable income, and the eligible employer must pay federal and provincial taxes on the amount of the GASPÉTC in the following tax year. *See* Appx2871, Appx2882-2896, Appx2818-2837. Consequently, Marmen Énergie received a tax credit of CAD [ Tax Credit] on its year-2017 Québec tax return (filed during the POI), and also paid CAD [ Tax Owed] in federal and provincial taxes for the GASPÉTC claimed on its year-2016 tax returns. *See* Appx2871.

### B. Commerce's *Final Determination* and the CIT's Opinion

In calculating the benefit Marmen Énergie received from the GASPÉTC, Commerce used the full amount of the tax credit (CAD [Tax Credit]), and ignored the additional taxes Marmen Énergie paid as a result of the program (CAD [Tax Owed]). In doing so, Commerce interpreted 19 C.F.R. § 351.509(a)(1), which provides for the benefit calculation of a direct tax program, as a "rule {that} simply provides direction in assessing how the program results in a benefit in the year at issue (the POI), with no regard to any consequences from the prior year's benefit." Appx127. Commerce also claimed that "the treatment of income taxes resulting from countervailable tax programs is governed by Section 771(6) of the Act {(19 U.S.C. § 1677(6))}, which limits the subsidy offsets that Commerce may recognize to specific circumstances, and by 19 CFR 351.503(e), which prohibits Commerce from considering the tax consequences of subsidies generally." Appx126.

On appeal, the CIT recognized that "the parties have not identified a case or investigation involving exactly the circumstances at issue here (i.e., the direct inclusion of a tax benefit as taxable income)." Appx54. Nevertheless, the CIT expressed its concern that a rejection of Commerce's interpretation of the direct-taxes-benefit regulation, § 351.509(a)(1), "could radically reshape how Commerce conducts its investigations." *Id.* The CIT stated that "'tax paid by a firm as a result of the program' does not necessarily mean that tax liabilities from a previous year's

use of the program are a component 'result of the program,'" and deferred to Commerce's interpretation of the regulation. *Id.* (quoting 19 C.F.R. § 351.509(a)(1)). The CIT also held that Commerce's interpretation of § 351.509(a)(1) was consistent with its past practice, even though the legal issue raised had not previously been addressed by Commerce.

# V. QUÉBEC'S ON-THE-JOB-TRAINING TAX CREDIT

## A. Description of Québec's On-the-Job-Training Tax Credit

The On-the-Job-Training Tax Credit encourages businesses to take on trainees and improve the professional skills of young people in Québec. Appx1970. Any corporation in any industry with a qualified, formal training program that accepts students or apprentices "can claim a tax credit at a rate of 24% in respect of the salary or wages paid to the student or apprentice, and the salary or wages paid to an employee for hours devoted to supervision of the student or apprentice." *Id.* Eligible corporations claim this refundable tax credit when filing their income tax returns. Appx1972. As Québec explained in its initial questionnaire response, to be eligible for the tax credit an employer:

- Must carry on a qualified business in Québec and have an establishment in Québec;
- Must not be a corporation exempt from tax; and
- Must have obtained within six months after the end of the training period:

- A certificate from the *Ministère du Travail, de l'Emploi et de la Solidarité Sociale* (Ministry of Labor, Employment and Social Solidarity) or from the Kativik Regional Government, or
- A certificate of participation in a qualified training program (form CO 1029.8.33.10, Certificate of Participation in a Qualified Training Period), duly signed by a representative of the recognized educational institution.

Appx1976-1977. Only training programs that meet these criteria are eligible for the On-The-Job-Training Tax Credit.

The On-the-Job-Training Tax Credit is widely available and record evidence shows that 5,649 companies received the tax credit for tax year 2015; 5,888 for tax year 2016; 5,881 for tax year 2017; and 4,930 for tax year 2018. Appx2173. The thousands of companies that earned the tax credit encompass nine broad economic sector groupings, each of which represents dozens of industries. *Id*. These industries include agriculture, mining, manufacturing, construction, transportation and storage, wholesale trade, retail trade, finance and insurance, food and beverage, education, and health. *Id*. The universe of potential users of the tax credit includes all entities satisfying the eligibility criteria identified above. *Id.*

### B. Commerce's *Final Determination*

Commerce implicitly found that Québec's On-the-Job-Training Program was not *de jure* specific because the program did not expressly limit access "to an enterprise or industry" under the program's eligibility criteria. *See* 19 U.S.C.

§ 1677(5A)(D)(i). Rather, Commerce found the program to be *de facto* specific. In doing so, Commerce determined that "it is reasonable to compare the actual number of companies that received the tax credit in 2018 to the total number of tax filers, inclusive of corporations and individuals in business, within Québec for 2018, to determine whether the program is limited in number and, therefore, *de facto* specific under section 771(5A)(D)(iii)(I) of the Act." Appx129. Commerce explained that the "figures, reported by the GOQ, indicate that the actual number of recipients that benefited from the tax credit during the POI relative to the total number of tax filers during the POI are limited in number on an enterprise basis." *Id.* In short, Commerce calculated the number of users as a percentage of the total number of tax filers, without acknowledging that the program was limited to entities with qualifying training programs under the program's objective, *de jure* non-specific eligibility criteria. By using a denominator that includes the tens of thousands of enterprises, big and small, that do not have qualifying training programs, Commerce's "analysis" pre-ordained its *de facto* specificity finding.

**C. The CIT's Opinion**

The CIT held that "Commerce's approach neither fails to comply with the statutory language nor contravenes the underlying aims set out in the {Statement of Administrative Action ("SAA")}." Appx53. The CIT reasoned that "{n}either the statute's text nor the SAA prohibit Commerce's approach, and it was reasonable to

think that a comparison to corporate tax filers would be instructive in determining whether the subsidy is widely spread throughout the economy or limited to a small number of enterprises." *Id.* The CIT announced that "the law itself permits Commerce to determine the appropriate reach of its specificity determinations," *id.* at 1292, Appx53, thereby granting near unfettered authority to Commerce to determine that an alleged subsidy program is specific.

## SUMMARY OF THE ARGUMENT

**Issue 1: Exclusion of the Auditor's Adjustment from the Sales Denominator**

Commerce's decision to reject an independent auditor's USD-CAD exchange rate adjustment as "unverified and unreliable" is unreasonable and unsupported by substantial evidence. Commerce relied on a false premise: that Commerce's verification team discovered errors in the auditor's adjustment through spot checking. To the contrary, Commerce's Verification Report confirms that Marmen self-identified the handful of erroneously USD-coded sales Commerce claimed to have discovered through spot-checking, and that the only spot-checking Commerce performed supported the auditor's adjustment. In fact, the erroneously USD-coded sales were so inconsequential (amounting to less than 0.2% of the total value of the adjustment) that Commerce did not bother to mention them in the Verification Report's Summary of Findings. Contradicted by the Verification Report, Commerce's decision to reject the auditor's exchange rate adjustment is unsupported by substantial evidence. The CIT similarly erred by failing to account for the Verification Report in affirming Commerce's decision.

Commerce's decision also contravenes the agency's longstanding practice of relying on audited financial statements to verify a respondent's reported information (a practice the CIT failed to account for below). Commerce took the extraordinary step of discrediting the audited financial statements themselves – without compelling

evidence to question the auditor's opinion that Marmen's financial statements were accurate in all material respects. Further, but for Commerce's unreasonable decision to reject the auditor's exchange rate adjustment, Marmen's final CVD rate would have been *de minimis* at less than 1.00%, meaning that Marmen would not have been subject to a CVD order. Consequently, Commerce's dismissal of the auditor's exchange rate adjustment also resulted in a failure to calculate Marmen's subsidy rate as accurately as possible, contrary to the agency's fundamental obligation under the statute. For these reasons, Commerce's decision to reject the auditor's adjustment is also not in accordance with law.

**Issue 2: Finding that the Class 1 CCA for Manufacturing Buildings Was a Countervailable Subsidy**

Commerce's finding in the *Final Determination* that the CCA Class 1 deduction for manufacturing buildings was countervailable is neither supported by substantial evidence on the record nor in accordance with law. The CIT's opinion sustaining Commerce's finding failed to engage with the Canadian Parties' arguments, ignored important deficiencies in Commerce's analysis, and misconstrued both 19 U.S.C. § 1677(5)(D)(ii) and 19 C.F.R. § 351.509(a)(1).

***First,*** both Commerce's and the CIT's conclusion that the CCA for Class 1 manufacturing buildings allowed Marmen to pay less in taxes, and that it thus received a countervailable benefit, was based on a mischaracterization of the 10 percent deduction as "accelerated," as well as on a factually incorrect description of

the mechanics by which a taxpayer claims the 10 percent deduction. Record evidence demonstrates that the 10 percent deduction is not accelerated for purposes of 19 C.F.R. § 351.509(a)(1), but rather reflects the amount by which the manufacturing building had actually depreciated. Moreover, Commerce concluded, with no rational basis, that the taxpayer's use of a specific tax form (Schedule 8) to claim the 10 percent deduction demonstrates that the 10 percent depreciation rate confers a countervailable benefit. However, the particular form used to claim a deduction is legally irrelevant for purposes of determining whether a benefit is conferred.

***Second*,** for there to be a countervailable subsidy from a tax deduction, there must be a financial contribution in the form of revenue foregone that was otherwise due. 19 U.S.C. § 1677(5)(D)(ii). A tax depreciation deduction cannot satisfy this standard unless the amount of depreciation allowed is greater than the amount that would normally apply under the tax system of the government in question. Commerce failed to address record evidence showing that the 10 percent deduction was fully consistent with the norms of Canada's tax rules governing depreciation, based on the useful lives of assets. The CIT similarly failed to engage with the Canadian Parties' arguments, and otherwise provided an inappropriate and perfunctory analysis supporting Commerce's finding of a financial contribution.

**Issue 3: Benefit Calculation for the GASPÉTC Program**

Commerce acted contrary to the plain language of its unambiguous regulation when it calculated the benefit from a Government of Québec tax program. The direct taxes benefit regulation requires Commerce to consider the total tax effect of the program at issue. Commerce's contrary interpretation in this case is unlawful.

While the Gaspésie tax credit is applied to reduce income tax payable, it is also considered taxable income, and the eligible employer must pay federal and provincial taxes on the amount of the GASPÉTC in the following tax year. *See* Appx2871; Appx2882-2896. Consequently, on its year-2017 tax returns examined in the underlying investigation, while Marmen Énergie received a tax credit of CAD [ Tax Credit], it also paid CAD [Tax Owed ] in federal and provincial taxes for the GASPÉTC claimed on its year-2016 Québec tax return. *See* Appx2871.

Under Commerce's regulation, "a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." 19 C.F.R. § 351.509(a)(1). The plain language of the regulation required Commerce to calculate the amount of the tax savings as a result of the GASPÉTC program, which includes both the tax credit and the additional taxes paid as a result of the same program. But in calculating the benefit Marmen Énergie received from the program, Commerce included only the amount of the tax credit, and disregarded the federal and provincial taxes Marmen Énergie paid in the

same tax year as a result of the tax credit program. *See* Appx127. Consequently, Commerce failed to apply the unambiguous instruction of § 351.509(a)(1). On appeal, the CIT erred in upholding Commerce's misinterpretation of its regulation.

**Issue 4: Finding that the On-the-Job-Training Tax Credit Is *De Facto* Specific**

Commerce erred in its determination that the On-the-Job-Training Tax Credit is *de facto* specific because it failed to consider its implicit *de jure* non-specificity finding and did not conduct a proper analysis of whether the credit was "limited in number" and, thus, *de facto* specific. Under a proper legal analysis, the On-the-Job-Training Tax Credit is not *de facto* specific, considering the pool of eligible companies.

Thousands of companies in dozens of industries throughout Québec used the On-the-Job-Training Tax Credit that supports training and the improvement of the professional skills of young people by allowing companies to claim a tax credit at the rate of 24% of the salary or wages paid to the student or apprentice, and of the salary or wages paid to an employee for hours devoted to supervision and training of the student or apprentice. Appx1970. Commerce determined that the credit was *de facto* specific under Section 771(5A)(D)(iii)(I), stating, "the actual recipients of {the} subsidy, whether on an enterprise or industry basis, are limited in number." Appx128-129. Commerce's determination is contrary to law.

Section 771(5A)(D) of the Tariff Act of 1930, 19 U.S.C. § 1677(5A)(D), requires that a subsidy be specific to an enterprise or industry, or group thereof, in law or in fact, to be countervailed. Commerce reached its *de facto* specificity determination by comparing the thousands of recipients of the tax credit to all corporate tax filers in Québec (approximately 400,000). *Id*. However, it is impermissible under the statute to find that a tax program is "limited in number" under the *de facto* specificity provision of the statute by simply comparing the number of users to the total number of tax filers. Rather, the text and structure of the statute require that the *de jure* specificity determination inform the *de facto* specificity analysis.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews the CIT's rulings *de novo*, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). Because it does so "without affording any deference to the Court of International Trade, this court must review the entire record for substantial evidence and compliance with law." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed Cir. 2003) (citation and internal quotation marks omitted). Therefore, this Court "must reverse a determination that is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Viraj Group v. United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

## II. COMMERCE'S DECISION TO EXCLUDE THE AUDITOR'S EXCHANGE RATE ADJUSTMENT FROM THE SALES DENOMINATOR IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW

Commerce's decision to reject an independent auditor's USD-CAD exchange rate adjustment as "unverified and unreliable" is unreasonable and unsupported by substantial evidence, because it is contradicted by Commerce's findings in the Verification Report. In addition, Commerce's decision is inconsistent with its longstanding practice to rely on respondents' audited financial statements to verify

their questionnaire responses, as well as the agency's statutory obligation to calculate CVD rates as accurately as possible.

### A. Commerce's Verification Report Contradicts Its Decision To Reject the Auditor's Exchange Rate Adjustment

In *Linyi Chengen Imp. & Exp. Co.*, the CIT concluded that a Commerce final determination was "arbitrary and capricious in light of perceived inconsistencies on the record" – "particularly the verification report and related exhibits . . . ." 391 F. Supp. 3d 1283, 1294 (Ct. Int'l Trade 2019). Similarly, here, Commerce's decision that the auditor's USD-CAD exchange rate adjustment is "unverified and unreliable" is contradicted by the Verification Report and, thus, arbitrary and unsupported by substantial evidence. Commerce rejected the auditor's adjustment for Marmen Inc. based on a false premise: that Commerce verifiers "discovered" five Euro-coded sales through "spot-checking." Appx115.

To justify its decision to reject the auditor's USD-CAD exchange rate adjustment as "unverified and unreliable," Commerce claimed that its verifiers found – through "spot-checking" – that five sales included in the adjustment were not made in USD. *See* Appx115-116 ("As the purpose of these checks was to sample and spot check the transactions in Marmen's books and records to determine whether Marmen's auditor's adjustment was accurate and reliable, we conclude that the auditor's adjustment was not accurate or reliable."). A "spot-check" is a "test made without warning on a randomly selected subject." *See Spot check*, OXFORD LEXICO,

https://www.lexico.com/definition/spot_check (last visited Aug. 23, 2022); *see also Spot check*, DICTIONARY.COM, https://www.dictionary.com/browse/spot-check (last visited Aug. 23, 2022) ("a random sampling or quick sample investigation"). As confirmed by the Verification Report and accompanying exhibits, the Commerce verifiers did ***not*** "discover" five transactions miscoded as USD sales through spot-checking. To the contrary, the only spot-checking the verifiers performed ***supported*** the auditor's exchange rate adjustment.

An objective reading of the Verification Report reveals the following. ***First, Marmen self-identified the five Euro-coded sales Commerce claims to have discovered through spot-checking (i.e., random selection of individual sales).*** In advance of verification, Marmen prepared detailed lists of the sales building to Marmen Inc.'s and Marmen Énergie's total USD sales values in 2018, which the independent auditor (Deloitte) converted to Canadian dollars for presentation of the companies' total sales revenues in their year-2018 financial statements. *See* Appx8592-8594, 8597, 8605-8606 (Marmen Inc. sales), Appx8644-8647 (Marmen Énergie sales). The USD-sales listings prepared by Marmen showed that Marmen Inc. made five sales – covered by four invoices – in Euro. *See* Appx8593, Appx8597, Appx8605, Appx8638. The five Euro-coded sales represented ***less than 0.2%*** of the total value of the auditor's exchange rate adjustment for Marmen Inc. in 2018. *See* Appx8590, Appx8624, Appx8636-Appx8638 (*i.e.*, the total value of the

four invoices divided by Marmen Inc.'s total USD-sales value recorded in its general ledger equals 0.17%). Marmen presented the USD-sales listings to Commerce at verification. *See* Appx8679, Appx8685. Commerce did not "discover" the five Euro-coded sales through random selection at verification; Marmen identified the Euro-coded sales in the USD-sales listings it prepared for Commerce.

***<u>Second</u>*, *after reviewing Marmen Inc.'s USD-sales listings, and "confirm{ing} there were <u>no additional Euro coded sales</u>{,}" Commerce's verifiers conducted spot-checks of the USD-coded sales, selecting invoices at random, and "<u>confirmed that the payments were made in USD</u>."*** *See* Appx8680 (emphasis added). Commerce also spot-checked ***Marmen Énergie's*** USD-sales listing, and confirmed the selected invoices were paid in U.S. dollars. *See* Appx8685. Thus, the only spot-checking performed by Commerce indicated that – other than a handful of Euro-coded sales – the sales in Marmen's USD-sales listings were, in fact, paid in U.S. dollars, supporting the auditor's exchange rate adjustment. Having found no additional Euro-coded sales through spot-checking beyond the few identified by Marmen, it was unreasonable for Commerce to infer that additional errors were likely and conclude that the auditor's exchange rate adjustment was "unverified and unreliable."

***<u>Third</u>*, *Commerce concluded verification early on the fourth day.*** If Commerce's verification team was unsatisfied or had questions concerning the

auditor's exchange rate adjustment, they could have remained the full five days scheduled for verification to conduct additional testing (*i.e.*, spot-checking). *Compare* Appx8654 *with* Appx8542. They did not. In fact, Commerce also could have interviewed Deloitte directly about the USD-CAD adjustment, because the Deloitte auditors participated in the verification and were available to answer questions. *See* Appx8708 (List of Verification Participants). Instead, Commerce's team completed the verification early on the fourth day without any suggestion of dissatisfaction or that Marmen had failed to address any of the issues or questions raised during the proceeding.

***Fourth*, despite having nearly two months to consider what transpired at verification, Commerce's verifiers did not identify the auditor's exchange rate adjustment as an issue in the Verification Report's "Summary of Findings."** *See* Appx8655. By regulation, the verification report is required to include "the methods, procedures, ***and results*** of a verification . . . ." 19 C.F.R. § 351.307(c) (emphasis added). Moreover, the Verification Report in this case states that the Summary of Findings is provided "as a convenience in order to better aide the parties' preparation of comments before Commerce." Appx8655. Neither Commerce's Summary of Findings nor the Verification Report's discussion of the auditor's exchange rate adjustment (at Appx8676-8685) suggests that the adjustment was "unverified and unreliable," let alone an issue. To the contrary, the Summary

of Findings indicates that the auditor's adjustment was necessary to convert Marmen's USD sales to CAD for the sales denominator: "The currency adjustments ***required to convert USD sales to CAD values*** were made in the '***Year End auditor adjustment*** in GL 40000 for Gain(loss) exchange rate' figures . . . ." Appx8655 (emphasis added).

In summary, an objective reading of the Verification Report reveals that Marmen self-identified the five sales Commerce claimed to have discovered through spot-checking; the five erroneously USD-coded sales amounted to less than 0.2% of the total value of Deloitte's exchange rate adjustment for Marmen Inc.; the only spot-checking performed by Commerce's verification team confirmed that other USD-coded sales included in the adjustment were made in USD; and the verifiers concluded the verification early on the fourth day, apparently satisfied, and prepared their Summary of Findings from the verification without any mention of an issue or question concerning the auditor's exchange rate adjustment. For these reasons, Commerce's Verification Report contradicts its own explanation that it deemed Deloitte's exchange rate adjustment to be "unverified and unreliable" based on "spot-checking Marmen's records during verification." Appx115-116. Because Commerce's rationale for excluding the auditor's exchange rate adjustment from Marmen's sales denominator is unfounded, Commerce's decision is unsupported by substantial evidence. *See Consol. Edison Co. v. Labor Bd.*, 305 U.S. 197, 229 (1938)

("{S}ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

Similarly, the CIT erred in affirming Commerce's decision to reject the auditor's adjustment by failing to account for the significant contradictory evidence reflected in the Verification Report. *See* Appx48-49; *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

### B. Commerce's Decision To Reject the Auditor's Exchange Rate Adjustment Is Inconsistent with Its Longstanding Practice and Statutory Obligation

Commerce's decision to reject the independent auditor's USD-CAD exchange rate adjustment is also inconsistent with the agency's longstanding practice, which is to rely on audited financial statements to verify a respondent's reported information. Here, in contrast, Commerce took the extraordinary step of verifying the audited financial statements themselves. Commerce's unreasonable decision had severe consequences for Marmen, as it inflated Marmen's CVD rate from *de minimis* (*i.e.*, less than 1.00%) to above *de minimis*. *See* 19 U.S.C. § 1671b(b)(4) (de minimis countervailable subsidy). In other words, but for Commerce's decision to reject the auditor's opinion, Commerce's final CVD determination would have been negative. *See id.* For this reason, Commerce's dismissal of the auditor's exchange rate

adjustment is also inconsistent with the agency's statutory obligation to calculate countervailable subsidy rates as accurately as possible.

Commerce's longstanding practice is to verify the accuracy of reported information by reconciling that information with the respondent's audited financial statements, tax returns, or "other financial records, prepared for purposes independent of the antidumping proceeding . . . ." *Chrome-Plated Lug Nuts from Taiwan*, 64 Fed. Reg. 17314, 17316 (Dep't Commerce Apr. 9, 1999) (final results 1996-1997 review); *see also Fresh Cut Flowers from Mexico*, 60 Fed. Reg. 49569, 49570 (Dep't Commerce Sept. 26, 1995) (final results 1991-1992 review) (noting Commerce's preference for using audited financial statements or tax returns to verify reported information); *Gourmet Equip. Corp. v. United States*, 24 C.I.T. 572, 576 (2000) (affirming Commerce's use of facts available where respondent was unable to provide audited financial statements or any other "substantiation of {the respondent's} data independent from the antidumping investigation"). For this reason, Commerce's verification agenda instructed Marmen to be prepared to reconcile its reported sales values to Marmen Inc.'s and Marmen Énergie's financial statements. Appx8549.

Commerce, however, turned this practice on its head, substituting its judgment for that of an independent auditing firm that concluded that Marmen Inc.'s "financial statements present fairly, ***in all material respects***, the financial position of the

Company as at December 31, 2018, and the results of its operations" in accordance with Canadian GAAP. *See* Appx2696-2697 (auditor's letter) (emphasis added). By rejecting the auditor's USD-CAD exchange rate adjustment, Commerce effectively determined that the audited CAD sales revenue figures presented in Marmen Inc.'s and Marmen Énergie's financial statements were unreliable.

Commerce's decision to reject an independent auditor's opinion is extraordinary. We are aware of only one trade remedy proceeding in which the reliability of a respondent's audited financial statements was at issue: *Butt-Weld Pipe Fittings from Taiwan*. In that case, Commerce stated:

> An independent auditing firm whose business is to express an opinion on whether financial statements are fairly presented according to the appropriate country's GAAP (in this case, the United States), who has not otherwise been demonstrated to be in other than good standing, is in an appropriate position to judge these financial statements. Therefore, in order for the Department to reject the independent auditor's opinion and discredit the financial statements it would need to have ***compelling evidence*** to the contrary. We have not found such evidence in this case.

*Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 71 Fed. Reg. 67098 (Dep't Commerce Nov. 20, 2006), accompanying Issues & Decision Memo at Comment 1 (emphasis added); *see also SeAH Steel VINA Corp. v. United States*, 269 F. Supp. 3d 1335, 1352 (Ct. Int'l Trade 2017) (citing *Butt-Weld Pipe Fittings from Taiwan* and stating, "Commerce need not audit the auditor").

"Commerce acts arbitrarily and violates the law when it 'consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice.'" *SeAH Steel VINA Corp. v. United States*, 182 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2016) (quoting *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003)). Here, contrary to its longstanding practice to rely on audited financial statements, Commerce rejected the auditor's professional judgment concerning the presentation of Marmen Inc.'s and Marmen Énergie's year-2018 revenue figures (expressed in CAD) in the companies' financial statements without "compelling evidence" for doing so. Commerce took this aggressive action solely because of a respondent-identified, currency error amounting to less than 0.2% of the auditor's exchange rate adjustment for one of the companies (Marmen Inc.) – notwithstanding that spot-checking performed at verification confirmed the accuracy of the adjustment overall, and Commerce's verifiers deemed it unnecessary to mention the currency error as an issue in the Verification Report's Summary of Findings. By failing to cite compelling evidence supporting its extreme decision to disregard an auditor's opinion, Commerce rendered a determination that violated its longstanding practice and, hence, the law.

The impact of Commerce's decision was consequential. As "facts available," Commerce replaced Marmen's audited CAD sales value with a figure including sales left unconverted in USD, thereby understating the sales denominator of the

subsidy rate calculation.[2] *See* Appx116. This, in turn, inflated Marmen's final subsidy rate from *de minimis* (*i.e.*, less than 1.00%) to above *de minimis* (at 1.13%) – transforming what would have been a negative final CVD determination into an affirmative one. *See* 19 U.S.C. § 1671b(b)(4). Commerce has a "statutory mandate to determine margins 'as accurately as possible' under the antidumping and countervailing duty statutes . . . ." *POSCO v. United States*, 296 F. Supp. 3d 1320, 1340 n.31 (Ct. Int'l Trade 2018) (quoting *Lasko Metal Prods. Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994)). Commerce failed to meet its statutory obligation here, further rendering its final CVD determination not in accordance with law.

---

[2] Compounding the distortion, Commerce arbitrarily ***accepted*** the auditor's exchange rate adjustment to the extent it resulted in a ***reduction*** to Marmen's sales denominator. That is, Commerce accepted the conversion of Marmen Inc.'s and Marmen Énergie's USD-denominated sales to CAD for purposes of the intercompany sales deduction, which reduces the sales denominator. *See* Appx121-122; Appx8930-8938 (Commerce's sales denominator calculations in columns N-P and rows 67-289). A lower sales denominator means a higher subsidy rate. *See* 19 C.F.R. § 351.525(a).

## III. THE 10 PERCENT CLASS 1 DEPRECIATION DEDUCTION FOR MANUFACTURING BUILDINGS IS NOT COUNTERVAILABLE

### A. The Class 1 Depreciation Deduction for Manufacturing Buildings Did Not Provide a Countervailable Benefit

#### 1. Commerce Erred in Evaluating the Nature and Structure of the CCA for Class 1 Assets

Commerce's determination that the 10 percent depreciation rate for manufacturing buildings conferred a benefit is flawed for two reasons: (1) Commerce disregarded the nature of the different kinds of buildings making up the subclasses within Class 1; (2) Commerce relied on an incorrect characterization of how a taxpayer claims a 10 percent depreciation deduction; and (3) Commerce improperly conflated the statutory requirements of benefit and specificity.

First, Commerce found that, while all Class 1 assets are a single type or category of assets, not all are eligible for the same depreciation rate. *See*, *e.g.*, Appx98. According to Commerce, any depreciation rate greater than the lowest Class 1 rate of four percent is accelerated and confers a benefit. *Cf.* Appx98 (finding that "taxpayers qualify for the ***additional deduction*** for a certain Class 1 asset" (emphasis added)).

In so deciding, Commerce refused to accept as relevant the critical fact that the different rates apply to ***different kinds*** of buildings with ***different characteristics and uses***, and consequently, a ***different average useful life***. Commerce did not compare any of the Class 1 depreciation rates to other CCA Classes of assets,

presumably because those are ***different kinds*** of assets. By that logic, if the Canadian tax regulations were structured so that manufacturing buildings with a 10 percent depreciation rate were placed in a different CCA class, Commerce would not have found a benefit. Commerce's benefit finding is thus based solely on Canada's creation of asset subclasses for three categories of different kinds of buildings (*i.e.*, manufacturing, commercial, and residential) – each with its own depreciation rate based on the useful life of the particular category of building – ***within*** a single CCA class, rather than creating separate classes for each building category. *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001); *Royal Thai Gov't v. United States*, 502 F. Supp. 2d 1334, 1341 (Ct. Int'l Trade 2007) ("Commerce may not treat two like situations differently without explanation." (citation omitted)).

Canada raised this argument before the CIT. Instead of engaging with the argument, the CIT summarily concluded that "Commerce did not unreasonably compare two dissimilar classes of assets; rather, it compared the different tax treatment under {the Government of Québec's} and {the Government of Canada's} laws per the classifications those governments provided." Appx55. This fails to explain, however, ***why*** the different types of buildings in Class 1 are not "dissimilar," or what evidence supports Commerce's conclusion on that point. And, like

Commerce, the CIT failed to address that Class 1 does contain different kinds of buildings that depreciate at different rates.

Second, Commerce claimed that a benefit was conferred because a taxpayer must elect the 10 percent depreciation rate for manufacturing buildings on a Schedule 8 form. *See* Appx98. But the manner in which a tax benefit is claimed is distinct from the substance of the benefit. Further, ***all*** depreciation deductions for ***all*** CCA classes are claimed on the same Schedule 8 form, whether it be for Class 1 buildings eligible for the four percent, six percent, or 10 percent depreciation rate, or for assets under ***any other*** CCA Class. *See* Appx2841, Appx2851–2854, Appx2856–2858, Appx8051–8052. Thus, the use of Schedule 8 to claim the deduction is immaterial.

The CIT also erred by accepting Commerce's unsupported conclusion regarding Schedule 8, without engaging with the Canadian Parties' arguments. *See* Appx56. Contrary to the CIT's and Commerce's characterizations, there is nothing special or unique about Schedule 8 because all depreciation deductions for Class 1 assets are claimed on Schedule 8. And even if there were a special form unique to each kind of CCA deduction, it still would not be relevant to determining whether a particular deduction provides a countervailable benefit. Significantly, Commerce never explained why it would be relevant.

Last, Commerce focused on the fact that, to receive the 10 percent depreciation rate for manufacturing buildings, taxpayers must meet certain eligibility requirements (*i.e.*, 90 percent of the building floor space is used for manufacturing). *See* Appx98. Commerce thus considered that "the proper universe of taxpayers" in assessing benefit included not just taxpayers with assets eligible for the 10 percent depreciation rate (*i.e.*, manufacturing plants), but all taxpayers that could claim any Class 1 deduction. Appx98. Commerce's focus on the eligibility requirements conflates the separate statutory requirements of specificity and benefit. Who is eligible for a program goes to whether and how the program is "specific." *See* 19 U.S.C. § 1677(5A)(D)(i)-(iv). Conversely, the benefit analysis looks at whether the depreciation deduction reduces taxes paid by a firm at a preferential (*e.g.*, accelerated) rate of depreciation. *See* 19 C.F.R. § 351.509(a)(1); *see also* discussion *infra*, *Section V.*

The CIT's analysis fares no better. The CIT simply repeated Commerce's explanation that the eligibility criteria supported a finding that the 10 percent depreciation rate conferred a benefit. Appx55–56. The CIT did not address Canada's argument that the eligibility criteria were unrelated to the issue of benefit.

Thus, the CIT, like Commerce, simply failed to address the uncontested fact that manufacturing buildings depreciate at a faster rate than residential buildings,

such that no benefit within the meaning of the law is conferred as a result of the higher depreciation rate.

### 2. Commerce and the CIT failed to Properly Interpret and Apply Commerce's Direct Tax Benefit Regulation

Under 19 C.F.R. § 351.509(a)(1), a direct tax program confers a benefit "to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." By reducing a firm's taxable income, a depreciation deduction results in a firm paying "less than the tax the firm would have paid" absent the deduction. 19 C.F.R. § 351.509(a)(1). In that sense, ***any*** depreciation deduction could be considered a "program" within the meaning of the regulation. *See id*. However, Commerce does not treat, nor has it ever treated, depreciation deductions as countervailable benefits under this regulation solely because they reduce taxes owed. To do otherwise would cause all depreciation deductions to be potentially countervailable, which would produce absurd results. Nor is that how Commerce has treated depreciation deductions in other cases.

Specifically, Commerce has only found a countervailable benefit from a depreciation deduction when the program provided an advantage to the taxpayer, over and above what the country's ***normal*** depreciation rules would otherwise permit. These preferences have been of two kinds: (1) an accelerated depreciation deduction that allowed the taxpayer to take a larger deduction than under the

country's regular depreciation rules; or (2) an allowance of a particular depreciation deduction based on a taxpayer's geographic location. *See* Appx8733–8734, and the cases cited therein. To our knowledge, however, Commerce has never countervailed a ***non-preferential*** depreciation deduction.

Thus, Commerce's and the CIT's fundamental error in this case was construing the 10 percent CCA rate as creating a preference, despite evidence that the depreciation rate is based on the average useful life of a particular asset. The *StatCan Study* establishes that buildings that qualify for the 10 percent depreciation rate are ***not*** afforded a preference because such manufacturing buildings actually do depreciate at a 10 percent rate. Thus, for purposes of interpreting and applying 19 C.F.R. § 351.509(a)(1), the benefit conferred by the 10 percent depreciation rate is no different from any other standard depreciation deduction that would not provide a countervailable benefit. Accordingly, the Court should reverse the CIT because it did not hold Commerce to account for failing to adequately engage with and address the evidence in the *StatCan Study*. *See, e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 ("A reviewing court must consider the record as a whole, including that which 'fairly detracts from its weight' . . . ." (quoting *Universal Camera*, 340 U.S. at 477–78)).

### 3. The CIT Inappropriately Applied a "*Chevron*" Analysis to Commerce's Interpretation of 19 C.F.R. § 351.509(a)(1)

While an agency's interpretation of a statute is analyzed under *Chevron*, an agency's interpretation of its regulations is governed by a different standard, generally referred to as "*Auer* deference." *See generally Auer v. Robbins*, 519 U.S. 452 (1997). Here, the CIT improperly used *Chevron* instead of *Auer* to review Commerce's interpretation and application of Commerce's tax benefit ***regulation*** (19 C.F.R. § 351.509(a)(1)).

*Auer* deference uses an analysis similar in some respects to *Chevron*, *see, e.g.*, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (observing that a reviewing court must "exhaust all the 'traditional tools' of construction" (quoting *Chevron*, 467 U.S. at 843 n.9)), but there are important differences between the two standards, particularly at step two. Specifically, a court is supposed to perform a more rigorous analysis at step two when examining an agency's construction of regulation than it does for a statute.[3] *See Kisor*, 139 S. Ct. at 2416–18 (stating that the "the regulatory interpretation must be one actually made by the agency," that "the agency's interpretation must in some way implicate substantive expertise" and "an agency's reading of a rule must reflect fair and considered judgment" (citations omitted)). By instead applying *Chevron*, the CIT failed to consider whether Commerce's

[3] The CIT reached step two after perfunctorily concluding that the regulation did not unambiguously require the interpretation urged by the Canadian Parties. Appx55.

interpretation and application of its regulation actually withstands scrutiny under *Auer*.

### B. Commerce's Finding that the Class 1 Depreciation Deduction for Manufacturing Buildings Provided a Financial Contribution Is Unsupported by Substantial Evidence and Not in Accordance with the Law

In addition to Commerce's flawed benefit analysis, the Court should remand Commerce's financial contribution finding because: (1) within the norms of Canada's tax system, the Class 1 depreciation deduction for manufacturing buildings did not result in a government authority foregoing revenue otherwise due; and (2) Commerce ignored the *StatCan Study*, which contradicted Commerce's conclusion that the CCA at a 10 percent depreciation rate provided a financial contribution.

#### 1. The Governments of Canada and Québec Did Not Forego Revenue that Was Otherwise Due

The Class 1 depreciation deduction for manufacturing buildings does not amount to revenue foregone that was otherwise due to the Governments of Canada or Québec for two reasons. First, CIT jurisprudence recognizes that Commerce must take the tax scheme of a foreign country as it finds it for purposes of a financial contribution finding. Second, within the norms of Canada's system, the evidence establishes that the Governments of Canada and Québec did not forego additional

taxes by reason of the 10 percent depreciation rate, so no revenue was foregone that was ***otherwise due***.

**a. Commerce Must Take a Foreign Government's Tax System as It Finds It**

The U.S. statute (19 U.S.C. § 1677(5)(D)) identifies four categories of government action that can constitute a financial contribution—(i) transfers of funds from a government to a company (*e.g.*, grants or loans); (ii) foregoing revenue that is otherwise due (such as tax credits or deductions from taxable income); (iii) government provision of goods or services to a company; and (iv) government purchase of goods from a company. It will often be readily apparent whether a contribution has been made under (i), (iii), or (iv). However, this is not the case for programs that fall under (ii).

Unlike the other three categories of financial contribution, tax programs are uniquely sovereign in nature, with no market parallel. Further, Congress has provided no guidance on what is meant by "foregoing . . . revenue that is otherwise due," and certainly not how it applies in the context of a tax depreciation deduction. Nor does the World Trade Organization ("WTO") Agreement on Subsidies and Countervailing Measures (the "SCM Agreement")[4] explain what this means.

---

[4] Agreement on Subsidies and Countervailing Measures, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14 ("SCM Agreement"). Section 1677(5)(D)(ii) implements Art. 1.1(a)(1)(ii) of the SCM Agreement. Like 19 U.S.C. § 1677(5)(D)(ii), the SCM Agreement provision

Read literally, ***every*** tax deduction results in revenue foregone. However, it cannot be, and Commerce has never asserted, that every tax deduction satisfies the standard of "foregoing . . . revenue that *is* ***otherwise due***." 19 U.S.C. § 1677(5)(D)(ii) (emphasis added). There must be some delimiting principle to avoid that absurd result.

As the CIT has noted:

> Laws of taxation are certainly not subsidies when they first exact taxes. They do not become subsidies to the taxpayer when they present equal *opportunities* to reduce the exaction. The reduction is no more a subsidy than the basic tax law itself or the repeal of the law. Tax laws become bounties or grants to the taxpayer only if the elimination, or reduction of the tax is selective. Only then can it be said that the bestowal of a benefit has replaced a general decision as to the level of taxation.

*Bethlehem Steel Corp. v. United States*, 590 F. Supp. 1237, 1245 (Ct. Int'l Trade 1984) (emphasis added). In other words, Commerce must take a country's tax system as it finds it, and only deductions that constitute deviations from the norms of a country's tax system can be considered foregoing revenue that is otherwise due. *See Gov't of Sri Lanka v. United States,* 308 F. Supp. 3d 1373, 1377 (Ct. Int'l Trade 2018); *Bethlehem Steel Corp. v. United States*, 223 F.Supp.2d 1372, 1382 (Ct. Int'l Trade 2002).

---

includes as one form of potentially countervailable financial contribution the foregoing or non-collection of "revenue that is otherwise due."

Indeed, by not finding that the four percent depreciation rate for Class 1 residential buildings is countervailable, Commerce implicitly concedes this point. Appx99. That is, Commerce accepted that the four percent depreciation rate was not a financial contribution because it reflects a "normal" depreciation rate – without considering whether depreciation rates are lower for other CCA classes.

Additionally, the United States accepted this principle in a WTO challenge to the U.S. Foreign Sales Corporation rules for calculating taxable income. Panel Report, *United States – Tax Treatment for Foreign Sales Corporations, Recourse to Art. 21.5 of the DSU by the European Community*, WT/DS108/RW (adopted Jan. 29, 2002), Annex A-2, First Written Submission of the United States (Feb. 7, 2001), 61–66. In that case, the United States explained the meaning of the phrase "revenue that is otherwise due is foregone or not collected" as used in Art. 1.1(a)(1)(ii) of the SCM Agreement (which 19 U.S.C. § 1677(5)(D)(ii) implements), as follows:

> ***Thus, the standard of subparagraph (ii) . . . , looks to whether, by virtue of a challenged measure, a government foregoes tax revenues that would otherwise be due under the normative benchmark that is the Member's "prevailing domestic standard."*** It was with reference to this WTO legal standard that the United States developed the Act.

*Id*. at 66 (emphasis added).

This demonstrates the United States' understanding that the language "foregoing . . . revenue that is otherwise due" is the same as the understanding

advanced by the Canadian Parties.[5] Thus, if a country's tax system allows depreciation deductions based on the useful lives of assets, and a particular deduction does not exceed the rate at which the asset decreases in value, the deduction cannot be considered revenue foregone that "is otherwise due" under the tax norms of that country.

#### b. Undisputed Record Evidence Conclusively Establishes that the Depreciation Deduction at Issue Does Not Deviate from the Norms of Canada's Tax System

The 10 percent depreciation rate for manufacturing buildings does ***not*** exceed the rate at which the relevant Class 1 assets depreciate in value. The *StatCan Study*, which used "empirical studies measuring economic depreciation," Appx2530, explicitly concluded that what are now the different sub-categories of non-residential Class 1 assets actually depreciate at a higher rate than the four percent rate that applies only to residential buildings, Appx2550. Accordingly, the record establishes that the prevailing norm in Canada is to allow depreciation deductions based on the rates at which the assets depreciate in value. Only a deviation from that norm may

[5] The above explanation of the meaning of "otherwise due" is not what a ***WTO panel*** said, but is the ***United States'*** own position on that point. Further, although WTO decisions are not binding on U.S. courts, WTO adjudicatory decisions may be persuasive. *See Usinor, Beautor, Haironville, Sollac Atlantique, Sollace Lorraine v. United States*, 342 F. Supp. 2d 1267, 1279 n.13 (Ct. Int'l Trade 2004) (stating that the court's "opinions may be informed by WTO documents," even if WTO decisions are not binding in U.S. courts).

constitute revenue foregone that was otherwise due. *See supra, Section III.B.1.a.* Because the 10 percent depreciation rate for manufacturing buildings is consistent with, rather than a deviation from, that norm, Commerce's conclusion to the contrary is not supported by substantial evidence.

The CIT's reasons for rejecting Canada's financial contribution argument are without merit. The CIT reasoned that Commerce need not consider the norms of tax treatment in a country "where an election is available for more favorable treatment because the norm relied upon in such case is indeed provided by the country's own tax system." Appx56. But Commerce had pointed to the requirement to elect the 10 percent depreciation rate as part of its benefit finding, not its financial contribution finding. Appx98. The CIT thus erred in articulating an argument in support of Commerce's financial contribution finding that Commerce itself never explained. Appx55–56. The CIT inexplicably concluded that the central principle of Canada's depreciation rules – that assets can be depreciated based on their useful lives – was not relevant.

### 2. Commerce Failed to Address Evidence Fairly Detracting from Its Conclusion

Commerce failed to engage with or even address the *StatCan Study* in determining whether the 10 percent depreciation rate for manufacturing buildings provided a financial contribution. Commerce merely stated that the "the difference between the {four percent deduction and the 10 percent deduction} represents the

forgoing of revenue otherwise owed." Appx99. How Commerce reached that conclusion is not apparent in the record, and this absence alone warrants a remand. *See Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (finding that when an agency reaches a decision without considering an important aspect of the problem, that decision is arbitrary and capricious); *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("{T}he path of Commerce's decision must be reasonably discernable to a reviewing court.").

The CIT's justification of Commerce's failure to engage with the *StatCan Study* is also untenable. Both the CIT and Commerce failed to appreciate the relevance of the *StatCan Study* in the financial contribution determination: that it establishes whether the Government of Canada foregoes revenue otherwise due. Instead of considering that aspect of the *StatCan Study*, the CIT found that Commerce's reasons for finding a ***benefit*** justified its failure to address the *StatCan Study* as it related to ***financial contribution***. For example, the CIT found that it was reasonable for Commerce "to compare the challenged tax treatment to the treatment of the whole of Class 1 assets" such that Commerce was not required to "explicitly engage with the empirical bases supporting" the 10 percent depreciation rate. Appx55–56. But, as discussed in *Section III.A.A.1*, Commerce's comparisons of the tax treatments within Class 1 were part of its incorrect reasoning for finding that no benefit was conferred, not part of its financial contribution finding. Appx98.

Similarly, the CIT found that Commerce reasonably "confine{d} its analysis to the comparisons provided for by law, even if the more favorable treatment better reflects the economic reality." Appx56. But again, this refers to the comparison provided for in 19 C.F.R. § 351.509(a)(1), which relates to ***benefit***. *See* 19 C.F.R. § 351.509(a)(1). Accordingly, the Court should reject the CIT's decision to excuse Commerce's failure to address the *StatCan Study*.

### 3. Commerce's Construction of 19 U.S.C. § 1677(5)(D)(ii) Is Not in Accordance with the Law

Finally, Commerce's construction of the statutory phrase "foregoing . . . revenue that is otherwise due" cannot be sustained, as it is inconsistent with statutory goals and conflicts with Commerce's own practice. *See APEX Exps. v. United States*, 777 F.3d at 1373, 1379 (Fed. Cir. 2015). First, it would be unreasonable to construe the statute as authorizing Commerce to treat every depreciation deduction as revenue foregone that was otherwise due, as that would produce absurd results. Second, Commerce's approach in this case is not reflective of agency practice because Commerce has only countervailed depreciation deductions when a particular asset was allowed a preferential depreciation rate compared to the rate that

would normally apply to ***that same asset***. *See* Appx8733–8734 n.82, and the cases cited therein. That is not the case here.

## IV. THE DIRECT TAXES BENEFIT REGULATION REQUIRED COMMERCE TO CALCULATE THE GASPÉTC BENEFIT USING BOTH THE AMOUNT OF THE TAX CREDIT CLAIMED AND THE ADDITIONAL TAXES PAID AS A RESULT OF THE PROGRAM

Commerce's interpretation of its direct taxes benefit regulation, 19 C.F.R. § 351.509(a)(1), is contrary to its plain meaning, under which Commerce is required to consider the total tax effect of the program. The plain language of the direct tax benefit regulation required Commerce to calculate the GASPÉTC benefit using both the amount of the tax credit Marmen Énergie claimed in the year-2017 tax return and the additional taxes Marmen Énergie paid on the income received from the GASPÉTC as reported in the same tax return. Commerce, however, calculated the benefit solely as the amount of the tax credit, contrary to the plain language of the regulation. Moreover, in attempting to support its interpretation of the direct tax benefit regulation, Commerce pointed to 19 C.F.R. § 351.503(e), which provides that Commerce generally does not consider tax consequences when calculating a benefit, and 19 U.S.C. § 1677(6), which limits the offsets that Commerce may recognize when calculating the net countervailable subsidy. Appx126. As discussed below, neither provision is applicable.

The direct taxes benefit regulation, 19 C.F.R. § 351.509(a)(1), is unambiguous and requires the total tax effect of the GASPÉTC program to be considered in

calculating the benefit. If the language of an agency's regulation is unambiguous, then the agency's interpretation is not entitled to deference. *See Kisor*, 139 S. Ct. at 2415 ("{I}f the law gives an answer – if there is only one reasonable construction of a regulation – then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense."). "{B}efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction. . . . a court must 'carefully consider{ }' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* (citations omitted).

As noted, the statute provides that a subsidy is a financial contribution provided by a government that confers a benefit to the recipient and is specific. *See* 19 U.S.C. § 1677(5)(A), (B), and (E). A financial contribution in the context of a tax credit means the government is "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income.'" 19 U.S.C. § 1677(5)(D)(ii). The statute sets forth examples of when an equity infusion, a loan, a loan guarantee, the provision of goods or services, and the purchase of goods confer a benefit, but is silent as to when a tax program confers a benefit to the recipient. *See* 19 U.S.C. § 1677(5)(E).

Commerce has promulgated "rules regarding the identification and measurement of countervailable subsidies." 19 C.F.R. § 351.501. These include

various regulations relating to the determination of a benefit to the recipient. Section 351.503(a) provides:

> (a) *Specific rules*. In the case of a government program for which a specific rule for the measurement of a benefit is contained in this subpart E, the Secretary will measure the extent to which a financial contribution (or income or price support) confers a benefit as provided in that rule. For example, § 351.504(a) prescribes the specific rule for measurement of the benefit of grants.

19 C.F.R. § 351.503(a); *see also Countervailing Duties*, 63 Fed. Reg. 65348, 65359 (Dept. Commerce Nov. 25, 1998) (final rule) ("*Preamble*") (stating, with respect to 19 C.F.R. § 351.503(a), "{w}here a government program is covered by a specific rule contained in these regulations, such as a program providing . . . direct tax exemptions . . . , ***we will not seek to establish, nor entertain arguments related to, whether or how that program comports with the definition of benefit contained in this section***") (emphasis added).

Like the example given in the regulation for grants, a specific rule exists for tax programs. For direct tax programs, 19 C.F.R. § 351.509(a)(1) provides "a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid ***in the absence of the program***." (Emphasis added.) The regulation could have said that, for direct tax programs, the benefit is the amount of the tax credit, or the benefit is the amount of the remission of the tax. But the regulation does not say that. Rather, the regulation asks, "but for the tax program, what would the firm have paid?" Consequently, the unambiguous language of the

direct taxes regulation requires the GASPÉTC program to be viewed in its entirety in the same tax return. The benefit is the difference between the tax paid as a result of the program and the tax paid absent the program (*i.e.*, the tax savings).

Commerce ignored the regulation's "but for" test and instead calculated the benefit for the GASPÉTC program as the amount of the tax credit itself, without taking into account the additional taxes paid on the same year's tax return "as a result of the program." Commerce's interpretation of 19 C.F.R. § 351.509(a)(1) as a "rule {that} simply provides direction in assessing how the program results in a benefit in the year at issue (the POI), with no regard to any consequences from the prior year's benefit," Appx127, is contrary to the unambiguous regulation, which requires Commerce to calculate the tax savings "as a result of the program."

Commerce claims that its interpretation is reasonable because of "19 CFR 351.503(e), which prohibits Commerce from considering the tax consequences of subsidies generally." *Id.* This ignores the text and structure of the regulations because § 351.503 (regarding "benefit" generally) does not apply when a more specific rule governs calculation of the benefit for the type of program in question, such as a tax credit under § 351.509(a). It is also contradicted by the *Preamble* of the regulations. *See Preamble*, 63 Fed. Reg. at 65359. With regard to § 351.503(e), which provides that, "{i}n calculating the amount of a benefit, the Secretary will not consider the tax consequences of the benefit," the *Preamble* explains:

> Another related topic involves the treatment of taxes on subsidies. Typically, we have referred to this issue as the "secondary tax consequences" of subsidies. Section 351.527 of the 1997 Proposed Regulations stated that we would not take account of secondary tax consequences. ***For example, if receipt of a grant increases the amount of income tax paid by a firm, we do not reduce the amount of the benefit from the grant to reflect the higher taxes paid***. In these Final Regulations, we have retained this rule and have relocated it to § 351.503(e).

63 Fed. Reg. at 65362 (emphasis added).

Here, the GASPÉTC is a tax program, so, by its very nature, the tax consequences cannot be considered secondary (unlike a grant, for example). Rather, the tax consequences of a tax program ***are*** the benefit. Commerce's interpretation of its regulations as precluding it from considering the additional income taxes paid as a result of the program is contrary to the unambiguous meaning of 19 C.F.R. § 351.509(a)(1), as corroborated by a harmonious reading with § 351.503(a).

Commerce also cited Section 771(6) of the Tariff Act, 19 U.S.C. § 1677(6), stating that "the circumstances under which Commerce may use as offset in the calculation of a subsidy benefit are limited to: a) application fees, *etc.*, paid in order to qualify for or to receive the benefit; b) a loss in the value in the case of a deferred subsidy; and c) export taxes, *etc.*, on U.S. exports to offset the subsidy." Appx127.

That statutory offset provision, however, instructs Commerce how to determine the ***net*** countervailable subsidy once it has determined the ***gross*** countervailable subsidy. According to the statute's text and structure, the "net

countervailable subsidy" provision at 19 U.S.C. § 1677(6) is not reached until Commerce has made its determination as to whether a countervailable subsidy exists under 19 U.S.C. § 1677(5), which includes the determination of whether a benefit was conferred under § 1677(5)(E). Here, because Commerce's calculation of the "benefit" of the Gaspésie tax credit under 19 C.F.R. § 351.509(a)(1) precedes any consideration of the "net countervailable subsidy" under 19 U.S.C. § 1677(5)(D), the statutory offset provision is irrelevant.

Under *Kisor*,[6] Commerce is bound by the unambiguous language of its regulations. The Canadian Parties respectfully request that the CIT's decision be reversed, and this issue be remanded to Commerce to recalculate the tax benefit in accordance with the unambiguous instruction of the direct taxes benefit regulation.

## V. COMMERCE MISINTERPRETED THE "LIMITED IN NUMBER" LANGUAGE IN THE *DE FACTO* SPECIFICITY STATUTORY PROVISION AND UNLAWFULLY DETERMINED THAT THE ON-THE-JOB-TRAINING PROGRAM WAS *DE FACTO* SPECIFIC

Commerce misinterpreted the "limited in number" language in the *de facto* specificity statutory provision and unlawfully determined that Québec's On-The-Job-Training Program was *de facto* specific. Commerce ignored the text and

[6] 139 S. Ct. at 2414-18 (limiting the deference owed to an agency's interpretation of its own regulations and requiring that courts exhaust the traditional tools of interpretation to determine whether the language of the regulations is genuinely ambiguous). If the language is not ambiguous, then the agency's interpretation is not entitled to deference. *Id*. at 2415.

structure of the statute that require the *de jure* specificity determination to inform the *de facto* specificity determination.

As discussed below in Section A, the text and structure of the statute require Commerce to determine whether a subsidy is specific as a matter of law, and, if it is not specific as a matter of law, then to determine whether the subsidy is specific as a matter of fact, taking into consideration its matter of law analysis of the subsidy. Sections B and C explain that the legislative history and the *Charming Betsy* canon of statute interpretation support a plain reading of the statute, which requires that Commerce consider the analysis informing its *de jure* specificity finding as part of its *de facto* specificity analysis.

Further, as discussed in Sections D and E below, Commerce's current interpretation of the statute improperly requires near universal availability and use of the program by all tax filers to be non-specific. This interpretation of the statute (*i.e.*, allowing a percentage test to determine whether users were limited in number) is inconsistent with Congressional intent. Finally, Commerce's *de facto* specificity analysis is not in accordance with law and, as such, Commerce has acted beyond the bounds of its statutory authority.

### A. The Text and Structure of the Statute Unambiguously Require the *De Jure* Analysis to Inform the *De Facto* Analysis of the "Limited Number" Statutory Provision

When reviewing Commerce's statutory interpretations, the Court first determines whether Congress has spoken directly to the question at issue, because the Court and agency "must give effect to the unambiguously expressed intent of Congress." *Chevron.*, 467 U.S. at 842-43. For this analysis, the Court must "employ traditional tools of statutory construction and examine 'the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012) (quoting *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000)). "{T}he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Here, the text and structure of the statute unambiguously require the *de jure* analysis to inform the *de facto* analysis of the "limited number" statutory provision. Accordingly, Commerce erred in using the number of ***all*** tax filers to determine *de facto* specificity – instead of the number of potential users of the tax program based on the eligibility criteria Commerce itself found were not *de jure* specific.

Québec's On-The-Job-Training Program falls within the domestic subsidy provision of the statute. The *de jure* and *de facto* specificity provisions of the statute state as follows:

> In determining whether a subsidy . . . is a specific subsidy, in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy, the following guidelines shall apply:
>
> (i) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law.
>
> (ii) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if—
>
> (I) eligibility is automatic,
>
> (II) the criteria or conditions for eligibility are strictly followed, and
>
> (III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.
>
> For purposes of this clause, the term "objective criteria or conditions" means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.
>
> (iii) Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist:
>
> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
>
> (II) An enterprise or industry is a predominant user of the subsidy.
>
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
>
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D).

Here, the text and structure of the statute are clear and unambiguous. Under 19 U.S.C. § 1677(5A)(D)(i) and (ii), Commerce must make a *de jure* specificity finding first, which then informs its *de facto* specificity analysis. That is, Commerce determines if the criteria or conditions governing the program's eligibility are such that the subsidy cannot be considered specific as a matter of law. If the answer is that the subsidy is not *de jure* specific, then Commerce proceeds to clause (iii) to make its *de facto* specificity determination. 19 U.S.C. § 1677(5A)(D)(iii). In doing so, the text and structure of the statute preclude Commerce from considering whether the actual recipients of the subsidy are "limited in number" as a matter of fact under § 1677(5A)(D)(iii)(I), without reference to the entities that are eligible for the program based on criteria Commerce determined are not limiting as a matter of law.

### B. Commerce's Interpretation of "Limited in Number" as Not Incorporating Its *De Jure* Analysis Contradicts the Statement of Administrative Action

An examination of the legislative history further demonstrates that the statute unambiguously requires that Commerce's *de jure* specificity analysis inform its *de facto* specificity analysis. The Statement of Administrative Action ("SAA") is the "authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."

19 U.S.C. § 3512(d). Consistent with the statute's text and structure, the SAA recognizes that 19 U.S.C. § 1677(5A)(D) provides for a sequential analysis, which requires first determining whether a subsidy is specific as a matter of law (§ 1677(5A)(D)(i)-(ii)) before determining whether the subsidy is specific as a matter of fact (§ 1677(5A)(D)(iii)).

The SAA provides in this regard that: "{a}lthough it has long been established that intent to target benefits is not a prerequisite for a countervailable subsidy, the *de jure* prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, ***further inquiry into the actual use of the subsidy is unnecessary***." *Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Rep. No. 103-316, at 930 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 ("SAA") (emphasis added). In other words, Commerce need not conduct a *de facto* specificity analysis if it determines the program is *de jure* specific. Thus, the SAA further evinces Congress's intent that the *de jure* specificity analysis precedes and informs the *de facto* specificity analysis.

The SAA also explains that the statutory intent is "to apply the specificity test in light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy." *Id.* at 929, 1994 U.S.C.C.A.N. at 4242.

Further, the SAA's authoritative instructions recognize that subsidy disciplines are not meant to prevent States from pursuing valid policy goals by providing that, "{c}onsistent with longstanding U.S. practice, government assistance that is both generally available and widely and evenly distributed throughout the jurisdiction of the subsidizing authority is not an actionable subsidy." *Id.* at 913, 1994 U.S.C.C.A.N. at 4230. That is, the specificity test is meant "to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy." *Id.* at 930, U.S.C.C.A.N. at 4242.

### C. The *Charming Betsy* Canon of Statutory Interpretation Also Supports the View That the *De Jure* Analysis Should Inform the "Limited in Number" Analysis Under the *De Facto* Determination

The United States' international obligations also require that Commerce's *de jure* specificity analysis inform its *de facto* specificity analysis. The *Charming Betsy* canon of statutory interpretation provides that, "absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations." *Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1581 (Fed. Cir. 1995). This Court has elsewhere described *Charming Betsy* as operating to require that statutes "must be interpreted to be consistent with international obligations, absent contrary indications in the statutory language or its legislative history." *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348

(Fed. Cir. 2004) (alteration accepted) (quoting *Luigi Bormioli Corp. v. United States*, 304 F.3d 1362, 1368 (Fed. Cir. 2002)). As adopted by U.S. law, the proper legal standard under the SCM Agreement is that the *de jure* and *de facto* specificity analyses proceed sequentially and that, when reaching the *de facto* prong of the test, the findings made under the *de jure* prong are to be taken into account.

The language of Article 2 of the SCM Agreement mirrors the language in the statute and requires a sequential analysis:

> If, ***notwithstanding any appearance of non-specificity resulting from the application of the principles laid down in subparagraphs (a) and (b)*** {relating to *de jure* specificity}, there are reasons to believe that the subsidy may in fact be specific, other factors may be considered.

Art. 2.1(c) (acknowledging that if initial analysis (*i.e.*, a *de jure* analysis) does not result in a specificity finding, there may be other factual reasons pointing to a different result) (emphasis added).

Accordingly, the *Preamble* emphasizes that the purpose of the specificity test under 19 U.S.C. § 1677(5A)(D) is "simply to ensure that subsidies that are distributed very widely throughout an economy are not countervailed." *Preamble*, 63 Fed. Reg. at 65357. Here, the pool of companies eligible for the On-The-Job-Training Tax Credit, while smaller than the total number of tax filers, is widespread throughout the economy; therefore, the program should not be deemed specific.

WTO Panel and Appellate Body Reports also describe the specificity analysis as a sequential one and that, when reaching the *de facto* prong of the test, the findings

made under the *de jure* prong are to be taken into account. An instructive example of why the methodology employed by Commerce contravenes the statute is found in the Panel and Appellate Body reports in the *WTO dispute DS353: United States — Large Civil Aircraft (2nd complaint)*.

In that case, the Appellate Body noted that (as is the case with 19 U.S.C. § 1677(5A)(D)), Article 2.1 of the SCM Agreement calls for a sequential analysis that requires first determining whether a subsidy is specific as a matter of law before determining whether the subsidy is specific as a matter of fact: "we observed that where a panel's assessment proceeds from Article 2.1(a) and (b) to Article 2.1(c), the panel's analysis under subparagraph (c) would normally build upon the relevant legislative framework examined under Article 2.1(a) and (b)." Appellate Body Report, *United States – Measures Affecting Trade in Large Civil Aircraft (Second Complaint), Recourse to Article 21.5 of the DSU by the European Union*, WTO Doc. WT/DS353/AB/RW ¶ 5.240 (adopted Apr. 12, 2019). The Appellate Body also indicated that "in those cases where the granting authority or the legislation pursuant to which the granting authority operates sets out explicit eligibility criteria for the subsidy, panels should normally examine the question of whether the subsidy is used by a limited number of certain enterprises in light of these eligibility criteria." *Id.* ¶ 5.181.

In sum, when making a "limited in number" determination under 19 U.S.C. § 1677(5A)(D)(iii)(I), Commerce must take into consideration the potential recipients, *i.e.*, those meeting the neutral criteria or conditions governing the eligibility of the subsidy. The statute requires Commerce to do this by building on its factual analysis of whether the alleged subsidy is *de jure* specific. Therefore, a finding of specificity under 19 U.S.C. § 1677(5A)(D)(iii)(I) that simply compares the number of users to the total number of tax filers – the latter of which exceeds the number of potential recipients determined based on non-*de jure* specific criteria – is contrary to Congress's intent and not in accordance with law.

### D. Commerce's Interpretation of the Statute Improperly Requires Near Universal Application and Use to Be Non-Specific

Commerce's approach to specificity is based on an erroneous interpretation of the statute that, as a practical matter, would require near universal availability and use of a tax program before a tax measure could be found to be non-specific. If Commerce instead had applied the correct widespread availability/use test contemplated by Congress, and considered all the relevant facts showing widespread use of the On-The-Job-Training Tax Credit throughout the Québec economy, it could not have found the On-The-Job-Training Tax Credit to be *de facto* specific. *See* 19 U.S.C. § 1677(5A)(D)(iii) (requiring, in addition to an evaluation of *de jure* specificity prior to *de facto* specificity, an evaluation of the additional *de facto*

factors and "the extent of the diversification of the economic activities" with Québec).

When discussing the "limited in number" factor, the SAA consistently and repeatedly relates the meaning of the term "limited" to concepts of "small" and "large":

- "…if the actual users of the subsidy are too large in number to reasonably be considered as a specific group…"
- "…with respect to economic diversification, in determining whether the number of industries using a subsidy is small or large …"

SAA at 931-32, U.S.C.C.A.N. at 4242-43. The SAA's use of "small" and "large" in connection with a review of the *de facto* factors is consistent with the dictionary definition of "limited." "Limited" is defined as "small in amount or number;" "kept within a particular size, range, time, etc." *Limited*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/limited (last visited Aug. 23, 2022). While there is no set mathematical formula for determining when a program is "limited," plainly there must be a restriction to a distinctly identifiable, narrowly defined subset of the economy. Consistent with the widespread availability test, an analysis of whether the users of a program are "limited in number" must be based on whether the group of users is large or small. The SAA in fact provides the

question that should be asked when analyzing the first factor: Are "the actual users of the subsidy . . . too large in number to reasonably be considered as a specific group?" SAA at 931, U.S.C.C.A.N. at 4242. A program that is widely, but not universally, used cannot be considered "limited" under any common definition of that word.

Commerce's rejection of the requirement to consider the breadth of usage of a measure in different sectors of an economy leads to an approach inconsistent with the Congressional intent and the statute, both of which necessarily require Commerce to consider specificity on a case-by-case basis. Commerce's approach is also inconsistent with its prior practice of considering the number of users in the context of how widely the subsidy is used across the economy. Without explanation, Commerce no longer considers that the "limited in number" factor requires an analysis of whether use of the program is widespread. *See, e.g.*, *AK Steel Corp. v. United States*, 192 F.3d 1367, 1382–85 (Fed. Cir. 1999) (sustaining a decision that a program was not *de facto* specific because 317 companies were eligible and 207 used the program).

### E. Commerce's Interpretation of the Statute as Allowing a Percentage Test to Determine Whether Users Were Limited in Number Is Inconsistent with Congressional Intent

The plain language of section 1677(5A)(D)(iii)(I) asks whether the ***actual*** recipients of the measure are limited in number, not whether the actual recipients as

a ***percentage*** of all tax filers is limited. And, while the statute does not require Commerce to rely on more than one factor set out in 19 U.S.C. § 1677(5A)(D)(iii) for finding *de facto* specificity, that does mean that Commerce is permitted to disregard the other factors. Whereas the references in subsections (D)(iii)(II) and (D)(iii)(III) to "predominant" or "disproportionately large" usage clearly anticipate something like a percentage analysis, the "limited in number" test of subsection (D)(iii)(I) does not. *See* 19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV). The absence of any reference to relativity or proportionality under the limited-in-number provision, subsection (D)(iii)(I), demonstrates that a percentage analysis is not appropriate in determining whether a subsidy is limited in number.

Indeed, this is exactly what the SAA directs Commerce to do when determining *de facto* specificity. The SAA states that Commerce must "seek and consider information ***relevant to all***" of the factors set out in section 1677(5A)(D)(iii)(I)–(IV), not just the number of users alone under subsection (D)(iii)(I). SAA at 931, U.S.C.C.A.N. at 4242 (emphasis added). Under *Chevron* prong one, where Congress has clearly spoken to an issue, contrary agency action is entitled to no deference. *Chevron*, 467 U.S. at 843. By rejecting the need to consider the breadth of usage of a measure in different sectors of an economy, the percentage test results in findings of *de facto* specificity that are clearly inconsistent with Congressional intent as expressed in the SAA.

The percentage test also conflicts with the different and correct method of analysis previously used by Commerce. For example, in *Royal Thai Government v. United States*, the court upheld Commerce's finding that a program that prioritized 351 companies for debt restructuring was not *de facto* specific, "given the numerous and diverse industries represented on the 351 list." 341 F. Supp. 2d 1315, 1319 (Ct. Int'l Trade 2004), *aff'd in part, rev'd in part on other grounds & remanded*, 436 F.3d 1330, 1336 (Fed. Cir. 2006) (affirming the Department's determination that debt-restructuring scheme was not *de facto* specific). Further, in *Bethlehem Steel Corp. v. United States*, the CIT upheld Commerce's finding that a Korean voluntary electricity curtailment program, in which 190 customers representing sixteen industries participated, was not *de facto* specific. 140 F. Supp. 2d 1354, 1368–69 (Ct. Int'l Trade 2001). In *AK Steel Corp.*, this Court reviewed a Korean program under which any company newly listed on the Korean Stock Exchange in 1987 or 1988 could revalue its assets. 92 F.3d at 1382–85. Commerce had determined that this program was not *de facto* specific because, of the 316 companies that were eligible, 207 used the program. This court upheld Commerce's determination as supported by substantial evidence. *Id.* at 1385. Commerce's percentage approach thus overturns, without explanation, its longstanding prior practice of considering the number of users in the context of how widely the subsidy is used across the economy.

As recognized by the CIT, when applying § 1677(5A)(D)(iii)(I), Commerce must "compare the industries receiving the subsidy to the industry makeup of the country at issue as a whole." *Changzhou Trina Solar Energy Co., Ltd. v. United States,* 352 F.Supp.3d 1316, 1330 (Ct. Int'l Trade 2018). Such an analysis ensures that countervailing duties are not imposed when the subsidy is widely available and used throughout the economy, such as for the On-The-Job-Training Program, which has thousands of users in many industries.

Finally, including all tax filers as the comparison (denominator) is distortive. It does not take into account that entities that do not pay taxes, such as not-for-profit enterprises, are unable to use the program under the program's eligibility criteria. Further, it assumes every tax filer that might qualify for the deduction would use it every single year, but not all companies would be in a situation to run an On-The-Job-Training Program every year.

### F. Commerce Did Not Stay Within the Bounds of its Statutory Authority When Comparing the Users of the On-The-Job-Training Program with All Tax Filers

The Supreme Court has stated that, in applying *Chevron*, "the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, ***whether the agency has stayed within the bounds of its statutory authority***." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (emphasis added). The statute's text, structure, legislative history and the *Charming Betsy* canon all

support that Commerce's specificity test requires the *de jure* determination to inform the *de facto* determination of whether "{t}he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number," 19 U.S.C. § 1677(5A)(D)(iii)(I), that universal use is not required, and that a percentage test is unlawful. The sheer number of users (4,930 during the POI) hardly suggests that the subsidy is specific to an enterprise or industry. The thousands of companies that earned the tax credit participate in nine broad economic sector groupings – including, among others, agricultural users to construction, retail, trade, finance, manufacturing, and hospitality – each representing dozens of industries, making impossible a finding pursuant to which the tax credit might be specific to "an industry." "If the numerous enterprises that received benefits had comprised a limited number of industries, then the program would have been specific. However, because the users represented numerous and diverse industries, the program was found not to be specific." *Preamble*, 63 Fed. Reg. at 65357 (discussing *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1240-41 (Fed. Cir. 1992)).

By comparing the subsidy users to the total number of tax filers, Commerce's methodology leads to the absurd result that no program could successfully pass muster of Commerce's *de facto* specificity test. Commerce's methodology reads out of the statute the specificity prong of the subsidy analysis, rendering it meaningless. *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("The cardinal principle of

statutory construction is to save and not to destroy," and a court is obligated "to give effect, if possible, to every clause and word of a statute.") (citations and internal quotation marks omitted). Commerce has not stayed within the bounds of its statutory authority, which requires that Commerce analyze whether recipients of a tax credit are "limited in number" based on the objective criteria or conditions governing its eligibility finding under the *de jure* prong of the statute, and does not allow Commerce to require near universal use or a percentage test using all tax filers.

Therefore, a finding of specificity under 19 U.S.C. § 1677(5A)(D)(iii)(I) that compares the percentage of users to the total number of tax filers, a greater number of tax filers than the pool of potential recipients determined by Commerce to be non-*de jure* specific, is inconsistent with Congress's intent and not in accordance with law.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Commerce's conclusions in the *Final Determination* regarding Marmen's sales denominator, the CCA for Class 1 manufacturing buildings, the GASPÉTC program, Québec's On-The-Job-Training Tax Credit Program, and the CIT's decision sustaining Commerce's conclusions, are unsupported by substantial evidence on the record and otherwise not in accordance with law. The Canadian Parties respectfully request that the Court reverse the CIT's decisions on these issues, and remand to Commerce with instructions to issue a revised determination, consistent with the opinion of the Court.

Respectfully submitted,

/s/ Jay C. Campbell

Jay C. Campbell
Ron Kendler
Allison Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co.

/s/ Joanne E. Osendarp
Joanne E. Osendarp
Lynn G. Kamarck
Alan G. Kashdan
Timothy J. Hruby
Conor Gilligan

McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
Tel: (202) 756-8349

Counsel for Government of Canada

/s/ Matthew J. Clark
Matthew J. Clark
Nancy A. Noonan
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 857-6000

Counsel for Government of Québec

August 25, 2022

# ADDENDUM

***Government of Québec v. United States***

**No. 20-00168, Slip Opinion 22-21 & Judgment**

**(Ct. Int'l Trade Mar. 18, 2022)**

**(Appx1-38)**

**Non-Confidential Version**

Slip Op. 22-21

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **THE GOVERNMENT OF QUÉBEC,**<br>**Plaintiff,**<br>**and**<br>**MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO.,**<br>**Consolidated Plaintiffs,**<br>**and**<br>**THE GOVERNMENT OF CANADA,**<br>**Plaintiff-Intervenor,**<br>**v.**<br>**THE UNITED STATES,**<br>**Defendant,**<br>**and**<br>**WIND TOWER TRADE COALITION,**<br>**Defendant-Intervenor,**<br>**and**<br>**THE GOVERNMENT OF ONTARIO,**<br>**Defendant-Intervenor.** | **Before: Gary S. Katzmann, Judge**<br>**Consol. Court No. 20-00168**<br><br>***PUBLIC VERSION*** |

**OPINION**

[Plaintiff's, Consolidated-Plaintiffs', Plaintiff-Intervenor's and Defendant-Intervenor's Motions for Judgment on the Agency Record are Denied, and Commerce's Final Results are Sustained.]

Dated: March 18, 2022

Nancy A. Noonan, ArentFox Schiff LLP, of Washington, D.C., argued for Plaintiff Government of Québec. With her on the joint brief were Matthew J. Clark, Jessica J. DiPietro, and Aman Kakar. With them on the prior briefs were Arent Fox LLP, of Washington, D.C.

Jay C. Campbell, White & Case, LLP, of Washington, D.C., argued for Consolidated Plaintiffs Marmen, Inc.; Marmen Énergie Inc.; and Marmen Energy Co. With him on the brief were Allison J.G.Kepkay, Ting-Ting Kao, and Ron Kendler.

Alan G. Kashdan, McDermott Will & Emery LLP, of Washington, D.C., argued for Plaintiff-Intervenor Government of Canada. With him on the brief were Joanne E. Osendarp, Tim Hruby, and Conor Gilligan.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With him on the brief were Brian M. Boyton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of Counsel Paul K. Keith, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance.

Maureen E. Thorson, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Wind Tower Trade Coalition. With him on the brief were Alan H. Price, Daniel B. Pickard, Robert E. DeFrancesco, III, Laura El-Sabaawi, and Cynthia C. Galvez.

H. Deen Kaplan, Hogan Lovells US LLP, of Washington, D.C., for Defendant-Intervenor Government of Ontario.

Katzmann, Judge: Wind towers are used to convert the energy from wind to electrical energy. Utility scale wind towers, now before the court, are tubular steel structures upon which other wind turbine components are mounted, and are used primarily in utility scale electrical power generation projections. Petitions for the Imposition of Antidumping and Countervailing Duties, Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam at 7–18 (July 9, 2019), P.R. 1, 2, 7, 9, 15, C.R. 1, 2, 7, 9, 15 (“Petitions”). This case presents five issues arising from the United States Department of Commerce’s (“Commerce”) final determination after countervailing duty (“CVD”) investigation that in derogation of U.S. fair trade laws, subsidies are being provided to producers and exporters of utility wind towers from Canada, and from Commerce’s consequent issuance of CVD orders based on assessment of remedial CVD subsidy rates. Utility Scale Wind Towers from Canada: Final

Affirmative Countervailing Duty Determ. and Final Negative Determ. of Critical Circumstances, 85 Fed. Reg. 40,245 (July 6, 2020), P.R. 401 ("Final Results"). The Final Results are now challenged for a variety of reasons by Plaintiff Government of Québec ("GoQ"), Plaintiff-Intervenor Government of Canada ("GoC"), and Consolidated Plaintiffs Marmen Énergie and Marmen Inc. (collectively, "Marmen"), as well as by Defendant-Intervenor Wind Tower Trade Coalition ("WTTC"). First, Marmen challenges Commerce's determination that Marmen's proposed foreign currency adjustment from its auditor was unverified and unreliable, and accordingly properly excluded from the total sales denominator used to calculate the subsidy rate. Second, WTTC challenges Commerce's determination that the Québec Local Content Requirement program constitutes a "recurring benefit" such that it was not countervailable during the period of investigation ("POI"). Third, GoQ and GoC challenge Commerce's determination that the Québec On-the-Job Training Tax Credit is de facto specific as required by 19 U.S.C. § 1677(5A). Fourth, GoQ and Marmen challenge Commerce's exclusion of tax liabilities in computing the benefit conferred by the GASPÉTC tax credit. Fifth, GoQ, GoC and Marmen challenge Commerce's determination of financial contribution and benefit for additional depreciation allowed for buildings used in manufacturing in Canada's and Québec's tax systems. The court sustains all of Commerce's challenged determinations and denies the motions of Plaintiff, Consolidated Plaintiff, Plaintiff-Intervenors, and Defendant-Intervenor for judgment on the agency record.

## BACKGROUND

### *I. Legal Background*

The Tariff Act of 1930 (the "Tariff Act") was enacted to empower Commerce to address trade distortions caused by unfair economic practices.[1] In particular, it provides for the investigation of potential government subsidization and for the imposition of duties on subject merchandise. Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); see also Bebitz Flanges Works Pvt. Ltd. v. United States, 44 CIT __, __, 433 F. Supp. 3d 1309, 1314 (2020). These CVD actions are intended to be remedial rather than punitive in nature, Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103 (Fed. Cir. 1990), and it is therefore Commerce's duty to determine rates "as accurately as possible," Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

In order to impose duties under Section 701 of the Tariff Act of 1930, Commerce must first find the existence of a countervailable subsidy. A countervailable subsidy is one which satisfies the following elements: (1) a government or public authority has directly or indirectly provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. See 19 U.S.C. §§ 1677(5), (5A). If Commerce determines that

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition. Citations to 19 U.S.C. §§ 1677e, 1677m however, are not to the U.S. Code, 2012 edition, but to the unofficial U.S. Code Annotated 2018 edition. The current U.S.C.A. reflects the amendments made to 19 U.S.C. §§ 1677e, 1677m (2012) by the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015). The TPEA amendments are applicable to all determinations made on or after August 6, 2015, and therefore, are applicable to this proceeding. See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

a foreign government is providing a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, sold, or likely to be sold for import into the United States, and the International Trade Commission determines that an industry in the United States thereby is materially injured or threatened with material injury, Commerce is required by statute to impose a CVD upon such merchandise equal to the net countervailable subsidy. See id. § 1677(5).

With respect to the first factor, the Tariff Act defines financial contribution not only as "the direct transfer of funds" but also as "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income." Id. § 1677(5)(D)(i)–(ii).

With respect to the second factor, the Tariff Act and Commerce regulations set out how Commerce must define, quantify and allocate benefits. In relevant part: (i) The Tariff Act provides that "a benefit shall normally be treated as conferred . . . in the case where goods or services are provided . . . if such goods are purchased for more than adequate remuneration[,]" id. § 1677(5)(E); (ii) 19 C.F.R. § 351.503 provides the general rules for identifying and delimiting a benefit; and, (iii) 19 C.F.R. § 351.509 provides specific rules for benefits provided by means of direct taxes.

With respect to the third factor, the statute requires that a countervailable subsidy must exhibit either de jure or de facto specificity. See 19 U.S.C. § 1677(5A). A subsidy is de jure specific where the authority providing the subsidy, or its authorizing legislation, expressly limits access to the subsidy to an enterprise or industry. See id. § 1677(5A)(D)(i). To avoid a designation of de jure specificity, the administering authority must ensure that access to the subsidy is governed by objective industry- or enterprise-neutral criteria resulting in automatic eligibility, and that the criteria for eligibility are both strictly followed and clearly set forth in the relevant official materials so as to be verifiable. See id. § 1677(5A)(D)(ii). A subsidy that escapes de jure

specificity may nevertheless be designated de facto specific if one or more of the following criteria are satisfied: (1) the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (2) an enterprise or industry is a predominant user of the subsidy; (3) an enterprise or industry receives a disproportionately large amount of the subsidy; or (4) the manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others. Id. § 1677(5A)(D)(iii)(I)–(IV).

## *II. Factual and Procedural History*

On July 9, 2019, WTTC filed AD and CVD petitions with Commerce, alleging in relevant part that utility scale wind towers from Canada were subsidized, and that imports of these products were causing material injury to the U.S. wind tower industry. See generally, Petitions. On August 6, 2019, Commerce began its investigation of Marmen for the period of investigation ("POI") from January 1, 2018, through December 31, 2018. See Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations, 84 Fed. Reg. 38,216 (Dep't Commerce Aug. 6, 2019); see also Mem. from J. Maeder to J. Kessler, re: Issues and Decision Mem. for the Final Determ. of the Countervailing Duty Investigation of Utility Scale Wind Towers from Canada at 3 (Dep't Commerce June 29, 2020), P.R. 399 ("IDM"). Commerce then selected "the two largest producers/exporters of the subject merchandise, by volume," as mandatory respondents: Marmen Énergie and Marmen Inc. (collectively, "Marmen").[2] Mem. from J. Maeder to J. Kessler, re: Decision Mem. for the Prelim. Determ. of

---

[2] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large

the Countervailing Duty Investigation of Utility Scale Wind Towers from Canada at 2 (Dep't Commerce Dec. 6, 2019), P.R. 308 ("PDM"). On December 13, 2019, Commerce preliminarily determined that countervailable subsidies are being provided to producers and exporters of wind towers from Canada through eight identified programs or credits; among them, a Québécois tax credit for on-the-job training, Québec's Tax Credit to Promote Employment in Gaspésie and Certain Maritime Regions of Québec (GASPÉTC), and Canada's and Québec's treatment of depreciation for the taxation of certain buildings used in manufacturing. Utility Scale Wind Towers From Canada: Prelim. Affirmative Countervailing Duty Determ., and Alignment of Final Determ. With Final Antidumping Duty Determ., 84 Fed. Reg. 68,126. (Dep't Commerce Dec. 13, 2019), P.R. 313 ("Preliminary Results"); see also PDM at 8–16. Commerce further preliminarily determined that the Québec Local Content Requirement, a component of the wind farm energy production and purchase process, was not countervailable. PDM at 19–20.

---

number of exporters or producers involved in the investigation or review, the administering authority may—

(A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—

(i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or

(ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or

(B) determine a single country-wide subsidy rate to be applied to all exporters and producers.

The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

Subsequently, Commerce conducted a verification of the information submitted by Marmen[3] and published its Final Results.[4] Final Results; IDM at 9. In Commerce's Final Results, it concluded that wind towers from Canada were being subsidized at a rate of 1.18% for the mandatory respondent and all others. 85 Fed. Reg at 40,246. Relevant here, Commerce again found that Québec's on-the-job training tax credit, the GASPÉTC program, and Canada's and Québec's tax treatment of manufacturing facilities provide countervailable benefits, and determined that the Québec Local Content Requirement was not countervailable.

On September 4, 2020, GoQ filed a complaint challenging Commerce's final determination in the investigation of wind towers from Canada. Compl., ECF No. 2. On October 5, 2020, GoC joined the case as a Plaintiff-Intervenor,[5] Order, ECF No. 20, and WTTC joined the case as a Defendant-Intervenor, Order, ECF No. 19. Marmen and WTTC additionally initiated separate appeals of Commerce's determination, which were consolidated into the present case on November 21, 2020. Order, ECF No. 26.[6] On February 11, 2021, GoQ, GoC, Marmen and WTTC each moved for judgment on the agency record. Pl.'s Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 28 ("GoQ's Br."); Consol. Pl.-Int. GoC's Mem. in Supp. of Rule 56.2 Mot. for J. on

---

[3] Commerce declined to formally verify the responses from GoQ and GoC as a result of travel restrictions imposed in response to the Covid-19 pandemic.

[4] The final countervailing duty order was signed by Commerce on August 20, 2020, and published in the Federal Register on August 26, 2020. Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Am. Final Affirmative Countervailing Duty Determ. and Countervailing Duty Orders, 85 Fed. Reg. 52,543, 52,545 (Dep't Commerce Aug. 26, 2020), P.R. 425 (reducing the subsidy rate to 1.13% in response to a ministerial error allegation for reasons unrelated to this action).

[5] GoC qualifies as an interested party pursuant to 19 U.S.C. § 1677(9)(B), and is therefore entitled to intervene as a matter of right pursuant to 28 U.S.C. § 2631(j)(1)(B).

[6] The Government of Ontario also joined the action as Defendant-Intervenor, but has not further participated in the litigation.

the Agency R., ECF No. 32 ("GoC's Br."); Mem. of Points & Auths. in Supp. of Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 34-1 ("Marmen's Br.); WTTC's Revised Mem. in Supp. of its Rule 56.2 Mot. for J. upon the Agency R., ECF No. 36 ("WTTC's Br.") (revised Feb. 12, 2021). On June 10, 2021, the Government responded to each of these motions. Def.'s Resp. to Pls.' Rule 56.2 Mots. for J. on the Agency R., ECF No. 44 ("Def.'s Br."). Also on June 10, 2021, (i) GoQ and Marmen responded to WTTC's motion (regarding the Québec Local Content Requirement), GoQ's Resp. in Opp'n to WTTC's Rule 56.2 Mot. for J. on the Agency R., ECF No. 42 ("GoQ's Resp."); Consol. Pl.'s Resp. Br., ECF No. 47 ("Marmen's Resp."), and (ii) WTTC responded to GoC's, GoQ's and Marmen's motions for judgment on the agency record, WTTC's Resp. Br., ECF No. 45 ("WTTC's Resp."). Next, on July 8, 2021, (i) GoQ, GoC and Marmen replied to the responses filed by the Government and WTTC, Reply Br. of Pl. GoQ, ECF No. 56 ("GoQ's Reply"); Consol. Pl.-Int. GoC's Rule 56.2 Reply Br., ECF No. 55 (GoC's Reply"); Reply Br. in Supp. of Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 58 ("Marmen's Reply"); and (ii) WTTC replied to the Government, GoQ and Marmen, WTTC's Reply Br., ECF No. 53 ("WTTC's Reply").

On November 12, 2021, the parties submitted responses to questions presented by the court in advance of oral argument. Pl. GoQ Resp. to Questions for Oral Arg, ECF No. 74 ("GoQ's Oral Arg. Subm."); GoC's Resp. to Ct.'s Questions for Oral Arg., ECF No. 76 ("GoC's Oral Arg. Subm."); Marmen's Resp. to Ct.'s Questions for Oral Arg., ECF No. 75; Def.'s Resp. to Ct.'s Nov. 1, 2021 Questions for Oral Arg., ECF No. 77; WTTC Resp. to Ct.'s Questions for Oral Arg, ECF No. 73. Oral argument was held on November 17, 2021. Oral Arg., ECF No. 80. Finally, on November 23, 2021, the parties, except WTTC, provided post-oral argument submissions. Pl.

GoQ's Post Arg. Subm., ECF No. 83; GoC's Post-Arg. Subm., ECF No. 81; Marmen's Post-Arg. Subm., ECF No. 85; Def.'s Post-Arg. Subm., ECF No. 82.

### ***III. Programs Assessed***

Québec Local Content Requirement

The Québec Local Content Requirement is a program in which the electric utility of Québec, Hydro-Québec, issues calls for tender ("CFTs") for blocks of wind-produced electricity.[7] To be eligible for the program, wind farm developers attempting to sell electricity to Hydro-Québec are required to make certain minimum expenditures in Québec in connection with their wind farms -- some tenders further specified minimum expenditures for specific regions of Québec. PDM at 19. Purchases from Marmen (including from wind turbine manufacturers that sourced their towers from Marmen), as a Québécois wind tower manufacturer (and, later, with a facility in the specific subregions), were eligible for inclusion in the required minimum. Marmen's Resp. at 4–9.

Commerce determined that, insofar as the GoQ "entrusted and directed" the purchase of wind towers from Marmen via the Québec Local Content Requirement, it involved a purchase for more-than-adequate remuneration ("MTAR"). PDM at 20; IDM at 37–38; 19 U.S.C. § 1677(5)(B)(iii). Commerce further concluded, based on the past treatment of purchases of goods and services for MTAR, that the Local Content Requirement was a recurring benefit. IDM at 36. A recurring benefit is allocated to the year the benefit is received.[8] 19 C.F.R. § 351.524(a).

---

[7] A CFT is the process by which a public company solicits bids from companies competing for works, supply or service contracts.

[8] Generally, Commerce allocates a non-recurring benefit over the number of years corresponding to the average useful life of a physical asset. See 19 C.F.R. § 351.524 (explaining the criteria for identifying and allocating recurring and non-recurring benefits).

Because Marmen did not make sales of wind towers to turbine manufacturers for local content requirement tenders during the POI, Commerce found no benefit during the POI and declined to countervail the program. IDM at 38; see also Marmen's Resp. at 4.

Québec's On-the-Job Tax Credit Program.

Québec's On-the-Job tax credit "encourages businesses to take on trainees and improve the professional skills of young workers" by allowing those businesses which do so to "claim a tax credit at a rate of 24% in respect to the salary or wages paid to the student or apprentice, and the salary or wages paid to an employee for hours devoted to the supervision of the student or apprentice." GoQ's Initial Questionnaire Resp., Ex.QC-C09-A at 1 (Oct. 9, 2019), P.R. 132; see also PDM at 15. Ultimately, Commerce determined that the On-the-Job tax credit provided a de facto specific subsidy because the "actual number of recipients that benefited from the tax credit during the POI relative to the total number of tax filers during the POI are limited in number on an enterprise basis." IDM at 56. It accordingly found a 0.01% ad valorem subsidy. Id. at 7.

GASPÉTC

GoQ's GASPÉTC tax program provides a 15% tax credit for qualifying salary and wages paid by an eligible company to eligible employees. PDM at 15–16. However, the amount of GASPÉTC credit claimed by an eligible company in a given tax year is treated as taxable income in the subsequent year. Id. On Marmen's tax-year 2017 return (filed in 2018), it claimed GASPÉTC credit toward provincial income taxes payable in Québec and included the amount of GASPÉTC credit it claimed in tax-year 2016 as income. IDM at 52; see also Marmen's Br. at 11.

Commerce found the benefit conferred to be the value of the tax credit claimed in tax-year 2017 and declined to reduce the value of the benefit by the additional 2017 tax liabilities Marmen

incurred by including its tax-year 2016 GASPÉTC credit as income in tax-year 2017. Ultimately, Commerce found a 0.78% ad valorem subsidy. Id. at 7.

Additional Depreciation

Both Federal and Provincial (Québecois) tax systems provide a depreciation deduction, called the Capital Cost Allowance ("CCA"), for property used to earn business or property income. Both systems divide assets into classes, which are then assigned their own rates and methods of depreciation over the useful life of the asset.

Under the Canadian CCA, Class 1 includes three kinds of buildings: residential buildings, non-residential buildings primarily used for manufacturing or processing and other non-residential buildings (e.g., buildings used in retail). GoC's Br. at 1. In Québec, Class 1 is designated for non-residential buildings. GoQ's Br. at 28. In both systems, the generally applicable rate of CCA for Class 1 assets is 4%, but taxpayers can claim a higher rate of depreciation for certain types of non-residential property. An additional 6% depreciation is allowed when at least 90% of an eligible building's floor space is used for manufacturing or processing and the building was acquired after March 18, 2007. IDM at 22. Similarly, an additional 2% depreciation is provided for eligible buildings acquired after March 18, 2007 when at least 90% is used for non-residential use. Id. Taxpayers in both systems must place the asset into a separate class to receive the additional depreciation. GoC's Br. at 12; GoQ's Br. at 28. This additional deprecation purportedly reflects differences in the useful life of assets used in manufacturing or other non-residential capacities, according to an empirical study conducted by an agency of GoC, Statistics Canada.

Marmen claimed the 10% depreciation on certain buildings. Marmen's Br. at 9–10. Commerce treated the additional depreciation as a financial contribution and quantified the benefit

as the 6% difference from the otherwise applicable rate for Class 1 assets. IDM at 24. Commerce ultimately determined a subsidy rate of 0.07% ad valorem. Id. at 6.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581 and 19 U.S.C. § 1516a(a)(2). As noted above, a subsidy is countervailable if it satisfies the elements of 19 U.S.C. § 1677(5): (i) a government or public authority has provided a financial contribution; (ii) a benefit is thereby conferred upon the recipient of the financial contribution; and (iii) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. See 19 U.S.C. §§ 1677(5), (5A).

The court sustains Commerce's CVD determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence "has been defined as 'more than a mere scintilla,' [and] as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The substantiality of evidence must account for anything in the record that "fairly detracts from its weight." CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)). This includes "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)). Commerce must also examine the record and provide a satisfactory explanation for its findings such that the record demonstrates a rational connection between the facts accepted and the determination made. See

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); Jindal Poly Films Ltd. of India v. United States, 43 CIT __, __, 365 F. Supp. 3d 1379, 1383 (2019). Commerce's findings may be found to be supported by substantial evidence even where two inconsistent conclusions could be drawn from the record. Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370, 1373 (2012) (citing Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1996)). However, agencies act contrary to law if their decision-making is not reasoned. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167−68 (1962).

## DISCUSSION

The court concludes that Commerce's final determination was in accordance with law and supported by substantial evidence. First, Commerce permissibly excluded the foreign auditor's adjustment as unreliable. Second, Commerce reasonably and lawfully determined that the Québec Local Content Requirement provided a recurring benefit. Third, Commerce acted reasonably within its statutory authority under 19 U.S.C. § 1677(5A)(D)(iii) in determining that the Québec On-the-Job Training tax credit was a de facto specific subsidy. Fourth, Commerce acted in accordance with law in excluding increased tax liabilities when conducting the benefit calculation for GASPÉTC. Fifth and finally, Commerce acted reasonably and in accordance with law when finding that the additional depreciation rate for Class 1 assets constituted a financial contribution and benefit equal to the difference between the rate assessed and the rate applicable if the additional depreciation were not claimed.

### *I. Commerce's Exclusion of Marmen's Foreign Currency Auditor Adjustment Was Supported by Substantial Evidence and in Accordance with Law.*

To calculate the total sales denominator for assessing the subsidy rate, Commerce used the total free-on-board sales less intercompany sales. IDM at 40–44. In both the Preliminary Results

and Final Results, Commerce relied on sales figures provided by Marmen in response to Commerce's Initial Questionnaire instead of on a later submission that included an adjustment from Marmen's auditor. IDM at 41. This later submission was provided in response to Commerce's request, prior to making its preliminary determination, for reconciliation of Marmen's reported sales figures. Id. Marmen's response included both revised sales figures and an exhibit that provided for "necessary adjustments," including one for "Year End auditor adjustment in GL[] for Gain(loss) exchange rate." Id. at 41. This adjustment was not further explained by the submission, except where Marmen noted that its "foreign currency transactions are translated into Canadian dollars using the exchange rate in effect at the date of transaction." Letter from Marmen to W. Ross, re: Utility Scale Wind Towers from Canada: Ministerial Error Comments at 2 (Dec. 18, 2019) P.R. 318 ("Marmen's Ministerial Error Comments"). Commerce used the initial sales figures in its Preliminary Results without making any adjustments, and subsequently declined to amend the Preliminary Results in response to Marmen's filed comment arguing that failure to make the adjustments constituted ministerial error. IDM at 41–44; see generally Marmen's Ministerial Error Comments.

At verification, Commerce learned that during the POI Marmen recorded the value of sales denominated in United States dollars ("USD") in its general ledger sales accounts in the amount of the USD-value of the sale, which were then treated on a one-to-one basis with Canadian dollars ("CAD"). IDM at 42; Mem. from Y. Bordas to File, re: Verification of Questionnaire Resps. of Marmen, Inc. Marmen Énergie Inc., and Gestion Marmen at 24 (Dep't Commerce Apr. 16, 2020), P.R. 374, C.R. 309 ("Marmen Verification Report"). Thus, Marmen's listed USD sales were undercounted in the total sales figures provided to Commerce, which Marmen reported in CAD. Marmen explained that to reach its final sales figures, it made year-end currency conversions

through an auditor's adjustment. IDM at 42. Accordingly, it argued that its total sales denominator should reflect the foreign currency exchange adjustments. Id.

When Commerce examined the sales accounts that were identified as needing to be converted from USD into CAD, it discovered five sales that were actually coded in the general ledgers as having been transacted in Euros. IDM at 42. Moreover, upon further investigation, Commerce discovered that two of the sales coded in the general ledgers as Euro-denominated were, in fact, transacted in CAD. Id. The other three were, indeed, transacted in Euros. Marmen Verification Report at 26–28. As the USD to CAD currency conversion would be inappropriate for at least these five sales, Commerce found the auditor's adjustment to be unverified and unreliable. IDM at 43. Instead, relying on facts available pursuant to 19 U.S.C. § 1677e, Commerce calculated the total sales denominator using Marmen's reported information, as it had in the Preliminary Results. IDM at 43. In so doing, Commerce explained that it conducts spot checks because it is unable to review every sale, but was satisfied with the accuracy of the data without the auditor's adjustment: "we find that the vast majority of the sales-related and other tests Commerce performed throughout the verification uncovered no other errors." Id.

Marmen now makes two primary arguments:[9] (i) Commerce acted contrary to law by failing to identify compelling evidence that the independent auditor was not in good standing prior to rejecting its report, Marmen's Br. at 14–17, and (ii) Commerce unreasonably inferred from the record that the auditor's adjustment was unreliable, id. at 17–21. The court rejects each, and

---

[9] Marmen also argues that "[c]ertain mistaken findings clouded Commerce's judgment[.]" Marmen's Br. at 22–24. The court declines the invitation to theorize about Commerce's unstated reasoning. Just as it may not consider post-hoc rationalizations, "the court must judge the propriety of [agency] action solely by the grounds invoked by the agency." Burlington Truck Lines, 371 U.S. at 169.

concludes that Commerce acted in accordance with law and with the support of substantial evidence when it applied facts available after identifying evidence of errors in the proposed foreign currency adjustment.

Marmen's argument that Commerce must accept an independent auditor's analysis of a respondent's financial statements, in the absence of "compelling evidence" that the auditor is not in good standing, is unavailing. Id. at 15–16. In support of the compelling evidence requirement, Marmen cites one case from this court, SeAH Steel VINA Corp. v. United States, 41 CIT __, __, 269 F. Supp. 3d 1335, 1352 (2017), and two administrative determinations, Notice of Final Results and Final Rescission in Part of Antidumping Duty Admin. Rev.: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan; 2005–2006, 73 Fed. Reg. 1,202 (Dep't Commerce Jan. 7, 2008) ("2008 Pipe Fittings A.R.") and Notice of Final Results and Final Rescission in Part of Antidumping Duty Admin. Rev.: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan; 2004–2005, 71 Fed. Reg. 67,098 (Dep't Commerce Nov. 20, 2006) ("2006 Pipe Fittings A.R."). Id. Even if the court were bound by the logic of SeAH Steel, that decision does not impose a rule requiring compelling evidence to set aside information provided by an auditor. See WTTC's Resp. at 15–16 (arguing this interpretation). Rather, SeAH Steel provides only that Commerce "can . . . accept the independent auditor's report as reliable unless 'compelling evidence' exists that the auditor is not in 'good standing.'" 269 F. Supp. 3d at 1352 (quoting 2006 Pipe Fittings A.R.) (emphasis added). Nor does Commerce's ability to accept the findings of independent auditors supersede its duty to verify the information it relies upon in making its final determination. 19 U.S.C. § 1677m(i). Moreover, the administrative determinations cited by Marmen each involve Commerce's review of an auditor's judgment as to the reasonableness of various exclusions from otherwise accurate financial statements -- not, as in this case, Commerce's determination to reject an auditor's

erroneous currency adjustments. See Issues and Decision Mem. at Cmt. 1 accompanying 2008 Pipe Fittings A.R. Nor was there any evidence, in the 2006 or 2008 Pipe Fittings A.R., that contradicted the independent auditor's conclusions. Id.; see also 2006 Pipe Fittings A.R. This is in sharp contrast to the present case, where the auditor's adjustments were shown to be at least partially in error. Accordingly, Marmen has not established that Commerce acted contrary to law or past practice when it rejected the auditor's adjustment without compelling evidence that the auditor was not in good standing.

Second, Marmen has not established that Commerce was unreasonable to conclude based on the record that the auditor's adjustment was unreliable. Marmen, in effect, argues that Commerce could not infer that there might be further errors from the five erroneously Euro-coded sales comprising less than 0.2% of the total value of Deloitte's exchange rate adjustment.[10] Marmen's Br. at 17. Specifically, Marmen argues (i) the only errors identified were the five Euro-coded errors; (ii) Commerce checked all the other Euro-coded sales and found no errors; and (iii) Commerce's other spot-checking revealed no additional errors. Marmen's Reply at 4, 13. However, as the Government notes, "errors uncovered in a spot check undermine the reliability of data more broadly." Def.'s Br. at 33–34.[11] While the impact of the discovered errors, taken alone,

---

[10] Marmen also argues that Commerce did not conduct a "spot check" at all because it reviewed a Marmen-prepared list of USD sales. Marmen's Reply at 4–7. Instead, Marmen contends, Commerce only conducted spot checks later when it selected invoices at random and found no discrepancies. This argument is not persuasive for two reasons. First, it would lead to undue interference in how Commerce conducts verification (including altering investigated party's impetus for compliance) if the court assessed and attributed significance to who identified what during verification. Second, as discussed, the very existence of errors has significance. See also infra note 11.

[11] The fact that the Euro-coded errors were identified is a sufficient basis for Commerce's determination that other USD-coded sales proposed to be converted might also be in error. Even if the Euro-coded errors have been comprehensively accounted for, the causes of those errors have not. Commerce was not unreasonable to conclude that the proposed adjustments may include

on the proposed foreign currency adjustment may be small, Commerce could reasonably infer that there may remain other errors. Thus, Commerce's determination that the auditor adjustment is unreliable is not unreasonable. Accordingly, Commerce's determination was supported by substantial evidence and not contrary to law. It is sustained.

### ***II. Commerce's Finding that the Québec Local Content Requirement Provided a Recurring Benefit Is Reasonable and in Accordance with Law.***

Commerce determined that the Québec Local Content Requirement was a recurring benefit such that, under 19 C.F.R. § 351.524(a), it is appropriately allocated to the year it was received. IDM at 36–37. Because Marmen did not make sales of wind towers in connection with CFT during the POI, Commerce therefore concluded that the Québec Local Content Requirement program did not confer any benefit on Marmen during the POI. Id. at 36. Accordingly, Commerce did not impose a countervailing duty. Id. at 38.

Commerce found that the Québec Local Content Requirement program provided a recurring benefit because it was a benefit in the form of the purchase of goods and services for MTAR ("MTAR benefit"). While Commerce has reserved formal regulation of MTAR benefits for a later date, it has stated that its intended approach is similar to the treatment of benefits in the form of less-than-adequate remuneration ("LTAR"). 63 Fed. Reg. 65,348, 65,379 (the "Preamble"); see 19 C.F.R. § 351.512. Here, Commerce explained that its determination relied on past treatment of MTAR benefits and LTAR regulations that indicate that the provision of goods

---

transactions denominated in the general ledger in a currency different than that in which they were actually transacted or other errors not identified by the auditor. The fact that the additional spot checks did not uncover errors does not negate the inference of unreliability given the auditor's failure to identify and resolve the Euro-coded errors.

and services for LTAR ("LTAR benefits") are normally treated as recurring benefits.[12]

If a subsidy is not on the illustrative lists or if a party challenges the treatment of a specific subsidy according to its position on one of the lists, the regulations also provides a three-part "test for determining whether a benefit is recurring or non-recurring." 19 C.F.R. § 351.524(c)(2). In this case, after the publication of the Preliminary Results, WTTC challenged Commerce's recurring benefit determination and its failure to apply the three-part test. See IDM at 33; Petitioner Case Brief at 20 (May 6, 2020), P.R. 381, C.R. 312. Subsequently, in its IDM, Commerce considered each component of the three-part test and concluded that "Marmen's sales of wind towers" (emphasis added) under the Québec Local Content Requirement program did not meet these criteria such that they would be considered a non-recurring benefit. IDM at 37.

The three-part test for the existence of a recurring benefit requires Commerce to consider:

> (i) Whether the subsidy is exceptional in the sense that the recipient cannot expect to receive additional subsidies under the same program on an ongoing basis from year to year;
> (ii) Whether the subsidy required or received the government's express authorization or approval (i.e., receipt of benefits is not automatic), or
> (iii) Whether the subsidy was provided for, or tied to, the capital structure or capital assets of the firm.

[12] Following the same principles as in LTAR analyses, Commerce has previously treated MTAR benefits as recurring benefits allocated to the year of receipt. PDM at 20. Commerce's analysis of LTAR benefits is guided by the regulation on "[a]llocation of benefit to a particular time period." 19 C.F.R. § 351.524. That regulation provides "non-binding illustrative lists of recurring and non-recurring benefits" and includes the provision of goods and services for LTAR as an example of a recurring benefit. 19 C.F.R. § 351.524(c). In addition, that regulation provides that LTAR benefits are allocated to the year received: either the year in which the recipient pays for the low-cost goods, or when the recipient was due to have paid the government for goods or services. 19 C.F.R. § 351.511(b)–(c). Citing both the past treatment of MTAR benefits and the LTAR analysis, Commerce found that the Québec Local Content Requirement program provided a recurring benefit, which was not conferred during the period of investigation. IDM at 36.

19 CFR 351.524(c)(2). With respect to the first part, Commerce explained that "[a]lthough issued as four discrete tranches, the CFTs were for purchases of wind energy, i.e., electricity, not wind towers. Marmen did not sell wind energy. Instead, it sold wind towers on a regular basis." IDM at 37. With respect to the second part, Commerce found that the sales of wind towers did not require approval from the GoQ. Id. at 38. Commerce explained that while Marmen produced some certification documents that were provided to Hydro-Québec, they were product specification documents, not sales approval documents for GoQ to expressly authorize or approve. Id. at 37. Finally, Commerce explained that, regarding the third part, the sales under the Québec Local Content Requirement program did not benefit "Marmen's capital structure or assets any more than any sale normally benefits a company." Id.[13]

WTTC now argues that Commerce acted unreasonably and unlawfully when it applied the three-part test to determine the program provided a recurring benefit because it failed to take into account material record evidence and deviated from its regulations without explanation. WTTC's Br. at 11–12. First, WTTC contends that Marmen could not expect to receive subsidies on a regular basis because Marmen made wind tower sales "contingent on Marmen's ability to meet the [local content requirements] provided in each specific CFT," and therefore, "the limitation of

[13] In addition, Commerce specifically considered an earlier supply agreement between Marmen and General Electric [[ ]]. IDM at 37–38. Commerce explained that the relationship of the [[ ]] to the benefits in the form of wind tower sales for MTAR was indirect and retroactive and thus not tied to capital assets. Id. For contrast, under past practice, Commerce found a benefit to be non-recurring when a "government financial contribution [] directly and/or indirectly prospectively support or contributes to a company's capital assets." Id. at 37. Moreover, Commerce explained that, even if those advanced funds were under investigation as a potential subsidy -- Commerce noted that WTTC did not make the proper allegation as to the elements of a subsidy -- they were provided prior to the POR and would have fallen outside the scope of its analysis. Id. at 38.

these CFTs to four discrete tranches necessarily limited the benefit that Marmen received from the sales" stemming from the four CFTs. Id. at 14. Second, WTTC maintains that Commerce failed to adequately address evidence that the subsidies under the program were not automatic but required the government's express authorization or approval -- including evidence that Marmen's contracts with customer-wind turbine manufacturers explicitly referred to the local content requirement and included documentation for GoQ's "compliance processes [that] demonstrated . . . GOQ expressly approved and monitored each and every project."[14] Id. at 16–18. Finally, WTTC asserts that Commerce mistakenly determined that the Québec Local Content Requirement program did not benefit Marmen's capital structure because it failed to consider, as required by regulation, how the program affected the "continued existence" of Marmen, WTTC's Br. at 19, 21–22,[15] and further failed to consider how the Québec Local Content Requirement program promoted the continued existence of the firm when it "spurred the creation of demand for wind energy generation and required the fulfilment of this demand from wind tower manufacturing

---

[14] In addition, WTTC argues that Commerce did not make a specific determination as to which documents it identified as "product specifications" in the IDM. WTTC's Reply at 13–15. But, Commerce need not have cited to the evidence binder so long as "the path of its decision" is otherwise reasonably discernible. NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

[15] WTTC argues that Commerce failed to address evidence that the [[ ]] were linked to subsequent purchases of wind towers when Commerce found that those funds did not directly benefit Marmen's capital structure. WTTC's Br. at 25. In relevant part, WTTC contends that the Québec Local Content Requirement program prompted General Electric to enter into an agreement with Marmen that [[ ]], and that this agreement was linked to wind tower sales because [[ ]]. Id. at 23–24. However, as Commerce correctly notes, the funds contributed were outside the scope of Commerce's analysis as they were provided prior to the average useful life in question. IDM at 38.

facilities in Québec," WTTC's Br. at 21–22. The court considers each of WTTC's arguments in turn, and concludes that each fails to establish that Commerce acted unreasonably or unlawfully.

Regarding WTTC's first contention, Commerce reasonably concluded that the benefits under the local content requirement were conferred on a regular basis through the regular, frequent purchase of wind towers based on the record of substantial sales under the program each year until 2017.[16] IDM at 37 ("Marmen's regular, frequent sales of wind towers to its customers . . . were not exceptional events. Although issued as four discrete tranches, the CFTs were for purchases of wind energy, i.e., electricity, not wind towers. Marmen did not sell wind energy. Instead, it sold wind towers on a regular basis."). While the analysis of the subsidy is complicated by how GoQ effectuates the serial transactions which relay the benefit from Hydro-Québec to Marmen, the IDM shows that Commerce extensively considered the nature of the transactions before concluding that the subsidies were regular and non-exceptional. Id. WTTC has not established that Commerce's consideration was unreasonable or otherwise inconsistent with the record, and the court therefore rejects WTTC's first argument.

With respect to WTTC's second contention, WTTC argues that Commerce's determination that GoQ was not required to provide express approval or authorization was unsupported by substantial evidence as a determination based on the singular and unsupported assertion that the Marmen's certification documents provided product specifications, not certifications for approval.

---

[16] WTTC argues that "'it is not use of a benefit that determines whether it is a recurring or non-recurring subsidy,' but the conditions under which the relevant authority offers the subsidy." WTTC's Reply at 9 (citing Issues and Decision Mem. accompanying Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Countervailing Duty Determ. and Final Negative Determ. of Critical Circumstances, 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008)). Nonetheless, Commerce's determination is consistent with this contention.

WTTC's Br. at 14, 19. The extent of Commerce's stated reasoning with regard to this second point is indeed sparse: "Further, we do not find that the certification Marmen provided to [Hydro-Québec] with its Québec LCR sales constitute express authorization or approval by the GOQ. Marmen's certifications are product specification, not sales approval, documents." IDM at 37. While brief, Commerce's conclusion is nevertheless sufficiently reasoned. As no one contends that particular sales from Marmen to turbine manufacturers were themselves subject to GoQ approval, the natural expectation is that the component of these serial transactions that GoQ might have expressly approved were the certification documents. Accordingly, it follows logically that -- as Commerce determined -- GoQ did not expressly authorize or approve the subsidy as it relates to Marmen. Accordingly, the court concludes that, with respect to the second prong of the recurring benefit test, Commerce adequately considered the record evidence and its rationale was reasonably discernible. See NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Lastly, with respect to the third part of the test, WTTC's argument that Commerce must consider how the program benefitted the "continued existence of the firm" is not persuasive. The Government correctly identifies that the text WTTC cites in the Preamble, 63 Fed. Reg. at 65,393, explains why Commerce considers whether a benefit is tied to capital structure or assets, not how. Def.'s Br. at 16. More generally, WTTC has not persuaded the court that Commerce unreasonably concluded that sales under the program did not "benefit[] Marmen's capital structure or assets any more than any sale normally benefits a company." IDM at 37. Rather, although the CFTs may have driven demand for Marmen's wind towers, there is no evidence in the record suggesting that the resultant sales were materially distinguishable from Marmen's everyday tower sales. Commerce's determination that the Québec Local Content Requirement conferred a recurring

benefit outside the POI and is thus not countervailable is sustained.

### *III. Commerce's Finding that the Québec On-the-Job Training Tax Credit Is De Facto Specific Is Reasonable and in Accordance with Law.*

The Tariff Act provides that Commerce can find de facto specificity if one or more of the following factors exist:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
> (II) An enterprise or industry is a predominant user of the subsidy.
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii). In its final rule implementing the Uruguay Round Agreements, Commerce explained that it considers each of these factors sequentially in order of appearance, and if one factor warrants a finding of specificity, it will undertake no further analysis. 63 Fed. Reg. at 65,355.

In this case, Commerce found the On-the-Job training tax credit to be de facto specific because the actual number of recipients was limited in number on an enterprise basis. IDM at 56 (citing 19 U.S.C. § 1677(5A)(D)(iii)(I)). To make its "limited in number" determination, Commerce compared "the actual number of companies that received the tax credit in 2018 to the total number of tax filers, inclusive of corporations and individuals in business, within Québec for 2018." Id. GoQ and GoC argue that Commerce's determination was methodologically unsound because (1) the comparison of credit recipients to total tax filers is an impermissible application of 19 U.S.C. § 1677(5A)(D)(iii)(I),[17] and (2) Commerce's comparison deviates from past practice

[17] The statutory evidence cited includes: (i) the statute's first factor says "actual recipients . . . are limited in number," without mentioning potential recipients; (ii) the statute's four factors mirror language in the Agreement on Subsidies and Countervailing Measures; (iii) the Statement of Administrative Action's statement that "the specificity test was intended to function as a rule of

without explanation. GoQ's Br. at 16, 20–22; GoC's Br. at 24; GoC's Reply at 15 n.19, 16; GoQ's Reply at 5–6 (proposing that Commerce should have considered only tax filers who provided a training program to trainees). In addition, both GoQ and GoC contend that Commerce's finding that the credit recipients are "limited in number" is unsupported by substantial evidence given the number and variety of companies participating in the credit program.[18] GoQ's Br. at 15–16, 19–20; GoC's Br. at 25–26.

The court concludes that Commerce's finding of de facto specificity was in accordance with law. GoQ and GoC agree that the statute does not preclude Commerce from comparing the actual number of users to potential users, but nevertheless argue that Commerce's methodology is contrary to the statutory requirements. GoQ Oral Arg. Subm. at 5–15; GoC Oral Arg. Subm. at 16–17. It is not. In applying 19 U.S.C. § 1677(5A)(D)(iii), Commerce found that "the actual number of recipients that benefited from the tax credit during the POI relative to the total number

---

reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy," Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA"); (iv) the SAA's embrace of Carlisle Tire & Rubber Co. v. United States, 5 CIT 229, 564 F. Supp. 834 (1983), which counseled against finding specificity in generally available benefits to avoid the absurd consequence of countervailing "public highways and bridges, as well as a tax credit for expenditures on capital investment even if available to all industries and sector," 5 CIT at 234; and (v) language in the SAA wherein, in discussing the four factors, "number" is qualified by words suggesting absolute rather than comparative evaluation.

[18] GoC further argues that Commerce's hierarchical approach is inconsistent with the SAA. GoC's Reply at 14 ("In particular, the SAA directs [Commerce] to 'seek and consider information relevant to all of {the four} factors.'") (citing SAA at 931) (emphasis in original)). This argument is unavailing because the SAA continues by providing that (i) "where the number of enterprises or industries using a subsidy is not large, the first factor alone would justify a finding of specificity" (as Commerce found here); and (ii) that "[b]ecause the weight accorded to the individual de facto specificity factors is likely to differ from case to case, Commerce shall find de facto specificity if one or more of the factors exists." SAA at 931.

of tax filers during the POI are limited in number on an enterprise basis." IDM at 56. This comparison both assesses whether "the actual recipients of the subsidy," on an enterprise basis, "are limited in number," 19 U.S.C. § 1677(5A)(D)(iii)(I), as well as whether the subsidy in question is "truly . . . broadly available and widely used throughout [the] economy," IDM at 56 (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act at 929, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040) ("SAA").[19] Accordingly, Commerce's approach neither fails to comply with the statutory language nor contravenes the underlying aims set out in the SAA.

Nor did Commerce err by using all corporate tax filers as the comparator group when assessing subsidy specificity. The Plaintiffs' arguments urging comparison to entities that employ trainees would improperly convert this test into a standard for predominant use -- a result which is particularly apparent when considering a limited-in-number analysis on an industry, rather than enterprise, basis. Neither the statute's text nor the SAA prohibit Commerce's approach, and it was reasonable to think that a comparison to corporate tax filers would be instructive in determining whether the subsidy is widely spread throughout the economy or limited to a small number of enterprises. GoQ's attempts to argue otherwise by relying on the court's (and Federal Circuit's) prior decisions fail. Bethlehem Steel Corp. v. United States, 25 CIT 307, 140 F. Supp. 2d. 1354 (2001) cannot provide the basis for determining Commerce's past practice with respect to the de facto specificity analysis relevant here, as the determination in that case employed an industry- rather than enterprise-level comparison, and further weighed all four rather than merely one of the

[19] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements Act] in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

factors required for a finding of specificity. Likewise, neither Royal Thai Gov't v. United States, 28 CIT 1218, 341 F. Supp. 2d 1315 (2004), aff'd in part, rev'd in part, and remanded 436 F.3d 1330 (Fed. Cir. 2006) nor the Federal Circuit's decision in AK Steel Corp. v. United States, 192 F.3d 1367 (Fed. Cir. 1999) involve a finding of "limited in number" specificity alone. Moreover, in each of these three cases, Commerce's non-specificity determination was sustained, so they offer weak evidence that the court here should second-guess Commerce's exercise of its expertise. On the other hand, Commerce has previously employed similar comparator groups in its past investigations. See, e.g., Issues and Decision Mem. at Cmt. 17 accompanying Final Determ. in the Countervailing Duty Investigation of 100- to 150-Seat Large Civil Aircraft from Canada, 82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017). In sum, the court finds that Commerce did not act contrary to law when considering corporate tax filers as the comparator group in its specificity analysis.

Finally, the court concludes that Commerce acted reasonably in determining that the actual recipients were limited in number. It is instructive that Congress provided this factor for Commerce to consider without specifying how Commerce should consider the factor. While GoC and GoQ are concerned that permitting Commerce to decide the scope of limited use would risk implicating any subsidy or benefit with less than (near) universal usage, the law itself permits Commerce to determine the appropriate reach of its specificity determinations. Although the court has the authority to consider the reasonableness of Commerce's determination, in this case, where only 2% of taxpayers received the disputed benefit, it cannot be said (without more) that Commerce's identification of a limited benefit, and thus of a de facto specific subsidy, is unreasonable. Accordingly, Commerce's determination is sustained.

## *IV. Commerce's Exclusion of Increased Tax Liabilities to Calculate the Total Benefit of the GASPÉTC Program Was Not Contrary to Law.*

Commerce declined to consider the increased tax liabilities incurred through GASPÉTC in calculating the program's benefit during the period of investigation. In so doing, Commerce cited 19 C.F.R. § 351.503(e), which provides that "[i]n calculating the amount of a benefit, the Secretary will not consider the tax consequences of the benefit." IDM at 53. Commerce noted that it has consistently treated income taxes as outside the statutorily-limited circumstances in which Commerce will subtract offsets from the gross countervailable subsidy amount. Id. (citing 19 U.S.C. § 1677(6)). Commerce therefore concluded that the regulation regarding "Direct Taxes" that specifically instructs Commerce to calculate the benefit as the difference between "'tax paid as a result of the program' and 'the tax the firm would have paid in the absence of the program' . . . simply provides direction in assessing how the program results in a benefit in the year at issue (the POI), with no regard to any consequences from the prior year's benefit." Id. at 54.

GoQ and Marmen contest Commerce's determination and argue that the "Direct Taxes" regulation sets out the only way Commerce may assess the value of the benefit. Accordingly, GoQ and Marmen argue that Commerce erred by failing to consider the increased tax liability in determining the size of the benefit conferred by GASPÉTC. They contend that the regulation directing Commerce not to consider tax consequences in calculating benefit, 19 C.F.R. § 351.503(e), is inapplicable because subsection (a) of that regulation and the Preamble each state that a specific rule on how to measure a benefit will be followed when provided. Marmen's Reply at 17–18; GoQ's Br. at 26; 63 Fed. Reg. at 65,359. Last, they argue that the exclusive list of statutory offsets is not implicated because Commerce must, in the first instance, determine the tax savings net of increased liabilities according to the "Direct Taxes" regulation's "in the absence of

the program" test before those offsets would even apply. Marmen's Reply at 15–18; GoQ's Br. at 25–26; GoQ's Reply at 9–13.

The court concludes that Commerce acted in accordance with law when it excluded the taxation of the previous year's tax credit in computing the benefit of GASPÉTC. It is true that Commerce may not disregard an existing policy determination manifest in the regulations without amending the regulations. Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 101 (2015) (citation omitted) ("[The Administrative Procedure Act mandates] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance"). However, the court is not persuaded that the regulations require that Commerce consider increased tax liabilities in determining tax benefits. As Commerce's benefit determination was a reasonable interpretation of the statute and regulations, its determination was in accordance with law.

Contrary to the arguments made by GoQ and Marmen, "tax paid by a firm as a result of the program" does not necessarily mean that tax liabilities from a previous year's use of the program are a component "result of the program." 19 C.F.R. § 351.509(a)(1). Counselling against this interpretation of the regulation is Commerce's past practice of not considering tax consequences and the expectation of less ambiguous language if Commerce intended to implement a substantial shift in policy. While the parties have not identified a case or investigation involving exactly the circumstances at issue here (i.e., the direct inclusion of a tax benefit as taxable income), Commerce's prior investigations reflect a uniform policy of ignoring tax consequences. See, e.g., Issues and Decision Mem. at 23–24 accompanying Final Determ. in the Countervailing Duty Investigation of Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012); see also, Issues and Decision Mem. accompanying Certain Softwood Lumber Products From Canada: Final Affirmative

Countervailing Duty Determ., and Final Negative Determ. of Critical Circumstances, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) (declining to offset a tax credit's effect of reducing available depreciation). To read the regulations as GoQ and Marmen urge would create an island where Commerce considers income tax effects in an ocean where it does not. Furthermore, it could radically reshape how Commerce conducts its investigations. For example, the "total impact" interpretation might also require Commerce to reduce benefit determinations of accelerated depreciation programs where a declining balance method confers less depreciation than otherwise afforded or where earlier additional depreciation results in recognizing a later, higher gain upon disposition. These considerations, taken in tandem with the language of the regulation, strongly suggest that Commerce did not amend its policy of uniformly disregarding tax consequences through the "Direct Taxes" regulation by embarking on a fundamentally different method of computing the benefit of tax programs contrary to its practice since the rulemaking. As Commerce's interpretation of the regulation is therefore reasonable, and is further consistent with past practice, its determination is sustained.

### *V. Commerce's Determination that GoQ's and GoC's Additional Depreciation for Buildings Used in Manufacturing Provided a Countervailable Financial Contribution and Benefit is Reasonable and in Accordance with Law.*

Commerce determined that the additional depreciation for qualifying buildings used in manufacturing under the GoC and GoQ tax systems constituted a countervailable financial contribution by reference to the revenue foregone relative to the general Class 1 depreciation rate. IDM at 24, 26. Similarly, Commerce determined the benefit amount using the additional 6% depreciation over the CCA treatment those buildings would have otherwise received in the absence of the additional depreciation provision (that is, a 4% otherwise-applicable rate and a 10% total rate with additional depreciation). Id. at 24 (applying the above-discussed "in the absence of the

program test" from 19 C.F.R. § 351.509(a)(1)). In its benefit analysis, Commerce noted that "in order to receive an additional deduction, a taxpayer needs to file an election by using a Schedule 8 form with its income tax return . . . [o]therwise, they would not receive the additional six percent deduction and instead receive the basic four percent of the CCA." Id. at 25 (citations omitted). Commerce rejected the argument that the 10% depreciation rate was just the "normal rate of depreciation that reflects the actual shorter useful life of the assets used for manufacturing purposes." Id. In so doing, Commerce noted that such argument relies on an implicit assumption that the relevant universe of taxpayers was those eligible for the special treatment, whereas "the proper universe of the taxpayers is not limited to the taxpayers who used the non-residential building within Class 1 assets for manufacturing but includes all taxpayers whose assets satisfy the scope of the entire Class 1 assets" because only the former can "can file for, and subsequently receive, the additional CCA." Id.

GoQ, GoC and Marmen oppose Commerce's determination. First, they each argue that Commerce's determination that a countervailable benefit exists is contrary to law. They claim that this additional depreciation does not meet the statutory definition of "financial contribution," which, in relevant part, reads "foregoing or not collecting revenue that is otherwise due." See GoQ's Br. at 29; GoC's Br. at 18–19; Marmen's Br. at 26–27 (each citing 19 U.S.C. § 1677(5)(D)(ii)). They contend that there was no revenue otherwise due as the depreciation allowed is consistent with the policy of CCA and underlying empirical evidence of the average useful life of the different types of assets. GoQ's Br. at 30; GoC's Br. at 18–23; Marmen's Br. at 26–27. Accordingly, the Plaintiffs each argue that the 10% rate is simply the "normal" rate of depreciation, and not a financial contribution.

Second, GoQ and GoC also argue that Commerce's countervailable benefit determination was contrary to law. In particular, they argue that Commerce's reliance on the "in the absence of the program" quantification in the "Direct Taxes" regulation begs the question of what taxes the firm would have paid in the absence of a program which sets the base taxation rate for Class 1 assets. GoQ's Br. at 29–39; GoC's Reply at 9.

Finally, the Plaintiffs each argue that Commerce's determination of financial contribution and benefit is not supported by substantial evidence. First, they argue that Commerce unreasonably compared two dissimilar classes of assets. GoQ's Br. at 29–30; GoC's Br. at 17–18; Marmen's Br. at 27. Second, they argue that Commerce ignored contrary evidence that manufacturing plants have shorter useful lives. GoQ's Br. at 31; GoC's Reply at 7–9; Marmen's Br. at 27–28. Third, they argue that it was unreasonable for Commerce not to consider the normal rate of depreciation for the buildings, which here is captured by the additional depreciation as reflected in GoC's empirical study and budget. GoQ's Br. at 30; GoC's Reply at 8; Marmen's Br. at 27.

The court finds that Commerce's financial contribution and benefit determinations are in accordance with law and supported by substantial evidence. Commerce acted in accordance with law because it reasonably interpreted both the statutory financial contribution definition and the "Direct Taxes" benefit regulation. Neither the statutory financial contribution definition nor "Direct Taxes" regulation unambiguously requires Commerce to compare the challenged program to itself, or to the treatment allegedly justified by empirical study, where a default tax rate is applicable in the absence of the challenged program. The statute's "foregoing or not collecting revenue that is otherwise due" language does not provide an exception for programs which attempt to reflect (successfully or not) the economic reality of depreciation. Likewise, the regulation's "in

the absence of the program" language does not require Commerce to ignore what tax the respondent would pay if not electing better tax treatment. Instead, Commerce reasonably interpreted the statute and regulation to require comparison to the otherwise applicable tax treatment -- provided by the 4% rate applicable if taxpayers did not elect the additional depreciation -- and the court is obliged to accept Commerce's reasonable interpretation as a "permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984). As the Government and WTTC note, the evidence supports a comparison between the Class 1 depreciation rate and the otherwise applicable rate: first, because the Class 1 depreciation provision is additional to the existing tax scheme; second, because GoC's own budget plan recognizes a default depreciation rate (e.g., "If the taxpayer forgoes the separate class, the current treatment will apply (i.e. a CCA rate of 4 per cent)"); and third, because taxpayers are required to file an election to receive the additional depreciation. Def.'s Br. at 27, 29–30; WTTC's Resp. at 26.

Commerce's determination was also supported by substantial evidence. First, Commerce did not unreasonably compare two dissimilar classes of assets; rather, it compared the different tax treatment under GoQ's and GoC's laws per the classifications those governments provided. Second, Commerce did not ignore contrary record evidence by failing to explicitly engage with the empirical bases supporting GoQ's and GoC's depreciation allowances for certain manufacturing buildings. Rather, Commerce addressed the argument that the challenged depreciation "reflects the actual shorter useful life of the assets used for manufacturing purposes" and reasonably concluded that it was correct to compare the challenged tax treatment to the treatment of the whole of Class 1 assets that applies to those who cannot elect the more

advantageous treatment.[20] IDM at 25. Finally, Commerce did not act unreasonably by declining to directly engage with the empirical bases governments stipulate as supporting their depreciation allowances or to treat those adequately supported rates as the normal rate or some other default or otherwise applicable rates. Rather, Commerce reasonably concluded that where a taxpayer can opt-in to more favorable treatment, it is reasonable for Commerce to confine its analysis to the comparisons provided for by law, even if the more favorable treatment better reflects economic reality. Where a government provides an option for more favorable tax treatment, Commerce is not required to undertake the analysis provided for by statute and regulations by comparing the challenged tax treatment to itself, even if the tax scheme as a whole attempts to accurately reflect the economic realities of specific taxpayers.[21] While the court's holding here does not prohibit Commerce from assessing empirical bases of a challenged tax program as might be appropriate to discharge its obligations under the statute and regulations where, for example, a non-elective tax

---

[20] The language in the IDM in response to the Plaintiffs' challenge focuses on the appropriate comparator group instead of what is the actual rate of depreciation or the empirical bases of the depreciation allowed. Nonetheless, Commerce adequately engaged with the record evidence by taking the position that Commerce must make the comparisons provided for in the statute and regulation and the Plaintiffs' challenge would have Commerce make an improper comparison. Accordingly, Commerce is best understood as concluding that even if the actual rate of depreciation coincides with depreciation allowed, that will not then require Commerce to compare the tax treatment under the challenged program to itself. The court holds that Commerce's approach was not unreasonable or inconsistent with law, even if the more favorable tax treatment elected more accurately reflects economic wear and tear.

[21] GoC's argument that "[t]here is no norm for determining what is "otherwise due" except . . . the country in question's own tax system," GoC's Br. at 19, is inapplicable where an election is available for more favorable tax treatment because the norm relied upon in such case is indeed provided by the country's own tax system. Similarly, GoC's argument that according to Commerce's own description "all claims for all tax deductions must be 'elected' by the taxpayer," GoC's Reply at 5, is also inapplicable as it ignores the practical difference that Commerce implicitly draws between a case in which a taxpayer can claim some tax benefit instead of none at all and one in which the taxpayer can claim a better tax benefit than a relatively worse one. The court's conclusion here is limited to the latter case.

program is more generous than economically justifiable, the court nevertheless finds that such analysis was neither necessary nor appropriate here. Commerce's determination that the additional depreciation rate available for Class 1 assets constituted a countervailable benefit is therefore sustained.

**CONCLUSION**

The court concludes that Commerce's final determination was in accordance with law and supported by substantial evidence. First, Commerce permissibly excluded the foreign auditor's adjustment as unreliable. Second, Commerce reasonably and lawfully determined that the Québec Local Content Requirement provided a recurring benefit. Third, Commerce acted reasonably within its statutory authority under 19 U.S.C. § 1677(5A)(D)(iii) in determining that the Québec On-the-Job Training tax credit was a de facto specific subsidy. Fourth, Commerce acted in accordance with law in excluding increased tax liabilities when conducting the benefit calculation for GASPÉTC. Fifth and finally, Commerce acted reasonably and lawfully when determining financial contribution and benefit from additional depreciation for buildings used in manufacturing by comparison to the rate applicable if the additional depreciation were not claimed.

For the foregoing reasons, Plaintiffs' and Defendant-Intervenor's motions for judgment on the agency record are denied; Commerce's Final Results are sustained, and judgment is entered in favor of the United States.

**SO ORDERED.**

*/s/ Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: March 18, 2022
New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

THE GOVERNMENT OF QUÉBEC,

Plaintiff,

and

MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO.,

Consolidated Plaintiffs,

and

THE GOVERNMENT OF CANADA,

Plaintiff-Intervenor,

v.

THE UNITED STATES,

Defendant,

and

WIND TOWER TRADE COALITION,

Defendant-Intervenor,

and

THE GOVERNMENT OF ONTARIO,

Defendant-Intervenor.

Before: Gary S. Katzmann, Judge
Consol. Court No. 20-00168

## JUDGMENT

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now, in conformity with that opinion, it is hereby

**ORDERED** that Plaintiff the Government of Québec's motion for judgment on the agency record is **DENIED**; and it is further

**ORDERED** that Consolidated Plaintiffs Marmen Inc., Marmen Énergie Inc., and Marmen Énergie Co.'s motion for judgment on the agency record is **DENIED**; and it is further

**ORDERED** that Plaintiff-Intervenor the Government of Canada's motion for judgment on the agency record is **DENIED**; and it is further

**ORDERED** that Defendant-Intervenor Wind Tower Trade Coalition's motion for judgment on the agency record is **DENIED**; and it is further

**ORDERED** that that Commerce's final results, as set out in Utility Scale Wind Towers from Canada: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances, 85 Fed. Reg. 40,245 (July 6, 2020), P.R. 401, are **SUSTAINED**.

*/s/ Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: March 18, 2022
New York, New York

***Government of Québec v. United States*,**

**567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022)**

**(Appx39-58)**

567 F.Supp.3d 1273
United States Court of International Trade.

The GOVERNMENT OF QUÉBEC, Plaintiff,
and
Marmen Inc., Marmen Énergie Inc., Marmen Energy Co., Consolidated Plaintiffs,
and
The Government of Canada, Plaintiff-Intervenor,
v.
The UNITED STATES, Defendant,
and
Wind Tower Trade Coalition, Defendant-Intervenor,
and
The Government of Ontario, Defendant-Intervenor.

Slip Op. 22-21
|
Consol. Court No. 20-00168
|
March 18, 2022

**Synopsis**
**Background:** Government of Québec filed complaint challenging Department of Commerce's final determination following countervailing duty (CVD) investigation into allegation that subsidies were being provided to producers and exporters of utility wind towers from Canada in derogation of United States fair trade laws. The Government of Canada intervened as a plaintiff, and trade coalition intervened as a defendant, following which exporter and trade coalition initiated separate appeals of Commerce's determination, which were consolidated into present case. Government of Ontario joined as defendant-intervenor, but did not further participate in litigation. Governments of Québec and Canada, exporter, and trade coalition moved for judgment on the agency record.

**Holdings:** The Court of International Trade, Gary S. Katzmann, J., held that:

[1] Department was not required to have compelling evidence that independent auditor was not in good standing in order to set aside auditor's analysis of exporter's financial statements;

[2] Department reasonably inferred from discovered errors that auditor's currency adjustments were unreliable;

[3] Department acted reasonably and lawfully in determining that local content requirement program conferred recurring benefit outside period of investigation;

[4] Department reasonably determined that tax credit was a de-facto specific subsidy;

[5] exclusion of previous year's tax credit accorded with regulations applying to determination of a program's benefit; and

[6] Department's determination that additional depreciation deduction was a countervailable benefit was supported by substantial evidence and applicable law.

Department's final results sustained.

**Procedural Posture(s):** Motion for Judgment on Administrative Record.

West Headnotes (13)

**[1]** **Customs Duties** Countervailing or Dumping Duties

The Tariff Act of 1930 provides for the investigation of potential government subsidization, and for the imposition of duties on subject merchandise. Tariff Act of 1930, § 303 et seq., 19 U.S.C.A. § 1303 et seq.

**[2]** **Customs Duties** Countervailing or Dumping Duties

Countervailing duty (CVD) actions are intended to be remedial rather than punitive in nature, and it is therefore Department of Commerce's duty to determine rates as accurately as possible.

**[3]** **Customs Duties** Proceedings

The substantiality of evidence supporting a countervailing duty determination must account for anything in the record that fairly detracts from

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

its weight; this includes contradictory evidence or evidence from which conflicting inferences could be drawn. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

[4] **Customs Duties** Proceedings

For a court to sustain a countervailing duty (CVD) determination, Department Commerce must examine the record and provide a satisfactory explanation for its findings such that the record demonstrates a rational connection between the facts accepted and the determination made. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

[5] **Customs Duties** Proceedings

Department of Commerce's findings supporting a countervailing duty (CVD) determination may be found to be supported by substantial evidence even where two inconsistent conclusions could be drawn from the record; however, agencies act contrary to law if their decision-making is not reasoned. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

[6] **Customs Duties** Proceedings

Department of Commerce was not required to have compelling evidence that independent auditor was not in good standing in order to set aside auditor's analysis of exporter's financial statements in Department's countervailing duty (CVD) investigation; Department's ability to accept findings of independent auditor did not supersede its duty to verify information it relied upon in making its final determination, and Department discovered auditor made erroneous currency adjustments. Tariff Act of 1930 § 782, 19 U.S.C.A. § 1677m(i).

[7] **Customs Duties** Proceedings

Department of Commerce reasonably inferred from discovered errors that independent auditor's foreign currency exchange adjustments in exporter's general ledger sales accounts were unreliable in Department's countervailing duty (CVD) investigation arising from alleged subsidies provided to producers and exporters of utility wind towers; errors uncovered in spot check undermined the reliability of the data more broadly, Department discovered two sales that were coded in general ledgers as having been transacted in Euros but were actually transacted in Canadian dollars, and that conversion of United States dollar to Canadian currency was inappropriate for at least five sales.

[8] **Customs Duties** Bounties or grants

Department of Commerce acted reasonably and lawfully in determining that Government of Québec's local content requirement program, consisting of calls for tender (CFTs) for purchases of wind energy, conferred a recurring benefit on exporter of utility wind towers outside of the period of investigation, such that imposition of a countervailing duty (CVD) against exporter was not warranted; Department extensively considered the nature of the transactions before concluding the subsidies for wind energy were regular and non-exceptional, Government of Québec did not expressly authorize or approve subsidy as it related to exporter, and there was no evidence suggesting that exporter's sales resulting from CFTs were materially distinguishable from exporter's everyday wind tower sales. 19 C.F.R. § 351.524(c)(2).

[9] **Customs Duties** Bounties or grants

Department of Commerce's determination that Government of Québec's on-the-job training tax credit was a de-facto specific subsidy, which provided countervailable subsidy to producers and exporters of wind towers from Canada, was reasonable pursuant to statutory definition of de-facto specific domestic subsidies; Department determined actual recipients of subsidy was limited in number on an enterprise basis by evaluating actual number of recipients relative to total number of corporate tax filers, comparison to corporate tax filers helped determine whether

subsidy was widespread or limited to small number of enterprises, only 2% of taxpayers received benefit, and statute allowed Department to determine appropriate reach of specificity determinations so long as it was reasonable. Tariff Act of 1930 § 771, 19 U.S.C.A. § 1677(5A)(D)(iii).

[10] **Customs Duties** Bounties or grants

Exclusion of taxation of previous year's tax credit in Department of Commerce's computation of countervailable subsidy of Government of Québec's tax credit program, which was intended to promote employment in certain geographical regions, accorded with regulations that applied to Department's determination of program's benefit to Government of Québec and exporter of utility wind towers; regulations did not require Department to consider increased tax liabilities in determining tax benefits, regulation that directed consideration of tax paid as a result of the program did not mean that tax liabilities from a previous year's use of program were a "result of the program," and Department's decision to ignore tax consequence was consistent with its past practices. 19 C.F.R. §§ 351.503(e), 351.509(a)(1).

[11] **Customs Duties** Bounties or grants

In calculating a countervailable subsidy, the Department of Commerce may not disregard an existing policy determination manifest in the regulations without amending the regulations.

[12] **Customs Duties** Bounties or grants

Substantial evidence and applicable law supported Department of Commerce's determination that additional 6% depreciation deduction for property used to earn business or property income was a countervailable benefit provided to producers and exporters of utility wind towers; statute did not exclude programs that attempted to reflect economic reality of depreciation, Department reasonably interpreted law to require comparison to 4% rate applicable if taxpayers did not elect additional depreciation, Department reasonably compared challenged tax treatments to treatment of similar assets that cannot elect the advantageous treatment, and Department addressed argument that challenged depreciation reflected economic reality of shorter useful life of assets. Tariff Act of 1930 § 771, 19 U.S.C.A. § 1677(5)(D)(ii); 19 C.F.R. § 351.509(a)(1).

[13] **Customs Duties** Bounties or grants

Where government provides option for more favorable tax treatment, Department of Commerce, in determining whether benefit is countervailable, is not required to undertake analysis provided for by statute and regulations by comparing challenged tax treatment to itself, even if tax scheme as whole attempts to accurately reflect economic realities of specific taxpayers. Tariff Act of 1930 § 771, 19 U.S.C.A. § 1677(5)(D)(ii); 19 C.F.R. § 351.509(a)(1).

**Attorneys and Law Firms**

***1276** Nancy A. Noonan, ArentFox Schiff LLP, of Washington, D.C., argued for Plaintiff Government of Québec. With her on the joint brief were Matthew J. Clark, Jessica J. DiPietro, and Aman Kakar. With them on the prior briefs were Arent Fox LLP, of Washington, D.C.

Jay C. Campbell, White & Case, LLP, of Washington, D.C., argued for Consolidated Plaintiffs Marmen, Inc.; Marmen Énergie Inc.; and Marmen Energy Co. With him on the brief were Allison J.G.Kepkay, Ting-Ting Kao, and Ron Kendler.

Alan G. Kashdan, McDermott Will & Emery LLP, of Washington, D.C., argued for Plaintiff-Intervenor Government of Canada. With him on the brief were Joanne E. Osendarp, Tim Hruby, and Conor Gilligan.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With him on the brief were Brian M. Boyton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of Counsel

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

Paul K. Keith, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance.

Maureen E. Thorson, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Wind Tower Trade Coalition. With him on the brief were Alan H. Price, Daniel B. Pickard, Robert E. DeFrancesco, III, Laura El-Sabaawi, and Cynthia C. Galvez.

H. Deen Kaplan, Hogan Lovells US LLP, of Washington, D.C., for Defendant-Intervenor Government of Ontario.

## OPINION

Katzmann, Judge:

***1277** Wind towers are used to convert the energy from wind to electrical energy. Utility scale wind towers, now before the court, are tubular steel structures upon which other wind turbine components are mounted, and are used primarily in utility scale electrical power generation projections. Petitions for the Imposition of Antidumping and Countervailing Duties, Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam at 7–18 (July 9, 2019), P.R. 1, 2, 7, 9, 15, C.R. 1, 2, 7, 9, 15 ("Petitions"). This case presents five issues arising from the United States Department of Commerce's ("Commerce") final determination after countervailing duty ("CVD") investigation that in derogation of U.S. fair trade laws, subsidies are being provided to producers and exporters of utility wind towers from Canada, and from Commerce's consequent issuance of CVD orders based on assessment of remedial CVD subsidy rates. Utility Scale Wind Towers from Canada: Final Affirmative Countervailing Duty Determ. and Final Negative Determ. of Critical Circumstances, 85 Fed. Reg. 40,245 (July 6, 2020), P.R. 401 ("Final Results"). The Final Results are now challenged for a variety of reasons by Plaintiff Government of Québec ("GoQ"), Plaintiff-Intervenor Government of Canada ("GoC"), and Consolidated Plaintiffs Marmen Énergie and Marmen Inc. (collectively, "Marmen"), as well as by Defendant-Intervenor Wind Tower Trade Coalition ("WTTC"). First, Marmen challenges Commerce's determination that Marmen's proposed foreign currency adjustment from its auditor was unverified and unreliable, and accordingly properly excluded from the total sales denominator used to calculate the subsidy rate. Second, WTTC challenges Commerce's determination that the Québec Local Content Requirement program constitutes a "recurring benefit" such that it was not countervailable during the period of investigation ("POI"). Third, GoQ and GoC challenge Commerce's determination that the Québec On-the-Job Training Tax Credit is de facto specific as required by 19 U.S.C. § 1677(5A). Fourth, GoQ and Marmen challenge Commerce's exclusion of tax liabilities in computing the benefit conferred by the GASPÉTC tax credit. Fifth, GoQ, GoC and Marmen challenge Commerce's determination of financial contribution and benefit for additional depreciation allowed for buildings used in manufacturing in Canada's and Québec's tax systems. The court sustains all of Commerce's challenged determinations and denies the motions of Plaintiff, Consolidated Plaintiff, Plaintiff-Intervenors, and Defendant-Intervenor for judgment on the agency record.

## BACKGROUND

### *I. Legal Background*

**[1]** **[2]** The Tariff Act of 1930 (the "Tariff Act") was enacted to empower Commerce to address trade distortions caused by unfair economic practices. [1] In particular, ***1278** it provides for the investigation of potential government subsidization and for the imposition of duties on subject merchandise. Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); see also Bebitz Flanges Works Pvt. Ltd. v. United States, 44 CIT ——, ——, 433 F. Supp. 3d 1309, 1314 (2020). These CVD actions are intended to be remedial rather than punitive in nature, Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103 (Fed. Cir. 1990), and it is therefore Commerce's duty to determine rates "as accurately as possible," Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

1 Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition. Citations to 19 U.S.C. §§ 1677e, 1677m however, are not to the U.S. Code, 2012 edition, but to the unofficial U.S. Code Annotated 2018 edition. The current U.S.C.A. reflects the amendments made to 19 U.S.C. §§ 1677e, 1677m (2012) by the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015). The TPEA amendments are applicable to all determinations made on or after August 6, 2015, and therefore, are applicable to this proceeding. See Dates of Application of Amendments to the Antidumping

and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

In order to impose duties under Section 701 of the Tariff Act of 1930, Commerce must first find the existence of a countervailable subsidy. A countervailable subsidy is one which satisfies the following elements: (1) a government or public authority has directly or indirectly provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. See 19 U.S.C. §§ 1677(5), (5A). If Commerce determines that a foreign government is providing a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, sold, or likely to be sold for import into the United States, and the International Trade Commission determines that an industry in the United States thereby is materially injured or threatened with material injury, Commerce is required by statute to impose a CVD upon such merchandise equal to the net countervailable subsidy. See id. § 1677(5).

With respect to the first factor, the Tariff Act defines financial contribution not only as "the direct transfer of funds" but also as "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income." Id. § 1677(5)(D)(i)–(ii).

With respect to the second factor, the Tariff Act and Commerce regulations set out how Commerce must define, quantify and allocate benefits. In relevant part: (i) The Tariff Act provides that "a benefit shall normally be treated as conferred ... in the case where goods or services are provided ... if such goods are purchased for more than adequate remuneration[,]" id. § 1677(5)(E); (ii) 19 C.F.R. § 351.503 provides the general rules for identifying and delimiting a benefit; and, (iii) 19 C.F.R. § 351.509 provides specific rules for benefits provided by means of direct taxes.

With respect to the third factor, the statute requires that a countervailable subsidy must exhibit either de jure or de facto specificity. See 19 U.S.C. § 1677(5A). A subsidy is de jure specific where the authority providing the subsidy, or its authorizing legislation, expressly limits access to the subsidy to an enterprise or industry. See id. § 1677(5A)(D)(i). To avoid a designation of de jure specificity, the administering authority must ensure that access to the subsidy is governed by objective industry- or enterprise-neutral criteria resulting in automatic eligibility, and that the criteria for eligibility are both strictly followed and clearly set forth in the relevant official materials so as to be verifiable. See id. § 1677(5A)(D)(ii). A subsidy that escapes ***1279** de jure specificity may nevertheless be designated de facto specific if one or more of the following criteria are satisfied: (1) the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (2) an enterprise or industry is a predominant user of the subsidy; (3) an enterprise or industry receives a disproportionately large amount of the subsidy; or (4) the manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others. Id. § 1677(5A)(D)(iii)(I)–(IV).

### *II. Factual and Procedural History*

On July 9, 2019, WTTC filed AD and CVD petitions with Commerce, alleging in relevant part that utility scale wind towers from Canada were subsidized, and that imports of these products were causing material injury to the U.S. wind tower industry. See generally, Petitions. On August 6, 2019, Commerce began its investigation of Marmen for the period of investigation ("POI") from January 1, 2018, through December 31, 2018. See Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations, 84 Fed. Reg. 38,216 (Dep't Commerce Aug. 6, 2019); see also Mem. from J. Maeder to J. Kessler, re: Issues and Decision Mem. for the Final Determ. of the Countervailing Duty Investigation of Utility Scale Wind Towers from Canada at 3 (Dep't Commerce June 29, 2020), P.R. 399 ("IDM"). Commerce then selected "the two largest producers/exporters of the subject merchandise, by volume," as mandatory respondents: Marmen Énergie and Marmen Inc. (collectively, "Marmen").[2] Mem. from J. Maeder to J. Kessler, re: Decision Mem. for the Prelim. Determ. of the Countervailing Duty Investigation of Utility Scale Wind Towers from Canada at 2 (Dep't Commerce Dec. 6, 2019), P.R. 308 ("PDM"). On December 13, 2019, Commerce preliminarily determined that countervailable subsidies are being provided to producers and exporters of wind towers from Canada through eight identified programs or credits; among them, a Québécois tax credit for on-the-job training, Québec's Tax Credit to Promote Employment in Gaspésie and Certain Maritime Regions of Québec (GASPÉTC), and Canada's and Québec's treatment of depreciation for the taxation of certain buildings used in manufacturing. ***1280** Utility Scale Wind Towers From Canada: Prelim. Affirmative Countervailing Duty Determ.,

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

and Alignment of Final Determ. With Final Antidumping Duty Determ., 84 Fed. Reg. 68,126. (Dep't Commerce Dec. 13, 2019), P.R. 313 ("Preliminary Results"); see also PDM at 8–16. Commerce further preliminarily determined that the Québec Local Content Requirement, a component of the wind farm energy production and purchase process, was not countervailable. PDM at 19–20.

2 In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—
>
> (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—
>
> (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
>
> (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
>
> (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.
>
> The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

Subsequently, Commerce conducted a verification of the information submitted by Marmen[3] and published its Final Results.[4] Final Results; IDM at 9. In Commerce's Final Results, it concluded that wind towers from Canada were being subsidized at a rate of 1.18% for the mandatory respondent and all others. 85 Fed. Reg at 40,246. Relevant here, Commerce again found that Québec's on-the-job training tax credit, the GASPÉTC program, and Canada's and Québec's tax treatment of manufacturing facilities provide countervailable benefits, and determined that the Québec Local Content Requirement was not countervailable.

3 Commerce declined to formally verify the responses from GoQ and GoC as a result of travel restrictions imposed in response to the Covid-19 pandemic.

4 The final countervailing duty order was signed by Commerce on August 20, 2020, and published in the Federal Register on August 26, 2020. Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Am. Final Affirmative Countervailing Duty Determ. and Countervailing Duty Orders, 85 Fed. Reg. 52,543, 52,545 (Dep't Commerce Aug. 26, 2020), P.R. 425 (reducing the subsidy rate to 1.13% in response to a ministerial error allegation for reasons unrelated to this action).

On September 4, 2020, GoQ filed a complaint challenging Commerce's final determination in the investigation of wind towers from Canada. Compl., ECF No. 2. On October 5, 2020, GoC joined the case as a Plaintiff-Intervenor,[5] Order, ECF No. 20, and WTTC joined the case as a Defendant-Intervenor, Order, ECF No. 19. Marmen and WTTC additionally initiated separate appeals of Commerce's determination, which were consolidated into the present case on November 21, 2020. Order, ECF No. 26.[6] On February 11, 2021, GoQ, GoC, Marmen and WTTC each moved for judgment on the agency record. Pl.'s Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 28 ("GoQ's Br."); Consol. Pl.-Int. GoC's Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 32 ("GoC's Br."); Mem. of Points & Auths. in Supp. of Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 34-1 ("Marmen's Br.); WTTC's Revised Mem. in Supp. of its Rule 56.2 Mot. for J. upon the Agency R., ECF No. 36 ("WTTC's Br.") (revised Feb. 12, 2021). On June 10, 2021, the Government responded to each of these motions. Def.'s Resp. to Pls.' Rule 56.2 Mots. for J. on the Agency R., ECF No. 44 ("Def.'s Br."). Also on June 10, 2021, (i) GoQ and Marmen responded to WTTC's motion (regarding the Québec Local Content Requirement), GoQ's Resp. in Opp'n to WTTC's Rule 56.2 Mot. for J. on the Agency R., ECF No. 42 ("GoQ's Resp."); Consol. Pl.'s Resp. Br., ECF No. 47 ("Marmen's Resp."), and (ii) WTTC responded to GoC's, GoQ's and Marmen's motions for judgment on the agency record, WTTC's Resp. Br., ECF No. 45 ("WTTC's Resp."). Next, on July 8, 2021, (i) GoQ, GoC and Marmen replied

to the responses filed by the Government and WTTC, Reply Br. of Pl. GoQ, ECF No. 56 ("GoQ's Reply"); Consol. Pl.-Int. GoC's Rule 56.2 Reply Br., ECF No. 55 (GoC's Reply"); Reply Br. in Supp. of Pls.' Rule ***1281** 56.2 Mot. for J. on the Agency R., ECF No. 58 ("Marmen's Reply"); and (ii) WTTC replied to the Government, GoQ and Marmen, WTTC's Reply Br., ECF No. 53 ("WTTC's Reply").

5 GoC qualifies as an interested party pursuant to 19 U.S.C. § 1677(9)(B), and is therefore entitled to intervene as a matter of right pursuant to 28 U.S.C. § 2631(j)(1)(B).

6 The Government of Ontario also joined the action as Defendant-Intervenor, but has not further participated in the litigation.

On November 12, 2021, the parties submitted responses to questions presented by the court in advance of oral argument. Pl. GoQ Resp. to Questions for Oral Arg, ECF No. 74 ("GoQ's Oral Arg. Subm."); GoC's Resp. to Ct.'s Questions for Oral Arg., ECF No. 76 ("GoC's Oral Arg. Subm."); Marmen's Resp. to Ct.'s Questions for Oral Arg., ECF No. 75; Def.'s Resp. to Ct.'s Nov. 1, 2021 Questions for Oral Arg., ECF No. 77; WTTC Resp. to Ct.'s Questions for Oral Arg, ECF No. 73. Oral argument was held on November 17, 2021. Oral Arg., ECF No. 80. Finally, on November 23, 2021, the parties, except WTTC, provided post-oral argument submissions. Pl. GoQ's Post Arg. Subm., ECF No. 83; GoC's Post-Arg. Subm., ECF No. 81; Marmen's Post-Arg. Subm., ECF No. 85; Def.'s Post-Arg. Subm., ECF No. 82.

### *III. Programs Assessed*

Québec Local Content Requirement

The Québec Local Content Requirement is a program in which the electric utility of Québec, Hydro-Québec, issues calls for tender ("CFTs") for blocks of wind-produced electricity.[7] To be eligible for the program, wind farm developers attempting to sell electricity to Hydro-Québec are required to make certain minimum expenditures in Québec in connection with their wind farms -- some tenders further specified minimum expenditures for specific regions of Québec. PDM at 19. Purchases from Marmen (including from wind turbine manufacturers that sourced their towers from Marmen), as a Québécois wind tower manufacturer (and, later, with a facility in the specific subregions), were eligible for inclusion in the required minimum. Marmen's Resp. at 4–9.

7 A CFT is the process by which a public company solicits bids from companies competing for works, supply or service contracts.

Commerce determined that, insofar as the GoQ "entrusted and directed" the purchase of wind towers from Marmen via the Québec Local Content Requirement, it involved a purchase for more-than-adequate remuneration ("MTAR"). PDM at 20; IDM at 37–38; 19 U.S.C. § 1677(5)(B)(iii). Commerce further concluded, based on the past treatment of purchases of goods and services for MTAR, that the Local Content Requirement was a recurring benefit. IDM at 36. A recurring benefit is allocated to the year the benefit is received.[8] 19 C.F.R. § 351.524(a). Because Marmen did not make sales of wind towers to turbine manufacturers for local content requirement tenders during the POI, Commerce found no benefit during the POI and declined to countervail the program. IDM at 38; see also Marmen's Resp. at 4.

8 Generally, Commerce allocates a non-recurring benefit over the number of years corresponding to the average useful life of a physical asset. See 19 C.F.R. § 351.524 (explaining the criteria for identifying and allocating recurring and non-recurring benefits).

Québec's On-the-Job Tax Credit Program.

Québec's On-the-Job tax credit "encourages businesses to take on trainees and improve the professional skills of young workers" by allowing those businesses which do so to "claim a tax credit at a rate of 24% in respect to the salary or wages paid to the student or apprentice, and the salary or wages paid to an employee for hours devoted to the supervision of the student or apprentice." GoQ's Initial Questionnaire Resp., Ex.QC-C09-A at 1 (Oct. 9, ***1282** 2019), P.R. 132; see also PDM at 15. Ultimately, Commerce determined that the On-the-Job tax credit provided a de facto specific subsidy because the "actual number of recipients that benefited from the tax credit during the POI relative to the total number of tax filers during the POI are limited in number on an enterprise basis." IDM at 56. It accordingly found a 0.01% ad valorem subsidy. Id. at 7.

GASPÉTC

GoQ's GASPÉTC tax program provides a 15% tax credit for qualifying salary and wages paid by an eligible company to eligible employees. PDM at 15–16. However, the amount

of GASPÉTC credit claimed by an eligible company in a given tax year is treated as taxable income in the subsequent year. Id. On Marmen's tax-year 2017 return (filed in 2018), it claimed GASPÉTC credit toward provincial income taxes payable in Québec and included the amount of GASPÉTC credit it claimed in tax-year 2016 as income. IDM at 52; see also Marmen's Br. at 11.

Commerce found the benefit conferred to be the value of the tax credit claimed in tax-year 2017 and declined to reduce the value of the benefit by the additional 2017 tax liabilities Marmen incurred by including its tax-year 2016 GASPÉTC credit as income in tax-year 2017. Ultimately, Commerce found a 0.78% ad valorem subsidy. Id. at 7.

Additional Depreciation

Both Federal and Provincial (Québecois) tax systems provide a depreciation deduction, called the Capital Cost Allowance ("CCA"), for property used to earn business or property income. Both systems divide assets into classes, which are then assigned their own rates and methods of depreciation over the useful life of the asset.

Under the Canadian CCA, Class 1 includes three kinds of buildings: residential buildings, non-residential buildings primarily used for manufacturing or processing and other non-residential buildings (e.g., buildings used in retail). GoC's Br. at 1. In Québec, Class 1 is designated for non-residential buildings. GoQ's Br. at 28. In both systems, the generally applicable rate of CCA for Class 1 assets is 4%, but taxpayers can claim a higher rate of depreciation for certain types of non-residential property. An additional 6% depreciation is allowed when at least 90% of an eligible building's floor space is used for manufacturing or processing and the building was acquired after March 18, 2007. IDM at 22. Similarly, an additional 2% depreciation is provided for eligible buildings acquired after March 18, 2007 when at least 90% is used for non-residential use. Id. Taxpayers in both systems must place the asset into a separate class to receive the additional depreciation. GoC's Br. at 12; GoQ's Br. at 28. This additional deprecation purportedly reflects differences in the useful life of assets used in manufacturing or other non-residential capacities, according to an empirical study conducted by an agency of GoC, Statistics Canada.

Marmen claimed the 10% depreciation on certain buildings. Marmen's Br. at 9–10. Commerce treated the additional depreciation as a financial contribution and quantified the benefit as the 6% difference from the otherwise applicable rate for Class 1 assets. IDM at 24. Commerce ultimately determined a subsidy rate of 0.07% ad valorem. Id. at 6.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581 and 19 U.S.C. § 1516a(a)(2). As noted above, a subsidy is countervailable if it satisfies the ***1283** elements of 19 U.S.C. § 1677(5): (i) a government or public authority has provided a financial contribution; (ii) a benefit is thereby conferred upon the recipient of the financial contribution; and (iii) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. See 19 U.S.C. §§ 1677(5), (5A).

**[3] [4] [5]** The court sustains Commerce's CVD determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence "has been defined as 'more than a mere scintilla,' [and] as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The substantiality of evidence must account for anything in the record that "fairly detracts from its weight." CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)). This includes "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Commerce must also examine the record and provide a satisfactory explanation for its findings such that the record demonstrates a rational connection between the facts accepted and the determination made. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); Jindal Poly Films Ltd. of India v. United States, 43 CIT ——, ——, 365 F. Supp. 3d 1379, 1383 (2019). Commerce's findings may be found to be supported by substantial evidence even where two inconsistent conclusions could be drawn from the record. Aluminum Extrusions Fair Trade Comm. v. United States, 36 C.I.T. 1370, 1373 (2012) (citing Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d

131 (1966)). However, agencies act contrary to law if their decision-making is not reasoned. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–68, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

## DISCUSSION

The court concludes that Commerce's final determination was in accordance with law and supported by substantial evidence. First, Commerce permissibly excluded the foreign auditor's adjustment as unreliable. Second, Commerce reasonably and lawfully determined that the Québec Local Content Requirement provided a recurring benefit. Third, Commerce acted reasonably within its statutory authority under 19 U.S.C. § 1677(5A)(D)(iii) in determining that the Québec On-the-Job Training tax credit was a de facto specific subsidy. Fourth, Commerce acted in accordance with law in excluding increased tax liabilities when conducting the benefit calculation for GASPÉTC. Fifth and finally, Commerce acted reasonably and in accordance with law when finding that the additional depreciation rate for Class 1 assets constituted a financial contribution and benefit equal to the difference between the rate assessed and the rate applicable if the additional depreciation were not claimed.

### *I. Commerce's Exclusion of Marmen's Foreign Currency Auditor Adjustment Was Supported by Substantial Evidence and in Accordance with Law.*

To calculate the total sales denominator for assessing the subsidy rate, Commerce ***1284** used the total free-on-board sales less intercompany sales. IDM at 40–44. In both the Preliminary Results and Final Results, Commerce relied on sales figures provided by Marmen in response to Commerce's Initial Questionnaire instead of on a later submission that included an adjustment from Marmen's auditor. IDM at 41. This later submission was provided in response to Commerce's request, prior to making its preliminary determination, for reconciliation of Marmen's reported sales figures. Id. Marmen's response included both revised sales figures and an exhibit that provided for "necessary adjustments," including one for "Year End auditor adjustment in GL[ ] for Gain(loss) exchange rate." Id. at 41. This adjustment was not further explained by the submission, except where Marmen noted that its "foreign currency transactions are translated into Canadian dollars using the exchange rate in effect at the date of transaction." Letter from Marmen to W. Ross, re: Utility Scale Wind Towers from Canada: Ministerial Error Comments at 2 (Dec. 18, 2019) P.R. 318 ("Marmen's Ministerial Error Comments"). Commerce used the initial sales figures in its Preliminary Results without making any adjustments, and subsequently declined to amend the Preliminary Results in response to Marmen's filed comment arguing that failure to make the adjustments constituted ministerial error. IDM at 41–44; see generally Marmen's Ministerial Error Comments.

At verification, Commerce learned that during the POI Marmen recorded the value of sales denominated in United States dollars ("USD") in its general ledger sales accounts in the amount of the USD-value of the sale, which were then treated on a one-to-one basis with Canadian dollars ("CAD"). IDM at 42; Mem. from Y. Bordas to File, re: Verification of Questionnaire Resps. of Marmen, Inc. Marmen Énergie Inc., and Gestion Marmen at 24 (Dep't Commerce Apr. 16, 2020), P.R. 374, C.R. 309 ("Marmen Verification Report"). Thus, Marmen's listed USD sales were undercounted in the total sales figures provided to Commerce, which Marmen reported in CAD. Marmen explained that to reach its final sales figures, it made year-end currency conversions through an auditor's adjustment. IDM at 42. Accordingly, it argued that its total sales denominator should reflect the foreign currency exchange adjustments. Id.

When Commerce examined the sales accounts that were identified as needing to be converted from USD into CAD, it discovered five sales that were actually coded in the general ledgers as having been transacted in Euros. IDM at 42. Moreover, upon further investigation, Commerce discovered that two of the sales coded in the general ledgers as Euro-denominated were, in fact, transacted in CAD. Id. The other three were, indeed, transacted in Euros. Marmen Verification Report at 26–28. As the USD to CAD currency conversion would be inappropriate for at least these five sales, Commerce found the auditor's adjustment to be unverified and unreliable. IDM at 43. Instead, relying on facts available pursuant to 19 U.S.C. § 1677e, Commerce calculated the total sales denominator using Marmen's reported information, as it had in the Preliminary Results. IDM at 43. In so doing, Commerce explained that it conducts spot checks because it is unable to review every sale, but was satisfied with the accuracy of the data without the auditor's adjustment: "we find that the vast majority of the sales-related and other tests Commerce performed throughout the verification uncovered no other errors." Id.

Marmen now makes two primary arguments: ***1285** [9] (i) Commerce acted contrary to law by failing to identify compelling evidence that the independent auditor was not in good standing prior to rejecting its report, Marmen's Br. at 14–17, and (ii) Commerce unreasonably inferred from the record that the auditor's adjustment was unreliable, id. at 17–21. The court rejects each, and concludes that Commerce acted in accordance with law and with the support of substantial evidence when it applied facts available after identifying evidence of errors in the proposed foreign currency adjustment.

9 Marmen also argues that "[c]ertain mistaken findings clouded Commerce's judgment[.]" Marmen's Br. at 22–24. The court declines the invitation to theorize about Commerce's unstated reasoning. Just as it may not consider post-hoc rationalizations, "the court must judge the propriety of [agency] action solely by the grounds invoked by the agency." Burlington Truck Lines, 371 U.S. at 169, 83 S.Ct. 239.

**[6]** Marmen's argument that Commerce must accept an independent auditor's analysis of a respondent's financial statements, in the absence of "compelling evidence" that the auditor is not in good standing, is unavailing. Id. at 15–16. In support of the compelling evidence requirement, Marmen cites one case from this court, SeAH Steel VINA Corp. v. United States, 41 CIT ——, ——, 269 F. Supp. 3d 1335, 1352 (2017), and two administrative determinations, Notice of Final Results and Final Rescission in Part of Antidumping Duty Admin. Rev.: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan; 2005–2006, 73 Fed. Reg. 1,202 (Dep't Commerce Jan. 7, 2008) ("2008 Pipe Fittings A.R.") and Notice of Final Results and Final Rescission in Part of Antidumping Duty Admin. Rev.: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan; 2004–2005, 71 Fed. Reg. 67,098 (Dep't Commerce Nov. 20, 2006) ("2006 Pipe Fittings A.R."). Id. Even if the court were bound by the logic of SeAH Steel, that decision does not impose a rule requiring compelling evidence to set aside information provided by an auditor. See WTTC's Resp. at 15–16 (arguing this interpretation). Rather, SeAH Steel provides only that Commerce "can ... accept the independent auditor's report as reliable unless 'compelling evidence' exists that the auditor is not in 'good standing.' " 269 F. Supp. 3d at 1352 (quoting 2006 Pipe Fittings A.R.) (emphasis added). Nor does Commerce's ability to accept the findings of independent auditors supersede its duty to verify the information it relies upon in making its final determination. 19 U.S.C. § 1677m(i). Moreover, the administrative determinations cited by Marmen each involve Commerce's review of an auditor's judgment as to the reasonableness of various exclusions from otherwise accurate financial statements -- not, as in this case, Commerce's determination to reject an auditor's erroneous currency adjustments. See Issues and Decision Mem. at Cmt. 1 accompanying 2008 Pipe Fittings A.R. Nor was there any evidence, in the 2006 or 2008 Pipe Fittings A.R., that contradicted the independent auditor's conclusions. Id.; see also 2006 Pipe Fittings A.R. This is in sharp contrast to the present case, where the auditor's adjustments were shown to be at least partially in error. Accordingly, Marmen has not established that Commerce acted contrary to law or past practice when it rejected the auditor's adjustment without compelling evidence that the auditor was not in good standing.

**[7]** Second, Marmen has not established that Commerce was unreasonable to conclude based on the record that the auditor's adjustment was unreliable. Marmen, in effect, argues that Commerce could not infer that there might be further errors from the five erroneously Euro-coded ***1286** sales comprising less than 0.2% of the total value of Deloitte's exchange rate adjustment.[10] Marmen's Br. at 17. Specifically, Marmen argues (i) the only errors identified were the five Euro-coded errors; (ii) Commerce checked all the other Euro-coded sales and found no errors; and (iii) Commerce's other spot-checking revealed no additional errors. Marmen's Reply at 4, 13. However, as the Government notes, "errors uncovered in a spot check undermine the reliability of data more broadly." Def.'s Br. at 33–34.[11] While the impact of the discovered errors, taken alone, on the proposed foreign currency adjustment may be small, Commerce could reasonably infer that there may remain other errors. Thus, Commerce's determination that the auditor adjustment is unreliable is not unreasonable. Accordingly, Commerce's determination was supported by substantial evidence and not contrary to law. It is sustained.

10 Marmen also argues that Commerce did not conduct a "spot check" at all because it reviewed a Marmen-prepared list of USD sales. Marmen's Reply at 4–7. Instead, Marmen contends, Commerce only conducted spot checks later when it selected invoices at random and found no discrepancies. This argument is not persuasive for two reasons. First, it would lead to

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

undue interference in how Commerce conducts verification (including altering investigated party's impetus for compliance) if the court assessed and attributed significance to who identified what during verification. Second, as discussed, the very existence of errors has significance. See also infra note 11.

11 The fact that the Euro-coded errors were identified is a sufficient basis for Commerce's determination that other USD-coded sales proposed to be converted might also be in error. Even if the Euro-coded errors have been comprehensively accounted for, the causes of those errors have not. Commerce was not unreasonable to conclude that the proposed adjustments may include transactions denominated in the general ledger in a currency different than that in which they were actually transacted or other errors not identified by the auditor. The fact that the additional spot checks did not uncover errors does not negate the inference of unreliability given the auditor's failure to identify and resolve the Euro-coded errors.

### *II. Commerce's Finding that the Québec Local Content Requirement Provided a Recurring Benefit Is Reasonable and in Accordance with Law.*

Commerce determined that the Québec Local Content Requirement was a recurring benefit such that, under 19 C.F.R. § 351.524(a), it is appropriately allocated to the year it was received. IDM at 36–37. Because Marmen did not make sales of wind towers in connection with CFT during the POI, Commerce therefore concluded that the Québec Local Content Requirement program did not confer any benefit on Marmen during the POI. Id. at 36. Accordingly, Commerce did not impose a countervailing duty. Id. at 38.

Commerce found that the Québec Local Content Requirement program provided a recurring benefit because it was a benefit in the form of the purchase of goods and services for MTAR ("MTAR benefit"). While Commerce has reserved formal regulation of MTAR benefits for a later date, it has stated that its intended approach is similar to the treatment of benefits in the form of less-than-adequate remuneration ("LTAR"). 63 Fed. Reg. 65,348, 65,379 (the "Preamble"); see 19 C.F.R. § 351.512. Here, Commerce explained that its determination relied on past treatment of MTAR benefits and LTAR regulations that indicate that the provision of goods and services for LTAR ("LTAR benefits") are normally treated as recurring benefits.[12]

12 Following the same principles as in LTAR analyses, Commerce has previously treated MTAR benefits as recurring benefits allocated to the year of receipt. PDM at 20. Commerce's analysis of LTAR benefits is guided by the regulation on "[a]llocation of benefit to a particular time period." 19 C.F.R. § 351.524. That regulation provides "non-binding illustrative lists of recurring and non-recurring benefits" and includes the provision of goods and services for LTAR as an example of a recurring benefit. 19 C.F.R. § 351.524(c). In addition, that regulation provides that LTAR benefits are allocated to the year received: either the year in which the recipient pays for the low-cost goods, or when the recipient was due to have paid the government for goods or services. 19 C.F.R. § 351.511(b)–(c). Citing both the past treatment of MTAR benefits and the LTAR analysis, Commerce found that the Québec Local Content Requirement program provided a recurring benefit, which was not conferred during the period of investigation. IDM at 36.

***1287** If a subsidy is not on the illustrative lists or if a party challenges the treatment of a specific subsidy according to its position on one of the lists, the regulations also provides a three-part "test for determining whether a benefit is recurring or non-recurring." 19 C.F.R. § 351.524(c)(2). In this case, after the publication of the Preliminary Results, WTTC challenged Commerce's recurring benefit determination and its failure to apply the three-part test. See IDM at 33; Petitioner Case Brief at 20 (May 6, 2020), P.R. 381, C.R. 312. Subsequently, in its IDM, Commerce considered each component of the three-part test and concluded that "Marmen's sales of wind towers" (emphasis added) under the Québec Local Content Requirement program did not meet these criteria such that they would be considered a non-recurring benefit. IDM at 37.

The three-part test for the existence of a recurring benefit requires Commerce to consider:

(i) Whether the subsidy is exceptional in the sense that the recipient cannot expect to receive additional subsidies under the same program on an ongoing basis from year to year;

(ii) Whether the subsidy required or received the government's express authorization or approval (i.e., receipt of benefits is not automatic), or

(iii) Whether the subsidy was provided for, or tied to, the capital structure or capital assets of the firm.

19 CFR 351.524(c)(2). With respect to the first part, Commerce explained that "[a]lthough issued as four discrete tranches, the CFTs were for purchases of wind energy, i.e., electricity, not wind towers. Marmen did not sell wind energy. Instead, it sold wind towers on a regular basis." IDM at 37. With respect to the second part, Commerce found that the sales of wind towers did not require approval from the GoQ. Id. at 38. Commerce explained that while Marmen produced some certification documents that were provided to Hydro-Québec, they were product specification documents, not sales approval documents for GoQ to expressly authorize or approve. Id. at 37. Finally, Commerce explained that, regarding the third part, the sales under the Québec Local Content Requirement program did not benefit "Marmen's capital structure or assets any more than any sale normally benefits a company." Id. [13]

13 In addition, Commerce specifically considered an earlier supply agreement between Marmen and General Electric [[ ]]. IDM at 37–38. Commerce explained that the relationship of the [[ ]] to the benefits in the form of wind tower sales for MTAR was indirect and retroactive and thus not tied to capital assets. Id. For contrast, under past practice, Commerce found a benefit to be non-recurring when a "government financial contribution [ ] directly and/or indirectly prospectively support or contributes to a company's capital assets." Id. at 37. Moreover, Commerce explained that, even if those advanced funds were under investigation as a potential subsidy -- Commerce noted that WTTC did not make the proper allegation as to the elements of a subsidy -- they were provided prior to the POR and would have fallen outside the scope of its analysis. Id. at 38.

***1288** **[8]** WTTC now argues that Commerce acted unreasonably and unlawfully when it applied the three-part test to determine the program provided a recurring benefit because it failed to take into account material record evidence and deviated from its regulations without explanation. WTTC's Br. at 11–12. First, WTTC contends that Marmen could not expect to receive subsidies on a regular basis because Marmen made wind tower sales "contingent on Marmen's ability to meet the [local content requirements] provided in each specific CFT," and therefore, "the limitation of these CFTs to four discrete tranches necessarily limited the benefit that Marmen received from the sales" stemming from the four CFTs. Id. at 14. Second, WTTC maintains that Commerce failed to adequately address evidence that the subsidies under the program were not automatic but required the government's express authorization or approval -- including evidence that Marmen's contracts with customer-wind turbine manufacturers explicitly referred to the local content requirement and included documentation for GoQ's "compliance processes [that] demonstrated ... GOQ expressly approved and monitored each and every project." [14] Id. at 16–18. Finally, WTTC asserts that Commerce mistakenly determined that the Québec Local Content Requirement program did not benefit Marmen's capital structure because it failed to consider, as required by regulation, how the program affected the "continued existence" of Marmen, WTTC's Br. at 19, 21–22, [15] and further failed to consider how the Québec Local Content Requirement program promoted the continued existence of the firm when it "spurred the creation of demand for wind energy generation and required the fulfilment of this demand from wind tower manufacturing facilities in Québec," WTTC's Br. at 21–22. The court considers each of WTTC's arguments in turn, and concludes that each fails to establish that Commerce acted unreasonably or unlawfully.

14 In addition, WTTC argues that Commerce did not make a specific determination as to which documents it identified as "product specifications" in the IDM. WTTC's Reply at 13–15. But, Commerce need not have cited to the evidence binder so long as "the path of its decision" is otherwise reasonably discernible. NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

15 WTTC argues that Commerce failed to address evidence that the [[ ]] were linked to subsequent purchases of wind towers when Commerce found that those funds did not directly benefit Marmen's capital structure. WTTC's Br. at 25. In relevant part, WTTC contends that the Québec Local Content Requirement program prompted General Electric to enter into an agreement with Marmen that [[ ]], and that this agreement was linked to wind tower sales because [[ ]]. Id. at 23–24. However, as

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

Commerce correctly notes, the funds contributed were outside the scope of Commerce's analysis as they were provided prior to the average useful life in question. IDM at 38.

Regarding WTTC's first contention, Commerce reasonably concluded that the benefits under the local content requirement were conferred on a regular basis through the regular, frequent purchase of wind towers based on the record of substantial sales under the program each year until 2017.[16] IDM at 37 ("Marmen's regular, ***1289** frequent sales of wind towers to its customers ... were not exceptional events. Although issued as four discrete tranches, the CFTs were for purchases of wind energy, i.e., electricity, not wind towers. Marmen did not sell wind energy. Instead, it sold wind towers on a regular basis."). While the analysis of the subsidy is complicated by how GoQ effectuates the serial transactions which relay the benefit from Hydro-Québec to Marmen, the IDM shows that Commerce extensively considered the nature of the transactions before concluding that the subsidies were regular and non-exceptional. Id. WTTC has not established that Commerce's consideration was unreasonable or otherwise inconsistent with the record, and the court therefore rejects WTTC's first argument.

16 WTTC argues that " 'it is not use of a benefit that determines whether it is a recurring or non-recurring subsidy,' but the conditions under which the relevant authority offers the subsidy." WTTC's Reply at 9 (citing Issues and Decision Mem. accompanying Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Countervailing Duty Determ. and Final Negative Determ. of Critical Circumstances, 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008)). Nonetheless, Commerce's determination is consistent with this contention.

With respect to WTTC's second contention, WTTC argues that Commerce's determination that GoQ was not required to provide express approval or authorization was unsupported by substantial evidence as a determination based on the singular and unsupported assertion that the Marmen's certification documents provided product specifications, not certifications for approval. WTTC's Br. at 14, 19. The extent of Commerce's stated reasoning with regard to this second point is indeed sparse: "Further, we do not find that the certification Marmen provided to [Hydro-Québec] with its Québec LCR sales constitute express authorization or approval by the GOQ. Marmen's certifications are product specification, not sales approval, documents." IDM at 37. While brief, Commerce's conclusion is nevertheless sufficiently reasoned. As no one contends that particular sales from Marmen to turbine manufacturers were themselves subject to GoQ approval, the natural expectation is that the component of these serial transactions that GoQ might have expressly approved were the certification documents. Accordingly, it follows logically that -- as Commerce determined -- GoQ did not expressly authorize or approve the subsidy as it relates to Marmen. Accordingly, the court concludes that, with respect to the second prong of the recurring benefit test, Commerce adequately considered the record evidence and its rationale was reasonably discernible. See NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Lastly, with respect to the third part of the test, WTTC's argument that Commerce must consider how the program benefitted the "continued existence of the firm" is not persuasive. The Government correctly identifies that the text WTTC cites in the Preamble, 63 Fed. Reg. at 65,393, explains why Commerce considers whether a benefit is tied to capital structure or assets, not how. Def.'s Br. at 16. More generally, WTTC has not persuaded the court that Commerce unreasonably concluded that sales under the program did not "benefit[ ] Marmen's capital structure or assets any more than any sale normally benefits a company." IDM at 37. Rather, although the CFTs may have driven demand for Marmen's wind towers, there is no evidence in the record suggesting that the resultant sales were materially distinguishable from Marmen's everyday tower sales. Commerce's determination that the Québec Local Content Requirement conferred a recurring benefit outside the POI and is thus not countervailable is sustained.

### *III. Commerce's Finding that the Québec On-the-Job Training Tax Credit Is De Facto Specific Is Reasonable and in Accordance with Law.*

The Tariff Act provides that Commerce can find de facto specificity if one or more of the following factors exist:

***1290** (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.

(II) An enterprise or industry is a predominant user of the subsidy.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii). In its final rule implementing the Uruguay Round Agreements, Commerce explained that it considers each of these factors sequentially in order of appearance, and if one factor warrants a finding of specificity, it will undertake no further analysis. 63 Fed. Reg. at 65,355.

**[9]** In this case, Commerce found the On-the-Job training tax credit to be de facto specific because the actual number of recipients was limited in number on an enterprise basis. IDM at 56 (citing 19 U.S.C. § 1677(5A)(D)(iii)(I)). To make its "limited in number" determination, Commerce compared "the actual number of companies that received the tax credit in 2018 to the total number of tax filers, inclusive of corporations and individuals in business, within Québec for 2018." Id. GoQ and GoC argue that Commerce's determination was methodologically unsound because (1) the comparison of credit recipients to total tax filers is an impermissible application of 19 U.S.C. § 1677(5A)(D)(iii)(I),[17] and (2) Commerce's comparison deviates from past practice without explanation. GoQ's Br. at 16, 20–22; GoC's Br. at 24; GoC's Reply at 15 n.19, 16; GoQ's Reply at 5–6 (proposing that Commerce should have considered only tax filers who provided a training program to trainees). In addition, both GoQ and GoC contend that Commerce's finding that the credit recipients are "limited in number" is unsupported by substantial evidence given the number and variety of companies participating in the credit program.[18] GoQ's Br. at 15–16, 19–20; GoC's Br. at 25–26.

17 The statutory evidence cited includes: (i) the statute's first factor says "actual recipients ... are limited in number," without mentioning potential recipients; (ii) the statute's four factors mirror language in the Agreement on Subsidies and Countervailing Measures; (iii) the Statement of Administrative Action's statement that "the specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy," Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA"); (iv) the SAA's embrace of Carlisle Tire & Rubber Co. v. United States, 5 C.I.T. 229, 564 F. Supp. 834 (1983), which counseled against finding specificity in generally available benefits to avoid the absurd consequence of countervailing "public highways and bridges, as well as a tax credit for expenditures on capital investment even if available to all industries and sector," 5 C.I.T. at 234, 564 F.Supp. 834; and (v) language in the SAA wherein, in discussing the four factors, "number" is qualified by words suggesting absolute rather than comparative evaluation.

18 GoC further argues that Commerce's hierarchical approach is inconsistent with the SAA. GoC's Reply at 14 ("In particular, the SAA directs [Commerce] to 'seek and consider information relevant to all of {the four} factors.' ") (citing SAA at 931) (emphasis in original). This argument is unavailing because the SAA continues by providing that (i) "where the number of enterprises or industries using a subsidy is not large, the first factor alone would justify a finding of specificity" (as Commerce found here); and (ii) that "[b]ecause the weight accorded to the individual de facto specificity factors is likely to differ from case to case, Commerce shall find de facto specificity if one or more of the factors exists." SAA at 931.

***1291** The court concludes that Commerce's finding of de facto specificity was in accordance with law. GoQ and GoC agree that the statute does not preclude Commerce from comparing the actual number of users to potential users, but nevertheless argue that Commerce's methodology is contrary to the statutory requirements. GoQ Oral Arg. Subm. at 5–15; GoC Oral Arg. Subm. at 16–17. It is not. In applying 19 U.S.C. § 1677(5A)(D)(iii), Commerce found that "the actual number of recipients that benefited from the tax credit during the POI relative to the total number of tax filers during the POI are limited in number on an enterprise basis." IDM at 56. This comparison both assesses whether "the actual recipients of the subsidy," on an enterprise basis, "are limited in number," 19 U.S.C. § 1677(5A)(D)(iii)(I), as well as whether the subsidy in question is "truly ... broadly available and widely used throughout [the] economy," IDM at

56 (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act at 929, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040) ("SAA").[19] Accordingly, Commerce's approach neither fails to comply with the statutory language nor contravenes the underlying aims set out in the SAA.

19 The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements Act] in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

Nor did Commerce err by using all corporate tax filers as the comparator group when assessing subsidy specificity. The Plaintiffs' arguments urging comparison to entities that employ trainees would improperly convert this test into a standard for predominant use -- a result which is particularly apparent when considering a limited-in-number analysis on an industry, rather than enterprise, basis. Neither the statute's text nor the SAA prohibit Commerce's approach, and it was reasonable to think that a comparison to corporate tax filers would be instructive in determining whether the subsidy is widely spread throughout the economy or limited to a small number of enterprises. GoQ's attempts to argue otherwise by relying on the court's (and Federal Circuit's) prior decisions fail. Bethlehem Steel Corp. v. United States, 25 C.I.T. 307, 140 F. Supp. 2d. 1354 (2001) cannot provide the basis for determining Commerce's past practice with respect to the de facto specificity analysis relevant here, as the determination in that case employed an industry-rather than enterprise-level comparison, and further weighed all four rather than merely one of the factors required for a finding of specificity. Likewise, neither Royal Thai Gov't v. United States, 28 C.I.T. 1218, 341 F. Supp. 2d 1315 (2004), aff'd in part, rev'd in part, and remanded 436 F.3d 1330 (Fed. Cir. 2006) nor the Federal Circuit's decision in AK Steel Corp. v. United States, 192 F.3d 1367 (Fed. Cir. 1999) involve a finding of "limited in number" specificity alone. Moreover, in each of these three cases, Commerce's non-specificity determination was sustained, so they offer weak evidence that the court here should second-guess Commerce's exercise of its expertise. On the other hand, Commerce has previously employed similar comparator groups in its past investigations. See, e.g., Issues and Decision Mem. at Cmt. 17 accompanying ***1292** Final Determ. in the Countervailing Duty Investigation of 100- to 150-Seat Large Civil Aircraft from Canada, 82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017). In sum, the court finds that Commerce did not act contrary to law when considering corporate tax filers as the comparator group in its specificity analysis.

Finally, the court concludes that Commerce acted reasonably in determining that the actual recipients were limited in number. It is instructive that Congress provided this factor for Commerce to consider without specifying how Commerce should consider the factor. While GoC and GoQ are concerned that permitting Commerce to decide the scope of limited use would risk implicating any subsidy or benefit with less than (near) universal usage, the law itself permits Commerce to determine the appropriate reach of its specificity determinations. Although the court has the authority to consider the reasonableness of Commerce's determination, in this case, where only 2% of taxpayers received the disputed benefit, it cannot be said (without more) that Commerce's identification of a limited benefit, and thus of a de facto specific subsidy, is unreasonable. Accordingly, Commerce's determination is sustained.

### *IV. Commerce's Exclusion of Increased Tax Liabilities to Calculate the Total Benefit of the GASPÉTC Program Was Not Contrary to Law.*

Commerce declined to consider the increased tax liabilities incurred through GASPÉTC in calculating the program's benefit during the period of investigation. In so doing, Commerce cited 19 C.F.R. § 351.503(e), which provides that "[i]n calculating the amount of a benefit, the Secretary will not consider the tax consequences of the benefit." IDM at 53. Commerce noted that it has consistently treated income taxes as outside the statutorily-limited circumstances in which Commerce will subtract offsets from the gross countervailable subsidy amount. Id. (citing 19 U.S.C. § 1677(6)). Commerce therefore concluded that the regulation regarding "Direct Taxes" that specifically instructs Commerce to calculate the benefit as the difference between " 'tax paid as a result of the program' and 'the tax the firm would have paid in the absence of the program' ... simply provides direction in assessing how the program results in a benefit in the year at issue (the POI), with no regard to any consequences from the prior year's benefit." Id. at 54.

GoQ and Marmen contest Commerce's determination and argue that the "Direct Taxes" regulation sets out the only way Commerce may assess the value of the benefit. Accordingly, GoQ and Marmen argue that Commerce erred by failing to consider the increased tax liability in determining the

size of the benefit conferred by GASPÉTC. They contend that the regulation directing Commerce not to consider tax consequences in calculating benefit, 19 C.F.R. § 351.503(e), is inapplicable because subsection (a) of that regulation and the Preamble each state that a specific rule on how to measure a benefit will be followed when provided. Marmen's Reply at 17–18; GoQ's Br. at 26; 63 Fed. Reg. at 65,359. Last, they argue that the exclusive list of statutory offsets is not implicated because Commerce must, in the first instance, determine the tax savings net of increased liabilities according to the "Direct Taxes" regulation's "in the absence of the program" test before those offsets would even apply. Marmen's Reply at 15–18; GoQ's Br. at 25–26; GoQ's Reply at 9–13.

**[10]** **[11]** The court concludes that Commerce acted in accordance with law when it excluded the taxation of the previous year's tax credit in computing the benefit ***1293** of GASPÉTC. It is true that Commerce may not disregard an existing policy determination manifest in the regulations without amending the regulations. Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 101, 135 S.Ct. 1199, 191 L.Ed.2d 186 (2015) (citation omitted) ("[The Administrative Procedure Act mandates] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance"). However, the court is not persuaded that the regulations require that Commerce consider increased tax liabilities in determining tax benefits. As Commerce's benefit determination was a reasonable interpretation of the statute and regulations, its determination was in accordance with law.

Contrary to the arguments made by GoQ and Marmen, "tax paid by a firm as a result of the program" does not necessarily mean that tax liabilities from a previous year's use of the program are a component "result of the program." 19 C.F.R. § 351.509(a)(1). Counselling against this interpretation of the regulation is Commerce's past practice of not considering tax consequences and the expectation of less ambiguous language if Commerce intended to implement a substantial shift in policy. While the parties have not identified a case or investigation involving exactly the circumstances at issue here (i.e., the direct inclusion of a tax benefit as taxable income), Commerce's prior investigations reflect a uniform policy of ignoring tax consequences. See, e.g., Issues and Decision Mem. at 23–24 accompanying Final Determ. in the Countervailing Duty Investigation of Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012); see also, Issues and Decision Mem. accompanying Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determ., and Final Negative Determ. of Critical Circumstances, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) (declining to offset a tax credit's effect of reducing available depreciation). To read the regulations as GoQ and Marmen urge would create an island where Commerce considers income tax effects in an ocean where it does not. Furthermore, it could radically reshape how Commerce conducts its investigations. For example, the "total impact" interpretation might also require Commerce to reduce benefit determinations of accelerated depreciation programs where a declining balance method confers less depreciation than otherwise afforded or where earlier additional depreciation results in recognizing a later, higher gain upon disposition. These considerations, taken in tandem with the language of the regulation, strongly suggest that Commerce did not amend its policy of uniformly disregarding tax consequences through the "Direct Taxes" regulation by embarking on a fundamentally different method of computing the benefit of tax programs contrary to its practice since the rulemaking. As Commerce's interpretation of the regulation is therefore reasonable, and is further consistent with past practice, its determination is sustained.

### *V. Commerce's Determination that GoQ's and GoC's Additional Depreciation for Buildings Used in Manufacturing Provided a Countervailable Financial Contribution and Benefit is Reasonable and in Accordance with Law.*

Commerce determined that the additional depreciation for qualifying buildings used in manufacturing under the GoC and GoQ tax systems constituted a countervailable financial contribution by reference to the revenue foregone relative to the general Class 1 depreciation rate. IDM at 24, 26. Similarly, Commerce determined the benefit ***1294** amount using the additional 6% depreciation over the CCA treatment those buildings would have otherwise received in the absence of the additional depreciation provision (that is, a 4% otherwise-applicable rate and a 10% total rate with additional depreciation). Id. at 24 (applying the above-discussed "in the absence of the program test" from 19 C.F.R. § 351.509(a)(1)). In its benefit analysis, Commerce noted that "in order to receive an additional deduction, a taxpayer needs to file an election by using a Schedule 8 form with its income tax return ... [o]therwise, they would not receive the additional six percent deduction and instead receive the basic four percent of the CCA." Id. at 25 (citations omitted). Commerce rejected the argument that the 10% depreciation rate was just the "normal rate of depreciation that reflects the actual shorter

useful life of the assets used for manufacturing purposes." Id. In so doing, Commerce noted that such argument relies on an implicit assumption that the relevant universe of taxpayers was those eligible for the special treatment, whereas "the proper universe of the taxpayers is not limited to the taxpayers who used the non-residential building within Class 1 assets for manufacturing but includes all taxpayers whose assets satisfy the scope of the entire Class 1 assets" because only the former can "can file for, and subsequently receive, the additional CCA." Id.

**[12]** GoQ, GoC and Marmen oppose Commerce's determination. First, they each argue that Commerce's determination that a countervailable benefit exists is contrary to law. They claim that this additional depreciation does not meet the statutory definition of "financial contribution," which, in relevant part, reads "foregoing or not collecting revenue that is otherwise due." See GoQ's Br. at 29; GoC's Br. at 18–19; Marmen's Br. at 26–27 (each citing 19 U.S.C. § 1677(5)(D)(ii)). They contend that there was no revenue otherwise due as the depreciation allowed is consistent with the policy of CCA and underlying empirical evidence of the average useful life of the different types of assets. GoQ's Br. at 30; GoC's Br. at 18–23; Marmen's Br. at 26–27. Accordingly, the Plaintiffs each argue that the 10% rate is simply the "normal" rate of depreciation, and not a financial contribution.

Second, GoQ and GoC also argue that Commerce's countervailable benefit determination was contrary to law. In particular, they argue that Commerce's reliance on the "in the absence of the program" quantification in the "Direct Taxes" regulation begs the question of what taxes the firm would have paid in the absence of a program which sets the base taxation rate for Class 1 assets. GoQ's Br. at 29–39; GoC's Reply at 9.

Finally, the Plaintiffs each argue that Commerce's determination of financial contribution and benefit is not supported by substantial evidence. First, they argue that Commerce unreasonably compared two dissimilar classes of assets. GoQ's Br. at 29–30; GoC's Br. at 17–18; Marmen's Br. at 27. Second, they argue that Commerce ignored contrary evidence that manufacturing plants have shorter useful lives. GoQ's Br. at 31; GoC's Reply at 7–9; Marmen's Br. at 27–28. Third, they argue that it was unreasonable for Commerce not to consider the normal rate of depreciation for the buildings, which here is captured by the additional depreciation as reflected in GoC's empirical study and budget. GoQ's Br. at 30; GoC's Reply at 8; Marmen's Br. at 27.

The court finds that Commerce's financial contribution and benefit determinations are in accordance with law and supported by substantial evidence. Commerce acted in accordance with law because it ***1295** reasonably interpreted both the statutory financial contribution definition and the "Direct Taxes" benefit regulation. Neither the statutory financial contribution definition nor "Direct Taxes" regulation unambiguously requires Commerce to compare the challenged program to itself, or to the treatment allegedly justified by empirical study, where a default tax rate is applicable in the absence of the challenged program. The statute's "foregoing or not collecting revenue that is otherwise due" language does not provide an exception for programs which attempt to reflect (successfully or not) the economic reality of depreciation. Likewise, the regulation's "in the absence of the program" language does not require Commerce to ignore what tax the respondent would pay if not electing better tax treatment. Instead, Commerce reasonably interpreted the statute and regulation to require comparison to the otherwise applicable tax treatment -- provided by the 4% rate applicable if taxpayers did not elect the additional depreciation -- and the court is obliged to accept Commerce's reasonable interpretation as a "permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As the Government and WTTC note, the evidence supports a comparison between the Class 1 depreciation rate and the otherwise applicable rate: first, because the Class 1 depreciation provision is additional to the existing tax scheme; second, because GoC's own budget plan recognizes a default depreciation rate (e.g., "If the taxpayer forgoes the separate class, the current treatment will apply (i.e. a CCA rate of 4 per cent)"); and third, because taxpayers are required to file an election to receive the additional depreciation. Def.'s Br. at 27, 29–30; WTTC's Resp. at 26.

**[13]** Commerce's determination was also supported by substantial evidence. First, Commerce did not unreasonably compare two dissimilar classes of assets; rather, it compared the different tax treatment under GoQ's and GoC's laws per the classifications those governments provided. Second, Commerce did not ignore contrary record evidence by failing to explicitly engage with the empirical bases supporting GoQ's and GoC's depreciation allowances for certain manufacturing buildings. Rather, Commerce addressed the argument that the challenged depreciation "reflects the actual

shorter useful life of the assets used for manufacturing purposes" and reasonably concluded that it was correct to compare the challenged tax treatment to the treatment of the whole of Class 1 assets that applies to those who cannot elect the more advantageous treatment.[20] IDM at 25. Finally, Commerce did not act unreasonably by declining to directly engage with the empirical bases governments stipulate as supporting their depreciation allowances or to treat those adequately ***1296** supported rates as the normal rate or some other default or otherwise applicable rates. Rather, Commerce reasonably concluded that where a taxpayer can opt-in to more favorable treatment, it is reasonable for Commerce to confine its analysis to the comparisons provided for by law, even if the more favorable treatment better reflects economic reality. Where a government provides an option for more favorable tax treatment, Commerce is not required to undertake the analysis provided for by statute and regulations by comparing the challenged tax treatment to itself, even if the tax scheme as a whole attempts to accurately reflect the economic realities of specific taxpayers.[21] While the court's holding here does not prohibit Commerce from assessing empirical bases of a challenged tax program as might be appropriate to discharge its obligations under the statute and regulations where, for example, a non-elective tax program is more generous than economically justifiable, the court nevertheless finds that such analysis was neither necessary nor appropriate here. Commerce's determination that the additional depreciation rate available for Class 1 assets constituted a countervailable benefit is therefore sustained.

20 The language in the IDM in response to the Plaintiffs' challenge focuses on the appropriate comparator group instead of what is the actual rate of depreciation or the empirical bases of the depreciation allowed. Nonetheless, Commerce adequately engaged with the record evidence by taking the position that Commerce must make the comparisons provided for in the statute and regulation and the Plaintiffs' challenge would have Commerce make an improper comparison. Accordingly, Commerce is best understood as concluding that even if the actual rate of depreciation coincides with depreciation allowed, that will not then require Commerce to compare the tax treatment under the challenged program to itself. The court holds that Commerce's approach was not unreasonable or inconsistent with law, even if the more favorable tax treatment elected more accurately reflects economic wear and tear.

21 GoC's argument that "[t]here is no norm for determining what is "otherwise due" except ... the country in question's own tax system," GoC's Br. at 19, is inapplicable where an election is available for more favorable tax treatment because the norm relied upon in such case is indeed provided by the country's own tax system. Similarly, GoC's argument that according to Commerce's own description "all claims for all tax deductions must be 'elected' by the taxpayer," GoC's Reply at 5, is also inapplicable as it ignores the practical difference that Commerce implicitly draws between a case in which a taxpayer can claim some tax benefit instead of none at all and one in which the taxpayer can claim a better tax benefit than a relatively worse one. The court's conclusion here is limited to the latter case.

## CONCLUSION

The court concludes that Commerce's final determination was in accordance with law and supported by substantial evidence. First, Commerce permissibly excluded the foreign auditor's adjustment as unreliable. Second, Commerce reasonably and lawfully determined that the Québec Local Content Requirement provided a recurring benefit. Third, Commerce acted reasonably within its statutory authority under 19 U.S.C. § 1677(5A)(D)(iii) in determining that the Québec On-the-Job Training tax credit was a de facto specific subsidy. Fourth, Commerce acted in accordance with law in excluding increased tax liabilities when conducting the benefit calculation for GASPÉTC. Fifth and finally, Commerce acted reasonably and lawfully when determining financial contribution and benefit from additional depreciation for buildings used in manufacturing by comparison to the rate applicable if the additional depreciation were not claimed.

For the foregoing reasons, Plaintiffs' and Defendant-Intervenor's motions for judgment on the agency record are denied; Commerce's Final Results are sustained, and judgment is entered in favor of the United States.

**SO ORDERED.**

**All Citations**

567 F.Supp.3d 1273

End of Document © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**19 U.S.C. § 3512**

(2) The obligations of the TRIPs Agreement shall enter into force for the United States on January 1, 1996.

(3) Australia, Canada, Japan, Switzerland, and the Member States of the European Community shall be extended full protection under chapter 9 of title 17, United States Code, effective on July 1, 1995. In addition, as of January 1, 1996, full protection under chapter 9 of title 17, United States Code, shall be extended to all WTO Members.

(4) The Secretary of Agriculture is designated, under section 491 of the 1979 Act, as amended (19 U.S.C. 2578), as the official responsible for informing the public of the sanitary and phytosanitary standard-setting activities of each international standard-setting organization.

(5) The USTR is authorized to exercise my authority under section 404 of the URAA (19 U.S.C. 3601) to implement the MOU with Argentina, through such regulations as the USTR, or, at the direction of the USTR, other appropriate agencies, may issue.

(6) In order to make conforming changes and technical corrections to certain HTS provisions, pursuant to actions taken in Proclamation 6763 [set out above], the HTS and Proclamation 6763 are modified as set forth in the Annex to this proclamation.

(7) All provisions of previous proclamations and Executive orders that are inconsistent with the actions taken in this proclamation are superseded to the extent of such inconsistency.

(8) This proclamation shall be effective upon publication in the Federal Register.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-third day of March, in the year of our Lord nineteen hundred and ninety-five, and of the Independence of the United States of America the two hundred and nineteenth.

WILLIAM J. CLINTON.

ANNEX

The Annex of Proclamation 6780, which amended the Harmonized Tariff Schedule of the United States, is not set out under this section because the Harmonized Tariff Schedule is not set out in the Code. See Publication of Harmonized Tariff Schedule note set out under section 1202 of this title.

EX. ORD. NO. 13042. IMPLEMENTING FOR UNITED STATES ARTICLE VIII OF AGREEMENT ESTABLISHING WORLD TRADE ORGANIZATION CONCERNING LEGAL CAPACITY AND PRIVILEGES AND IMMUNITIES

Ex. Ord. No. 13042, Apr. 9, 1997, 62 F.R. 18017, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 101(b) of the Uruguay Round Agreements Act (Public Law 103-465) [19 U.S.C. 3511(b)] and section 1 of the International Organizations Immunities Act (22 U.S.C. 288), I hereby implement for the United States the provisions of Article VIII of the Agreement Establishing the World Trade Organization.

SECTION 1. The provisions of the Convention on the Privileges and Immunities of the Specialized Agencies (U.N. General Assembly Resolution 179 (II) of November 21, 1947, 33 U.N.T.S. 261) shall apply to the World Trade Organization, its officials, and the representatives of its members, provided: (1) sections 19(b) and 15, regarding immunity from taxation, and sections 13(d) and section 20, regarding immunity from national service obligations, shall not apply to U.S. nationals and aliens admitted for permanent residence; (2) with respect to section 13(d) and section 19(c), regarding exemption from immigration restrictions and alien registration requirements, World Trade Organization officials and representatives of its members shall be entitled to the same, and no greater, privileges, exemptions, and immunities as are accorded under similar circumstances to officers and employees of foreign governments, and members of their families; (3) with respect to section 9(a) regarding exemption from taxation, such exemption shall not extend to taxes levied on real property, or that portion of real property, which is not used for the purposes of the World Trade Organization. The leasing or renting by the World Trade Organization of its property to another entity or person to generate revenue shall not be considered a use for the purposes of the World Trade Organization. Whether property or portions thereof are used for the purposes of the World Trade Organization shall be determined within the sole discretion of the Secretary of State or the Secretary's designee; (4) with respect to section 25(2)(II) regarding approval of orders to leave the United States, "Foreign Minister" shall mean the Secretary of State or the Secretary's designee.

SEC. 2. In addition and without impairment to the protections extended above, having found that the World Trade Organization is a public international organization in which the United States participates within the meaning of the International Organizations Immunities Act [22 U.S.C. 288 et seq.], I hereby designate the World Trade Organization as a public international organization entitled to enjoy the privileges, exemptions, and immunities conferred by that Act, except that section 6 of that Act [22 U.S.C. 288c], providing exemption from property tax imposed by, or under the authority of, any Act of Congress, shall not extend to taxes levied on property, or that portion of property, that is not used for the purposes of the World Trade Organization. The leasing or renting by the World Trade Organization of its property to another entity or person to generate revenue shall not be considered a use for the purposes of the World Trade Organization. Whether property or portions thereof are used for the purposes of the World Trade Organization shall be determined within the sole discretion of the Secretary of State or the Secretary's designee. This designation is not intended to abridge in any respect privileges, exemptions, or immunities that the World Trade Organization otherwise enjoys or may acquire by international agreements or by congressional action.

WILLIAM J. CLINTON.

ACCEPTANCE OF WTO AGREEMENT

Memorandum of President of the United States, Dec. 23, 1994, 60 F.R. 1003, provided:

Memorandum for the United States Trade Representative

Being advised that Canada, the European Community, Mexico, Japan, and other major trading countries have committed to acceptance of the Uruguay Round Agreements, I have determined that a sufficient number of foreign countries are accepting the obligations of those Agreements, in accordance with article XIV of the Agreement Establishing the World Trade Organization (WTO Agreement), to ensure the effective operation of, and adequate benefits for the United States under, those Agreements.

Pursuant to section 101(b) of the Uruguay Round Agreements Act (Public Law 103–465; 108 Stat. 4809) [19 U.S.C. 3511(b)] and section 301 of title 3, United States Code, I hereby direct the United States Trade Representative, or his designee, to accept the Uruguay Round Agreements, as described in section 101(d) of that Act, on behalf of the United States in accordance with article XIV of the WTO Agreement.

You are authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON.

## § 3512. Relationship of agreements to United States law and State law

### (a) Relationship of agreements to United States law

#### (1) United States law to prevail in conflict

No provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that

is inconsistent with any law of the United States shall have effect.

**(2) Construction**

Nothing in this Act shall be construed—

(A) to amend or modify any law of the United States, including any law relating to—

(i) the protection of human, animal, or plant life or health,

(ii) the protection of the environment, or

(iii) worker safety, or

(B) to limit any authority conferred under any law of the United States, including section 2411 of this title,

unless specifically provided for in this Act.

**(b) Relationship of agreements to State law**

**(1) Federal-State consultation**

**(A) In general**

On December 8, 1994, the President shall, through the intergovernmental policy advisory committees on trade established under section 2114c(2)(A) of this title, consult with the States for the purpose of achieving conformity of State laws and practices with the Uruguay Round Agreements.

**(B) Federal-State consultation process**

The Trade Representative shall establish within the Office of the United States Trade Representative a Federal-State consultation process for addressing issues relating to the Uruguay Round Agreements that directly relate to, or will potentially have a direct effect on, the States. The Federal-State consultation process shall include procedures under which—

(i) the States will be informed on a continuing basis of matters under the Uruguay Round Agreements that directly relate to, or will potentially have a direct impact on, the States;

(ii) the States will be provided an opportunity to submit, on a continuing basis, to the Trade Representative information and advice with respect to matters referred to in clause (i); and

(iii) the Trade Representative will take into account the information and advice received from the States under clause (ii) when formulating United States positions regarding matters referred to in clause (i).

The Federal Advisory Committee Act (5 U.S.C. App.) shall not apply to the Federal-State consultation process established by this paragraph.

**(C) Federal-State cooperation in WTO dispute settlement**

(i) When a WTO member requests consultations with the United States under Article 4 of the Understanding on Rules and Procedures Governing the Settlement of Disputes referred to in section 3511(d)(16) of this title (hereafter in this subsection referred to as the "Dispute Settlement Understanding") concerning whether the law of a State is inconsistent with the obligations undertaken by the United States in any of the Uruguay Round Agreements, the Trade Representative shall notify the Governor of the State or the Governor's designee, and the chief legal officer of the jurisdiction whose law is the subject of the consultations, as soon as possible after the request is received, but in no event later than 7 days thereafter.

(ii) Not later than 30 days after receiving such a request for consultations, the Trade Representative shall consult with representatives of the State concerned regarding the matter. If the consultations involve the laws of a large number of States, the Trade Representative may consult with an appropriate group of representatives of the States concerned, as determined by those States.

(iii) The Trade Representative shall make every effort to ensure that the State concerned is involved in the development of the position of the United States at each stage of the consultations and each subsequent stage of dispute settlement proceedings regarding the matter. In particular, the Trade Representative shall—

(I) notify the State concerned not later than 7 days after a WTO member requests the establishment of a dispute settlement panel or gives notice of the WTO member's decision to appeal a report by a dispute settlement panel regarding the matter; and

(II) provide the State concerned with the opportunity to advise and assist the Trade Representative in the preparation of factual information and argumentation for any written or oral presentations by the United States in consultations or in proceedings of a panel or the Appellate Body regarding the matter.

(iv) If a dispute settlement panel or the Appellate Body finds that the law of a State is inconsistent with any of the Uruguay Round Agreements, the Trade Representative shall consult with the State concerned in an effort to develop a mutually agreeable response to the report of the panel or the Appellate Body and shall make every effort to ensure that the State concerned is involved in the development of the United States position regarding the response.

**(D) Notice to States regarding consultations on foreign subcentral government laws**

(i) Subject to clause (ii), the Trade Representative shall, at least 30 days before making a request for consultations under Article 4 of the Dispute Settlement Understanding regarding a subcentral government measure of another WTO member, notify, and solicit the views of, appropriate representatives of each State regarding the matter.

(ii) In exigent circumstances clause (i) shall not apply, in which case the Trade Representative shall notify the appropriate representatives of each State not later than 3 days after making the request for consultations referred to in clause (i).

**(2) Legal challenge**

**(A) In general**

No State law, or the application of such a State law, may be declared invalid as to any

person or circumstance on the ground that the provision or application is inconsistent with any of the Uruguay Round Agreements, except in an action brought by the United States for the purpose of declaring such law or application invalid.

**(B) Procedures governing action**

In any action described in subparagraph (A) that is brought by the United States against a State or any subdivision thereof—

(i) a report of a dispute settlement panel or the Appellate Body convened under the Dispute Settlement Understanding regarding the State law, or the law of any political subdivision thereof, shall not be considered as binding or otherwise accorded deference;

(ii) the United States shall have the burden of proving that the law that is the subject of the action, or the application of that law, is inconsistent with the agreement in question;

(iii) any State whose interests may be impaired or impeded in the action shall have the unconditional right to intervene in the action as a party, and the United States shall be entitled to amend its complaint to include a claim or cross-claim concerning the law of a State that so intervenes; and

(iv) any State law that is declared invalid shall not be deemed to have been invalid in its application during any period before the court's judgment becomes final and all timely appeals, including discretionary review, of such judgment are exhausted.

**(C) Reports to congressional committees**

At least 30 days before the United States brings an action described in subparagraph (A), the Trade Representative shall provide a report to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate—

(i) describing the proposed action;

(ii) describing efforts by the Trade Representative to resolve the matter with the State concerned by other means; and

(iii) if the State law was the subject of consultations under the Dispute Settlement Understanding, certifying that the Trade Representative has substantially complied with the requirements of paragraph (1)(C) in connection with the matter.

Following the submission of the report, and before the action is brought, the Trade Representative shall consult with the committees referred to in the preceding sentence concerning the matter.

**(3) "State law" defined**

For purposes of this subsection—

(A) the term "State law" includes—

(i) any law of a political subdivision of a State; and

(ii) any State law regulating or taxing the business of insurance; and

(B) the terms "dispute settlement panel" and "Appellate Body" have the meanings given those terms in section 3531 of this title.

**(c) Effect of agreement with respect to private remedies**

**(1) Limitations**

No person other than the United States—

(A) shall have any cause of action or defense under any of the Uruguay Round Agreements or by virtue of congressional approval of such an agreement, or

(B) may challenge, in any action brought under any provision of law, any action or inaction by any department, agency, or other instrumentality of the United States, any State, or any political subdivision of a State on the ground that such action or inaction is inconsistent with such agreement.

**(2) Intent of Congress**

It is the intention of the Congress through paragraph (1) to occupy the field with respect to any cause of action or defense under or in connection with any of the Uruguay Round Agreements, including by precluding any person other than the United States from bringing any action against any State or political subdivision thereof or raising any defense to the application of State law under or in connection with any of the Uruguay Round Agreements—

(A) on the basis of a judgment obtained by the United States in an action brought under any such agreement; or

(B) on any other basis.

**(d) Statement of administrative action**

The statement of administrative action approved by the Congress under section 3511(a) of this title shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.

(Pub. L. 103–465, title I, § 102, Dec. 8, 1994, 108 Stat. 4815.)

REFERENCES IN TEXT

This Act, referred to in subsecs. (a)(2) and (d), is Pub. L. 103–465, Dec. 8, 1994, 108 Stat. 4809, known as the Uruguay Round Agreements Act. For complete classification of this Act to the Code, see Short Title note set out under section 3501 of this title and Tables.

The Federal Advisory Committee Act, referred to in subsec. (b)(1)(B), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, as amended, which is set out in the Appendix to Title 5, Government Organization and Employees.

**§ 3513. Implementing actions in anticipation of entry into force; regulations**

**(a) Implementing actions**

After December 8, 1994—

(1) the President may proclaim such actions, and

(2) other appropriate officers of the United States Government may issue such regulations,

as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date any of the

# 19 U.S.C. § 1671

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





## § 1671b. Preliminary determinations

### (a) Determination by Commission of reasonable indication of injury

#### (1) General rule

Except in the case of a petition dismissed by the administering authority under section 1671a(c)(3) of this title, the Commission, within the time specified in paragraph (2), shall determine, based on the information available to it at the time of the determination, whether there is a reasonable indication that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of the subject merchandise and that imports of the subject merchandise are not negligible. If the Commission finds that imports of the subject merchandise are negligible or otherwise makes a negative determination under this paragraph, the investigation shall be terminated.

#### (2) Time for Commission determination

The Commission shall make the determination described in paragraph (1)—

(A) in the case of a petition filed under section 1671a(b) of this title—

(i) within 45 days after the date on which the petition is filed, or

(ii) if the time has been extended pursuant to section 1671a(c)(1)(B) of this title, within 25 days after the date on which the Commission receives notice from the administering authority of initiation of the investigation, and

(B) in the case of an investigation initiated under section 1671a(a) of this title, within 45 days after the date on which the Commission receives notice from the administering authority that an investigation has been initiated under such section.

### (b) Preliminary determination by administering authority; expedited determinations; waiver of verification

(1) Within 65 days after the date on which the administering authority initiates an investigation under section 1671a(c) of this title, or an investigation is initiated under section 1671a(a) of this title, but not before an affirmative determination by the Commission under subsection (a) of this section, the administering authority shall make a determination, based upon the information available to it at the time of the determination, of whether there is a reasonable basis to believe or suspect that a countervailable subsidy is being provided with respect to the subject merchandise.

(2) Notwithstanding paragraph (1), when the petition is one subject to section 1671a(b)(3) of this title, the Administering Authority shall, taking into account the nature of the countervailable subsidy concerned, make the determination required by paragraph (1) on an expedited basis and within 65 days after the date on which the administering authority initiates an investigation under section 1671a(c) of this title unless the provisions of subsection (c) of this section apply.

(3) Within 55 days after the initiation of an investigation the administering authority shall cause an official designated for such purpose to review the information concerning the case received during the first 50 days of the investigation, and, if there appears to be sufficient information available upon which the determination can reasonably be based, to disclose to the petitioner and any interested party, then a party to the proceedings that requests such disclosure, all available nonconfidential information and all other information which is disclosed pursuant to section 1677f of this title. Within 3 days (not counting Saturdays, Sundays, or legal public holidays) after such disclosure, the petitioner and each party which is an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title to whom such disclosure was made may furnish to the administering authority an irrevocable written waiver of verification of the information received by the authority, and an agreement that it is willing to have a determination made on the basis of the record then available to the authority. If a timely waiver and agreement have been received from the petitioner and each party which is an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title to whom the disclosure was made, and the authority finds that sufficient information is then available upon which the preliminary determination can reasonably be based, a preliminary determination shall be made on an expedited basis on the basis of the record established during the first 50 days after the investigation was initiated.

(4) DE MINIMIS COUNTERVAILABLE SUBSIDY.—

(A) GENERAL RULE.—In making a determination under this subsection, the administering authority shall disregard any de minimis countervailable subsidy. For purposes of the preceding sentence, a countervailable subsidy is de minimis if the administering authority determines that the aggregate of the net countervailable subsidies is less than 1 percent ad valorem or the equivalent specific rate for the subject merchandise.

(B) EXCEPTION FOR DEVELOPING COUNTRIES.—In the case of subject merchandise imported from a Subsidies Agreement country (other than a country to which subparagraph (C) applies) designated by the Trade Representative as a developing country in accordance with section 1677(36) of this title, a countervailable subsidy is de minimis if the administering authority determines that the aggregate of the net countervailable subsidies does not exceed 2 percent ad valorem or the equivalent specific rate for the subject merchandise.

(C) CERTAIN OTHER DEVELOPING COUNTRIES.—In the case of subject merchandise imported from a Subsidies Agreement country that is—

(i) a least developed country, as determined by the Trade Representative in accordance with section 1677(36) of this title, or

(ii) a developing country with respect to which the Trade Representative has notified the administering authority that the coun-

try has eliminated its export subsidies on an expedited basis within the meaning of Article 27.11 of the Subsidies Agreement,

subparagraph (B) shall be applied by substituting "3 percent" for "2 percent".

(D) LIMITATIONS ON APPLICATION OF SUBPARAGRAPH (C).—

(i) IN GENERAL.—In the case of a country described in subparagraph (C)(i), the provisions of subparagraph (C) shall not apply after the date that is 8 years after the date the WTO Agreement enters into force.

(ii) SPECIAL RULE FOR SUBPARAGRAPH (C)(ii) COUNTRIES.—In the case of a country described in subparagraph (C)(ii), the provisions of subparagraph (C) shall not apply after the earlier of—

(I) the date that is 8 years after the date the WTO Agreement enters into force, or

(II) the date on which the Trade Representative notifies the administering authority that such country is providing an export subsidy.

(5) NOTIFICATION OF ARTICLE 8 VIOLATION.—If the only subsidy under investigation is a subsidy with respect to which the administering authority received notice from the Trade Representative of a violation of Article 8 of the Subsidies Agreement, paragraph (1) shall be applied by substituting "60 days" for "65 days".

**(c) Extension of period in extraordinarily complicated cases**

**(1) In general**

If—

(A) the petitioner makes a timely request for an extension of the period within which the determination must be made under subsection (b), or

(B) the administering authority concludes that the parties concerned are cooperating and determines that—

(i) the case is extraordinarily complicated by reason of—

(I) the number and complexity of the alleged countervailable subsidy practices;

(II) the novelty of the issues presented;

(III) the need to determine the extent to which particular countervailable subsidies are used by individual manufacturers, producers, and exporters; or

(IV) the number of firms whose activities must be investigated; and

(ii) additional time is necessary to make the preliminary determination,

then the administering authority may postpone making the preliminary determination under subsection (b) until not later than the 130th day after the date on which the administering authority initiates an investigation under section 1671a(c) of this title, or an investigation is initiated under section 1671a(a) of this title.

**(2) Notice of postponement**

The administering authority shall notify the parties to the investigation, not later than 20 days before the date on which the preliminary determination would otherwise be required under subsection (b), if it intends to postpone making the preliminary determination under paragraph (1). The notification shall include an explanation of the reasons for the postponement. Notice of the postponement shall be published in the Federal Register.

**(d) Effect of determination by the administering authority**

If the preliminary determination of the administering authority under subsection (b) is affirmative, the administering authority—

(1)(A) shall—

(i) determine an estimated individual countervailable subsidy rate for each exporter and producer individually investigated, and, in accordance with section 1671d(c)(5) of this title, an estimated all-others rate for all exporters and producers not individually investigated and for new exporters and producers within the meaning of section 1675(a)(2)(B) of this title, or

(ii) if section 1677f–1(e)(2)(B) of this title applies, determine a single estimated country-wide subsidy rate, applicable to all exporters and producers, and

(B) shall order the posting of a cash deposit, bond, or other security, as the administering authority deems appropriate, for each entry of the subject merchandise in an amount based on the estimated individual countervailable subsidy rate, the estimated all-others rate, or the estimated country-wide subsidy rate, whichever is applicable,

(2) shall order the suspension of liquidation of all entries of merchandise subject to the determination which are entered, or withdrawn from warehouse, for consumption on or after the later of—

(A) the date on which notice of the determination is published in the Federal Register, or

(B) the date that is 60 days after the date on which notice of the determination to initiate the investigation is published in the Federal Register, and

(3) shall make available to the Commission all information upon which its determination was based and which the Commission considers relevant to its injury determination, under such procedures as the administering authority and the Commission may establish to prevent disclosure, other than with the consent of the party providing it or under protective order, of any information to which confidential treatment has been given by the administering authority.

The instructions of the administering authority under paragraphs (1) and (2) may not remain in effect for more than 4 months.

**(e) Critical circumstances determinations**

**(1) In general**

If a petitioner alleges critical circumstances in its original petition, or by amendment at any time more than 20 days before the date of a final determination by the administering authority, then the administering authority shall promptly (at any time after the initiation of the investigation under this part) de-

termine, on the basis of the information available to it at that time, whether there is a reasonable basis to believe or suspect that—

(A) the alleged countervailable subsidy is inconsistent with the Subsidies Agreement, and

(B) there have been massive imports of the subject merchandise over a relatively short period.

**(2) Suspension of liquidation**

If the determination of the administering authority under paragraph (1) is affirmative, then any suspension of liquidation ordered under subsection (d)(2) shall apply, or, if notice of such suspension of liquidation is already published, be amended to apply, to unliquidated entries of merchandise entered, or withdrawn from warehouse, for consumption on or after the later of—

(A) the date which is 90 days before the date on which the suspension of liquidation was first ordered, or

(B) the date on which notice of the determination to initiate the investigation is published in the Federal Register.

**(f) Notice of determination**

Whenever the Commission or the administering authority makes a determination under this section, the Commission or the administering authority, as the case may be, shall notify the petitioner, and other parties to the investigation, and the Commission or the administering authority (whichever is appropriate) of its determination. The administering authority shall include with such notification the facts and conclusions on which its determination is based. Not later than 5 days after the date on which the determination is required to be made under subsection (a)(2), the Commission shall transmit to the administering authority the facts and conclusions on which its determination is based.

**(g) Time period where upstream subsidization is involved**

**(1) In general**

Whenever the administering authority concludes prior to a preliminary determination under subsection (b), that there is a reasonable basis to believe or suspect that an upstream subsidy is being bestowed, the time period within which a preliminary determination must be made shall be extended to 250 days after the filing of a petition under section 1671a(b) of this title or initiation of an investigation under section 1671a(a) of this title (310 days in cases declared extraordinarily complicated under subsection (c)), if the administering authority concludes that such additional time is necessary to make the required determination concerning upstream subsidization.

**(2) Exceptions**

Whenever the administering authority concludes, after a preliminary determination under subsection (b), that there is a reasonable basis to believe or suspect that an upstream subsidy is being bestowed—

(A) in cases in which the preliminary determination was negative, the time period within which a final determination must be made shall be extended to 165 or 225 days, as appropriate, under section 1671d(a)(1) of this title; or

(B) in cases in which the preliminary determination is affirmative, the determination concerning upstream subsidization—

(i) need not be made until the conclusion of the first annual review under section 1675 of this title of any eventual Countervailing Duty Order, or, at the option of the petitioner, or

(ii) will be made in the investigation and the time period within which a final determination must be made shall be extended to 165 or 225 days, as appropriate, under section 1671d(a)(1) of this title, as appropriate,[1] except that the suspension of liquidation ordered in the preliminary determination shall terminate at the end of 120 days from the date of publication of that determination and not be resumed unless and until the publication of a Countervailing Duty Order under section 1671e(a) of this title.

There may be an extension of time for the making of a final determination under this subsection only if the administering authority determines that such additional time is necessary to make the required determination concerning upstream subsidization.

(June 17, 1930, ch. 497, title VII, §703, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 152; amended Pub. L. 98–181, title I [title VI, §650(b)], Nov. 30, 1983, 97 Stat. 1266; Pub. L. 98–573, title VI, §§603, 613(c), Oct. 30, 1984, 98 Stat. 3024, 3036; Pub. L. 99–514, title XVIII, §1886(a)(3), Oct. 22, 1986, 100 Stat. 2921; Pub. L. 100–418, title I, §§1324(a)(2), 1326(d)(1), Aug. 23, 1988, 102 Stat. 1200, 1204; Pub. L. 103–465, title II, §§212(b)(1)(A), (C), (D), (F), 214(a)(1), 215(a), 233(a)(5)(C), (6)(A)(iii), (iv), (B), 263(a), 264(a), (c)(1), (2), 270(a)(1)(B)–(D), (b)(1)(B), 283(a), Dec. 8, 1994, 108 Stat. 4847, 4848, 4850, 4852, 4899, 4901, 4911, 4912, 4914, 4917, 4930; Pub. L. 104–295, §20(b)(5), Oct. 11, 1996, 110 Stat. 3527.)

AMENDMENTS

1996—Subsec. (b)(1). Pub. L. 104–295 amended Pub. L. 103–465, §212(b)(1)(C)(i)(I). See 1994 Amendment note below.

1994—Subsec. (a). Pub. L. 103–465, §212(b)(1)(A), amended heading and text of subsec. (a) generally. Prior to amendment, text read as follows: "Except in the case of a petition dismissed by the administering authority under section 1671a(c)(3) of this title, the Commission, within 45 days after the date on which a petition is filed under section 1671a(b) of this title or on which it receives notice from the administering authority of an investigation commenced under section 1671a(a) of this title, shall make a determination, based upon the best information available to it at the time of the determination, of whether there is a reasonable indication that—

"(1) an industry in the United States—

"(A) is materially injured, or

"(B) is threatened with material injury, or

"(2) the establishment of an industry in the United States is materially retarded,

by reason of imports of the merchandise which is the subject of the investigation by the administering au-

[1] So in original. The words "as appropriate," probably should not appear.

thority. If that determination is negative, the investigation shall be terminated."

Subsec. (b)(1). Pub. L. 103–465, § 270(a)(1)(B), substituted "countervailable subsidy" for "subsidy".

Pub. L. 103–465, § 233(a)(5)(B), (6)(A)(iii), substituted "initiated" for "commenced" and "subject merchandise" for "merchandise which is the subject of the investigation".

Pub. L. 103–465, § 212(b)(1)(C)(i)(II), (III), substituted "based upon the information" for "based upon the best information" and struck out at end "If the determination of the administering authority under this subsection is affirmative, the determination shall include an estimate of the net subsidy."

Pub. L. 103–465, § 212(b)(1)(C)(i)(I), as amended by Pub. L. 104–295, substituted "65 days after the date on which the administering authority initiates an investigation under section 1671a(c) of this title" for "85 days after the date on which a petition is filed under section 1671a(b) of this title".

Subsec. (b)(2). Pub. L. 103–465, § 270(a)(1)(C), substituted "countervailable subsidy" for "subsidy".

Pub. L. 103–465, § 264(c)(1), substituted "paragraph (1)" for "subsection (b)(1) of this section" in two places and made technical amendments to references to section 1671a(b)(3) of this title and subsection (c) of this section to correct references to corresponding provisions of original act.

Pub. L. 103–465, § 212(b)(1)(C)(ii), substituted "65 days after the date on which the administering authority initiates an investigation under section 1671a(c) of this title" for "85 days after the date on which the petition is filed under section 1671a(b) of this title".

Subsec. (b)(4). Pub. L. 103–465, § 263(a), added par. (4).

Subsec. (b)(5). Pub. L. 103–465, § 283(a), added par. (5).

Subsec. (c)(1). Pub. L. 103–465, §§ 212(b)(1)(D), 233(a)(6)(A)(iv), in concluding provisions, substituted "130th day after the date on which the administering authority initiates an investigation under section 1671a(c) of this title" for "150th day after the date on which a petition is filed under section 1671a(b) of this title" and "initiated" for "commenced".

Subsec. (c)(1)(B)(i). Pub. L. 103–465, § 270(a)(1)(D), (b)(1)(B), substituted "countervailable subsidy" for "subsidy" in subcl. (I) and "countervailable subsidies" for "subsidies" in subcl. (III).

Subsec. (d). Pub. L. 103–465, § 215(a)(1)(B), inserted concluding provisions.

Subsec. (d)(1). Pub. L. 103–465, § 264(a)(4), added par. (1). Former par. (1) redesignated (2).

Pub. L. 103–465, § 215(a)(1)(A), substituted "warehouse, for consumption on or after the later of—" and subpars. (A) and (B), for "warehouse, for consumption on or after the date of publication of the notice of the determination in the Federal Register,".

Subsec. (d)(2). Pub. L. 103–465, § 264(a)(1)–(3), redesignated par. (1) as (2), inserted "and" at end, and struck out former par. (2) which read as follows: "shall order the posting of a cash deposit, bond, or other security, as it deems appropriate, for each entry of the merchandise concerned equal to the estimated amount of the net subsidy, and".

Subsec. (e)(1). Pub. L. 103–465, § 214(a)(1), in introductory provisions, struck out "best" before "information" and amended subpars. (A) and (B) generally. Prior to amendment, subpars. (A) and (B) read as follows:

"(A) the alleged subsidy is inconsistent with the Agreement, and

"(B) there have been massive imports of the class or kind of merchandise which is the subject of the investigation over a relatively short period."

Subsec. (e)(2). Pub. L. 103–465, §§ 215(a)(2), 264(c)(2), substituted "subsection (d)(2)" for "subsection (d)(1)" and "warehouse, for consumption on or after the later of—" and subpars. (A) and (B) for "warehouse, for consumption on or after the date which is 90 days before the date on which suspension of liquidation was first ordered."

Subsec. (f). Pub. L. 103–465, § 212(b)(1)(F), amended heading and text of subsec. (f) generally. Prior to amendment, text read as follows: "Whenever the Commission or the administering authority makes a determination under this section, it shall notify the petitioner, other parties to the investigation, and the other agency of its determination and of the facts and conclusions of law upon which the determination is based, and it shall publish notice of its determination in the Federal Register."

Subsec. (g)(1). Pub. L. 103–465, § 233(a)(6)(B), substituted "initiation" for "commencement".

1988—Subsec. (b)(3). Pub. L. 100–418, § 1326(d)(1), substituted "(F), or (G)" for "or (F)" in two places.

Subsec. (e)(1). Pub. L. 100–418, § 1324(a)(2), inserted "(at any time after the initiation of the investigation under this part)" after "promptly" in introductory provisions.

1986—Subsecs. (g), (h). Pub. L. 99–514 redesignated subsec. (h) as (g) and substituted "or 225 days, as appropriate, under section 1671d(a)(1) of this title" for "days under section 1671d(a)(1) of this title or 225 days under section 1671d(a)(2) of this title, as appropriate" in par. (2)(A), and "or 225 days, as appropriate, under section 1671d(a)(1) of this title" for "days under section 1671d(a)(2) of this title" in par. (2)(B)(ii).

1984—Subsec. (b)(3). Pub. L. 98–573, § 603, added par. (3).

Subsec. (h). Pub. L. 98–573, § 613(c), added subsec. (h).

1983—Subsec. (b). Pub. L. 98–181 designated existing provisions as par. (1) and added par. (2).

### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

### Effective Date of 1988 Amendment

Amendment by section 1324(a)(2) of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and amendment by section 1326(d)(1) of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, see section 1337(b), (c) of Pub. L. 100–418, set out as a note under section 1671 of this title.

### Effective Date of 1984 Amendment

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

### Uruguay Round Agreements: Entry Into Force

The Uruguay Round Agreements, including the World Trade Organization Agreement and agreements annexed to that Agreement, as referred to in section 3511(d) of this title, entered into force with respect to the United States on Jan. 1, 1995. See note set out under section 3511 of this title.

### Plan Amendments Not Required Until January 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

**§ 1671c. Termination or suspension of investigation**

**(a) Termination of investigation upon withdrawal of petition**

**(1) In general**

**(A) Withdrawal of petition**

Except as provided in paragraphs (2) and (3), an investigation under this part may be terminated by either the administering authority or the Commission, after notice to all parties to the investigation, upon withdrawal of the petition by the petitioner or by the administering authority if the investigation was initiated under section 1671a(a) of this title.

**(B) Refiling of petition**

If, within 3 months after the withdrawal of a petition under subparagraph (A), a new petition is filed seeking the imposition of duties on both the subject merchandise of the withdrawn petition and the subject merchandise from another country, the administering authority and the Commission may use in the investigation initiated pursuant to the new petition any records compiled in an investigation conducted pursuant to the withdrawn petition. This subparagraph applies only with respect to the first withdrawal of a petition.

**(2) Special rules for quantitative restriction agreements**

**(A) In general**

Subject to subparagraphs (B) and (C), the administering authority may not terminate an investigation under paragraph (1) by accepting, with the government of the country in which the countervailable subsidy practice is alleged to occur, an understanding or other kind of agreement to limit the volume of imports into the United States of the subject merchandise unless the administering authority is satisfied that termination on the basis of that agreement is in the public interest.

**(B) Public interest factors**

In making a decision under subparagraph (A) regarding the public interest, the administering authority shall take into account—

(i) whether, based upon the relative impact on consumer prices and the availability of supplies of the merchandise, the agreement would have a greater adverse impact on United States consumers than the imposition of countervailing duties;

(ii) the relative impact on the international economic interests of the United States; and

(iii) the relative impact on the competitiveness of the domestic industry producing the like merchandise, including any such impact on employment and investment in that industry.

**(C) Prior consultations**

Before making a decision under subparagraph (A) regarding the public interest, the administering authority shall, to the extent practicable, consult with—

(i) potentially affected consuming industries; and

(ii) potentially affected producers and workers in the domestic industry producing the like merchandise, including producers and workers not party to the investigation.

**(3) Limitation on termination by Commission**

The Commission may not terminate an investigation under paragraph (1) before a preliminary determination is made by the administering authority under section 1671b(b) of this title.

**(b) Agreements to eliminate or offset completely a countervailable subsidy or to cease exports of subject merchandise**

The administering authority may suspend an investigation if the government of the country in which the countervailable subsidy practice is alleged to occur agrees, or exporters who account for substantially all of the imports of the subject merchandise agree—

(1) to eliminate the countervailable subsidy completely or to offset completely the amount of the net countervailable subsidy, with respect to that merchandise exported directly or indirectly to the United States, within 6 months after the date on which the investigation is suspended, or

(2) to cease exports of that merchandise to the United States within 6 months after the date on which the investigation is suspended.

**(c) Agreements eliminating injurious effect**

**(1) General rule**

If the administering authority determines that extraordinary circumstances are present in a case, it may suspend an investigation upon the acceptance of an agreement from a government described in subsection (b), or from exporters described in subsection (b), if the agreement will eliminate completely the injurious effect of exports to the United States of the subject merchandise.

**(2) Certain additional requirements**

Except in the case of an agreement by a foreign government to restrict the volume of imports of the subject merchandise into the United States, the administering authority may not accept an agreement under this subsection unless—

(A) the suppression or undercutting of price levels of domestic products by imports of that merchandise will be prevented, and

(B) at least 85 percent of the net countervailable subsidy will be offset.

**(3) Quantitative restrictions agreements**

The administering authority may accept an agreement with a foreign government under this subsection to restrict the volume of imports of subject merchandise into the United States, but it may not accept such an agreement with exporters.

**(4) Definition of extraordinary circumstances**

**(A) Extraordinary circumstances**

For purposes of this subsection, the term "extraordinary circumstances" means circumstances in which—

# 19 U.S.C. § 1677

## § 1676a. Required determinations

### (a) In general

Before the expiration date, if any, of a quantitative restriction agreement accepted under section 1671c(a)(2) or 1671c(c)(3) of this title (if suspension of the related investigation is still in effect)—

(1) the administering authority shall, at the direction of the President, initiate a proceeding to determine whether any countervailable subsidy is being provided with respect to the subject merchandise and, if being so provided, the net countervailable subsidy; and

(2) if the administering authority initiates a proceeding under paragraph (1), the Commission shall determine whether imports of the merchandise of the kind subject to the agreement will, upon termination of the agreement, materially injure, or threaten with material injury, an industry in the United States or materially retard the establishment of such an industry.

### (b) Determinations

The determinations required to be made by the administering authority and the Commission under subsection (a) shall be made under such procedures as the administering authority and the Commission, respectively, shall by regulation prescribe, and shall be treated as final determinations made under section 1671d of this title for purposes of judicial review under section 1516a of this title. If the determinations by each are affirmative, the administering authority shall—

(1) issue a countervailing duty order under section 1671e of this title effective with respect to merchandise entered on and after the date on which the agreement terminates; and

(2) order the suspension of liquidation of all entries of subject merchandise which are entered, or withdrawn from warehouse for consumption, on or after the date of publication of the order in the Federal Register.

### (c) Hearings

The determination proceedings required to be prescribed under subsection (b) shall provide that the administering authority and the Commission must, upon the request of any interested party, hold a hearing in accordance with section 1677c of this title on the issues involved.

(June 17, 1930, ch. 497, title VII, § 762, as added Pub. L. 98–573, title VI, § 611(a)(4), Oct. 30, 1984, 98 Stat. 3032; amended Pub. L. 103–465, title II, §§ 233(a)(5)(Z), (AA), 270(a)(1)(J), Dec. 8, 1994, 108 Stat. 4900, 4917.)

AMENDMENTS

1994—Subsec. (a)(1). Pub. L. 103–465, §§ 233(a)(5)(Z), 270(a)(1)(J), inserted "countervailable" before "subsidy" in two places and substituted "subject merchandise" for "merchandise subject to the agreement".

Subsec. (b)(2). Pub. L. 103–465, § 233(a)(5)(AA), substituted "subject merchandise" for "merchandise subject to the order".

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE

Section applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, or reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

PART IV—GENERAL PROVISIONS

CODIFICATION

The designation "PART IV" was in the original "Subtitle D" and was editorially changed in order to conform the numbering format of this subtitle to the usages employed in the codification of the remainder of the Tariff Act of 1930 as originally enacted.

## § 1677. Definitions; special rules

For purposes of this subtitle—

### (1) Administering authority

The term "administering authority" means the Secretary of Commerce, or any other officer of the United States to whom the responsibility for carrying out the duties of the administering authority under this subtitle are transferred by law.

### (2) Commission

The term "Commission" means the United States International Trade Commission.

### (3) Country

The term "country" means a foreign country, a political subdivision, dependent territory, or possession of a foreign country, and, except for the purpose of antidumping proceedings, may include an association of 2 or more foreign countries, political subdivisions, dependent territories, or possessions of countries into a customs union outside the United States.

### (4) Industry

#### (A) In general

The term "industry" means the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product.

#### (B) Related parties

(i) If a producer of a domestic like product and an exporter or importer of the subject merchandise are related parties, or if a producer of the domestic like product is also an importer of the subject merchandise, the producer may, in appropriate circumstances, be excluded from the industry.

(ii) For purposes of clause (i), a producer and an exporter or importer shall be considered to be related parties, if—

(I) the producer directly or indirectly controls the exporter or importer,

(II) the exporter or importer directly or indirectly controls the producer,

(III) a third party directly or indirectly controls the producer and the exporter or importer, or

(IV) the producer and the exporter or importer directly or indirectly control a third party and there is reason to believe that the relationship causes the producer to act differently than a nonrelated producer.

For purposes of this subparagraph, a party shall be considered to directly or indirectly control another party if the party is legally or operationally in a position to exercise restraint or direction over the other party.

**(C) Regional industries**

In appropriate circumstances, the United States, for a particular product market, may be divided into 2 or more markets and the producers within each market may be treated as if they were a separate industry if—

(i) the producers within such market sell all or almost all of their production of the domestic like product in question in that market, and

(ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

In such appropriate circumstances, material injury, the threat of material injury, or material retardation of the establishment of an industry may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of that product, is not injured, if there is a concentration of dumped imports or imports of merchandise benefiting from a countervailable subsidy into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured or threatened by material injury, or if the establishment of an industry is being materially retarded, by reason of the dumped imports or imports of merchandise benefiting from a countervailable subsidy. The term "regional industry" means the domestic producers within a region who are treated as a separate industry under this subparagraph.

**(D) Product lines**

The effect of dumped imports or imports of merchandise benefiting from a countervailable subsidy shall be assessed in relation to the United States production of a domestic like product if available data permit the separate identification of production in terms of such criteria as the production process or the producer's profits. If the domestic production of the domestic like product has no separate identity in terms of such criteria, then the effect of the dumped imports or imports of merchandise benefiting from a countervailable subsidy shall be assessed by the examination of the production of the narrowest group or range of products, which includes a domestic like product, for which the necessary information can be provided.

**(E) Industry producing processed agricultural products**

**(i) In general**

Subject to clause (v), in an investigation involving a processed agricultural product produced from any raw agricultural product, the producers or growers of the raw agricultural product may be considered part of the industry producing the processed product if—

(I) the processed agricultural product is produced from the raw agricultural product through a single continuous line of production; and

(II) there is a substantial coincidence of economic interest between the producers or growers of the raw agricultural product and the processors of the processed agricultural product based upon relevant economic factors, which may, in the discretion of the Commission, include price, added market value, or other economic interrelationships (regardless of whether such coincidence of economic interest is based upon any legal relationship).

**(ii) Processing**

For purposes of this subparagraph, the processed agricultural product shall be considered to be processed from a raw agricultural product through a single continuous line of production if—

(I) the raw agricultural product is substantially or completely devoted to the production of the processed agricultural product; and

(II) the processed agricultural product is produced substantially or completely from the raw product.

**(iii) Relevant economic factors**

For purposes of clause (i)(II), in addition to such other factors it considers relevant to the question of coincidence of economic interest, the Commission shall—

(I) if price is taken into account, consider the degree of correlation between the price of the raw agricultural product and the price of the processed agricultural product; and

(II) if added market value is taken into account, consider whether the value of the raw agricultural product constitutes a significant percentage of the value of the processed agricultural product.

**(iv) Raw agricultural product**

For purposes of this subparagraph, the term "raw agricultural product" means any farm or fishery product.

**(v) Termination of this subparagraph**

This subparagraph shall cease to have effect if the United States Trade Representative notifies the administering authority and the Commission that the application of this subparagraph is inconsistent with the international obligations of the United States.

**(5) Countervailable subsidy**

**(A) In general**

Except as provided in paragraph (5B), a countervailable subsidy is a subsidy described in this paragraph which is specific as described in paragraph (5A).

**(B) Subsidy described**

A subsidy is described in this paragraph in the case in which an authority—

(i) provides a financial contribution,

(ii) provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or

(iii) makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments,

to a person and a benefit is thereby conferred. For purposes of this paragraph and paragraphs (5A) and (5B), the term "authority" means a government of a country or any public entity within the territory of the country.

**(C) Other factors**

The determination of whether a subsidy exists shall be made without regard to whether the recipient of the subsidy is publicly or privately owned and without regard to whether the subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise. The administering authority is not required to consider the effect of the subsidy in determining whether a subsidy exists under this paragraph.

**(D) Financial contribution**

The term "financial contribution" means—

(i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

(ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

(iii) providing goods or services, other than general infrastructure, or

(iv) purchasing goods.

**(E) Benefit conferred**

A benefit shall normally be treated as conferred where there is a benefit to the recipient, including—

(i) in the case of an equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made,

(ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market,

(iii) in the case of a loan guarantee, if there is a difference, after adjusting for any difference in guarantee fees, between the amount the recipient of the guarantee pays on the guaranteed loan and the amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, and

(iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

**(F) Change in ownership**

A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by the administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change in ownership is accomplished through an arm's length transaction.

**(5A) Specificity**

**(A) In general**

A subsidy is specific if it is an export subsidy described in subparagraph (B) or an import substitution subsidy described in subparagraph (C), or if it is determined to be specific pursuant to subparagraph (D).

**(B) Export subsidy**

An export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions.

**(C) Import substitution subsidy**

An import substitution subsidy is a subsidy that is contingent upon the use of domestic goods over imported goods, alone or as 1 of 2 or more conditions.

**(D) Domestic subsidy**

In determining whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy, the following guidelines shall apply:

(i) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law.

(ii) Where the authority providing the subsidy, or the legislation pursuant to

which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if—

(I) eligibility is automatic,

(II) the criteria or conditions for eligibility are strictly followed, and

(III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.

For purposes of this clause, the term "objective criteria or conditions" means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.

(iii) Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist:

(I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.

(II) An enterprise or industry is a predominant user of the subsidy.

(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation.

(iv) Where a subsidy is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy, the subsidy is specific.

For purposes of this paragraph and paragraph (5B), any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries.

**(5B) Categories of noncountervailable subsidies**

**(A) In general**

Notwithstanding the provisions of paragraphs (5) and (5A), in the case of merchandise imported from a Subsidies Agreement country, a subsidy shall be treated as noncountervailable if the administering authority determines in an investigation under part I of this subtitle or a review under part III of this subtitle that the subsidy meets all of the criteria described in subparagraph (B), (C), or (D), as the case may be, or the provisions of subparagraph (E)(i) apply.

**(B) Research subsidy**

**(i) In general**

Except for a subsidy provided on the manufacture, production, or export of civil aircraft, a subsidy for research activities conducted by a person, or by a higher education or research establishment on a contract basis with a person, shall be treated as noncountervailable, if the subsidy covers not more than 75 percent of the costs of industrial research or not more than 50 percent of the costs of precompetitive development activity, and such subsidy is limited exclusively to—

(I) the costs of researchers, technicians, and other supporting staff employed exclusively in the research activity,

(II) the costs of instruments, equipment, land, or buildings that are used exclusively and permanently (except when disposed of on a commercial basis) for the research activity,

(III) the costs of consultancy and equivalent services used exclusively for the research activity, including costs for bought-in research, technical knowledge, and patents,

(IV) additional overhead costs incurred directly as a result of the research activity, and

(V) other operating costs (such as materials and supplies) incurred directly as a result of the research activity.

**(ii) Definitions**

For purposes of this subparagraph—

**(I) Industrial research**

The term "industrial research" means planned search or critical investigation aimed at the discovery of new knowledge, with the objective that such knowledge may be useful in developing new products, processes, or services, or in bringing about a significant improvement to existing products, processes, or services.

**(II) Precompetitive development activity**

The term "precompetitive development activity" means the translation of industrial research findings into a plan, blueprint, or design for new, modified, or improved products, processes, or services, whether intended for sale or use, including the creation of a first prototype that would not be capable of commercial use. The term also may include the conceptual formulation and design of products, processes, or services alternatives and initial demonstration or pilot projects, if these same projects cannot be converted or used for industrial application or commercial exploitation. The term does not include routine or periodic alterations to existing products, production lines, manufacturing processes, services, or other ongoing operations even if those alterations may represent improvements.

**(iii) Calculation rules**

**(I) In general**

In the case of a research activity that spans both industrial research and precompetitive development activity, the allowable level of the noncountervailable subsidy shall not exceed 62.5 percent of the costs set forth in subclauses (I), (II), (III), (IV), and (V) of clause (i).

**(II) Total eligible costs**

The allowable level of a noncountervailable subsidy described in clause (i) shall be based on the total eligible costs incurred over the duration of a particular project.

**(C) Subsidy to disadvantaged regions**

**(i) In general**

A subsidy provided, pursuant to a general framework of regional development, to a person located in a disadvantaged region within a country shall be treated as noncountervailable, if it is not specific (within the meaning of paragraph (5A)) within eligible regions and if the following conditions are met:

(I) Each region identified as disadvantaged within the territory of a country is a clearly designated, contiguous geographical area with a definable economic and administrative identity.

(II) Each region is considered a disadvantaged region on the basis of neutral and objective criteria indicating that the region is disadvantaged because of more than temporary circumstances, and such criteria are clearly stated in the relevant statute, regulation, or other official document so as to be capable of verification.

(III) The criteria described in subclause (II) include a measurement of economic development.

(IV) Programs provided within a general framework of regional development include ceilings on the amount of assistance that can be granted to a subsidized project. Such ceilings are differentiated according to the different levels of development of assisted regions, and are expressed in terms of investment costs or costs of job creation. Within such ceilings, the distribution of assistance is sufficiently broad and even to avoid the predominant use of a subsidy by, or the provision of disproportionately large amounts of a subsidy to, an enterprise or industry as described in paragraph (5A)(D).

**(ii) Measurement of economic development**

For purposes of clause (i), the measurement of economic development shall be based on one or more of the following factors:

(I) Per capita income, household per capita income, or per capita gross domestic product that does not exceed 85 percent of the average for the country subject to investigation or review.

(II) An unemployment rate that is at least 110 percent of the average unemployment rate for the country subject to investigation or review.

The measurement of economic development shall cover a 3-year period, but may be a composite measurement and may include factors other than those set forth in this clause.

**(iii) Definitions**

For purposes of this subparagraph—

**(I) General framework of regional development**

The term "general framework of regional development" means that the regional subsidy programs are part of an internally consistent and generally applicable regional development policy, and that regional development subsidies are not granted in isolated geographical points having no, or virtually no, influence on the development of a region.

**(II) Neutral and objective criteria**

The term "neutral and objective criteria" means criteria that do not favor certain regions beyond what is appropriate for the elimination or reduction of regional disparities within the framework of the regional development policy.

**(D) Subsidy for adaptation of existing facilities to new environmental requirements**

**(i) In general**

A subsidy that is provided to promote the adaptation of existing facilities to new environmental requirements that are imposed by statute or by regulation, and that result in greater constraints and financial burdens on the recipient of the subsidy, shall be treated as noncountervailable, if the subsidy—

(I) is a one-time nonrecurring measure,

(II) is limited to 20 percent of the cost of adaptation,

(III) does not cover the cost of replacing and operating the subsidized investment, a cost that must be fully borne by the recipient,

(IV) is directly linked and proportionate to the recipient's planned reduction of nuisances and pollution, and does not cover any manufacturing cost savings that may be achieved, and

(V) is available to all persons that can adopt the new equipment or production processes.

**(ii) Existing facilities**

For purposes of this subparagraph, the term "existing facilities" means facilities that have been in operation for at least 2 years before the date on which the new environmental requirements are imposed.

**(E) Notified subsidy program**

**(i) General rule**

If a subsidy is provided pursuant to a program that has been notified in accordance with Article 8.3 of the Subsidies

Agreement, the subsidy shall be treated as noncountervailable and shall not be subject to investigation or review under this subtitle.

**(ii) Exception**

Notwithstanding clause (i), a subsidy shall be treated as countervailable if—

(I) the Trade Representative notifies the administering authority that a determination has been made pursuant to Article 8.4 or 8.5 of the Subsidies Agreement that the subsidy, or the program pursuant to which the subsidy was provided, does not satisfy the conditions and criteria of Article 8.2 of the Subsidies Agreement; and

(II) the subsidy is specific within the meaning of paragraph (5A).

**(F) Certain subsidies on agricultural products**

Domestic support measures that are provided with respect to products listed in Annex 1 to the Agreement on Agriculture, and that the administering authority determines conform fully to the provisions of Annex 2 to that Agreement, shall be treated as noncountervailable. Upon request by the administering authority, the Trade Representative shall provide advice regarding the interpretation and application of Annex 2.

**(G) Provisional application**

(i) Subparagraphs (B), (C), (D), and (E) shall not apply on or after the first day of the month that is 66 months after the WTO Agreement enters into force, unless the provisions of such subparagraphs are extended pursuant to section 3572(c) of this title.

(ii) Subparagraph (F) shall not apply to imports from a WTO member country at the end of the 9-year period beginning on January 1, 1995. The Trade Representative shall determine the precise termination date for each WTO member country in accordance with paragraph (i) of Article 1 of the Agreement on Agriculture and such date shall be notified to the administering authority.

**(6) Net countervailable subsidy**

For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of—

(A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,

(B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and

(C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

**(7) Material injury**

**(A) In general**

The term "material injury" means harm which is not inconsequential, immaterial, or unimportant.

**(B) Volume and consequent impact**

In making determinations under sections 1671b(a), 1671d(b), 1673b(a), and 1673d(b) of this title, the Commission, in each case—

(i) shall consider—

(I) the volume of imports of the subject merchandise,

(II) the effect of imports of that merchandise on prices in the United States for domestic like products, and

(III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States; and

(ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

In the notification required under section 1671d(d) or 1673d(d) of this title, as the case may be, the Commission shall explain its analysis of each factor considered under clause (i), and identify each factor considered under clause (ii) and explain in full its relevance to the determination.

**(C) Evaluation of relevant factors**

For purposes of subparagraph (B)—

**(i) Volume**

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

**(ii) Price**

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

**(iii) Impact on affected domestic industry**

In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—

(I) actual and potential decline in output, sales, market share, gross profits, operating profits, net profits, ability to service debt, productivity, return on investments, return on assets, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

**(iv) Captive production**

If domestic producers internally transfer significant production of the domestic like product for the production of a downstream article and sell significant production of the domestic like product in the merchant market, and the Commission finds that—

(I) the domestic like product produced that is internally transferred for processing into that downstream article does not enter the merchant market for the domestic like product, and

(II) the domestic like product is the predominant material input in the production of that downstream article,

then the Commission, in determining market share and the factors affecting financial performance set forth in clause (iii), shall focus primarily on the merchant market for the domestic like product.

**(D) Special rules for agricultural products**

(i) The Commission shall not determine that there is no material injury or threat of material injury to United States producers of an agricultural commodity merely because the prevailing market price is at or above the minimum support price.

(ii) In the case of agricultural products, the Commission shall consider any increased burden on government income or price support programs.

**(E) Special rules**

For purposes of this paragraph—

**(i) Nature of countervailable subsidy**

In determining whether there is a threat of material injury, the Commission shall consider information provided to it by the administering authority regarding the nature of the countervailable subsidy granted by a foreign country (particularly whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement) and the effects likely to be caused by the countervailable subsidy.

**(ii) Standard for determination**

The presence or absence of any factor which the Commission is required to evaluate under subparagraph (C) or (D) shall not necessarily give decisive guidance with respect to the determination by the Commission of material injury.

**(F) Threat of material injury**

**(i) In general**

In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise, the Commission shall consider, among other relevant economic factors—

(I) if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement), and whether imports of the subject merchandise are likely to increase,

(II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

(VII) in any investigation under this subtitle which involves imports of both a raw agricultural product (within the meaning of paragraph (4)(E)(iv)) and any product processed from such raw agricultural product, the likelihood that there will be increased imports, by reason of product shifting, if there is an affirmative determination by the Commission under section 1671d(b)(1) or 1673d(b)(1) of this title with respect to either the raw agricultural product or the processed agricultural product (but not both),

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

**(ii) Basis for determination**

The Commission shall consider the factors set forth in clause (i) as a whole in making a determination of whether further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted under this subtitle. The presence or absence of any factor which the Commission is required to consider under clause (i) shall not necessarily give decisive guidance with respect to the determination. Such a determination may not be made on the basis of mere conjecture or supposition.

**(iii) Effect of dumping in third-country markets**

**(I) In general**

In investigations under part II of this subtitle, the Commission shall consider whether dumping in the markets of foreign countries (as evidenced by dumping findings or antidumping remedies in other WTO member markets against the same class or kind of merchandise manufactured or exported by the same party as under investigation) suggests a threat of material injury to the domestic industry. In the course of its investigation, the Commission shall request information from the foreign manufacturer, exporter, or United States importer concerning this issue.

**(II) WTO member market**

For purposes of this clause, the term "WTO member market" means the market of any country which is a WTO member.

**(III) European Communities**

For purposes of this clause, the European Communities shall be treated as a foreign country.

**(G) Cumulation for determining material injury**

**(i) In general**

For purposes of clauses (i) and (ii) of subparagraph (C), and subject to clause (ii), the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which—

(I) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,

(II) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or

(III) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,

if such imports compete with each other and with domestic like products in the United States market.

**(ii) Exceptions**

The Commission shall not cumulatively assess the volume and effect of imports under clause (i)—

(I) with respect to which the administering authority has made a preliminary negative determination, unless the administering authority subsequently made a final affirmative determination with respect to those imports before the Commission's final determination is made;

(II) from any country with respect to which the investigation has been terminated;

(III) from any country designated as a beneficiary country under the Caribbean Basin Economic Recovery Act (19 U.S.C. 2701 et seq.) for purposes of making a determination with respect to that country, except that the volume and effect of imports of the subject merchandise from such country may be cumulatively assessed with imports of the subject merchandise from any other country designated as such a beneficiary country to the extent permitted by clause (i); or

(IV) from any country that is a party to an agreement with the United States establishing a free trade area, which entered into force and effect before January 1, 1987, unless the Commission determines that a domestic industry is materially injured or threatened with material injury by reason of imports from that country.

**(iii) Records in final investigations**

In each final determination in which it cumulatively assesses the volume and effect of imports under clause (i), the Commission shall make its determinations based on the record compiled in the first investigation in which it makes a final determination, except that when the administering authority issues its final determination in a subsequently completed investigation, the Commission shall permit the parties in the subsequent investigation to submit comments concerning the significance of the administering authority's final determination, and shall include such comments and the administering authority's final determination in the record for the subsequent investigation.

**(iv) Regional industry determinations**

In an investigation which involves a regional industry, and in which the Commission decides that the volume and effect of imports should be cumulatively assessed under this subparagraph, such assessment shall be based upon the volume and effect of imports into the region or regions determined by the Commission. The provisions of clause (iii) shall apply to such investigations.

**(H) Cumulation for determining threat of material injury**

To the extent practicable and subject to subparagraph (G)(ii), for purposes of clause

(i)(III) and (IV) of subparagraph (F), the Commission may cumulatively assess the volume and price effects of imports of the subject merchandise from all countries with respect to which—

(i) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,

(ii) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or

(iii) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,

if such imports compete with each other and with domestic like products in the United States market.

**(I) Consideration of post-petition information**

The Commission shall consider whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation under part I or II of this subtitle is related to the pendency of the investigation and, if so, the Commission may reduce the weight accorded to the data for the period after the filing of the petition in making its determination of material injury, threat of material injury, or material retardation of the establishment of an industry in the United States.

**(J) Effect of profitability**

The Commission may not determine that there is no material injury or threat of material injury to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved.

**(8) Subsidies Agreement; Agreement on Agriculture**

**(A) Subsidies Agreement**

The term "Subsidies Agreement" means the Agreement on Subsidies and Countervailing Measures referred to in section 3511(d)(12) of this title.

**(B) Agreement on Agriculture**

The term "Agreement on Agriculture" means the Agreement on Agriculture referred to in section 3511(d)(2) of this title.

**(9) Interested party**

The term "interested party" means—

(A) a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise,

(B) the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported,

(C) a manufacturer, producer, or wholesaler in the United States of a domestic like product,

(D) a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product,

(E) a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States,

(F) an association, a majority of whose members is composed of interested parties described in subparagraph (C), (D), or (E) with respect to a domestic like product, and

(G) in any investigation under this subtitle involving an industry engaged in producing a processed agricultural product, as defined in paragraph (4)(E), a coalition or trade association which is representative of either—

(i) processors,

(ii) processors and producers, or

(iii) processors and growers,

but this subparagraph shall cease to have effect if the United States Trade Representative notifies the administering authority and the Commission that the application of this subparagraph is inconsistent with the international obligations of the United States.

**(10) Domestic like product**

The term "domestic like product" means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle.

**(11) Affirmative determinations by divided Commission**

If the Commissioners voting on a determination by the Commission, including a determination under section 1675 of this title, are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination. For the purpose of applying this paragraph when the issue before the Commission is to determine whether there is—

(A) material injury to an industry in the United States,

(B) threat of material injury to such an industry, or

(C) material retardation of the establishment of an industry in the United States,

by reason of imports of the merchandise, an affirmative vote on any of the issues shall be treated as a vote that the determination should be affirmative.

**(12) Attribution of merchandise to country of manufacture or production**

For purposes of part I of this subtitle, merchandise shall be treated as the product of the country in which it was manufactured or produced without regard to whether it is imported directly from that country and without regard to whether it is imported in the same condition as when exported from that country or in a changed condition by reason of remanufacture or otherwise.

**(13) Repealed. Pub. L. 103–465, title II, § 222(i)(2), Dec. 8, 1994, 108 Stat. 4876**

**(14) Sold or, in the absence of sales, offered for sale**

The term "sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers in commercial quantities, or

(B) in the ordinary course of trade to one or more selected purchasers in commercial quantities at a price which fairly reflects the market value of the merchandise,

without regard to restrictions as to the disposition or use of the merchandise by the purchaser except that, where such restrictions are found to affect the market value of the merchandise, adjustment shall be made therefor in calculating the price at which the merchandise is sold or offered for sale.

**(15) Ordinary course of trade**

The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:

(A) Sales disregarded under section 1677b(b)(1) of this title.

(B) Transactions disregarded under section 1677b(f)(2) of this title.

(C) Situations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price.

**(16) Foreign like product**

The term "foreign like product" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the subject merchandise,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

**(17) Usual commercial quantities**

The term "usual commercial quantities", in any case in which the subject merchandise is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

**(18) Nonmarket economy country**

**(A) In general**

The term "nonmarket economy country" means any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise.

**(B) Factors to be considered**

In making determinations under subparagraph (A) the administering authority shall take into account—

(i) the extent to which the currency of the foreign country is convertible into the currency of other countries;[1]

(ii) the extent to which wage rates in the foreign country are determined by free bargaining between labor and management,

(iii) the extent to which joint ventures or other investments by firms of other foreign countries are permitted in the foreign country,

(iv) the extent of government ownership or control of the means of production,

(v) the extent of government control over the allocation of resources and over the price and output decisions of enterprises, and

(vi) such other factors as the administering authority considers appropriate.

**(C) Determination in effect**

(i) Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority.

(ii) The administering authority may make a determination under subparagraph (A) with respect to any foreign country at any time.

**(D) Determinations not in issue**

Notwithstanding any other provision of law, any determination made by the administering authority under subparagraph (A) shall not be subject to judicial review in any investigation conducted under part II of this subtitle.

**(E) Collection of information**

Upon request by the administering authority, the Commissioner of U.S. Customs and Border Protection shall provide the administering authority a copy of all public and proprietary information submitted to, or obtained by, the Commissioner of U.S. Cus-

[1] So in original. The semicolon probably should be a comma.

toms and Border Protection that the administering authority considers relevant to proceedings involving merchandise from nonmarket economy countries. The administering authority shall protect proprietary information obtained under this section from public disclosure in accordance with section 1677f of this title.

**(19) Equivalency of leases to sales**

In determining whether a lease is equivalent to a sale for purposes of this subtitle, the administering authority shall consider—

(A) the terms of the lease,

(B) commercial practice within the industry,

(C) the circumstances of the transaction,

(D) whether the product subject to the lease is integrated into the operations of the lessee or importer,

(E) whether in practice there is a likelihood that the lease will be continued or renewed for a significant period of time, and

(F) other relevant factors, including whether the lease transaction would permit avoidance of antidumping or countervailing duties.

**(20) Application to governmental importations**

**(A) In general**

Except as otherwise provided by this paragraph, merchandise imported by, or for the use of, a department or agency of the United States Government (including merchandise provided for under chapter 98 of the Harmonized Tariff Schedule of the United States) is subject to the imposition of countervailing duties or antidumping duties under this subtitle or section 1303 of this title.

**(B) Exceptions**

Merchandise imported by, or for the use of, the Department of Defense shall not be subject to the imposition of countervailing or antidumping duties under this subtitle if—

(i) the merchandise is acquired by, or for use of, such Department—

(I) from a country with which such Department had a Memorandum of Understanding which was in effect on January 1, 1988, and has continued to have a comparable agreement (including renewals) or superceding agreements, and

(II) in accordance with terms of the Memorandum of Understanding in effect at the time of importation, or

(ii) the merchandise has no substantial nonmilitary use.

**(21) United States-Canada Agreement**

The term "United States-Canada Agreement" means the United States-Canada Free-Trade Agreement.

**(22) USMCA**

The term "USMCA" has the meaning given that term in section 4502 of this title.

**(23) Entry**

The term "entry" includes, in appropriate circumstances as determined by the administering authority, a reconciliation entry created under a reconciliation process, defined in section 1401(s) of this title, that is initiated by an importer. The liability of an importer under an antidumping or countervailing duty proceeding for entries of merchandise subject to the proceeding will attach to the corresponding reconciliation entry or entries. Suspension of liquidation of the reconciliation entry or entries, for the purpose of enforcing this subtitle, is equivalent to the suspension of liquidation of the corresponding individual entries; but the suspension of liquidation of the reconciliation entry or entries for such purpose does not preclude liquidation for any other purpose.

**(24) Negligible imports**

**(A) In general**

**(i) Less than 3 percent**

Except as provided in clauses (ii) and (iv), imports from a country of merchandise corresponding to a domestic like product identified by the Commission are "negligible" if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available that precedes—

(I) the filing of the petition under section 1671a(b) or 1673a(b) of this title, or

(II) the initiation of the investigation, if the investigation was initiated under section 1671a(a) or 1673a(a) of this title.

**(ii) Exception**

Imports that would otherwise be negligible under clause (i) shall not be negligible if the aggregate volume of imports of the merchandise from all countries described in clause (i) with respect to which investigations were initiated on the same day exceeds 7 percent of the volume of all such merchandise imported into the United States during the applicable 12-month period.

**(iii) Determination of aggregate volume**

In determining aggregate volume under clause (ii) or (iv), the Commission shall not consider imports from any country specified in paragraph (7)(G)(ii).

**(iv) Negligibility in threat analysis**

Notwithstanding clauses (i) and (ii), the Commission shall not treat imports as negligible if it determines that there is a potential that imports from a country described in clause (i) will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States, or that the aggregate volumes of imports from all countries described in clause (ii) will imminently exceed 7 percent of the volume of all such merchandise imported into the United States. The Commission shall consider such imports only for purposes of determining threat of material injury.

**(B) Negligibility for certain countries in countervailing duty investigations**

In the case of an investigation under section 1671 of this title, subparagraph (A) shall be applied to imports of subject merchandise from developing countries by substituting "4 percent" for "3 percent" in subparagraph (A)(i) and by substituting "9 percent" for "7 percent" in subparagraph (A)(ii).

**(C) Computation of import volumes**

In computing import volumes for purposes of subparagraphs (A) and (B), the Commission may make reasonable estimates on the basis of available statistics.

**(D) Regional industries**

In an investigation in which the Commission makes a regional industry determination under paragraph (4)(C), the Commission's examination under subparagraphs (A) and (B) shall be based upon the volume of subject merchandise exported for sale in the regional market in lieu of the volume of all subject merchandise imported into the United States.

**(25) Subject merchandise**

The term "subject merchandise" means the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921.

**(26) Section 1303**

The terms "section 1303" and "1303" mean section 1303 of this title as in effect on the day before the effective date of title II of the Uruguay Round Agreements Act.

**(27) Suspension agreement**

The term "suspension agreement" means an agreement described in section 1671c(b), 1671c(c), 1673c(b), 1673c(c), or 1673c(*l*) of this title.

**(28) Exporter or producer**

The term "exporter or producer" means the exporter of the subject merchandise, the producer of the subject merchandise, or both where appropriate. For purposes of section 1677b of this title, the term "exporter or producer" includes both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise.

**(29) WTO Agreement**

The term "WTO Agreement" means the Agreement defined in section 3501(9) of this title.

**(30) WTO member and WTO member country**

The terms "WTO member" and "WTO member country" mean a state, or separate customs territory (within the meaning of Article XII of the WTO Agreement), with respect to which the United States applies the WTO Agreement.

**(31) GATT 1994**

The term "GATT 1994" means the General Agreement on Tariffs and Trade annexed to the WTO Agreement.

**(32) Trade representative**

The term "Trade Representative" means the United States Trade Representative.

**(33) Affiliated persons**

The following persons shall be considered to be "affiliated" or "affiliated persons":

(A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.

(B) Any officer or director of an organization and such organization.

(C) Partners.

(D) Employer and employee.

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

(G) Any person who controls any other person and such other person.

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

**(34) Dumped; dumping**

The terms "dumped" and "dumping" refer to the sale or likely sale of goods at less than fair value.

**(35) Dumping margin; weighted average dumping margin**

**(A) Dumping margin**

The term "dumping margin" means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise.

**(B) Weighted average dumping margin**

The term "weighted average dumping margin" is the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer.

**(C) Magnitude of the margin of dumping**

The magnitude of the margin of dumping used by the Commission shall be—

(i) in making a preliminary determination under section 1673b(a) of this title in an investigation (including any investigation in which the Commission cumulatively assesses the volume and effect of imports under paragraph (7)(G)(i)), the dumping margin or margins published by the administering authority in its notice of initiation of the investigation;

(ii) in making a final determination under section 1673d(b) of this title, the dumping margin or margins most recently

published by the administering authority prior to the closing of the Commission's administrative record;

(iii) in a review under section 1675(b)(2) of this title, the most recent dumping margin or margins determined by the administering authority under section 1675a(c)(3) of this title, if any, or under section 1673b(b) or 1673d(a) of this title; and

(iv) in a review under section 1675(c) of this title, the dumping margin or margins determined by the administering authority under section 1675a(c)(3) of this title.

**(36) Developing and least developed country**

**(A) Developing country**

The term "developing country" means a country designated as a developing country by the Trade Representative.

**(B) Least developed country**

The term "least developed country" means a country which the Trade Representative determines is—

(i) a country referred to as a least developed country within the meaning of paragraph (a) of Annex VII to the Subsidies Agreement, or

(ii) any other country listed in Annex VII to the Subsidies Agreement, but only if the country has a per capita gross national product of less than $1,000 per annum as measured by the most recent data available from the World Bank.

**(C) Publication of list**

The Trade Representative shall publish in the Federal Register, and update as necessary, a list of—

(i) developing countries that have eliminated their export subsidies on an expedited basis within the meaning of Article 27.11 of the Subsidies Agreement, and

(ii) countries determined by the Trade Representative to be least developed or developing countries.

**(D) Factors to consider**

In determining whether a country is a developing country under subparagraph (A), the Trade Representative shall consider such economic, trade, and other factors which the Trade Representative considers appropriate, including the level of economic development of such country (the assessment of which shall include a review of the country's per capita gross national product) and the country's share of world trade.

**(E) Limitation on designation**

A determination that a country is a developing or least developed country pursuant to this paragraph shall be for purposes of this subtitle only and shall not affect the determination of a country's status as a developing or least developed country with respect to any other law.

(June 17, 1930, ch. 497, title VII, § 771, as added Pub. L. 96–39, title I, § 101, July 26, 1979, 93 Stat. 176; amended Pub. L. 98–573, title VI, § 612(a), Oct. 30, 1984, 98 Stat. 3033; Pub. L. 99–514, title XVIII, § 1886(a)(9), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 100–418, title I, §§ 1312, 1316(b), 1326(a)–(c), 1327–1330, 1335, Aug. 23, 1988, 102 Stat. 1184, 1187, 1203–1206, 1210; Pub. L. 100–449, title IV, § 403(d), Sept. 28, 1988, 102 Stat. 1887; Pub. L. 100–647, title IX, § 9001(a)(5), Nov. 10, 1988, 102 Stat. 3807; Pub. L. 101–382, title I, § 139(a)(3), title II, § 224(a), (b), Aug. 20, 1990, 104 Stat. 653, 659, 660; Pub. L. 103–182, title IV, § 412(b), title VI, § 637(b), Dec. 8, 1993, 107 Stat. 2146, 2203; Pub. L. 103–465, title II, §§ 221(b), 222, 229(b), 233(a)(3), (4), (5)(BB)–(FF), (b), 251, 266, 267, 270(c)(2), (e), Dec. 8, 1994, 108 Stat. 4869, 4890, 4898–4902, 4915, 4917, 4918; Pub. L. 104–295, § 20(b)(7), (14), Oct. 11, 1996, 110 Stat. 3527; Pub. L. 114–27, title V, §§ 503, 504(a), June 29, 2015, 129 Stat. 384, 385; Pub. L. 114–125, title VIII, § 802(d)(2), Feb. 24, 2016, 130 Stat. 210; Pub. L. 116–113, title IV, § 422(b), Jan. 29, 2020, 134 Stat. 65.)

AMENDMENT OF SECTION

*For termination of amendment by section 501(c) of Pub. L. 100–449, see Effective and Termination Dates of 1988 Amendment note below.*

REFERENCES IN TEXT

The Caribbean Basin Economic Recovery Act, referred to in par. (7)(G)(ii)(III), is title II of Pub. L. 98–67, Aug. 5, 1983, 97 Stat. 384, as amended, which is classified principally to chapter 15 (§ 2701 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2701 of this title and Tables.

The Harmonized Tariff Schedule of the United States, referred to in par. (20)(A), is not set out in the Code. See Publication of Harmonized Tariff Schedule note set out under section 1202 of this title.

Section 1303 of this title, referred to in pars. (20)(A), (25), and (26), was repealed, effective Jan. 1, 1995, by Pub. L. 103–465, title II, § 261(a), Dec. 8, 1994, 108 Stat. 4908. For savings provisions and treatment of references to section 1303 in other laws, see section 261(b), (d)(1)(C) of Pub. L. 103–465, set out as notes under section 1303 of this title.

The Antidumping Act, 1921, referred to in par. (25), is act May 27, 1921, ch. 14, title II, 42 Stat. 11, as amended, which was classified generally to sections 160 to 171 of this title, and was repealed by Pub. L. 96–39, title I, § 106(a), July 26, 1979, 93 Stat. 193.

For the effective date of title II of the Uruguay Round Agreements Act, referred to in par. (26), as Jan. 1, 1995, see Effective Date of 1994 Amendment note set out under section 1671 of this title.

AMENDMENTS

2020—Par. (22). Pub. L. 116–113 added par. (22) and struck out former par. (22) which defined "NAFTA" as the North American Free Trade Agreement.

2015—Par. (7)(C)(iii)(I). Pub. L. 114–27, § 503(b), amended subcl. (I) generally. Prior to amendment, subcl. (I) read as follows: "actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,".

Par. (7)(C)(iv)(I) to (III). Pub. L. 114–27, § 503(c), inserted "and" at end of subcl. (I), struck out "and" after comma at end of subcl. (II), and struck out subcl. (III) which read as follows: "the production of the domestic like product sold in the merchant market is not generally used in the production of that downstream article,".

Par. (7)(J). Pub. L. 114–27, § 503(a), added subpar. (J).

Par. (15)(C). Pub. L. 114–27, § 504(a), added subpar. (C).

1996—Par. (16)(C)(i). Pub. L. 104–295, § 20(b)(7), which directed substitution of "subject merchandise" for "merchandise which is the subject of the investigation" in subpar. (B)(i), was executed by making the substitution in subpar. (C)(i) to reflect the probable intent of Congress.

Par. (30). Pub. L. 104–295, § 20(b)(14), substituted "Agreement" for "agreement" after "applies the WTO".

1994—Par. (1). Pub. L. 103–465, § 233(b)(2), substituted "Secretary of Commerce" for "Secretary of the Treasury".

Par. (4)(A). Pub. L. 103–465, § 222(a)(1), amended heading and text of subpar. (A) generally. Prior to amendment, text read as follows: "The term 'industry' means the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product; except that in the case of wine and grape products subject to investigation under this subtitle, the term also means the domestic producers of the principal raw agricultural product (determined on either a volume or value basis) which is included in the like domestic product, if those producers allege material injury, or threat of material injury, as a result of imports of such wine and grape products."

Par. (4)(B). Pub. L. 103–465, § 222(a)(1), amended heading and text of subpar. (B) generally. Prior to amendment, text read as follows: "When some producers are related to the exporters or importers, or are themselves importers of the allegedly subsidized or dumped merchandise, the term 'industry' may be applied in appropriate circumstances by excluding such producers from those included in that industry."

Par. (4)(C). Pub. L. 103–465, § 270(c)(2), in concluding provisions, substituted "dumped imports or imports of merchandise benefiting from a countervailable subsidy" for "subsidized or dumped imports" in two places.

Pub. L. 103–465, §§ 222(a)(2), 233(a)(3)(A)(i), substituted "domestic like product" for "like product" in cl. (i) and concluding provisions, and inserted at end of concluding provisions "The term 'regional industry' means the domestic producers within a region who are treated as a separate industry under this subparagraph."

Par. (4)(D). Pub. L. 103–465, §§ 233(a)(3)(A)(i), 270(c)(2), substituted "domestic like product" for "like product" wherever appearing and "dumped imports or imports of merchandise benefiting from a countervailable subsidy" for "subsidized or dumped imports" in two places.

Pars. (5) to (5B). Pub. L. 103–465, § 251(a), added pars. (5) to (5B), and struck out former par. (5) which defined "subsidy".

Par. (6). Pub. L. 103–465, § 251(b), inserted "countervailable" before "subsidy" wherever appearing in heading and text.

Par. (7)(B)(i)(I). Pub. L. 103–465, § 233(a)(5)(BB), substituted "subject merchandise" for "merchandise which is the subject of the investigation".

Par. (7)(B)(i)(II), (III), (C)(ii)(I). Pub. L. 103–465, § 233(a)(3)(B), substituted "domestic like products" for "like products".

Par. (7)(C)(iii). Pub. L. 103–465, § 222(b)(3), substituted "subparagraph (B)(i)(III)" for "subparagraph (B)(iii)" in introductory provisions.

Par. (7)(C)(iii)(IV). Pub. L. 103–465, § 233(a)(3)(A)(ii), substituted "domestic like product" for "like product".

Par. (7)(C)(iii)(V). Pub. L. 103–465, § 222(b)(1), added subcl. (V).

Par. (7)(C)(iv). Pub. L. 103–465, § 222(b)(2), added cl. (iv) and struck out former cl. (iv) which directed that Commission cumulatively assess volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of domestic industry in United States market, with an exception for imports which are products of country designated as beneficiary country under Caribbean Basin Economic Recovery Act.

Par. (7)(C)(v). Pub. L. 103–465, § 222(d)(1), struck out heading and text of cl. (v). Prior to amendment, text read as follows: "The Commission is not required to apply clause (iv) or subparagraph (F)(iv) in any case in which the Commission determines that imports of the merchandise subject to investigation are negligible and have no discernable adverse impact on the domestic industry. For purposes of making such determination, the Commission shall evaluate all relevant economic factors regarding the imports, including, but not limited to, whether—

"(I) the volume and market share of the imports are negligible,

"(II) sales transactions involving the imports are isolated and sporadic, and

"(III) the domestic market for the like product is price sensitive by reason of the nature of the product, so that a small quantity of imports can result in price suppression or depression.

For purposes of this clause, the Commission may treat as negligible and having no discernable adverse impact on the domestic industry imports that are the product of any country that is a party to a free trade area agreement with the United States which entered into force and effect before January 1, 1987, if the Commission determines that the domestic industry is not being materially injured by reason of such imports."

Par. (7)(E)(i). Pub. L. 103–465, § 266, amended heading and text of cl. (i) generally. Prior to amendment, text read as follows: "In determining whether there is a threat of material injury, the Commission shall consider such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement) provided by a foreign country and the effects likely to be caused by the subsidy."

Par. (7)(F)(i), (ii). Pub. L. 103–465, § 222(c), amended cls. (i) and (ii) generally, substituting present provisions for provisions which listed factors in determining as well as basis for determining that an industry is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise.

Par. (7)(F)(iii)(I), (II). Pub. L. 103–465, § 233(b)(1)(A), in subcl. (I), substituted "WTO member" for "GATT member", and in subcl. (II), substituted "WTO member" for "GATT member" in heading and text before "market", and "WTO member." for "signatory to The Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade (relating to antidumping measures)."

Par. (7)(F)(iv). Pub. L. 103–465, § 222(e)(1), struck out heading and text of cl. (iv). Prior to amendment, text read as follows: "To the extent practicable and subject to subparagraph (C)(iv)(II) and (v), for purposes of clause (i)(III) and (IV) the Commission may cumulatively assess the volume and price effects of imports from two or more countries if such imports—

"(I) compete with each other, and with like products of the domestic industry, in the United States market, and

"(II) are subject to any investigation under section 1303, 1671, or 1673 of this title."

Par. (7)(G), (H). Pub. L. 103–465, § 222(e)(2), added subpars. (G) and (H).

Par. (7)(I). Pub. L. 103–465, § 222(f), added subpar. (I).

Par. (8). Pub. L. 103–465, § 270(e), amended heading and text of par. (8) generally. Prior to amendment, text read as follows: "The terms 'Agreement on Subsidies and Countervailing Measures' and 'Agreement' mean the Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade (relating to subsidies and countervailing measures) approved under section 2503(a) of this title."

Par. (9)(A). Pub. L. 103–465, §§ 222(g)(1), 233(a)(5)(CC), substituted "subject merchandise" for "merchandise which is the subject of an investigation under this subtitle" and inserted "producers, exporters, or" before "importers".

Par. (9)(B). Pub. L. 103–465, § 222(g)(2), inserted "or from which such merchandise is exported" after "manufactured".

Par. (9)(C) to (F). Pub. L. 103–465, § 233(a)(3)(A)(iii), substituted "domestic like product" for "like product".

Par. (10). Pub. L. 103–465, § 233(a)(3)(A)(iii), substituted "domestic like product" for "like product" in heading and text.

Par. (11). Pub. L. 103–465, § 221(b), inserted ", including a determination under section 1675 of this title," after "determination by the Commission" in introductory provisions.

Par. (13). Pub. L. 103–465, § 222(i)(2), struck out heading and text of par. (13). Text read as follows: "For the purpose of determining United States price, the term 'exporter' includes the person by whom or for whose account the merchandise is imported into the United States if—

"(A) such person is the agent or principal of the exporter, manufacturer, or producer;

"(B) such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;

"(C) the exporter, manufacturer, or producer owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in any business conducted by such person; or

"(D) any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer."

Par. (15). Pub. L. 103–465, § 222(h), substituted "subject merchandise" for "merchandise which is the subject of an investigation" and inserted at end "The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:

"(A) Sales disregarded under section 1677b(b)(1) of this title.

"(B) Transactions disregarded under section 1677b(f)(2) of this title."

Par. (16). Pub. L. 103–465, § 233(a)(4), substituted "Foreign like product" for "Such or similar merchandise" as heading and "foreign like product" for "such or similar merchandise" in introductory provisions.

Par. (16)(A). Pub. L. 103–465, § 233(a)(5)(DD), substituted "subject merchandise" for "merchandise which is the subject of an investigation".

Par. (16)(B)(i). Pub. L. 103–465, § 233(a)(5)(EE), which directed the substitution of "subject merchandise" for "merchandise which is the subject of an investigation", was executed by making the substitution for text which contained the words "the investigation" rather than "an investigation", to reflect the probable intent of Congress.

Par. (17). Pub. L. 103–465, § 233(a)(5)(FF), substituted "subject merchandise" for "merchandise which is the subject of the investigation".

Par. (24). Pub. L. 103–465, § 222(d)(2), added par. (24).

Pars. (25) to (34). Pub. L. 103–465, § 222(i)(1), added pars. (25) to (34).

Par. (35). Pub. L. 103–465, § 229(b), added par. (35).

Par. (36). Pub. L. 103–465, § 267, added par. (36).

1993—Pars. (18), (21). Pub. L. 103–182, § 412(b)(1), redesignated par. (18), relating to United States-Canada Agreement, as (21).

Par. (22). Pub. L. 103–182, § 412(b)(2), added (22).

Par. (23). Pub. L. 103–182, § 637(b), added par. (23).

1990—Par. (7)(C)(iv). Pub. L. 101–382, § 224(a), amended cl. (iv) generally. Prior to amendment, cl. (iv) read as follows: "For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market."

Par. (7)(F)(iv). Pub. L. 101–382, § 224(b), substituted "(C)(iv)(II) and (v)" for "(C)(v)".

Par. (20)(A). Pub. L. 101–382, § 139(a)(3), substituted "chapter 98 of the Harmonized Tariff Schedule" for "schedule 8 of the Tariff Schedules".

1988—Par. (4)(E). Pub. L. 100–418, § 1326(a), added subpar. (E).

Par. (5). Pub. L. 100–418, § 1312, amended par. (5) generally. Prior to amendment, par. (5) read as follows: "The term 'subsidy' has the same meaning as the term 'bounty or grant' as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

"(A) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies).

"(B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

"(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

"(ii) The provision of goods or services at preferential rates.

"(iii) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

"(iv) The assumption of any costs or expenses of manufacture, production, or distribution."

Par. (7)(B). Pub. L. 100–418, § 1328(1), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "In making its determinations under sections 1671b(a), 1671d(b), 1673b(a), and 1673d(b) of this title, the Commission shall consider, among other factors—

"(i) the volume of imports of the merchandise which is the subject of the investigation,

"(ii) the effect of imports of that merchandise on prices in the United States for like products, and

"(iii) the impact of imports of such merchandise on domestic producers of like products."

Par. (7)(C). Pub. L. 100–418, § 1328(2), in heading substituted "relevant factors" for "volume and of price effects", in cl. (ii)(I) substituted "underselling" for "undercutting", and in cl. (iii) inserted "domestic" in heading and amended text generally. Prior to amendment, text of cl. (iii) read as follows: "In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

"(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

"(II) factors affecting domestic prices, and

"(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment."

Par. (7)(C)(v). Pub. L. 100–418, § 1330(b), added cl. (v).

Par. (7)(F)(i)(IX). Pub. L. 100–418, § 1326(b), which directed that par. (7)(F) be amended by adding subcl. (IX), was executed by adding subcl. (IX) to par. (7)(F)(i) to reflect the probable intent of Congress.

Par. (7)(F)(i)(X). Pub. L. 100–418, § 1329(1)–(3), added subcl. (X).

Par. (7)(F)(iii). Pub. L. 100–418, § 1329(4), added cl. (iii).

Par. (7)(F)(iv). Pub. L. 100–418, § 1330(a), added cl. (iv).

Par. (9)(G). Pub. L. 100–418, § 1326(c), added subpar. (G).

Par. (18). Pub. L. 100–449 temporarily added par. (18) relating to United States-Canada Agreement. See Effective and Termination Dates of 1988 Amendment note below.

Pub. L. 100–418, § 1316(b), added par. (18) relating to nonmarket economy country.

Par. (19). Pub. L. 100–647 redesignated par. (19), relating to application to governmental importations, as (20).

Pub. L. 100–418, § 1335, added par. (19) relating to application to governmental importations.

Pub. L. 100–418, § 1327, added par. (19) relating to equivalency of leases to sales.

Par. (20). Pub. L. 100–647 redesignated par. (19), relating to application to governmental importations, as (20).

1986—Par. (7)(F)(i). Pub. L. 99–514 substituted "the merchandise" for "any merchandise" in introductory provisions and "final orders" for "find orders" in subcl. (VIII).

1984—Par. (4)(A). Pub. L. 98–573, § 612(a)(1), inserted provision that in the case of wine and grape products subject to investigation under this subtitle, the term also means the domestic producers of the principal raw agricultural product (determined on either a volume or value basis) which is included in the like domestic product, if those producers allege material injury, or threat of material injury, as a result of imports of such wine and grape products.

Par. (7)(C)(iv). Pub. L. 98–623, § 612(a)(2)(A), added cl. (iv).

Par. (7)(F). Pub. L. 98–573, § 612(a)(2)(B), added subpar. (F).

Par. (9)(F). Pub. L. 98–573, § 612(a)(3), added subpar. (F).

Par. (14)(A), (B). Pub. L. 98–573, § 612(a)(4), substituted "in commercial quantities" for "at wholesale".

Par. (17). Pub. L. 98–573, § 612(a)(5), substituted "commercial quantities" for "wholesale quantities".

CHANGE OF NAME

"Commissioner of U.S. Customs and Border Protection" substituted for "Commissioner of Customs" in two places in par. (18)(E) on authority of section 802(d)(2) of Pub. L. 114–125, set out as a note under section 211 of Title 6, Domestic Security.

EFFECTIVE DATE OF 2020 AMENDMENT

Amendment by Pub. L. 116–113 effective on the date on which the USMCA enters into force (July 1, 2020), but not applicable to certain determinations under section 1516a of this title or binational panel reviews under NAFTA, see section 432 of Pub. L. 116–113, set out as a note under section 1516a of this title.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1993 AMENDMENT

Amendment by section 412(b) of Pub. L. 103–182 effective on the date the North American Free Trade Agreement enters into force with respect to the United States [Jan. 1, 1994], but not applicable to any final determination described in section 1516a(a)(1)(B) or (2)(B)(i), (ii), or (iii) of this title, notice of which is published in the Federal Register before such date, or to a determination described in section 1516a(a)(2)(B)(vi) of this title, notice of which is received by the Government of Canada or Mexico before such date, or to any binational panel review under the United States-Canada Free-Trade Agreement, or to any extraordinary challenge arising out of any such review that was commenced before such date, see section 416 of Pub. L. 103–182, formerly set out as an Effective Date note under former section 3431 of this title.

EFFECTIVE DATE OF 1990 AMENDMENT

Pub. L. 101–382, title II, § 224(c), Aug. 20, 1990, 104 Stat. 660, provided that: "The amendments made by subsections (a) and (b) [amending this section] apply with respect to investigations (including investigations regarding products of Canadian origin) initiated under section 702 or 732 of the Tariff Act of 1930 [19 U.S.C. 1671a, 1673a] on or after the date of the enactment of this Act [Aug. 20, 1990]."

EFFECTIVE AND TERMINATION DATES OF 1988 AMENDMENT

Amendment by Pub. L. 100–647 applicable as if such amendment took effect on Aug. 23, 1988, see section 9001(b) of Pub. L. 100–647, set out as a note under section 58c of this title.

Amendment by Pub. L. 100–449 effective on date United States-Canada Free-Trade Agreement enters into force (Jan. 1, 1989), and to cease to have effect on date Agreement ceases to be in force, see section 501(a), (c) of Pub. L. 100–449, set out in a note under section 2112 of this title.

Amendment by sections 1312, 1316(b), 1326(a)–(c), and 1327–1329 of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, see section 1337(b) of Pub. L. 100–418, set out as an Effective Date of 1988 Amendment note under section 1671 of this title.

Amendment by section 1330 of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, see section 1337(c) of Pub. L. 100–418.

Amendment by section 1335 of Pub. L. 100–418 applicable with respect to entries, and withdrawals from warehouse for consumption, that are liquidated on or after Aug. 23, 1988, see section 1337(e) of Pub. L. 100–418.

EFFECTIVE AND TERMINATION DATES OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984; but provisions of this subtitle not to be interpreted to prevent refiling of a petition under section 1671a or 1673a of this title that was filed before Oct. 30, 1984, if the purpose of refiling was to avail petitioner of amendment of par. (4)(A) of this section by Pub. L. 98–573, and such amendment of par. (4)(A) inapplicable to petitions filed (or refiled) under section 1671a or 1673a of this title after Sept. 30, 1986, see section 626(b)(1), (c)(1), (2) of Pub. L. 98–573, as amended, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

EFFECTIVE DATE

Part effective Jan. 1, 1980, see section 107 of Pub. L. 96–39, set out as a note under section 1671 of this title.

TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the United States Customs Service of the Department of the Treasury, including functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(1), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6. For establishment of U.S. Customs and Border Protection in the Department of Homeland Security, treated as if included in Pub. L. 107–296 as of Nov. 25, 2002, see section 211 of Title 6, as amended generally by Pub. L. 114–125, and section 802(b) of Pub. L. 114–125, set out as a note under section 211 of Title 6.

All functions of the Secretary of the Treasury under this subtitle were transferred to the Secretary of Commerce pursuant to Reorg. Plan No. 3 of 1979, § 5(a)(1)(C), 44 F.R. 69275, 93 Stat. 1381, eff. Jan. 2, 1980, as provided by section 1–107(a) of Ex. Ord. No. 12188, Jan. 2, 1980, 45 F.R. 993, set out as notes under section 2171 of this title, except that the Customs Service of the Department of the Treasury was to accept such deposits, bonds, or other security as deemed appropriate by the Secretary of Commerce, assess and collect such duties as directed by the Secretary of Commerce, and furnish such of its important records or copies thereof as requested by the Secretary incident to the functions transferred.

URUGUAY ROUND AGREEMENTS: ENTRY INTO FORCE

The Uruguay Round Agreements, including the World Trade Organization Agreement and agreements an-

nexed to that Agreement, as referred to in section 3511(d) of this title, entered into force with respect to the United States on Jan. 1, 1995. See note set out under section 3511 of this title.

EFFECT OF TERMINATION OF USMCA COUNTRY STATUS

For provisions relating to effect of termination of USMCA country status on sections 401 to 432 of Pub. L. 116–113, see section 4601 of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

## § 1677–1. Upstream subsidies

### (a) "Upstream subsidy" defined

The term "upstream subsidy" means any countervailable subsidy, other than an export subsidy, that—

(1) is paid or bestowed by an authority (as defined in section 1677(5) of this title) with respect to a product (hereafter in this section referred to as an "input product") that is used in the same country as the authority in the manufacture or production of merchandise which is the subject of a countervailing duty proceeding;

(2) in the judgment of the administering authority bestows a competitive benefit on the merchandise; and

(3) has a significant effect on the cost of manufacturing or producing the merchandise.

In applying this subsection, an association of two or more foreign countries, political subdivisions, dependent territories, or possessions of foreign countries organized into a customs union outside the United States shall be treated as being one country if the countervailable subsidy is provided by the customs union.

### (b) Determination of competitive benefit

#### (1) In general

Except as provided in paragraph (2), the administering authority shall decide that a competitive benefit has been bestowed when the price for the input product referred to in subsection (a)(1) for such use is lower than the price that the manufacturer or producer of merchandise which is the subject of a countervailing duty proceeding would otherwise pay for the product in obtaining it from another seller in an arms-length transaction.

#### (2) Adjustments

If the administering authority has determined in a previous proceeding that a countervailable subsidy is paid or bestowed on the input product that is used for comparison under paragraph (1), the administering authority may (A) where appropriate, adjust the price that the manufacturer or producer of merchandise which is the subject of such proceeding would otherwise pay for the product to reflect the effects of the countervailable subsidy, or (B) select in lieu of that price a price from another source.

### (c) Inclusion of amount of countervailable subsidy

If the administering authority decides, during the course of a countervailing duty proceeding that an upstream countervailable subsidy is being or has been paid or bestowed regarding the subject merchandise, the administering authority shall include in the amount of any countervailing duty imposed on the merchandise an amount equal to the amount of the competitive benefit referred to in subparagraph (1)(B),[1] except that in no event shall the amount be greater than the amount of the countervailable subsidy determined with respect to the upstream product.

(June 17, 1930, ch. 497, title VII, § 771A, as added Pub. L. 98–573, title VI, § 613(a), Oct. 30, 1984, 98 Stat. 3035; amended Pub. L. 99–514, title XVIII, § 1886(a)(10), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 103–465, title II, §§ 233(a)(5)(GG), 268, 270(a)(1)(K), (L), (2)(B), (c)(3), Dec. 8, 1994, 108 Stat. 4901, 4916, 4917; Pub. L. 104–295, § 20(b)(2), Oct. 11, 1996, 110 Stat. 3527.)

AMENDMENTS

1996—Subsec. (c). Pub. L. 104–295 amended directory language of Pub. L. 103–465, § 270(a)(2)(B). See 1994 Amendment note below.

1994—Subsec. (a). Pub. L. 103–465, § 268, inserted introductory provisions and struck out former introductory provisions which read as follows: "The term 'upstream subsidy' means any subsidy described in section 1677(5)(B)(i), (ii), (iii), or (iv) of this title by the government of a country that—", and in concluding provisions, inserted "countervailable" before "subsidy".

Subsec. (a)(1). Pub. L. 103–465, § 268(1), added par. (1) and struck out former par. (1) which read as follows: "is paid or bestowed by that government with respect to a product (hereafter referred to as an 'input product') that is used in the manufacture or production in that country of merchandise which is the subject of a countervailing duty proceeding;".

Subsec. (b)(2). Pub. L. 103–465, § 270(a)(1)(K), inserted "countervailable" before "subsidy" in two places.

Subsec. (c). Pub. L. 103–465, § 270(a)(2)(B), as amended by Pub. L. 104–295, inserted "countervailable" before "subsidy" in heading.

Pub. L. 103–465, § 270(a)(1)(L), (c)(3), inserted "countervailable" after "upstream" and substituted "the countervailable subsidy determined" for "subsidization determined".

Pub. L. 103–465, § 233(a)(5)(GG), substituted "subject merchandise" for "merchandise under investigation".

1986—Subsec. (a). Pub. L. 99–514 substituted "(ii), (iii), or (iv)" for "(ii), or (iii)" in introductory provisions.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE

Section effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

[1] So in original. Probably should be "subsection (a)(2) of this section,".

**19 C.F.R. § 351.307**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





then the applicant shall submit, along with the Form ITA–367, documentary evidence demonstrating that during the applicable period of investigation or period of review the party imported subject merchandise. For a scope inquiry, the applicant must present documentary evidence that it imported subject merchandise, or that it has taken steps towards importing the merchandise subject to the scope inquiry.

[63 FR 24402, May 4, 1998, as amended at 73 FR 3643, Jan. 22, 2008; 76 FR 39277, July 6, 2011]

**§ 351.306 Use of business proprietary information.**

(a) *By the Secretary.* The Secretary may disclose business proprietary information submitted to the Secretary only to:

(1) An authorized applicant;

(2) An employee of the Department of Commerce or the International Trade Commission directly involved in the proceeding in which the information is submitted;

(3) An employee of the Customs Service directly involved in conducting a fraud investigation relating to an antidumping or countervailing duty proceeding;

(4) The U.S. Trade Representative as provided by 19 U.S.C. 3571(i);

(5) Any person to whom the submitting person specifically authorizes disclosure in writing; and

(6) A charged party or counsel for the charged party under 19 CFR part 354.

(b) *By an authorized applicant.* An authorized applicant may retain business proprietary information for the time authorized by the terms of the administrative protective order. An authorized applicant may use business proprietary information for purposes of the segment of a proceeding in which the information was submitted. If business proprietary information that was submitted in a segment of the proceeding is relevant to an issue in a different segment of the proceeding, an authorized applicant may place such information on the record of the subsequent segment as authorized by the APO.

(c) *Identifying parties submitting business proprietary information.* (1) If a party submits a document containing business proprietary information of another person, the submitting party must identify, contiguously with each item of business proprietary information, the person that originally submitted the item (e.g., Petitioner, Respondent A, Respondent B). Business proprietary information not identified will be treated as information of the person making the submission. If the submission contains business proprietary information of only one person, it shall so state on the first page and identify the person that originally submitted the business proprietary information on the first page.

(2) If a party to a proceeding is not represented by an authorized applicant, a party submitting a document containing the unrepresented party's business proprietary information must serve the unrepresented party with a version of the document that contains only the unrepresented party's business proprietary information. The document must not contain the business proprietary information of other parties.

(d) *Disclosure to parties not authorized to receive business proprietary information.* No person, including an authorized applicant, may disclose the business proprietary information of another person to any other person except another authorized applicant or a Department official described in paragraph (a)(2) of this section. Any person that is not an authorized applicant and that is served with business proprietary information must return it to the sender immediately, to the extent possible without reading it, and must notify the Department. An allegation of an unauthorized disclosure will subject the person that made the alleged unauthorized disclosure to an investigation and possible sanctions under 19 CFR part 354.

[63 FR 24403, May 4, 1998]

**§ 351.307 Verification of information.**

(a) *Introduction.* Prior to making a final determination in an investigation or issuing final results of review, the Secretary may verify relevant factual information. This section clarifies when verification will occur, the contents of a verification report, and the procedures for verification.

(b) *In general.* (1) Subject to paragraph (b)(4) of this section, the Secretary will verify factual information upon which the Secretary relies in:

(i) A final determination in a continuation of a previously suspended countervailing duty investigation (section 704(g) of the Act), countervailing duty investigation, continuation of a previously suspended antidumping investigation (section 705(a) of the Act), or antidumping investigation;

(ii) The final results of an expedited antidumping review;

(iii) A revocation under section 751(d) of the Act;

(iv) The final results of an administrative review, new shipper review, or changed circumstances review, if the Secretary decides that good cause for verification exists; and

(v) The final results of an administrative review if:

(A) A domestic interested party, not later than 100 days after the date of publication of the notice of initiation of review, submits a written request for verification; and

(B) The Secretary conducted no verification under this paragraph during either of the two immediately preceding administrative reviews.

(2) The Secretary may verify factual information upon which the Secretary relies in a proceeding or a segment of a proceeding not specifically provided for in paragraph (b)(1) of this section.

(3) If the Secretary decides that, because of the large number of exporters or producers included in an investigation or administrative review, it is impractical to verify relevant factual information for each person, the Secretary may select and verify a sample.

(4) The Secretary may conduct verification of a person if that person agrees to verification and the Secretary notifies the government of the affected country and that government does not object. If the person or the government objects to verification, the Secretary will not conduct verification and may disregard any or all information submitted by the person in favor of use of the facts available under section 776 of the Act and §351.308.

(c) *Verification report.* The Secretary will report the methods, procedures, and results of a verification under this section prior to making a final determination in an investigation or issuing final results in a review.

(d) *Procedures for verification.* The Secretary will notify the government of the affected country that employees of the Department will visit with the persons listed below in order to verify the accuracy and completeness of submitted factual information. The notification will, where practicable, identify any member of the verification team who is not an officer of the U.S. Government. As part of the verification, employees of the Department will request access to all files, records, and personnel which the Secretary considers relevant to factual information submitted of:

(1) Producers, exporters, or importers;

(2) Persons affiliated with the persons listed in paragraph (d)(1) of this section, where applicable;

(3) Unaffiliated purchasers, or

(4) The government of the affected country as part of verification in a countervailing duty proceeding.

### §351.308 Determinations on the basis of the facts available.

(a) *Introduction.* The Secretary may make determinations on the basis of the facts available whenever necessary information is not available on the record, an interested party or any other person withholds or fails to provide information requested in a timely manner and in the form required or significantly impedes a proceeding, or the Secretary is unable to verify submitted information. If the Secretary finds that an interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," the Secretary may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. This section lists some of the sources of information upon which the Secretary may base an adverse inference and explains the actions the Secretary will take with respect to corroboration of information.

(b) *In general.* The Secretary may make a determination under the Act

# 19 C.F.R. § 351.501

(d) *Application of the average-to-average method*—(1) *In general.* In applying the average-to-average method, the Secretary will identify those sales of the subject merchandise to the United States that are comparable, and will include such sales in an "averaging group." The Secretary will calculate a weighted average of the export prices and the constructed export prices of the sales included in the averaging group, and will compare this weighted average to the weighted average of the normal values of such sales.

(2) *Identification of the averaging group.* An averaging group will consist of subject merchandise that is identical or virtually identical in all physical characteristics and that is sold to the United States at the same level of trade. In identifying sales to be included in an averaging group, the Secretary also will take into account, where appropriate, the region of the United States in which the merchandise is sold, and such other factors as the Secretary considers relevant.

(3) *Time period over which weighted average is calculated.* When applying the average-to-average method in an investigation, the Secretary normally will calculate weighted averages for the entire period of investigation. However, when normal values, export prices, or constructed export prices differ significantly over the course of the period of investigation, the Secretary may calculate weighted averages for such shorter period as the Secretary deems appropriate. When applying the average-to-average method in a review, the Secretary normally will calculate weighted averages on a monthly basis and compare the weighted-average monthly export price or constructed export price to the weighted-average normal value for the contemporaneous month.

(e) *Application of the average-to-transaction method*—In applying the average-to-transaction method in a review, when normal value is based on the weighted average of sales of the foreign like product, the Secretary will limit the averaging of such prices to sales incurred during the contemporaneous month.

(f) *Contemporaneous Month.* Normally, the Secretary will select as the contemporaneous month the first of the following months which applies:

(1) The month during which the particular U.S. sales under consideration were made;

(2) If there are no sales of the foreign like product during this month, the most recent of the three months prior to the month of the U.S. sales in which there was a sale of the foreign like product.

(3) If there are no sales of the foreign like product during any of these months, the earlier of the two months following the month of the U.S. sales in which there was a sale of the foreign like product.

[77 FR 8114, Feb. 14, 2012]

### §351.415 Conversion of currency.

(a) *In general.* In an antidumping proceeding, the Secretary will convert foreign currencies into United States dollars using the rate of exchange on the date of sale of the subject merchandise.

(b) *Exception.* If the Secretary establishes that a currency transaction on forward markets is directly linked to an export sale under consideration, the Secretary will use the exchange rate specified with respect to such foreign currency in the forward sale agreement to convert the foreign currency.

(c) *Exchange rate fluctuations.* The Secretary will ignore fluctuations in exchange rates.

(d) *Sustained movement in foreign currency value.* In an antidumping investigation, if there is a sustained movement increasing the value of the foreign currency relative to the United States dollar, the Secretary will allow exporters 60 days to adjust their prices to reflect such sustained movement.

## Subpart E—Identification and Measurement of Countervailable Subsidies

SOURCE: 63 FR 65407, Nov. 25, 1998, unless otherwise noted.

### §351.501 Scope.

The provisions of this subpart E set forth rules regarding the identification and measurement of countervailable subsidies. Where this subpart E does not expressly deal with a particular

type of alleged subsidy, the Secretary will identify and measure the subsidy, if any, in accordance with the underlying principles of the Act and this subpart E.

**§ 351.502 Specificity of domestic subsidies.**

(a) *Sequential analysis.* In determining whether a subsidy is *de facto* specific, the Secretary will examine the factors contained in section 771(5A)(D)(iii) of the Act sequentially in order of their appearance. If a single factor warrants a finding of specificity, the Secretary will not undertake further analysis.

(b) *Characteristics of a "group."* In determining whether a subsidy is being provided to a "group" of enterprises or industries within the meaning of section 751(5A)(D) of the Act, the Secretary is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy.

(c) *Traded goods sector.* In determining whether a subsidy is being provided to a "group" of enterprises or industries within the meaning of section 771(5A)(D) of the Act, the Secretary normally will consider enterprises that buy or sell goods internationally to comprise such a group.

(d) *Integral linkage.* Unless the Secretary determines that two or more programs are integrally linked, the Secretary will determine the specificity of a program under section 771(5A)(D) of the Act solely on the basis of the availability and use of the particular program in question. The Secretary may find two or more programs to be integrally linked if:

(1) The subsidy programs have the same purpose;

(2) The subsidy programs bestow the same type of benefit;

(3) The subsidy programs confer similar levels of benefits on similarly situated firms; and

(4) The subsidy programs were linked at inception.

(e) *Agricultural subsidies.* The Secretary will not regard a subsidy as being specific under section 771(5A)(D) of the Act solely because the subsidy is limited to the agricultural sector (domestic subsidy).

(f) *Subsidies to small-and medium-sized businesses.* The Secretary will not regard a subsidy as being specific under section 771(5A)(D) of the Act solely because the subsidy is limited to small firms or small-and medium-sized firms.

(g) *Disaster relief.* The Secretary will not regard disaster relief as being specific under section 771(5A)(D) of the Act if such relief constitutes general assistance available to anyone in the area affected by the disaster.

[63 FR 65407, Nov. 25, 1998, as amended at 85 FR 6043, Feb. 4, 2020]

**§ 351.503 Benefit.**

(a) *Specific rules.* In the case of a government program for which a specific rule for the measurement of a benefit is contained in this subpart E, the Secretary will measure the extent to which a financial contribution (or income or price support) confers a benefit as provided in that rule. For example, § 351.504(a) prescribes the specific rule for measurement of the benefit of grants.

(b) *Other subsidies*—(1) *In general.* For other government programs, the Secretary normally will consider a benefit to be conferred where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn.

(2) *Exception.* Paragraph (b)(1) of this section is not intended to limit the ability of the Secretary to impose countervailing duties when the facts of a particular case establish that a financial contribution (or income or price support) has conferred a benefit, even if that benefit does not take the form of a reduction in input costs or an enhancement of revenues. When paragraph (b)(1) of this section is not applicable, the Secretary will determine whether a benefit is conferred by examining whether the alleged program or practice has common or similar elements to the four illustrative examples in sections 771(5)(E)(i) through (iv) of the Act.

(c) *Distinction from effect of subsidy.* In determining whether a benefit is conferred, the Secretary is not required to consider the effect of the government

# 19 C.F.R. § 351.503

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





type of alleged subsidy, the Secretary will identify and measure the subsidy, if any, in accordance with the underlying principles of the Act and this subpart E.

**§ 351.502 Specificity of domestic subsidies.**

(a) *Sequential analysis.* In determining whether a subsidy is *de facto* specific, the Secretary will examine the factors contained in section 771(5A)(D)(iii) of the Act sequentially in order of their appearance. If a single factor warrants a finding of specificity, the Secretary will not undertake further analysis.

(b) *Characteristics of a "group."* In determining whether a subsidy is being provided to a "group" of enterprises or industries within the meaning of section 751(5A)(D) of the Act, the Secretary is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy.

(c) *Traded goods sector.* In determining whether a subsidy is being provided to a "group" of enterprises or industries within the meaning of section 771(5A)(D) of the Act, the Secretary normally will consider enterprises that buy or sell goods internationally to comprise such a group.

(d) *Integral linkage.* Unless the Secretary determines that two or more programs are integrally linked, the Secretary will determine the specificity of a program under section 771(5A)(D) of the Act solely on the basis of the availability and use of the particular program in question. The Secretary may find two or more programs to be integrally linked if:

(1) The subsidy programs have the same purpose;

(2) The subsidy programs bestow the same type of benefit;

(3) The subsidy programs confer similar levels of benefits on similarly situated firms; and

(4) The subsidy programs were linked at inception.

(e) *Agricultural subsidies.* The Secretary will not regard a subsidy as being specific under section 771(5A)(D) of the Act solely because the subsidy is limited to the agricultural sector (domestic subsidy).

(f) *Subsidies to small-and medium-sized businesses.* The Secretary will not regard a subsidy as being specific under section 771(5A)(D) of the Act solely because the subsidy is limited to small firms or small-and medium-sized firms.

(g) *Disaster relief.* The Secretary will not regard disaster relief as being specific under section 771(5A)(D) of the Act if such relief constitutes general assistance available to anyone in the area affected by the disaster.

[63 FR 65407, Nov. 25, 1998, as amended at 85 FR 6043, Feb. 4, 2020]

**§ 351.503 Benefit.**

(a) *Specific rules.* In the case of a government program for which a specific rule for the measurement of a benefit is contained in this subpart E, the Secretary will measure the extent to which a financial contribution (or income or price support) confers a benefit as provided in that rule. For example, § 351.504(a) prescribes the specific rule for measurement of the benefit of grants.

(b) *Other subsidies*—(1) *In general.* For other government programs, the Secretary normally will consider a benefit to be conferred where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn.

(2) *Exception.* Paragraph (b)(1) of this section is not intended to limit the ability of the Secretary to impose countervailing duties when the facts of a particular case establish that a financial contribution (or income or price support) has conferred a benefit, even if that benefit does not take the form of a reduction in input costs or an enhancement of revenues. When paragraph (b)(1) of this section is not applicable, the Secretary will determine whether a benefit is conferred by examining whether the alleged program or practice has common or similar elements to the four illustrative examples in sections 771(5)(E)(i) through (iv) of the Act.

(c) *Distinction from effect of subsidy.* In determining whether a benefit is conferred, the Secretary is not required to consider the effect of the government

action on the firm's performance, including its prices or output, or how the firm's behavior otherwise is altered.

(d) *Varying financial contribution levels*—(1) *In general*. Where a government program provides varying levels of financial contributions based on different eligibility criteria, and one or more of such levels is not specific within the meaning of §351.502, a benefit is conferred to the extent that a firm receives a greater financial contribution than the financial contributions provided at a non-specific level under the program. The preceding sentence shall apply only to the extent the Secretary determines that the varying levels of financial contributions are set forth in a statute, decree, regulation, or other official act; that the levels are clearly delineated and identifiable; and that the firm would have been eligible for the non-specific level of contributions.

(2) *Exception*. Paragraph (d)(1) of this section shall not apply where the statute specifies a commercial test for determining the benefit.

(e) *Tax consequences*. In calculating the amount of a benefit, the Secretary will not consider the tax consequences of the benefit.

### §351.504 Grants.

(a) *Benefit*. In the case of a grant, a benefit exists in the amount of the grant.

(b) *Time of receipt of benefit*. In the case of a grant, the Secretary normally will consider a benefit as having been received on the date on which the firm received the grant.

(c) *Allocation of a grant to a particular time period*. The Secretary will allocate the benefit from a grant to a particular time period in accordance with §351.524.

### §351.505 Loans.

(a) *Benefit*—(1) *In general*. In the case of a loan, a benefit exists to the extent that the amount a firm pays on the government-provided loan is less than the amount the firm would pay on a comparable commercial loan(s) that the firm could actually obtain on the market. *See* section 771(5)(E)(ii) of the Act. In making the comparison called for in the preceding sentence, the Secretary normally will rely on effective interest rates.

(2) *"Comparable commercial loan" defined*—(i) *"Comparable" defined*. In selecting a loan that is "comparable" to the government-provided loan, the Secretary normally will place primary emphasis on similarities in the structure of the loans (*e.g.*, fixed interest rate v. variable interest rate), the maturity of the loans (*e.g.*, short-term v. long-term), and the currency in which the loans are denominated.

(ii) *"Commercial" defined*. In selecting a "commercial" loan, the Secretary normally will use a loan taken out by the firm from a commercial lending institution or a debt instrument issued by the firm in a commercial market. Also, the Secretary will treat a loan from a government-owned bank as a commercial loan, unless there is evidence that the loan from a government-owned bank is provided on non-commercial terms or at the direction of the government. However, the Secretary will not consider a loan provided under a government program, or a loan provided by a government-owned special purpose bank, to be a commercial loan for purposes of selecting a loan to compare with a government-provided loan.

(iii) *Long-term loans*. In selecting a comparable loan, if the government-provided loan is a long-term loan, the Secretary normally will use a loan the terms of which were established during, or immediately before, the year in which the terms of the government-provided loan were established.

(iv) *Short-term loans*. In making the comparison required under paragraph (a)(1) of this section, if the government-provided loan is a short-term loan, the Secretary normally will use an annual average of the interest rates on comparable commercial loans during the year in which the government-provided loan was taken out, weighted by the principal amount of each loan. However, if the Secretary finds that interest rates fluctuated significantly during the period of investigation or review, the Secretary will use the most appropriate interest rate based on the circumstances presented.

(3) *"Could actually obtain on the market" defined*—(i) *In general*. In selecting

**19 C.F.R. § 351.509**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





(iii) *Significance of prior subsidies*. In determining whether a firm was equityworthy, the Secretary will ignore current and prior subsidies received by the firm.

(5) *Benefit where firm is equityworthy*. If the Secretary determines that the firm or project was equityworthy (*see* paragraph (a)(4) of this section), the Secretary will examine the terms and the nature of the equity purchased to determine whether the investment was otherwise inconsistent with the usual investment practice of private investors. If the Secretary determines that the investment was inconsistent with usual private investment practice, the Secretary will determine the amount of the benefit conferred on a case-by-case basis.

(6) *Benefit where firm is unequityworthy*. If the Secretary determines that the firm or project was unequityworthy (*see* paragraph (a)(4) of this section), a benefit to the firm exists in the amount of the equity infusion.

(7) *Allegations*. The Secretary will not investigate an equity infusion in a firm absent a specific allegation by the petitioner which is supported by information establishing a reasonable basis to believe or suspect that the firm received an equity infusion that provides a countervailable benefit within the meaning of paragraph (a)(1) of this section.

(b) *Time of receipt of benefit*. In the case of a government-provided equity infusion, the Secretary normally will consider the benefit to have been received on the date on which the firm received the equity infusion.

(c) *Allocation of benefit to a particular time period*. The benefit conferred by an equity infusion shall be allocated over the same time period as a non-recurring subsidy. *See* § 351.524(d).

### § 351.508 Debt forgiveness.

(a) *Benefit*. In the case of an assumption or forgiveness of a firm's debt obligation, a benefit exists equal to the amount of the principal and/or interest (including accrued, unpaid interest) that the government has assumed or forgiven. In situations where the entity assuming or forgiving the debt receives shares in a firm in return for eliminating or reducing the firm's debt obligation, the Secretary will determine the existence of a benefit under § 351.507 (equity infusions).

(b) *Time of receipt of benefit*. In the case of a debt or interest assumption or forgiveness, the Secretary normally will consider the benefit as having been received as of the date on which the debt or interest was assumed or forgiven.

(c) *Allocation of benefit to a particular time period*—(1) *In general*. The Secretary will treat the benefit determined under paragraph (a) of this section as a non-recurring subsidy, and will allocate the benefit to a particular year in accordance with § 351.524(d).

(2) *Exception*. Where an interest assumption is tied to a particular loan and where a firm can reasonably expect to receive the interest assumption at the time it applies for the loan, the Secretary will normally treat the interest assumption as a reduced-interest loan and allocate the benefit to a particular year in accordance with § 351.505(c) (loans).

### § 351.509 Direct taxes.

(a) *Benefit*—(1) *Exemption or remission of taxes*. In the case of a program that provides for a full or partial exemption or remission of a direct tax (*e.g.*, an income tax), or a reduction in the base used to calculate a direct tax, a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program.

(2) *Deferral of taxes*. In the case of a program that provides for a deferral of direct taxes, a benefit exists to the extent that appropriate interest charges are not collected. Normally, a deferral of direct taxes will be treated as a government-provided loan in the amount of the tax deferred, according to the methodology described in § 351.505. The Secretary will use a short-term interest rate as the benchmark for tax deferrals of one year or less. The Secretary will use a long-term interest rate as the benchmark for tax deferrals of more than one year.

(b) *Time of receipt of benefit*—(1) *Exemption or remission of taxes*. In the case

of a full or partial exemption or remission of a direct tax, the Secretary normally will consider the benefit as having been received on the date on which the recipient firm would otherwise have had to pay the taxes associated with the exemption or remission. Normally, this date will be the date on which the firm filed its tax return.

(2) *Deferral of taxes.* In the case of a tax deferral of one year or less, the Secretary normally will consider the benefit as having been received on the date on which the deferred tax becomes due. In the case of a multi-year deferral, the Secretary normally will consider the benefit as having been received on the anniversary date(s) of the deferral.

(c) *Allocation of benefit to a particular time period.* The Secretary normally will allocate (expense) the benefit of a full or partial exemption, remission, or deferral of a direct tax to the year in which the benefit is considered to have been received under paragraph (b) of this section.

**§351.510 Indirect taxes and import charges (other than export programs).**

(a) *Benefit*—(1) *Exemption or remission of taxes.* In the case of a program, other than an export program, that provides for the full or partial exemption or remission of an indirect tax or an import charge, a benefit exists to the extent that the taxes or import charges paid by a firm as a result of the program are less than the taxes the firm would have paid in the absence of the program.

(2) *Deferral of taxes.* In the case of a program, other than an export program, that provides for a deferral of indirect taxes or import charges, a benefit exists to the extent that appropriate interest charges are not collected. Normally, a deferral of indirect taxes or import charges will be treated as a government-provided loan in the amount of the taxes deferred, according to the methodology described in §351.505. The Secretary will use a short-term interest rate as the benchmark for tax deferrals of one year or less. The Secretary will use a long-term interest rate as the benchmark for tax deferrals of more than one year.

(b) *Time of receipt of benefit*—(1) *Exemption or remission of taxes.* In the case of a full or partial exemption or remission of an indirect tax or import charge, the Secretary normally will consider the benefit as having been received at the time the recipient firm otherwise would be required to pay the indirect tax or import charge.

(2) *Deferral of taxes.* In the case of the deferral of an indirect tax or import charge of one year or less, the Secretary normally will consider the benefit as having been received on the date on which the deferred tax becomes due. In the case of a multi-year deferral, the Secretary normally will consider the benefit as having been received on the anniversary date(s) of the deferral.

(c) *Allocation of benefit to a particular time period.* The Secretary normally will allocate (expense) the benefit of a full or partial exemption, remission, or deferral described in paragraph (a) of this section to the year in which the benefit is considered to have been received under paragraph (b) of this section.

**§351.511 Provision of goods or services.**

(a) *Benefit*—(1) *In general.* In the case where goods or services are provided, a benefit exists to the extent that such goods or services are provided for less than adequate remuneration. *See* section 771(5)(E)(iv) of the Act.

(2) *"Adequate Remuneration" defined*—(i) *In general.* The Secretary will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. Such a price could include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions. In choosing such transactions or sales, the Secretary will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability.

(ii) *Actual market-determined price unavailable.* If there is no useable market-determined price with which to make the comparison under paragraph

**19 C.F.R. § 351.525**

the industry under investigation, subject to the requirement, in paragraph (d)(2)(ii) of this section, that the difference between the company-specific AUL or country-wide AUL for the industry under investigation and the AUL in the IRS tables is significant. If this is the case, the Secretary will use company-specific or country-wide AULs to allocate non-recurring benefits over time (*see* paragraph (d)(2)(iii) of this section).

(ii) *Definition of "significant."* For purposes of this paragraph (d), *significant* means that a party has demonstrated that the company-specific AUL or country-wide AUL for the industry differs from AUL in the IRS tables by one year or more.

(iii) *Calculation of a company-specific or country-wide AUL.* A calculation of a company-specific AUL will not be accepted by the Secretary unless it satisfies the following requirements: the company must base its depreciation on an estimate of the actual useful lives of assets and it must use straight-line depreciation or demonstrate that its calculation is not distorted through irregular or uneven additions to the pool of fixed assets. A company-specific AUL is calculated by dividing the aggregate of the annual average gross book values of the firm's depreciable productive fixed assets by the firm's aggregated annual charge to accumulated depreciation, for a period considered appropriate by the Secretary, subject to appropriate normalizing adjustments. A country-wide AUL for the industry under investigation will not be accepted by the Secretary unless the respondent government demonstrates that it has a system in place to calculate AULs for its industries, and that this system provides a reliable representation of AUL.

(iv) *Exception.* Under certain extraordinary circumstances, the Secretary may consider whether an allocation period other than AUL is appropriate or whether the benefit stream begins at a date other than the date the subsidy was bestowed.

(3) *Selection of a discount rate.* (i) *In general.* The Secretary will select a discount rate based upon data for the year in which the government agreed to provide the subsidy. The Secretary will use as a discount rate the following, in order of preference:

(A) The cost of long-term, fixed-rate loans of the firm in question, excluding any loans that the Secretary has determined to be countervailable subsidies;

(B) The average cost of long-term, fixed-rate loans in the country in question; or

(C) A rate that the Secretary considers to be most appropriate.

(ii) *Exception for uncreditworthy firms.* In the case of a firm considered by the Secretary to be uncreditworthy (*see* §351.505(a)(4)), the Secretary will use as a discount rate the interest rate described in §351.505(a)(3)(iii).

**§351.525 Calculation of *ad valorem* subsidy rate and attribution of subsidy to a product.**

(a) *Calculation of ad valorem subsidy rate.* The Secretary will calculate an *ad valorem* subsidy rate by dividing the amount of the benefit allocated to the period of investigation or review by the sales value during the same period of the product or products to which the Secretary attributes the subsidy under paragraph (b) of this section. Normally, the Secretary will determine the sales value of a product on an f.o.b. (port) basis (if the product is exported) or on an f.o.b. (factory) basis (if the product is sold for domestic consumption). However, if the Secretary determines that countervailable subsidies are provided with respect to the movement of a product from the port or factory to the place of destination (*e.g.*, freight or insurance costs are subsidized), the Secretary may make appropriate adjustments to the sales value used in the denominator.

(b) *Attribution of subsidies*—(1) *In general.* In attributing a subsidy to one or more products, the Secretary will apply the rules set forth in paragraphs (b)(2) through (b)(7) of this section.

(2) *Export subsidies.* The Secretary will attribute an export subsidy only to products exported by a firm.

(3) *Domestic subsidies.* The Secretary will attribute a domestic subsidy to all products sold by a firm, including products that are exported.

(4) *Subsidies tied to a particular market.* If a subsidy is tied to sales to a particular market, the Secretary will attribute the subsidy only to products sold by the firm to that market.

(5) *Subsidies tied to a particular product.* (i) *In general.* If a subsidy is tied to the production or sale of a particular product, the Secretary will attribute the subsidy only to that product.

(ii) *Exception.* If a subsidy is tied to production of an input product, then the Secretary will attribute the subsidy to both the input and downstream products produced by a corporation.

(6) *Corporations with cross-ownership.* (i) *In general.* The Secretary normally will attribute a subsidy to the products produced by the corporation that received the subsidy.

(ii) *Corporations producing the same product.* If two (or more) corporations with cross-ownership produce the subject merchandise, the Secretary will attribute the subsidies received by either or both corporations to the products produced by both corporations.

(iii) *Holding or parent companies.* If the firm that received a subsidy is a holding company, including a parent company with its own operations, the Secretary will attribute the subsidy to the consolidated sales of the holding company and its subsidiaries. However, if the Secretary finds that the holding company merely served as a conduit for the transfer of the subsidy from the government to a subsidiary of the holding company, the Secretary will attribute the subsidy to products sold by the subsidiary.

(iv) *Input suppliers.* If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

(v) *Transfer of subsidy between corporations with cross-ownership producing different products.* In situations where paragraphs (b)(6)(i) through (iv) of this section do not apply, if a corporation producing non-subject merchandise received a subsidy and transferred the subsidy to a corporation with cross-ownership, the Secretary will attribute the subsidy to products sold by the recipient of the transferred subsidy.

(vi) *Cross-ownership defined.* Cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. Normally, this standard will be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.

(7) *Multinational firms.* If the firm that received a subsidy has production facilities in two or more countries, the Secretary will attribute the subsidy to products produced by the firm within the country of the government that granted the subsidy. However, if it is demonstrated that the subsidy was tied to more than domestic production, the Secretary will attribute the subsidy to multinational production.

(c) *Trading companies.* Benefits from subsidies provided to a trading company which exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm which is producing subject merchandise that is sold through the trading company, regardless of whether the trading company and the producing firm are affiliated.

**§ 351.526 Program-wide changes.**

(a) *In general.* The Secretary may take a program-wide change into account in establishing the estimated countervailing duty cash deposit rate if:

(1) The Secretary determines that subsequent to the period of investigation or review, but before a preliminary determination in an investigation (*see* § 351.205) or a preliminary result of an administrative review or a new shipper review (*see* §§ 351.213 and 351.214), a program-wide change has occurred; and

(2) The Secretary is able to measure the change in the amount of countervailable subsidies provided under the program in question.

(b) *Definition of program-wide change.* For purposes of this section, ''program-wide change'' means a change that:

(Form 19)

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS**

**CAFC Court No. 2022-1807**
**Gov't of Québec v. US**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 17,078 words.

☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.

☐ the filing contains __________ pages / __________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: August 25, 2022

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

(Form 31)

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**CAFC Court No. 2022-1807**
**Gov't of Québec v. US**

The foregoing document contains 23 unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: August 25, 2022

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

## CERTIFICATE OF SERVICE

**Government of Quebec v. US**
**CAFC Court No. 2022-1807**

I hereby certify that on August 25, 2022 the non-confidential version of Plaintiffs - Appellants' initial brief was served upon all parties by operation of the Court's electronic filing system.

Date: August 25, 2022

/s/ Jay C. Campbell
Jay C. Campbell
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600