NON-CONFIDENTIAL VERSION

2022-1807

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

THE GOVERNMENT OF QUEBEC, MARMEN INC., MARMEN ENERGIE INC., MARMEN ENERGY CO., THE GOVERNMENT OF CANADA,

Plaintiffs - Appellants

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendants - Appellees

THE GOVERNMENT OF ONTARIO,

Defendant

Appeal from the United States Court of International Trade in
Case Nos. 1:20-cv-00168-GSK, 1:20-cv-00170-GSK, and 1:20-cv-00172-GSK,
Judge Gary S. Katzmann

# RESPONSE BRIEF OF DEFENDANT-APPELLEE WIND TOWER TRADE COALITION

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
202-719-7000

*Counsel to Wind Tower Trade Coalition*

Dated: December 9, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1807

**Short Case Caption** Government of Quebec v. US

**Filing Party/Entity** Wind Tower Trade Coalition - Defendant-Appellee

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/31/2022

Signature: /s/ Alan H. Price

Name: Alan H. Price

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Wind Tower Trade Coalition | | Arcosa Wind Towers, Inc. is wholly owned by Arcosa, Inc., a publicly owned company |
| | | Broadwind Towers, Inc. is wholly owned by Broadwind Energy, Inc., a publicly traded company |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Daniel B. Pickard | | |
| Cynthia C. Galvez | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page


I. INTRODUCTION ....... 1

II. STATEMENT OF RELATED CASES ....... 1

III. STATEMENT OF THE ISSUES ....... 1

IV. STATEMENT OF THE CASE ....... 2

A. Marmen's Sales Denominators ....... 3

B. Capital Cost Allowance for Class 1a Assets ....... 7

C. Gaspésie Tax Credit ....... 9

D. Québec On-the-Job Tax Credit ....... 12

V. SUMMARY OF ARGUMENT ....... 14

VI. ARGUMENT ....... 16

A. Commerce's Determination of Marmen's Subsidy Denominator Should Be Affirmed ....... 16

1. Commerce's Determination is Not Inconsistent with its Verification Report ....... 17

2. Commerce's Determination is Not Inconsistent with its Practice or Statutory Duties ....... 22

3. Conclusion ....... 23

B. Commerce Properly Countervailed the CCA for Class 1a Assets Program ....... 24

1. Commerce Appropriately Found That the CCA for Class 1a Assets Program Provided a Benefit ....... 25

2. Commerce Appropriately Found That the CCA for Class 1a Assets Program Involved a Governmental Financial Contribution ....... 32

3. Conclusion Regarding the CCA for Class 1a Assets Program ....... 36

C. The Court Should Affirm Commerce's Treatment of the Gaspésie Tax Credit ....... 36

D. Commerce Properly Analyzed the Specificity of the On-The-Job Tax Credit Program ....................40

VII. CONCLUSION ....................50

## CONFIDENTIAL MATERIAL OMITTED

The confidential material omitted from this brief at pages 3, 14, 16, and 23 specifies the "applicable sales value" reported in Marmen's questionnaire responses. The confidential material omitted from this brief at page 4 specifies the separate, adjusted sales value that Marmen later claimed, and compares it with the originally reported "applicable sales value." The confidential material omitted from this brief at page 5 identifies a currency. The confidential material omitted from this brief at page 10 identifies the value of a claimed tax credit. The confidential material omitted from this brief at page 12 describes number of companies filing tax returns in Québec, the number that received a particular tax credit, and the number of trainees for which Marmen claimed that tax credit in its 2017 Québec tax return. The confidential material omitted from this brief at page 41 likewise identifies the number of trainees for which Marmen claimed that tax credit in its 2017 Québec tax return.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AK Steel Corp. v. United States*,
192 F.3d 1367 (Fed. Cir. 1999) ....................48

*Bethlehem Steel Corp. v. United States*,
140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ....................48

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ....................48

*Ford Motor Co. v. United States*,
926 F.3d 741 (Fed. Cir. 2019) ....................24

*Geneva Steel v. United States*,
914 F. Supp. 563 (Ct. Int'l Trade 1996) ....................39

*Government of Québec v. United States*,
567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) ....................3

*Royal Thai Gov't v. United States*,
341 F. Supp. 2d 1315 (Ct. Int'l Trade 2004), *aff'd in part, rev'd in part on other grounds & remanded*, 436 F.3d 1330 (Fed. Cir. 2006) ....................48

*Wilmar Trading PTE Ltd. v. United State*s,
466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) ....................48, 49

## Statutes

19 U.S.C. § 1677(5)(B) ....................3, 25, 32, 40

19 U.S.C. § 1677(5)(D)(ii) ....................32, 35, 36

19 U.S.C. § 1677(5A)(D)(i) ....................45

19 U.S.C. § 1677(5A)(D)(iii) ....................42

19 U.S.C. § 1677(5A)(D)(iii)(I) ....................40, 43, 44, 45

19 U.S.C. § 1677(6) ....................38

19 U.S.C. § 3512(c)(1) ........................................ 46

**Regulations**

19 C.F.R. § 351.307(c) ........................................ 21

19 C.F.R. § 351.503(e) ........................................ 37, 38

19 C.F.R. § 351.509(a)(1) ........................................ *passim*

19 C.F.R. § 351.525(a) ........................................ 3, 16

19 C.F.R. § 351.525(b)(6) ........................................ 3

**Administrative Materials**

*100- to 150-Seat Large Civil Aircraft From Canada*,
82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017) ........................................ 47

*Certain Carbon and Alloy Steel Cut-To-Length Plate From the Republic of Korea*,
82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) ........................................ 47

*Certain Fabricated Structural Steel From Canada*,
85 Fed. Reg. 5,387 (Dep't Commerce Jan. 30, 2020) ........................................ 35, 47

*Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China*,
75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010) ........................................ 26

*Sugar From Mexico*,
80 Fed. Reg. 57,337 (Dep't Commerce Sept. 23, 2015) ........................................ 26

*Supercalendered Paper From Canada*,
82 Fed. Reg. 18,896 (Dep't Commerce Apr. 24, 2017) ........................................ 35

**Other Authorities**

S. Rep. No. 96-249 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381 ........................................ 38

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ........................................ *passim*

## I. INTRODUCTION

On behalf of Defendant-Appellee the Wind Tower Trade Coalition ("WTTC"), we respectfully submit this response to the August 31, 2022 corrected opening brief of Plaintiffs-Appellants the Government of Québec ("GOQ"); the Government of Canada ("GOC"); and Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively "Marmen"). *See* Pl.-Appellants' Corrected Opening Brief (Aug. 31, 2022), ECF No. 32 ("Appellants' Br.").

## II. STATEMENT OF RELATED CASES

Like Appellants, WTTC is unaware of any appeals in or from the same civil action or proceeding that have previously been before this Court or any other appellate court. Likewise, WTTC is unaware of any action pending in the U.S. Court of International Trade ("CIT") that stands to be directly affected by the outcome of this appeal.

## III. STATEMENT OF THE ISSUES[1]

1. Whether the U.S. Department of Commerce ("Commerce") appropriately relied on Marmen's sales value as originally reported in calculating the company's dumping margin, where the agency's review at verification of

[1] WTTC agrees with Plaintiff-Appellants' jurisdictional statement, and therefore does not provide a separate jurisdictional statement, consistent with Fed. Cir. R. 28(b).

Marmen's claimed adjusted sales value revealed multiple errors affecting the calculation of the adjusted value.

2. Whether Commerce appropriately treated the GOC's provision of enhanced depreciation for certain manufacturing assets as conferring a financial contribution and a countervailable benefit where the program provided greater-than-standard depreciation rights, was only available to certain taxpayers, and where those taxpayers were required to actively elect for the enhanced depreciation treatment?

3. Whether Commerce appropriately calculated the benefits of the GOQ's Gaspésie Tax Credit program without regard to the tax consequences of the program, and where the agency's calculation was in keeping with its regulations and established practice?

4. Whether Commerce properly found the GOQ's On-the-Job Tax Credit program *de facto* specific based on its reasonable, standard method for analyzing *de facto* specificity of tax credits?

## IV. STATEMENT OF THE CASE

This appeal arises from Commerce's final determination in a countervailing duty ("CVD") investigation into utility-scale wind towers from Canada. *See* Appx000147-000149. Commerce initiated the investigation on July 29, 2019. Appx000360-000366. Commerce selected Marmen as its mandatory respondent,

and ultimately calculated a final subsidy margin of 1.18%. Appx000147-000149. The GOQ, GOC, Marmen, and the WTTC each appealed aspects of Commerce's final determination. Appx000003. The CIT upheld Commerce in all respects. *Id.* The CIT's determination was published as *Government of Québec v. United States*, 567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022). *See* Appx000039. The GOQ, GOC, and Marmen subsequently lodged this appeal to renew the challenges they raised at the CIT. *Compare* Appx000003 *with* Appellants' Br. at 3-4.

**A. <u>Marmen's Sales Denominators</u>**

The U.S. trade remedy laws provide that a "subsidy" exists where a foreign governmental "authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). Subsidies are "countervailable" where they are "specific." *Id.* Commerce generally determines CVD margins by dividing the value of subsidy benefits received during the investigation period by the respondent's relevant sales value during the period. *See* 19 C.F.R. § 351.525(a). Because Marmen Inc. and Marmen Énergie were cross-owned and both produced the subject merchandise, Commerce used the two entities' combined sales value, minus intercompany sales between them, as the denominator of the CVD calculation. *See, e.g.*, Appx008420-008421; 19 C.F.R. § 351.525(b)(6).

In its initial CVD questionnaire response, Marmen reported that its "applicable sales value" for 2018 was [ value ]. Appx002906-002907.

Marmen again identified this as the "applicable sales value" in a supplemental response and in comments filed in advance of Commerce's preliminary determination. Appx008143-008144; Appx008323, Appx008327. Commerce duly utilized this value in calculating Marmen's 1.09% preliminary margin. Appx008420-008421, Appx008427-008428.

Shortly after the preliminary determination, Marmen filed comments arguing that Commerce erred in relying on this sales value. Appx008434-008438. Marmen argued, for the first time, that Commerce should have increased Marmen's reported "applicable sales value" to [ value ], or by [percentage]. Appx 008435-008436. Marmen argued that the adjustment was necessary to reflect recalculations that Marmen's auditor made to "translate all sales revenue recorded in the {general ledger} to Canadian dollars." Appx008435. Marmen further averred that, if adopted, the recalculated sales value would lower the preliminarily calculated CVD margin from just over *de minimis* (1.09%) to just under *de minimis* (0.95%). Appx008436.

At verification, Commerce officials reviewed documentation relating to Marmen's claim for an upwards adjustment to its sales value. *See* Appx008654-008656, Appx008676-008680. The officials noted Marmen's explanation that the company made certain sales in U.S. dollars but recorded them in its general ledger on a one-to-one basis as if they were made in Canadian dollars. Appx008668; *see also* Appx008676-008677. Marmen's auditor later recalculated the general ledger

values to reflect a conversion from U.S. dollars to Canadian dollars using a single annual exchange rate. Appx008676-008677. Marmen and its auditor explained that the recalculation was prompted by questions that Commerce asked regarding Marmen's foreign exchange gains and losses. Appx008668.

In reviewing source records relevant to the recalculated sales value, Commerce's verifiers noted that the values for certain sales not made in U.S. dollars were nonetheless multiplied by a U.S. dollar exchange rate in the recalculation. Specifically, four sales in one of the subaccounts reviewed at verification were coded as reflecting values in [currency]. Appx008679. Of those four sales, two appear to have been mislabeled, and were actually paid in Canadian dollars in the first instance, making any conversion unnecessary. Appx008679-008680. The remaining two were paid in Euro, not U.S. dollars, such that the wrong exchange rate was applied. Appx008680. Beyond this, Commerce officials noted an additional sale, in a different subaccount, that was paid in Euro but then inappropriately converted using a U.S. dollar exchange rate. *Id.*

In its case brief, Marmen argued that Commerce should revise its sales denominator to reflect the auditor's recalculated value. Appx008742, Appx008747-008750. However, Commerce explained that it had not been able to verify the recalculated value. Appx000077. Citing the multiple errors uncovered during its verifiers' review of source documentation, the agency found the auditor's

recalculation unverified and unreliable. Appx000113-000117. Accordingly, it continued to utilize Marmen's originally reported sales value, pursuant to 19 U.S.C. § 1677e(a)(2)(D). Appx000116.

Marmen appealed this aspect of Commerce's determination to the CIT, making two primary arguments. Appx000003, Appx000016. First, Marmen argued that Commerce acted unlawfully by rejecting the auditor's recalculation without compelling evidence that the auditor was not in good standing. Appx000016. But the CIT found that Commerce had no legal duty to accept the auditor's recalculation simply because the auditor's firm was in good standing, and particularly not where the agency's review showed the recalculation to be at least partially erroneous. Appx000017-000018.

Second, Marmen argued that Commerce acted unreasonably in concluding that the auditor's recalculation was unreliable. Appx000016. The CIT found otherwise, noting that Commerce's review revealed errors affecting the recalculation. Appx000018-000019. Marmen argued that the errors were minor in number and in the context of overall sales value, but the CIT found that Commerce reasonably concluded that the discovery of errors at verification undermined the reliability of the recalculation more broadly. Appx000018. The errors were unexplained, and their existence allowed for the reasonable inference that the recalculation might reflect additional errors. Appx000018-000019. The CIT

accordingly upheld Commerce's decision not to accept the claimed adjusted sales value.

**B. Capital Cost Allowance for Class 1a Assets**

Marmen reported that it took advantage of accelerated depreciation rates for manufacturing buildings under Canada's Capital Cost Allowance ("CCA") for Class 1a assets program, thereby reducing its taxable income during the period of investigation ("POI"). Appx002590-002591, Appx002715-Appx002717, Appx002840-002845. Marmen explained that Canada's tax authority had established, for all corporate and individual business taxpayers in Canada, a 4% depreciation rate for Class 1 assets (buildings and other property). Appx002840-002845. However, a 2009 tax regulation created a separate classification for buildings in which at least 90% of floor space is used for manufacturing – *i.e.*, Class 1a assets. *Id.*; *see also* Appx008019, Appx008021-008022; Appx009547-009549. A 10% depreciation rate may be claimed for these assets. Appx002841; Appx008019, Appx008021-008022; Appx009547-009549. The regulation explicitly excludes certain industries from benefiting from the additional depreciation. Appx002507-002508. To take advantage of the 10% depreciation rate, taxpayers must elect for it on a letter or schedule filed with their income tax returns. Appx008021, Appx008024, Apppx008050-008052; Appx009547-009549.

"Both Marmen Inc. and Marmen Énergie claimed Class 1a CCAs on their respective year-2017 tax returns filed in 2018, which were recorded as deductions to taxable income." Appx002840-002841; *see also* Appx002859-Appx002860 (noting Marmen Inc.'s "Reduction in Taxable Income" relating to CCA for Class 1a assets). Commerce preliminarily determined that the additional depreciation for the Class 1a assets program was *de jure* specific within the meaning of 19 U.S.C. § 1677(5A)(D)(i) because eligibility was expressly limited to certain industries as a matter of law. Appx008396. Commerce further determined that the additional depreciation constituted a financial contribution in the form of revenue foregone by the GOC, and found that the tax credit provided a benefit equal to the difference between the tax paid and the tax that would have been paid absent the credit. *Id.* Commerce preliminarily calculated a net countervailable subsidy rate of 0.08% for Marmen for the CCA for Class 1a assets subsidy program. Appx008397.

In its case brief, Marmen argued that the CCA for Class la assets program did not provide a financial contribution or a benefit. Appx008758-008767. In the final determination, Commerce continued to countervail the CCA for Class la assets program, repeating and expanding on the reasoning from its preliminary results. Appx000095-000099.

Marmen, the GOC, and the GOQ appealed Commerce's treatment of the CCA for Class 1a assets program to the CIT. Appx000003, Appx000031-000032. They

argued that Commerce erred in finding that the additional depreciation constituted a financial contribution. Appx000032. They also argued that Commerce inappropriately relied on 19 C.F.R. § 351.509(a)(1) to find that the contribution conferred a benefit. Appx000033. Finally, they argued that substantial evidence did not support Commerce's treatment of the program. *Id.*

The CIT upheld Commerce's determination that the CCA for Class 1a assets program provided countervailable benefits. *Id.* The lower court found that Commerce reasonably determined the existence of a contribution and benefit by comparing the favorable tax treatment for certain manufacturing buildings allowed under the program with the standard tax treatment for buildings. Appx000033-000034. The CIT also found that Commerce's determination was supported by substantial evidence, as the agency (1) reasonably compared differing tax treatments under Canadian law "per the classifications" that the GOQ and GOC provided, (2) addressed respondents' arguments in favor of other comparisons, and (3) was not required to consider the empirical bases underlying Canada's decision to allow certain taxpayers to opt for more favorable tax treatment. Appx000034-000036.

### C. Gaspésie Tax Credit

The Tax Credit to Promote Employment in Gaspésie and Certain Maritime Regions of Québec ("Gaspésie Tax Credit") program was introduced to encourage job creation in selected geographic regions of Québec. Appx002181-002182;

Appx008400. To be eligible for the tax credit, a corporation must perform certain listed activities, including certain manufacturing activities. Appx002182. For corporations eligible as a result of their manufacturing, "the tax credit is refundable at a rate of 15% of total salary and eligible wages paid to eligible employees." *Id.*

Marmen Énergie claimed the Gaspésie Tax Credit on its 2017 Québec tax return in the amount of CAD[ value ], applying the full amount as a credit toward income taxes payable for that year. Appx002869-002871. Simultaneously, Marmen reported that it paid taxes in 2017 on the amount of the Gaspésie Tax Credit it received in 2016. Appx002871.

Commerce preliminarily found that the Gaspésie Tax Credit provided Marmen with a regionally-specific financial contribution during the POI. Appx008401. Commerce further found that the credit conferred a benefit in the amount of the tax credit used to reduce taxes payable in the POI. *Id.* To calculate the benefit, the agency "divided the amount of the tax credit that Marmen received during the POI, as reflected on its tax return filed during the POI, by Marmen's total sales during the POI . . . ." *Id.*

In its case brief, Marmen argued that Commerce should revise the benefit calculation. Appx008755-008757. Specifically, Marmen claimed that Commerce should deduct, from the amount of the 2017 Gaspésie Tax Credit that Marmen received, the taxes that Marmen paid in 2017 on income received through the same

tax credit program in 2016. *Id.* Commerce was not persuaded by this argument. Appx000123-000127.

Instead, Commerce found that while Marmen paid income taxes in 2017 on the 2016 tax year credit, those taxes were "not a component or a consequence of the 2017 tax year credit." Appx000125. "Rather, income taxes incurred on the taxable income generated by the 2016 tax year credit were due to be paid to the GOC and {GOQ} in the same year that the 2017 tax year tax credit was received as a benefit (*i.e.*, in the POI, 2018)." *Id.* The agency also pointed to 19 C.F.R. § 351.503(e), which provides that Commerce will not consider the tax consequences of a subsidy benefit when calculating the amount of the benefit. Appx000126.

Marmen and the GOQ appealed Commerce's treatment of the tax credit. Appx000003, Appx000029. They argued that Commerce erred in refusing to consider the 2017 tax consequences of Marmen's use of the program before the POI. Appx000029-000030. The lower court found that Commerce's regulations did not compel such consideration. Appx000030. Rather, the CIT noted Commerce's "uniform policy" of ignoring the tax consequences of subsidy benefits, and found its decision to follow its policy here reflected both a reasonable reading of its regulations and conformed to the agency's past practice. Appx000030-000031.

### D. Québec On-the-Job Tax Credit

The GOQ offers a tax credit to corporations and individuals that hire students or apprentices enrolled in a qualified training program. Appx001969-001970. "A corporation that takes on a student or an apprentice enrolled in a qualified training program can claim a tax credit at a rate of 24% in respect of the salary or wages paid to the student or apprentice, and the salary or wages paid to an employee for hours devoted to supervision of the student or apprentice." Appx001970. To claim the tax credit, a corporation must obtain certain third-party certificates and complete Form CO-1029.8.33.6 of the Québec income tax return. Appx002899-Appx002901.

In tax year 2018, 387,949 companies filed a tax return in the province of Québec; for tax year 2017, [number] companies filed a return. Appx001982. In tax year 2018, [number] companies received the On-the-Job Tax Credit; in tax year 2017, [number] companies received the credit. Appx002172-002173. Marmen claimed the credit for [number] trainees on its 2017 Québec income tax return, which was filed in calendar year 2018. Appx002591, Appx002899-Appx002903.

Commerce preliminarily found the GOQ's On-the-Job Tax Credit program countervailable. Appx008400. The GOQ argued in its case brief that Commerce incorrectly analyzed the *de facto* specificity of the program by considering whether the actual recipients of the tax credit were limited in comparison with the total number of business tax filers in Québec. Appx008714-008720. The GOQ argued

that Commerce instead "must examine whether a few companies or industries participated and whether any industry or company received a predominant or disproportionate amount in the context of the business that the company is involved {in}." Appx008719. In the final determination, Commerce continued to find the GOQ's On-the-Job Tax Credit program *de facto* specific. Appx000079-000080; Appx000127-000129.

The GOQ and the GOC challenged Commerce's *de facto* specificity determination at the CIT. Appx000003; Appx000025-000028. They argued that (1) U.S. law did not permit Commerce to determine specificity by comparing the number of tax credit recipients to total business tax filers and (2) Commerce deviated from past practice in employing this methodology. Appx000025-000026. They also argued that substantial evidence did not support Commerce's determination that credit recipients were "limited in number," given "the number and variety of companies participating in the credit program." Appx000026.

The lower court found that Commerce's approach reflected a reasonable reading of the statute that was consistent with the aims indicated in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"). Appx000026-000027. The CIT also found that Commerce's approach was not precluded by case law, and was consistent with its past practice. Appx000027-000028. Finally, the CIT found that Commerce's conclusion that the subsidy was *de*

*facto* specific was reasonable given the small percentage of business taxpayers receiving program benefits. Appx000028.

## V. SUMMARY OF ARGUMENT

Appellants challenge four aspects of Commerce's final determination in the CVD investigation into Canadian wind towers, and fail to make their case regarding any of these aspects.

First, Appellants argue that Commerce erred in refusing to utilize Marmen's recalculated sales value in the denominator of the subsidy calculations. But Marmen repeatedly reported its sales value as [ value ], and did not put forward its alternative, higher value until after the preliminary results. When Commerce nonetheless attempted to verify the newly proffered value, the agency found it affected by multiple errors. Commerce's decision not to rely on this unverifiable value was reasonable, and did not violate either its past practice or its statutory duties.

Second, Appellants claim that Commerce inappropriately found the CCA for Class 1a assets program countervailable. Under Canada's tax code, buildings are normally subject to a 4% depreciation rate. A higher, 10% rate is available for manufacturing buildings, but only those used in certain industries and only where the taxpayer actively claims the accelerated depreciation. In treating the program as providing a benefit equal to the difference between the standard and accelerated

rates, Commerce acted appropriately given the record and its regulations. Moreover, given the that the GOC would have received higher taxable revenue consistent with the standard 4% depreciation rate for buildings in the absence of the program, Commerce reasonably determined that the higher depreciation rate constituted a "financial contribution."

Third, Appellants argue that Commerce failed to reasonably measure the benefits of the GOQ's Gaspésie Tax Credit. However, Commerce's measurement was grounded in a reasonable interpretation of its regulations that – unlike Appellants' – is harmonious with the Tariff Act of 1930, as amended (the "Tariff Act") and with Congress's expressed expectations regarding offsets to countervailable subsidies. The agency's interpretation was also reasonable overall.

Fourth and finally, Appellants argue that Commerce inappropriately found the GOQ's On-the-Job Tax Credit program *de facto* specific. But Commerce's analysis was grounded in a reasonable interpretation of the statute that advanced the purpose expressed by Congress, and produced a reasonable result in this case. Accordingly, Commerce's specificity analysis regarding the On-the-Job Tax Credit program should be affirmed.

# VI. ARGUMENT[2]

Appellants challenge four aspects of Commerce's final determination in the CVD investigation concerning utility-scale wind towers from Canada. First, they argue that Commerce erred in refusing to utilize Marmen's recalculated sales value in the denominator of the subsidy calculations. Second, they claim that Commerce inappropriately found the CCA for Class 1a assets program countervailable. Third, they argue that Commerce failed to reasonably measure the benefits of the Gaspésie Tax Credit program. Fourth and finally, they argue that Commerce inappropriately found the GOQ's On-the-Job Tax Credit program *de facto* specific. As detailed below, these challenges are unpersuasive.

## A. Commerce's Determination of Marmen's Subsidy Denominator Should Be Affirmed

Commerce generally determines CVD margins by dividing the value of subsidy benefits received during the POI by the respondent's sales value during the period. *See* 19 C.F.R. § 351.525(a). Here, Marmen repeatedly reported its "applicable sales value" as equaling [ value ]. Appx002906-002907, Appx008143-008144, Appx008323, Appx008327. However, after Commerce relied on this sales value in its preliminary calculations, Marmen argued that the value

---

[2] The WTTC does not disagree with Plaintiff-Appellants' description of the standard of review, and thus does not provide a separate description of that standard here, consistent with Fed. Cir. R. 28(b).

should be raised to reflect certain adjustments that its auditor made to the values recorded in the company's general ledger. *See* Appx008434-008438; Appx008742, Appx008747-008750.

At verification, Commerce reviewed certain documents underlying the general ledger accounts that putatively formed the basis for the auditor's recalculation. Appx008679. During this review, Commerce uncovered multiple errors in the auditor's recalculation. Appx008679-008680. Commerce accordingly determined that the recalculated sales value was unverified and unreliable. Appx000113-000117.

Plaintiff-Appellants challenge Commerce's determination on two bases. First, they argue that Commerce's conclusion that the auditor's recalculation was unverified is contradicted by the agency's own verification report. Appellants' Br. at 32-37. Second, they argue that Commerce's determination is inconsistent with the agency's practice and its statutory obligations. *Id.* at 37-41. As detailed below, these arguments are not compelling.

**1. Commerce's Determination is Not Inconsistent with its Verification Report**

Appellants begin by arguing that, contrary to Commerce's statements in its final decision memorandum, the record does not show that agency verifiers "discovered" five errors affecting the auditor's recalculation during a "spot-check" of the recalculation at verification. *Id.* at 32. Rather, Appellants argue that Marmen

self-identified the errors and pointed them out to Commerce. *Id.* at 32-34. Appellants further claim that Commerce verified that the auditor's recalculation reflected no errors beyond the five described in the verification report. *Id.* at 34. Appellants state that neither Commerce's overall behavior during verification nor the verification report's summary of findings indicated any concern that the recalculated sales value suffered from meaningful deficiencies. *Id.* at 34-36. Based on the foregoing, Appellants conclude that Commerce erred in treating Marmen's recalculated sales value as unverified and unreliable. *Id.* at 36-37.

Appellants' claims are unpersuasive. First, Appellants do not demonstrate that Marmen pointed out the five errors described in the verification report to Commerce's verifiers, or otherwise affirmatively disclosed their existence. Commerce's verification agenda specifically tasked Marmen with proactively identifying, at the outset of verification, any errors in previously reported data that the company found while preparing for verification. Appx008545, Appx008547. Commerce specified that errors affecting sales value calculations were the kind of error that needed to be proactively disclosed. Appx008547. But while Marmen made certain corrective disclosures to Commerce's verifiers, corrections affecting its claimed adjusted sales value were not among them. Appx008657-008661.

Appellants point to certain record documents as support for their contention that Marmen, not Commerce, discovered the errors affecting its auditor's

recalculation and disclosed them to Commerce. Appellants' Br. at 33 (citing Appx008593, Appx008597, Appx008605, and Appx008638). But the cited documents are simply company records that the verifiers reviewed at verification. Appx008593, 008597, 008605, and 008638. They do no more than confirm that, as even Appellants appear to concede, at least five errors impacted the recalculated sales value, while providing no insight into who precisely "discovered" the errors or when. That said, the verification report indicates that Commerce's verifiers found these errors themselves, in the course of querying Marmen's electronic accounting system for information on sales categorized in specific general ledger sales accounts. Appx008679-008680.

Appellants take issue with Commerce's explanation that it not only discovered the errors, but did so during a "spot-check" of the data underlying the auditor's recalculation. Appellants define a "spot-check" as "a test made without warning on a randomly selected subject" or "a random sampling or quick sample investigation." Appellants' Br. at 32-33. But while Commerce's verification agenda instructed Marmen to "be prepared" to demonstrate how its calculated sales values tied to its general ledger, that agenda did not state that the agency's verifiers would examine the specific accounts or documents in which the errors were discovered.

*Compare* Appx008679-008680 *with* Appx008547-008555.[3] As such, Commerce's review, leading to its discovery of the errors, neatly fulfills Appellants' own characterization of a "spot-check."

More crucially, as the lower court noted, regardless of whether Commerce independently discovered the errors at verification or was told of them, Marmen's recalculated sales value was at least partially in error. Appx000018. In particular Commerce's verifiers noted that five sales not made in U.S. dollars were nonetheless multiplied by a U.S. dollar exchange rate in the recalculation. Appellants aver that these errors were too small to meaningfully affect the overall reliability of the recalculated value. Appellants' Br. at 33-34. But the fact that erroneous conversions affected multiple sales across differing accounts reasonably allowed Commerce to infer that additional errors affected the recalculated value. It was reasonable for Commerce to suspect that, for example, in addition to Euro-coded sales that were in fact paid in CAD, there were USD-coded sales that were in fact paid in CAD, and thus were also erroneously converted.

Appellants argue that Commerce comprehensively reviewed all of the sales underlying the recalculated sales value and verified that there were no additional errors. *Id.* at 34. But this is not the case. Instead, Commerce "reviewed all of the

---

[3] By contrast, the agenda instructed Marmen to have on hand full sales documentation for a specific group of individual, pre-selected sales. Appx008552-008553.

sales accounts and confirmed there were no additional Euro coded sales." Appx008680. This is not the same as a comprehensive review of all sales underlying the recalculation. Indeed, as Commerce explained, "Commerce lacks the ability to check each sale at verification, and so performs {spot} checks in order to test the broader reliability of reported information." Appx000116. In this case, Commerce's limited checks revealed multiple errors.

Finally, Appellants argue that neither the verification report itself nor the verifiers' behavior at verification suggested that the verifiers were concerned about the reliability of the recalculated sales value. Appellants' Br. at 34-36 But consistently with Commerce's regulations, the verification report is not meant to convey the agency's final conclusions regarding the implications of the verification exercise, or to render a final judgment as to whether any particular aspect of a company's reporting has been successfully verified. Rather, as the report states:

> The purpose of this verification report is to provide parties with a factual report of the methods, procedures, and results collected during Commerce's verification. This report does not draw conclusions as to whether the reported information was successfully verified, and further does not make findings or conclusions regarding how the facts obtained at verification will ultimately be treated in Commerce's analysis.

Appx008655 (citation omitted); *see also* 19 C.F.R. § 351.307(c).

Similarly, it is irrelevant that the verification report's "Summary of Findings" section did not describe the errors that are memorialized later in the same report. Appellants' Br. at 35-36. The "Summary of Findings" is merely an "illustrative" list

of observations made at verification, expressly stated not to be "all inclusive." Appx008655. It is likewise irrelevant that verification ended a day early. Appellants' Br. at 34-35. The fact that the verifiers felt that they had completed their tasks earlier than anticipated has no bearing on whether Commerce reasonably deemed Marmen's recalculated sales value unreliable.

In sum, Appellants do not persuade that Commerce's verification report undermines the agency's conclusion that Marmen's recalculated sales value was unverified and reliable. Rather, the verification report memorializes the existence of at least five separate errors underlying the recalculated value, and thus supports Commerce's determination.

**2. Commerce's Determination is Not Inconsistent with its Practice or Statutory Duties**

Appellants next argue that Commerce unreasonably departed from its past practice by "reject{ing} Marmen's independent auditor's opinion." *Id.* at 37-41. Appellants characterize this decision as "extreme" and unjustifiable. Appellants also argue that Commerce's treatment of the recalculated sales value violated the agency's statutory duty to calculate CVD margins as accurately as possible. *Id.* at 37-38. Appellants do not persuade that Commerce erred.

In support of their claim that Commerce unreasonably deviated from past practice, Appellants point to cases indicating that Commerce has the authority to accept an auditor's adjustments or calculations and is not required to look beyond

audited financial statements. *Id.* at 37-41. But the fact that Commerce may, in its discretion, rely on an auditor's calculations or adjustments does not mean that the agency is inexorably compelled to do so. Here, where the auditor's recalculation of Marmen's sales value was at least partially erroneous, the agency was not required to accept the recalculated sales value. *See, e.g.*, Appx000017-000018.

Appellants argue that, had Commerce accepted the recalculated sales value, Marmen would have received a *de minimis* margin. Appellants' Br. at 37. Accordingly, they conclude that Commerce's treatment of Marmen's recalculated sales value was contrary to the agency's duty to calculate CVDs as accurately as possible. *Id.* at 37-38. Of course, this argument assumes that the recalculated sales value was accurate. But even Appellants appear to concede that it was affected by at least the five errors described in the verification report. Further, the errors noted in the verification report reasonably suggested the presence of other, undiscovered errors impacting the recalculation.

### 3. Conclusion

Appellants do not persuade that Commerce was required to rely on Marmen's recalculated sales value. Marmen repeatedly reported its sales value as [ value ], and did not put forward the higher recalculated value until after the preliminary results. Appx002906-002907; Appx008143-008144; Appx008323, Appx008327; Appx 008435. When Commerce nonetheless attempted to verify the

newly proffered value, the agency found it affected by multiple errors. Commerce's decision not to rely on this unverifiable value was reasonable, and did not violate either its past practice or its statutory duties. Commerce's decision not to rely on the recalculated value should therefore be affirmed.[4]

### B. Commerce Properly Countervailed the CCA for Class 1a Assets Program

Canada's tax regulations establish two potential rates of depreciation for buildings and other property. In general, such assets are depreciable at a rate of 4%. Appx002840-002845; Appx009547-009549. However, an accelerated 10% depreciation rate is in some cases available for buildings in which at least 90% of floor space is used for manufacturing (*i.e.*, Class 1a assets). Appx002840-002845; *see also* Appx008019, Appx008021-008022; Appx009547-009549. Certain industries are excluded from claiming this rate for their manufacturing buildings, and even taxpayers in potentially eligible industries must affirmatively claim the accelerated rate when filing their tax returns. Appx002507-002508; Appx008021, Appx008024, Apppx008050-008052; Appx009547-009549.

---

[4] In a footnote, Appellants argue that Commerce arbitrarily relied on the recalculated value in determining the value of intercompany sales between Marmen Inc. and Marmen Energie, while simultaneously refusing to rely on it for purposes of determining the value of non-intercompany sales. Appellants' Br. at 41 n.2. Appellants, however, did not raise this argument in their briefs below, and thus failed to preserve it for appeal. Beyond this, the Court has repeatedly found that arguments made solely in footnotes are waived. *See, e.g.*, *Ford Motor Co. v. United States*, 926 F.3d 741, 760 n.12 (Fed. Cir. 2019).

"Both Marmen Inc. and Marmen Énergie claimed Class 1a CCAs on their respective year-2017 tax returns filed in 2018, which were recorded as deductions to taxable income." Appx002840-002841. Commerce treated the CCA for Class 1a assets program as providing countervailable subsidies, finding that it was specific, provided a benefit equal to the difference between the accelerated and standard depreciation rates, and constituted a financial contribution in the form of revenue foregone by the Canadian government. Appx000095-000099.

Appellants challenge this treatment on two main grounds. First, they argue that the 10% depreciation rate did not provide a countervailable benefit. Appellants' Br. at 42-49. Second, they argue that Commerce erred in finding that any benefits reflected a financial contribution made by the Canadian government. *Id.* at 49-57. These arguments are not persuasive.

### 1. Commerce Appropriately Found That the CCA for Class 1a Assets Program Provided a Benefit

To find that a subsidy exists, Commerce must first determine that "a benefit" exists. 19 U.S.C. § 1677(5)(B). Commerce's regulations provide that:

> In the case of a program that provides a full or partial exemption or remission of a direct tax (*e.g.*, an income tax), or reduction in the base used to calculate a direct tax, a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program.

19 C.F.R. § 351.509(a)(1). Pursuant to this provision, Commerce has previously found that income tax programs that provide for accelerated depreciation of assets

provide a benefit in the amount of the income tax saved. *See, e.g.*, Issues and Decision Memorandum accompanying *Sugar From Mexico*, 80 Fed. Reg. 57,337 (Dep't Commerce Sept. 23, 2015) (final affirm. countervailing duty deter.) at 22; Issues and Decision Memorandum accompanying *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China*, 75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010) (final affirm. countervailing duty deter., final affirm. critical circumstances deter.) at 20-21.

Employing this same methodology, Commerce here determined that the CCA for Class 1a assets program provided Marmen with a benefit. Appx000095-000099. Commerce noted that Canada's income tax regulations provide that the "standard" or "basic" depreciation rate for buildings is 4%. Appx00095, Appx000097. But manufacturing buildings owned by a taxpayer in an eligible industry were permitted a higher, 10% depreciation rate, provided that the taxpayer claimed that rate on its tax return. Appx000098; *see also* Appx009548. Commerce accordingly found that a benefit existed in the difference between the depreciation deduction calculated using the 10% accelerated and 4% standard rates, *i.e.*, the tax savings generated by the accelerated depreciation. Appx000098.

Appellants raise several challenges to this finding. First, they argue that Commerce would not have found a benefit had the GOC designated so-called Class 1a assets (certain manufacturing buildings) as an entirely separate class of

assets, rather than as a type or subset of Class 1 assets (buildings and certain other structures and equipment). Appellants' Br. at 42-44. Second, they argue that Commerce's determination hinged, at least in part, on a mistaken finding regarding the election filed by taxpayers to claim the 10% accelerated depreciation rate for Class 1a assets. *Id.* at 44. Relatedly, they argue that Commerce failed to explain the relevance of ethe GOC's requirement that taxpayers affirmatively claim the 10% depreciation rate, or its decision to prevent certain industries from accessing the rate. *Id.* at 44-45. Finally, they argue that Commerce failed to properly interpret its direct tax regulation, 19 C.F.R. § 351.509(a)(1), and that the lower court reviewed Commerce's interpretation of that regulation improperly. *Id.* at 46-49. These arguments are not compelling.

Appellants first argue that Commerce found a benefit only because Canada's tax regulations designate Class 1a assets as a subset of Class 1 assets, rather than as a separate asset class. Appellant's Br. at 42-44. There are two problems with this argument. First, while Appellants fault Commerce for putatively failing to "take a foreign government's tax system as it finds it," *id.* at 50, Canada's system treats Class 1a assets as a subset of Class 1 assets. *See, e.g.*, Appx000097; Appx008048-008049 (defining Class 1 assets to include buildings); Appx008038, Appx008043-008044 (providing accelerated depreciation for certain Class 1 assets). In treating Class 1a assets accordingly, Commerce took Canada's tax system as it found it.

Second, while Appellants assume that Commerce would have found no benefit had Canada designated Class 1a assets as an entirely separate numerical class of depreciable assets (as "Class 2" assets, for example), Appellants' assumption is just that. There is no reason to believe that Commerce would have approached the situation that Appellants propose other than by considering (1) what the basic depreciation rates for such an asset class were (2) whether there was nonetheless a method for obtaining an accelerated rate, and (3) whether there were limits on the number or kind of industries permitted to claim the accelerated rate.

Indeed, while Canada's tax regulations describe Class 1a as a subclass of Class 1, the GOC referred to Class 1a as a "separate class" from Class 1 in certain publications. Appx009546-0009548. Yet Commerce followed the methodology outlined above. Fundamentally, the issue is not whether Class 1a is better conceived of as a subset of Class 1 or as a separate class. It is whether Commerce reasonably determined that (1) there is a standard depreciation rate for buildings, and (2) an accelerated rate allowed only for certain buildings in specific circumstances (*i.e.*, used in particular ways by particular industries, and for which taxpayers actively claim the accelerated depreciation right). WTTC respectfully submits that, as explained herein, Commerce reasonably reached this determination.

Appellants next argue that Commerce's determination hinged, at least in part, upon a mistaken finding. Appellants' Br. at 44. Specifically, Appellants claim that

while Commerce found that eligible taxpayers were required to affirmatively claim the 10% rate through a "Schedule 8" form, that form is not unique to such claims. *Id.* Rather, it is a general form on which taxpayers record depreciation claims for assets of all kinds. *See, e.g.*, Appx002850-002858 (Schedule 8 forms filed by Marmen Inc. and Marmen Énergie). The problem here is that Commerce did not find that Schedule 8 was unique to claims for accelerated depreciation for Class 1a assets. Rather, it found that, as no one appears to contest, eligible taxpayers must affirmatively claim the accelerated rate on their Schedule 8. Appx000098; *see also* Appx002850-002858 (Marmen's Schedule 8); Appx009548 (selection from a taxpayer guidance document, informing readers that "you must elect" for the 10% depreciation rate in your tax filings). This understanding is also supported by GOC budget documents, which explain that taxpayers are not required to claim the 10% rate for eligible buildings in their tax filings; they may instead opt to "forego{}" such treatment, and declare their Class 1a assets under the standard rate 4% rate applicable to buildings. Appx002514.

Appellants go on to argue that Commerce failed to explain the relevance, for the agency's benefit finding, of either Canada's requirement that taxpayers affirmatively claim the accelerated treatment, or its prohibition on certain industries' taxpayers making such claims. Appellants' Br. at 44-45. But it is easily discernible that Commerce found these facts consistent with other record evidence indicating

that the 10% rate represented a departure from the "basic" or "standard" rate of depreciation. Appx000098.

Next, Appellants claim that, in finding a benefit, Commerce and the lower court erroneously interpreted the agency's direct tax regulation. Appellants' Br. at 46-49; *see also* 19 C.F.R. § 351.509(a)(1) (stating that "a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program"). Commerce found that, pursuant to this regulation, the benefit equaled the difference between the 4% "basic rate" of depreciation and the accelerated 10% rate for Class 1a assets. Appx000098. Appellants argue that this finding was unreasonable, because the 10% depreciation rate reflected the average useful life of manufacturing buildings and thus did not comprise a "preferential" rate. Appellants' Br. at 47; *see also id.* at 42-44 (arguing that Commerce unreasonably ignored the difference in use and actual useful life between Class 1 assets as a whole and the subclass of Class 1a assets).

Appellants' argument is unpersuasive. Below, Commerce acknowledged Appellants' arguments, based on Canadian governmental statistical studies, that the 10% depreciation rate for Class 1a buildings "does not provide a benefit because it is not an accelerated rate but rather a normal depreciation rate that reflects the actual shorter useful life of" manufacturing buildings. Appx000098. While Commerce did not directly cite the studies in its decision, it is apparent that the agency found

Appellants' reliance on them unconvincing, given that the GOC chose not to apply the 10% rate recommended by the studies to all manufacturing buildings. Appx000098; *see also* Appx002521-025222, Appx002550. Rather, it excluded certain industries' manufacturing buildings entirely, and administered the CCA for Class 1a assets program such that potential beneficiaries were required to actively claim the benefits. Appx000098. Given these facts, Commerce reasonably treated the 10% rate as nonstandard or, in Appellants' terminology, "preferential." It also reasonably found that "the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." 19 C.F.R. § 351.509(a)(1); Appx000098.

Appellants fare no better with their claim that the lower court wrongly reviewed Commerce's application of 19 C.F.R. § 351.509(a)(1) through the lens of *Chevron USA, Inc. v. National Resources Defense Council, Inc.*, rather than *Auer v. Robbins* and its progeny. Appellants' Br. at 48. As an initial matter, because this Court reviews Commerce's decision anew, the salient decision here remains Commerce's, not the lower court's. *See, e.g.*, *id.* at 31. More crucially, Appellants do not develop their arguments regarding the supposed impropriety of the lower court's review. *Id.* at 48. While faulting the lower court, they do not explain why the regulation should be held to be clearly unambiguous, or why Commerce should be

found not to have engaged its substantive expertise in relying on 19 C.F.R. § 351.509(a)(1).

In sum, Appellants do not persuade that Commerce's determination that the CCA for Class 1a assets program provided Marmen with a benefit. Under Canada's tax code, buildings are normally subject to a 4% depreciation rate. A higher, 10% rate is available for manufacturing buildings, but only in certain industries and only where the taxpayer actively claims the accelerated depreciation. In treating the program as providing a benefit equal to the difference between the standard and accelerated rates, Commerce acted appropriately given the record and its regulations.

### 2. Commerce Appropriately Found That the CCA for Class 1a Assets Program Involved a Governmental Financial Contribution

For a subsidy to exist, a benefit must not only exist, but it must arise from a governmental "financial contribution." 19 U.S.C. § 1677(5)(B). The statute defines "financial contribution" to include "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income." *Id.* § 1677(5)(D)(ii). Commerce treated the CCA for Class 1a assets program as providing a financial contribution in the form of foregone governmental revenue. Appx000099; Appx008396.

Appellants argue that Commerce erred in this regard. Appellants' Br. at 49-57. Appellants argue that tax deductions constitute foregone government revenue

only where "elimination . . . or reduction of the tax is selective." *Id.* at 50 (quoting *Bethlehem Steel Corp. v. United States*, 590 F. Supp. 1237, 1245 (Ct. Int'l Trade 1984)). Appellants further argue that, because the CCA for Class 1a assets program's 10% depreciation rate reflects the useful life of manufacturing assets, it cannot be treated as revenue forgone. *Id.* at 52-56. Appellants argue that "undisputed" record evidence establishes that the 10% depreciation rate does not deviate from the norms of Canada's tax system. *Id.* at 53-56. Finally, Appellants argue that Commerce's treatment of the CCA for Class 1a assets program violates 19 U.S.C. § 1677(5)(D)(ii) and is inconsistent with the agency's practice. *Id.* at 56-57.

These arguments are unpersuasive. Appellants argue that a tax deduction program can only constitute foregone governmental revenue where it is "selective," or otherwise presents a "deviation" from the norms of the country's tax system. *Id.* at 50-51. However, as noted above, Commerce here reasonably found that while Canada's tax system provided a standard depreciation rate of 4% for buildings, the GOC selectively reduced the taxes of certain manufacturing industries through a "deviation" from this standard rate. *See* discussion *supra* at 25-32; *see also* Appx000098. Commerce's finding that the benefits accruing to Marmen were connected to foregone governmental revenue was thus reasonable, and consistent with the record evidence regarding Canada's tax system.

Appellants next argue that, because the 10% depreciation rate that eligible taxpayers may claim under the CCA for Class 1a assets program is related to the useful life of manufacturing assets, it cannot be treated as revenue forgone. Appellants' Br. at 52-56. But again, although Canada's statistical agency produced studies recommending a 10% depreciation rate for manufacturing buildings generally, the GOC did not choose to adopt that recommendation. Appx00098; *see also* Appx002521-002522, Appx002550. Instead, the GOC excluded certain industries' buildings entirely, and administered the Class 1a assets program such that even companies in eligible industries could only access the benefits by affirmative claim. Appx00098.

Appellants claim that Commerce never explained or supported its determination that the benefits of the CCA for Class 1a assets program arose from foregone revenue, instead analyzing and explaining only its determination that the program provided a benefit. Appellants' Br. at 54-56. This argument, however, fails to recognize that, given the program at issue, the factual bases for both the benefit and contribution analyses are inextricably entwined. For example, and as noted above, a benefit exists by reason of the GOC's choice to selectively permit certain taxpayers to claim a depreciation rate above and beyond the standard rate. Just as that selectivity results in a *de jure* specific program, it also indicates that the GOC has foregone revenue that it would otherwise collect. Appx000095-000099.

Finally, Appellants argue that to accept Commerce's treatment of the CCA for Class 1a assets program would be to find that every tax deduction constitutes foregone government revenue, inconsistently with both 19 U.S.C. § 1677(5)(D)(ii) and agency practice. But the statute explicitly allows that a tax deduction may constitute a "financial contribution." 19 U.S.C. § 1677(5)(D)(ii). Further, Commerce did not find here that the mere existence of a tax deduction constituted revenue foregone. Rather, it found that the GOC's extension of accelerated depreciation benefits to a legally-defined subset of industries constituted foregone revenue. And as regards Commerce's practice, it has previously found both the CCA for Class 1a assets program and similar accelerated depreciation programs to constitute revenue foregone. Issues and Decision Memorandum accompanying *Certain Fabricated Structural Steel From Canada*, 85 Fed. Reg. 5,387 (Dep't Commerce Jan. 30, 2020) (final neg. countervailing duty deter.) at cmt. 4 ("*FSS from Canada* IDM"); Issues and Decision Memorandum accompanying *Supercalendered Paper From Canada*, 82 Fed. Reg. 18,896 (Dep't Commerce Apr. 24, 2017) (final results of countervailing duty expedited rev.) at cmt. 32.

In sum, Commerce did not err in finding that the CCA for Class 1a assets program involved a governmental financial contribution. Under the GOC's system, where a manufacturing facility was not eligible and/or a claim for additional depreciation not filed, the GOC would have received higher taxable revenue

consistent with the standard 4% depreciation rate for Class 1 assets. As such, the higher depreciation rate offered through the CCA for Class 1a assets program constituted a "financial contribution" in the form of "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income." 19 U.S.C. § 1677(5)(D)(ii).

#### 3. Conclusion Regarding the CCA for Class 1a Assets Program

Commerce reasonably found that the CCA for Class 1a benefits program provided Marmen with countervailable benefits. Appellants have not contested Commerce's determination that the program was specific, and the agency's benefit and contribution analyses are sensible and consistent with the record evidence, including the manner in which the GOC has chosen to implement its tax system. As such, Commerce's treatment of the program should be affirmed.

### C. The Court Should Affirm Commerce's Treatment of the Gaspésie Tax Credit

Marmen Énergie claimed the Gaspésie Tax Credit, meant to encourage job creation in selected regions of Québec, on its 2017 Québec tax return. Appx002181-002182; Appx008400; Appx002869-002871. Marmen applied the full amount of the credit toward income taxes payable for that year, while also reporting that it paid taxes in 2017 on the amount of the credit that it received in 2016. Appx002869-002871.

In calculating the benefit for the POI, Commerce did not offset the 2017 credit by the amount of taxes paid in 2017 on the credit received in 2016. Appx000123-000127. Commerce reasoned that while Marmen paid income taxes on the 2016 tax year credit, those taxes were "not a component or a consequence of the 2017 tax year credit." Appx000125. "Rather, income taxes incurred on the taxable income generated by the 2016 tax year credit were due to be paid to the GOC and {GOQ} in the same year that the 2017 tax year tax credit was received as a benefit (*i.e.*, in the POI, 2018)." *Id.* The agency also pointed to its regulations, which state that the agency will not consider a benefit's tax consequences in calculating the benefit's amount. Appx000126; 19 C.F.R. § 351.503(e).

Appellants challenged this determination at the lower court, Appx000003, Appx000029, and now renew their challenge here. They argue that the plain language of Commerce's direct tax benefit regulation, 19 C.F.R. § 351.509(a)(1), required the agency to offset the 2017 tax credit by the value of the taxes paid in 2017 on the 2016 credit. Appellants' Br. at 57, 60. Appellants further claim that neither 19 C.F.R. § 351.503(e) nor 19 U.S.C. § 1677(6), which Commerce cited as support for its refusal to offset the credit, apply in this case. *Id.* at 60-62. These arguments are without merit.

Commerce's direct tax regulation states that, in the case of programs that exempt/remit direct taxes or reduce the base used to calculate the tax, "a benefit

exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." 19 C.F.R. § 351.509(a)(1). The agency's general benefit regulation states that "{i}n calculating the amount of a benefit, the {agency} will not consider the tax consequences of the benefit." 19 C.F.R. § 351.503(e). Meanwhile, 19 U.S.C. § 1677(6) defines "net countervailable subsidy," and specifies three types of values that the agency "may subtract from the gross countervailable subsidy" to arrive at the "net" subsidy amount. 19 U.S.C. § 1677(6). The subtractable values include export taxes levied for the specific purpose of offsetting countervailable subsidies, but do not include other types of taxes, such as non-export taxes paid on prior-year subsidy benefits. *Id.*

The heart of Appellants' claim is that Commerce's direct tax regulation unambiguously required offsetting. Appellants' Br. at 57-60. But Commerce reasonably found otherwise, given its general benefit regulation's statement that tax consequences will not be taken into account. And crucially, Commerce's interpretation of its regulation recognizes the Tariff Act's exhaustive identification of the values that may be subtracted from the gross amount of a countervailable subsidy. Appx000126-000127; S. Rep. No. 96-249, at 86 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 472 ("For purposes of determining the net subsidy, there is subtracted from the gross subsidy only the items specified in section 771(6). The list

is narrowly drawn and is all inclusive."); *see also Geneva Steel v. United States*, 914 F. Supp. 563, 609-10 (Ct. Int'l Trade 1996) (finding that the Tariff Act "provides an exclusive list of offsets that may be deducted from the amount of a gross subsidy and an offset for income tax payments is not among them."). Appellants' argument that Commerce misinterpreted its regulations fundamentally fails to acknowledge that the statute controls.

Appellants attempt to draw a distinction between tax credit programs and other types of subsidy programs that involve potentially taxable benefits, such as grants. Appellants' Br. at 60-61. They argue that the tax consequences of grant programs are "secondary," and thus reasonably subject to 19 C.F.R. § 351.503(e)'s prohibition on taking into account the tax consequences of a subsidy program. *Id.* By contrast, Appellants aver that the tax consequences of a tax credit "are the benefit" of the program. *Id.* As such, Appellants argue that taxes incurred by reason of prior usage of a tax credit program must be figured into the current-year benefit calculation. *Id.* Otherwise, as indicated by their reading of 19 C.F.R. § 351.509(a)(1), the program's benefits will be overstated. *Id.*

Appellants do not persuade that a meaningful distinction exists between taxable income generated through grants and that generated by a tax credit. In either case, the recipient winds up with more money in its pocket in a given tax year than it would have had absent the grant or credit received that year. Any taxes it may need

to pay on prior-year benefits are "not a component or a consequence of the {current} tax year {program}." Appx000125.

Commerce's interpretation of its regulations, unlike Appellants', is harmonious with the Tariff Act and with Congress's expressed expectations regarding offsets to countervailable subsidies. It is also reasonable overall. This Court should therefore affirm Commerce's calculation of the 2017 benefit of the Gaspésie Tax Credit program.

### D. Commerce Properly Analyzed the Specificity of the On-The-Job Tax Credit Program

To be countervailable, subsidy programs must not just confer a benefit that arises from a governmental contribution; they must also be "specific." 19 U.S.C. § 1677(5)(B). The Tariff Act provides that subsidy programs are *de facto* specific where, for example, "{t}he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number." *Id.* § 1677(5A)(D)(iii)(I). The SAA provides that Commerce is to apply the statute's provisions regarding specificity "as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy." SAA, H.R. Doc. No. 103-316, vol. 1 at 929 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242. The specificity test is not "intended to function as a loophole through which narrowly {focused} subsidies provided to or used by

discrete segments of an economy could escape the purview of the CVD law." *Id.* at 930, 1994 U.S.C.C.A.N. at 4242.

The GOQ allows corporations and individuals that hire students or apprentices enrolled in a qualified training program, and that obtain a third-party certification of compliance with this hiring requirement, to claim a tax credit. Appx001969-001970. Marmen claimed the credit for [number] trainees on its 2017 Québec income tax return, which was filed in calendar year 2018. Appx002591, Appx002899-Appx002903. Commerce analyzed the specificity of the program pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I) by comparing the number of business taxpayers in Québec against the number of business taxpayers that obtained tax credits under the "On-the-Job" program. Upon finding that only a very small percentage of business filers received program benefits, Commerce concluded that the program was *de facto* specific. Appx000028; Appx000129; *see also* Appx001982 (identifying number of business taxpayers); Appx002173 (identifying number of taxpayers benefiting from the On-the-Job tax credit Program).

Appellants claim that Commerce's methodology for analyzing whether program beneficiaries were "limited in number" violated the Tariff Act and Congressional intent, exceeded the agency's authority, and was inconsistent with the overall purpose of a specificity analysis. Appellants' Br. at 62-78. Appellants argue that the law requires Commerce to analyze whether beneficiaries are

disproportionately concentrated in a few industries or sectors (in which case there is *de facto* specificity) or are dispersed throughout the economy (in which case there is not such specificity). *Id.* at 66, 71-74. Appellants aver that the law accordingly forbids Commerce from simply comparing the actual number of beneficiaries against the total number of enterprises that could have undertaken the actions necessary to claim program benefits. *See id.* This argument is unavailing.

The Tariff Act explicitly recognizes that even where a government does not expressly limit a program's beneficiaries to particular enterprises or industries, the program may yet be *de facto* specific where "one or more of the following factors exist":

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
> (II) An enterprise or industry is a predominant user of the subsidy.
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii). Here, Commerce straightforwardly read the language of subsection (I) to permit the agency to first identify the number of actual subsidy recipients on an enterprise basis, and then determine whether that number was "limited" in relation to the pool of tax-filers able to perform the actions necessary to claim benefits (*i.e.*, hiring trainees and obtaining certificates attesting to their having done so).

Appellants argue that subsection (I)'s reference to the "number" of recipients prohibits this comparison, or the use of any comparisons in determining whether recipients are "limited." Appellants' Br. at 73-74. They likewise argue that the use of the terms "predominant" and "disproportionately" in 19 U.S.C. § 1677(5A)(D)(iii)(II)-(III) indicates that Commerce may not analyze whether recipients are "limited in number" for purposes of subsection (I) by reference to the overall percentage of tax-filers that receive benefits. *Id.* at 74. Instead, they assert simplistically that because the On-the-Job tax credit program was used by "thousands" of users across "many industries," its users could not reasonably or lawfully be considered "limited in number." *Id.* at 76.

The Tariff Act requires Commerce not only to consider the actual number of recipients, but to assess whether those recipients are in "limited in number." 19 U.S.C. § 1677(5A)(D)(iii)(I). But just as any meaningful analysis of whether a number is "large" or "small" requires a comparator, *see* Appellants' Br. at 72-73, so does any meaningful consideration of whether a number is limited. Nine is a large number when considered against a universe of ten; it is small when compared against the sum of stars in the universe itself. The number ninety-nine is not particularly limited against a pool of one hundred; it is limited against a pool of one hundred thousand.

In arguing that comparisons of any kind are beside the point, Appellants contend that the aim of the *de facto* specificity analysis is to determine whether a program is "widely" used in the sense of being by entities in different economic sectors. *Id.* at 73. But rather than force Commerce into simplistic examinations of usage across sectors, the statute permits Commerce to analyze subsidy usage "on an enterprise . . . basis." Here, whether "{t}he actual recipients of the subsidy, whether considered *on an enterprise* or industry basis, are limited in number." 19 U.S.C. § 1677(5A)(D)(iii)(I) (emphasis added). Appellants would read the phrase "on an enterprise . . . basis" out of the statute.

Further, Congress has indicated that the purpose of the specificity analysis is to "winnow out only those foreign subsidies which truly are broadly available *and widely used*." SAA at 929, 1994 U.S.C.C.A.N. at 4242 (emphasis added). Appellants do not convince that Commerce's analytical approach fails to serve this aim. Rather, the fact that only a tiny percentage of business tax-filers received the tax credit reasonably permitted Commerce to conclude the "On-the-Job" program was not widely used (even if it might be broadly available). Likewise, the fact that such a small percentage of overall business tax-filers received credits reasonably permitted Commerce to conclude, consistently with the statute, that the actual recipients of the subsidy were limited in number.

Appellants next argue that the structure of the Tariff Act's specificity provisions requires Commerce to first judge *de jure* specificity, and to proceed to analyze *de facto* specificity only if *de jure* specificity is not found. Appellants' Br. at 63-66. From this, they reason that any *de facto* analysis must be conducted against the backdrop of the agency's *de jure* findings, taking the *de jure* analysis into account. *Id.* They conclude that, because Commerce found that the GOQ does not expressly "limit" access to the On-the-Job Tax Credit program to specific enterprises, any comparison-based analysis should have compared the number of subsidy recipients against the number of tax-filers that met program prerequisites (*i.e.*, hired trainees and obtained certificates attesting to their having done so), rather than against the number of tax-filers for which the program was lawfully accessible (*i.e.*, all business tax filers). *Id.* at 64; *see also* Appx000025-Appx000026.

Appellants' reading of the statutory language is neither necessary nor particularly sensible. The statute's *de jure* provisions speak of express industry- or enterprise-specific "limits" on access to programs; the *de facto* provisions speak of programs for which the actual beneficiaries are "limited in number." 19 U.S.C. §§ 1677(5A)(D)(i) & (iii)(I). But the mere fact that the concept of a "limit" exists in both provisions does not compel Appellants' reading. In fact, the opposite reading would be more natural – that having found that program access is not *de jure* limited to specific enterprises or industries, the appropriate comparison group for

Commerce's *de facto* analysis is all corporate taxpayers, because all corporate taxpayers are legally authorized to perform the actions required to claim the subsidy, and to then claim it.

To the extent that Appellants argue that Commerce's analysis was inconsistent with the decision made by the World Trade Organization's Appellate Body in a dispute involving large civil aircraft, Appellants' Br. at 70-71, such arguments are foreclosed by 19 U.S.C. § 3512(c)(1). In any event, it is the Tariff Act that controls and, as detailed above, the statute's language, structure, and legislative history are unsupportive of Appellants' argument. Nor would Appellants' preferred methodology advance the purpose of the statute's specificity provisions. As explained in the SAA, the specificity analysis is meant to "winnow out" only truly widespread subsidies, *i.e.*, those that are both "broadly available and widely used." SAA at 929, 1994 U.S.C.C.A.N. at 4242. The specificity test is not "intended to function as a loophole through which narrowly {focused} subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law." *Id.* at 930, 1994 U.S.C.C.A.N. at 4242. Rather than support these aims, Appellants' methodology would result in the agency essentially comparing the pool of subsidy recipients to itself, ignoring the fact that relatively few business tax-filers utilized the subsidy program.

Appellants argue that Commerce's analysis of the On-the-Job Tax Credit program did not comport with its "longstanding prior practice of considering the number of users in the context of how widely the subsidy is used across the economy." Appellants' Br. at 75-76. But what Appellants deem the "percentage approach" is Commerce's standard method for determining *de facto* specificity under 19 U.S.C. § 1677(5A)(D)(iii)(I), particularly with regard to tax credit programs. For example, in *Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea*, Commerce analyzed a tax credit and found it *de facto* specific based on section 771(5A)(D)(iii)(I), explaining that:

> {I}t is appropriate to include all corporate tax returns in our analysis of de facto specificity. In order to determine whether these {} tax credits are broadly available and widely used throughout an economy, we examined both the nominal number of recipients of each of these {} tax incentives . . . and compared the actual number of the users of these {} tax incentives to the actual number of corporate tax returns.

Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-To-Length Plate From the Republic of Korea*, 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) (final affirm. countervailing duty deter. and final neg. critical circumstances deter.) at cmt. 10. Likewise, Commerce employed this approach to analyzing tax programs in its investigations into Canadian aircraft and fabricated steel structures. *FSS from Canada* IDM at 35; Issues and Decision Memorandum accompanying *100- to 150-Seat Large Civil Aircraft From Canada*,

82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017) (final affirm. countervailing duty deter.) at cmt. 19.

Notably, none of the cases that Appellants cite involve tax credits. *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) (concerning an asset revaluation program); *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316, 1330 (Ct. Int'l Trade 2018) (concerning the governmental provision of inputs for less than adequate remuneration); *Royal Thai Gov't v. United States*, 341 F. Supp. 2d 1315 (Ct. Int'l Trade 2004), *aff'd in part, rev'd in part on other grounds & remanded*, 436 F.3d 1330, 1336 (Fed. Cir. 2006) (concerning debt restructuring programs); *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) (involving a voluntary electricity curtailment program).

Further, as the lower court noted, *Royal Thai Government, AK Steel*, and *Bethlehem Steel* did not "involve a finding of 'limited in number' specificity alone." Appx000027-000028. As for *Changzhou Trina*, the lower court in that case was concerned with parties' ability to manipulate the definition of "industry" for the purpose of specificity analyses conducted on an industry basis. Such concerns simply do not arise here, where the analysis was conducted on an enterprise basis.

A more relevant prior case is *Wilmar Trading PTE Ltd. v. United State*s, 466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020). While not involving a tax credit, the lower court there considered a challenge to Commerce's comparison of the number of

industries using a particular Indonesian subsidy program against "all possible subsidy recipients within the economy of Indonesia." *Id.* at 1357-58. The Court held that the agency's comparison "complied with both the statute's requirement of *de facto* specificity, and the SAA's direction to avoid countervailing subsidies with a widespread benefit throughout an economy." *Id.* at 1358. While Commerce conducted the analysis underlying *Wilmar Trading* on an industry basis, the statutory language equally authorizes assessment on an enterprise basis. As in *Wilmar Trading*, Commerce's assessment of *de facto* specificity here comports with the statutory language and fulfills the SAA's direction that Commerce apply a "rule of reason" that prevents findings of countervailable subsidies only where subsidy benefits are "truly widespread." SAA at 929-30, 1994 U.S.C.C.A.N. at 4242.

Finally, Appellants argue that Commerce's methodology renders 19 U.S.C. § 1677(5A)(D)(iii)(I) meaningless, and thus produces absurd results. Appellants' Br. at 76-78. As explained above, Appellants are incorrect in this assertion. Rather, it is Appellants whose preferred reading risks rendering 19 U.S.C. § 1677(5A)(D)(iii)(I) a nullity. Rather than producing absurd results, Commerce's approach in the review at bar – determining whether a tax credit program was widely used by (1) identifying the number of business taxpayer beneficiaries and (2) comparing this against the total number of business taxpayers – was grounded in a reasonable interpretation of the statute that advanced the purpose expressed by Congress. It also produced a

reasonable result in this case, given that no more than two percent of business tax filers received the subsidy. Appx000028. Accordingly, Commerce's specificity analysis regarding the On-the-Job Tax Credit should be affirmed.

## VII. CONCLUSION

For the foregoing reasons, Commerce's final affirmative CVD determination regarding Canadian wind towers should be affirmed.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade Coalition*

Dated: December 9, 2022

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1807

**Short Case Caption:** Government of Quebec v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 10,943 words.
- ☐ the filing has been prepared using a monospaced typeface and includes ______ lines of text.
- ☐ the filing contains ______ pages / ______ words / ______ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ______).

Date: 12/09/2022

Signature: /s/ Alan H. Price

Name: Alan H. Price

Save for Filing