2022-1807

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

THE GOVERNMENT OF QUÉBEC, MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., THE GOVERNMENT OF CANADA,
*Plaintiffs-Appellants*

v.

UNITED STATES, WIND TOWER TRADE COALITION,
*Defendants-Appellees*

Appeal from the United States Court of International Trade
in Case No. 20-00168, Judge Gary S. Katzmann

# BRIEF FOR DEFENDANT-APPELLEE UNITED STATES


BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
PAUL KEITH
Senior Attorney
Department of Commerce
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

JOSHUA E. KURLAND
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Email: Joshua.E.Kurland@usdoj.gov
*Attorneys for Defendant-Appellee*


December 9, 2022

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES ........................................................................ 1

STATEMENT OF THE CASE ........................................................................ 2

STATEMENT OF FACTS ........................................................................ 2

I. The Countervailing Duty Statute ........................................................................ 2

II. Administrative Proceedings ........................................................................ 3

III. Trial Court Proceedings ........................................................................ 6

SUMMARY OF THE ARGUMENT ........................................................................ 9

ARGUMENT ........................................................................ 12

I. Standard Of Review ........................................................................ 12

II. Commerce Lawfully Determined Not To Revise Marmen's Sales Denominator Based On An Auditor's Adjustment That Commerce Determined Was Unverified And Unreliable ........................................................................ 14

A. Commerce Reasonably Determined That The Auditor's Adjustment Was Unreliable Based On Errors Identified Through Verification ........................................................................ 15

B. Commerce's Determination Is Consistent With, And Supported By, The Facts Detailed In The Verification Report ........................................................................ 23

C. Commerce's Determination Is Consistent With Its Practice And Regulations Because Commerce Has An Obligation To Verify Reported Information ........................................................................ 29

III. The Trial Court Lawfully Sustained Commerce's Determination That The Additional Depreciation For Certain Class 1 Assets Program Conferred A Countervailable Benefit And Financial Contribution ........................................................................ 34

A. Commerce's Determination That The Additional Depreciation For Class 1 Assets Program Conferred A Countervailable Benefit Is Supported By Substantial Evidence ....................................................34

B. Commerce Reasonably Evaluated The Nature And Structure Of The Additional Depreciation For Certain Class 1 Assets Program..........37

C. Commerce Lawfully Interpreted And Applied Its Direct Tax Benefit Regulation..........................................................................41

D. Commerce's Determination That The Additional Depreciation For Class 1 Assets Program Provided A Financial Contribution Is Supported By Substantial Evidence And Otherwise Lawful ...............43

IV. Commerce's Determination Of The Benefit Under The GASPÉTC Program Is Supported By Substantial Evidence And Otherwise Lawful......46

A. Commerce's Decision Not To Offset The GASPÉTC Program's Benefit With A Previous Year's Tax Liability Is Consistent With The Governing Authorities And Commerce's Practice ...........................46

B. Appellants' Claims Based On 19 C.F.R. § 351.509(a)(1) Lack Merit ....54

V. The Trial Court Lawfully Sustained Commerce's Determination That Québec's Tax Credit For On-The-Job Training Is *De Facto* Specific..........58

A. Commerce Reasonably Determined That Québec's Tax Credit For On-The-Job Training Is *De Facto* Specific By Comparing The Actual Recipients To The Overall Number Of Tax Filers.......................58

B. Appellants Both Failed To Exhaust And Waived Their Argument That The Statute Requires The *De Jure* Specificity Analysis To Inform The *De Facto* Specificity Analysis .............................................62

C. In Any Event, Appellants' Argument That The *De Jure* Specificity Analysis Must Inform The *De Facto* Specificity Analysis Lacks Merit .........................................................................................66

D. Appellants Mischaracterize Commerce's Determination In Claiming That Commerce Found The On-The-Job Training Program *De Facto* Specific Based On Lack Of "Near Universal Application And Use" ......72

CONCLUSION ......78

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
802 F.3d 1339 (Fed. Cir. 2015) .......... 12, 26

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
992 F. Supp. 2d 1285 (Ct. Int'l Trade 2014),
*aff'd*, 802 F.3d 1339. 1357 (Fed. Cir. 2015) .......... 26

*AK Steel Corp. v. United States*,
192 F.3d 1367 (Fed. Cir. 1999) .......... 59 , 74, 75

*Apex Frozen Foods Priv. Ltd. v. United States*,
37 F. Supp. 3d 1286 (Ct. Int'l Trade 2014),
*aff'd*, 862 F.3d 1322 (Fed. Cir. 2017) .......... 65

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .......... 13

*Auer v. Robbins*,
519 U.S. 452 (1997) .......... 42

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
No. 17-00198, 2019 WL 5856438 (Ct. Int'l Trade Nov. 8, 2019) .......... 76

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .......... 13, 14, 42

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) .......... 13

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 12

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) .......... 13

*Corus Staal BV v. Dep't of Comm.*,
395 F.3d 1343 (Fed. Cir. 2005) .......................................................................70

*Corus Staal BV v. United States*,
30 C.I.T. 1040 (2006), *aff'd*, 502 F.3d 1370 (Fed. Cir. 2007) .............................65

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007) ........................................................... 63, 64, 65

*CP Kelco US, Inc. v. United States*,
No. 13-00288, 2015 WL 1544714 (Ct. Int'l Trade Mar. 31, 2015) .....................33

*Fine Furniture (Shanghai) Ltd. v. United States*,
748 F.3d 1365 (Fed. Cir. 2014) .........................................................................2

*Geneva Steel v. United States*,
914 F. Supp. 563 (Ct. Int'l Trade 1996) ...................................................... 51, 59

*Goodluck India Limited v. United States*,
11 F.4th 1335 (Fed. Cir. 2021) ........................................................... 15, 25, 27

*Government of Quebec v. United States*,
567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) .........................................................2

*JBF RAK LLC v. United States*,
790 F.3d 1358 (Fed. Cir. 2015) .................................................................. 14, 64

*Kajaria Iron Castings Pvt. Ltd, v. United States*,
156 F.3d 1163 (Fed. Cir. 1998) ..........................................................51, 52, 52-53

*Kiswok Indus. Pvt. Ltd. v. U.S.*,
28 C.I.T. 774 (2004) .........................................................................................52

*Linyi Chengen Imp. & Exp. Co. v. United States*,
391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) .......................................................28

*Mid Continent Steel & Wire, Inc. v. United States*,
203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) .......................................................33

*Mittal Steel Point Lisas Ltd. v. United States*,
548 F.3d 1375 (Fed. Cir. 2008) .......................................................................64

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .......................................................................13

*Novosteel SA v. United States*,
284 F.3d 1261 (Fed. Cir. 2002) .......................................................................65

*PPG Indus., Inc. v. United States*,
928 F.2d 1568 (Fed. Cir. 1991) .......................................................................59

*PSC VSMPO-Avisma Corp. v. United States,*
688 F.3d 751 (Fed. Cir. 2012) ....................................................................... 14, 75

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed.Cir.1990) .......................................................................64

*Royal Thai Gov't v. United States*,
436 F.3d 1330 (Fed. Cir. 2006) ....................................................................... *passim*

*SeAH Steel VINA Corp. v. United States*,
269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017) ................................................ 30, 31

*Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*
268 F.3d 1376 (Fed. Cir. 2001) .......................................................................12

*Timken Co. v. United States*,
354 F.3d 1334 (Fed. Cir. 2004) .......................................................................13

*U.S. Steel Grp. v. United States*,
96 F.3d 1352 (Fed. Cir. 1996) .......................................................................14

*Union Steel v. United States*,
713 F.3d 1101 (Fed. Cir. 2013) .......................................................................12

*United States v. Eurodif*,
555 U.S. 305 (2009) ....................................................................... 12, 14

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952) ....................64

*Woodford v. Ngo*,
548 U.S. 81 (2006) .................... 64-65

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
256 F. Supp. 3d 1346 (Ct. Int'l Trade 2017)....................64

**Statutes**

19 U.S.C. § 1516a(b) ....................12

19 U.S.C. § 1671(a) ....................2

19 U.S.C. § 1677(5) .................... 3, 43, 58

19 U.S.C. § 1677(5A) ....................*passim*

19 U.S.C. § 1677(6) ....................*passim*

19 U.S.C. § 1677e(a)....................*passim*

19 U.S.C. § 1677m(i)....................*passim*

28 U.S.C. § 2637(d) ....................63

28 U.S.C. § 2639(a) ....................12

19 U.S.C. § 3512(a) ....................69

19 U.S.C. § 3512(d) ....................7

**Regulations**

19 C.F.R. § 351.309(c)....................64

19 C.F.R. § 351.502(a).................... 59, 74

19 C.F.R. § 351.502(b) ....................58

19 C.F.R. § 351.503(e) ........ *passim*

19 C.F.R. § 351.504 ........ 52

19 C.F.R. § 351.509(a) ........ *passim*

19 C.F.R. § 351.509(b) ........ 46, 48

19 C.F.R. § 351.509(c) ........ 48

19 C.F.R. § 351.525(a) ........ 3

**Administrative Determinations**

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,946 (Dep't of Commerce July 29, 2016) ........ 62

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 86 Fed. Reg. 60,797 (Dep't of Commerce Nov. 4, 2021) ........ 53

*Certain Softwood Lumber Products From Canada*, 85 Fed. Reg. 77,163 (Dep't of Commerce Dec. 1, 2020) ........ 62, 76

*Certain Softwood Lumber Products from Canada*, 87 Fed. Reg. 48,455 (Dep't of Commerce Aug. 9, 2022) ........ 66, 68, 71

*Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 71 Fed. Reg. 67,098 (Dep't of Commerce Nov. 20, 2006) ........ 32

*Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 73 Fed. Reg. 1,202 (Dep't of Commerce Jan. 7, 2008) ........ 32

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) ........ 51-52, 53, 74

*Phosphate Fertilizers from the Kingdom of Morocco*, 86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021) ........ 76

*Supercalendered Paper From Canada*, 82 Fed. Reg. 18,896 (Dep't Commerce Apr. 24, 2017) ........ 53

*Utility Scale Wind Towers From Canada*,
84 Fed. Reg. 68,126 (Dep't of Commerce Dec. 13, 2019) ....................................4

*Utility Scale Wind Towers from Canada*,
85 Fed. Reg. 40,245 (Dep't of Commerce July 6, 2020) .......................................5

*Utility Scale Wind Towers From Canada, Indonesia, and the Socialist Republic of Vietnam*,
84 Fed. Reg. 38,216 (Dep't of Commerce Aug. 6, 2019) ......................................3

**Legislative History**

S. Rep. No. 249, 96th Cong., 1st Sess. (1979),
*reprinted in* 1979 U.S.C.C.A.N. 381 .....................................................................51

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 4040 ......................................................... *passim*

**World Trade Organization Materials**

Agreement on Subsidies and Countervailing Measures, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A
1869 U.N.T.S. 14 (Apr. 15, 1994)...........................................................................70

*United States – Measures Affecting Trade in Large Civil Aircraft (Second Complaint), Recourse to Article 21.5 of the DSU by the European Union*,
WTO Doc. WT/DS353/AB/RW (adopted Apr. 12, 2019) ..................... 69, 70, 71

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for appellee states that he is unaware of any other appeal in or from this civil action that was previously before this Court or any other appellate court, and is also unaware of any case pending before this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF THE ISSUES

1. Whether the trial court lawfully sustained the Department of Commerce's determination to exclude as unreliable an auditor's foreign exchange adjustment to the financial statements of appellants Marmen Inc. and Marmen Énergie, when Commerce identified multiple errors in the auditor's adjustment.

2. Whether the trial court lawfully sustained Commerce's determination that Canada's increased depreciation deduction for certain subsets of "Class 1" buildings provides a countervailable benefit and financial contribution to Marmen.

3. Whether the trial court lawfully sustained Commerce's calculation of the benefit for the Government of Québec's Tax Credit to Promote Employment in Gaspésie and Certain Maritime Regions of Québec (GASPÉTC) program, when Commerce did not offset the benefit that Marmen received under this program during the period of investigation by the income tax effect of benefits that Marmen had received under the program in the prior tax year.

4. Whether the trial court lawfully sustained Commerce's determination that Québec's on-the-job training tax credit is *de facto* specific, when the number of recipients of the tax credit was limited relative to the total number of tax filers in the economy during the period of investigation.

## STATEMENT OF THE CASE

Plaintiffs-appellants Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, Marmen), the Government of Québec (GOQ), and the Government of Canada (GOC) appeal the trial court's decision in *Government of Quebec v. United States*, 567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022), which sustained the final results of Commerce's countervailing duty investigation concerning utility scale wind towers from Canada.

## STATEMENT OF FACTS

### I. The Countervailing Duty Statute

This case concerns the Department of Commerce's authority to enforce the nation's countervailing duty (CVD) laws. The CVD statute is "a remedial measure that provides relief to domestic manufacturers by imposing duties upon imports of comparable foreign products that have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014) (citing 19 U.S.C. § 1671(a)). "The statute mandates that if 'the government of a country or any public entity within the territory of a country' is providing a countervailable subsidy with respect to the production or exportation of specific merchandise, 'then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy.'" *Id.*

Under the CVD statute, a countervailable subsidy exists if (1) a foreign government has directly or indirectly provided a "financial contribution"; (2) a "benefit" is thereby conferred upon the recipient (in this case, Marmen); and (3) the subsidy is "specific" to an enterprise, industry, or group of such enterprises or industries. 19 U.S.C. § 1677(5)-(5A). Commerce then calculates a subsidy rate for a given government program by dividing the amount of the benefit allocated to the one-year period of investigation by the respondent's relevant sales value during the investigation period (sometimes called the "sales denominator" in Commerce's calculations). 19 C.F.R. § 351.525(a).

## II. Administrative Proceedings

In July 2019, appellee Wind Tower Trade Coalition (WTTC) filed a CVD petition concerning imports of utility scale wind towers from several countries, including Canada. Commerce subsequently initiated a countervailing duty investigation covering those imports. *Utility Scale Wind Towers From Canada, Indonesia, and the Socialist Republic of Vietnam*, 84 Fed. Reg. 38,216 (Dep't of Commerce Aug. 6, 2019) (initiation notice). Commerce selected Marmen Inc. and Marmen Énergie as mandatory respondents in the investigation because they were the two largest exporters of subject merchandise by volume to the United States during the period of investigation. Appx371-72.

In December 2019, Commerce issued an affirmative preliminary determination, calculating a countervailable subsidy rate of 1.09 percent for Marmen (having determined that Marmen Inc. and Marmen Énergie are cross-owned entities). *Utility Scale Wind Towers From Canada*, 84 Fed. Reg. 68,126, 68,127 (Dep't of Commerce Dec. 13, 2019), and accompanying Prelim Decision Memo (PDM) (Appx8385-8418). Commerce preliminarily found multiple programs countervailable, including several at issue in this case: (1) the Government of Québec's Tax Credit to Promote Employment in Gaspesie and Certain Maritime Regions of Québec (GASPÉTC); (2) Québec's tax credit for on-the-job training; and (3) additional depreciation for certain subsets of Class 1 assets at the federal and provincial levels in Canada (allowing recipients to claim higher depreciation for manufacturing assets than otherwise applicable). Appx8396-8401.

Following the preliminary determination, Commerce conducted verification of information that Marmen had submitted. Appx76; *see also* Appx8653-8708 (Verification Report). As part of the verification process, Commerce reviewed an auditor's adjustment relating to currency conversion issues that Marmen had first included in a sales reconciliation subsequent to its initial questionnaire responses. Appx113-117. When checking the adjustment through verification, Commerce identified multiple errors in the adjustment. *Id.* These included instances in which sales supposedly made in U.S. Dollars (USD) (which were then converted to

Canadian Dollars (CAD)) were recorded in Marmen's general ledger as having *actually* been made in Euro, as well as further instances in which sales paid in Canadian Dollars were treated as USD sales, and thus erroneously "converted" from USD to CAD by the auditor adjustment. Appx115. In some cases, the errors stemmed from Marmen's general ledger sales accounts because they wrongly identified the currency of the sale. *Id.*

In June 2020, Commerce issued its affirmative final determination, maintaining its findings regarding the GASPÉTC program, Québec's tax credit for on-the-job training, and the additional depreciation for certain Class 1 assets. Appx92-99, Appx123-129; *see also Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,245 (Dep't of Commerce July 6, 2020) (*Final Determination*), and accompanying Issues and Decision Memo (IDM) (Appx74-146). Commerce also determined—having identified errors in the auditor's adjustment at verification—not to adjust Marmen's sales figures in the denominator of Commerce's CVD calculations based on the auditor's adjustment. Appx111-117. Instead, as the "facts available" pursuant to 19 U.S.C. § 1677e(a)(2)(D), Commerce relied on Marmen's sales information as recorded in Marmen's own general ledger to determine Marmen's total sales. Appx116.

Based on these determinations, Commerce calculated a final CVD subsidy rate of 1.18 percent for Marmen. *Final Determination*, 85 Fed. Reg. at 40,246.

## III. Trial Court Proceedings

The Government of Québec, the Government of Canada, Marmen, and WTTC commenced lawsuits to challenge various aspects of Commerce's final determination in the investigation. Specifically, Marmen challenged Commerce's determination that the auditor's adjustment was unreliable based on the errors that Commerce had identified through verification. Marmen and the Government of Québec challenged Commerce's calculation of the benefit under the GASPÉTC program, in which Commerce declined to offset the benefit by Marmen's income tax liability from receiving the previous year's benefit under the program. The Government of Québec and the Government of Canada challenged Commerce's finding that Québec's tax credit for on-the-job training is *de facto* specific because the number of recipients was limited on an enterprise basis, as well as Commerce's determination that the additional depreciation for certain Class 1 buildings used in manufacturing constitutes a countervailable financial contribution. WTTC challenged a separate aspect of Commerce's determination concerning the Québec Local Content Requirement program, and did not appeal the trial court's judgment sustaining Commerce's determination.

The trial court sustained Commerce's final determination in full. Regarding the auditor's adjustment, the trial court held that the errors Commerce identified "undermine the reliability of data more broadly." Appx18 (citation omitted). It

elaborated that, having discovered through verification various errors in the adjustment, "Commerce could reasonably infer that there may remain other errors." Appx18-19. Hence, although the effect of the discovered errors on the proposed foreign currency adjustment, taken alone, may have been small in absolute terms, Commerce's determination that the auditor's adjustment was unreliable was supported by substantial evidence and otherwise lawful. *Id.*

For Commerce's finding that Québec's tax credit for on-the-job training is *de facto* specific, the trial court held that Commerce's comparison of the actual recipients of the subsidy to the total number of tax filers during the investigation period "neither fails to comply with the statutory language nor contravenes the underlying aims set out in the {Statement of Administrative Action}." Appx27.[1] The trial court further held that Commerce did not "err by using all corporate tax filers as the comparator group when assessing subsidy specificity" when "it was reasonable to think that a comparison to corporate tax filers would be instructive in determining whether the subsidy is widely spread throughout the economy or limited to a small number of enterprises." *Id.* Lastly, the trial court concluded

[1] The Statement of Administrative Action (SAA) "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and {the Uruguay Round Agreements Act} in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d); *see also* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 (SAA).

that, "where only 2% of taxpayers received the disputed benefit, it cannot be said (without more) that Commerce's identification of a limited benefit, and thus of a de facto specific subsidy, is unreasonable." Appx28.

Regarding the benefit conferred by the GASPÉTC program, the trial court held that "Commerce's benefit determination was a reasonable interpretation of the statute and regulations." Appx30. The Government of Québec and Marmen had argued that Commerce must offset its calculation of the program's benefit by the increased income tax liability that Marmen paid based on its receipt of the tax credit under the program in the previous year. The trial court recognized, however, that Commerce's regulations at 19 C.F.R. § 351.503(e) prohibit Commerce from considering the tax consequences of a benefit. *Id.* The trial court thus observed, consistent with section 351.503(e), that "Commerce's prior investigations reflect a uniform policy of ignoring tax consequences." *Id.* Hence, notwithstanding the plaintiffs' citation to other regulations, the trial court explained that "{t}o read the regulations as GOQ and Marmen urge would create an island where Commerce considers income tax effects in an ocean where it does not." Appx31. The trial court consequently sustained Commerce's determination not to consider secondary income tax consequences of the GASPÉTC subsidy as reasonable.

Finally, the trial court sustained Commerce's determination that the additional depreciation for certain Class 1 buildings used in manufacturing, as

compared to the lower rate that was otherwise applicable to those buildings, constituted a countervailable financial contribution. The trial court explained that "{n}either the statutory financial contribution definition nor 'Direct Taxes' regulation unambiguously requires Commerce to compare the challenged program to itself, or to the treatment allegedly justified by empirical study, where a default tax rate is applicable in the absence of the challenged program." Appx33. Therefore, the trial court found that Commerce's determination comparing the otherwise applicable tax treatment to the tax treatment resulting from the additional depreciation program was reasonable. Regarding the arguments that the increased depreciation rate was intended to reflect the actual shorter useful life of buildings used in manufacturing, the trial court explained that "Commerce reasonably concluded that where a taxpayer can opt-in to more favorable treatment, it is reasonable for Commerce to confine its analysis to the comparisons provided for by law, even if the more favorable treatment better reflects economic reality." Appx35. Accordingly, the trial court sustained Commerce's determination.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Each of Commerce's determinations is lawful and should be affirmed.

First, Commerce's determination not to rely on Marmen's unverifiable auditor's adjustment is reasonable because, through verification, Commerce

identified errors affecting the adjustment. Commerce thus acted consistently with the statute's directives to verify the information on which Commerce relies and to resort to the facts otherwise available when information cannot be verified. Contrary to appellants claims, Commerce's determination is supported by its verification report, Commerce's approach to verification was reasonable under the circumstances, and Commerce did not contravene an established practice.

Second, Commerce reasonably found that the additional depreciation for certain Class 1 assets (*i.e.*, buildings primarily used for manufacturing) conferred a countervailable financial contribution and benefit to Marmen because it allowed Marmen to claim more depreciation on its buildings than it otherwise could have. Because the base depreciation rate for Class 1 assets for tax purposes is four percent, Commerce's determination that the additional six percent depreciation available for certain buildings used in manufacturing conferred a countervailable benefit is reasonable. Additionally, whether the actual depreciation rate for such buildings corresponds to their depreciation rates for tax purposes is immaterial to the fact that the program results in additional depreciation above the base rate, thereby providing a financial contribution from forgone revenue.

Third, Commerce's calculation of Marmen's benefit for the GASPÉTC tax program appropriately did not include the income tax effects of benefits under the program from prior years. Reducing the calculated benefit in the period of

investigation to account for the tax burden from benefits in prior years would amount to an offset, but the statute does not permit such an offset. Additionally, Commerce's regulations specifically instruct Commerce not to consider the tax effects of a subsidy. Therefore, Commerce acted consistently with the statute and its regulations in calculating Marmen's benefit under the program.

Fourth, Commerce reasonably found that Québec's on-the-job tax credit program is *de facto* specific because the number of recipients is limited on an enterprise basis. Commerce's finding that the users are limited in number is supported by substantial evidence because, although there are many users of the program, there are vastly more companies that are not recipients. Appellants both failed to exhaust and waived their argument that the statute requires the separate *de jure* specificity analysis to inform Commerce's analysis of *de facto* specificity, but even if they had not the argument lacks merit because the tests are distinct and covered by different statutory provisions. Additionally, Commerce's approach of comparing the subsidy recipients to the overall number of tax filers is reasonable, given the SAA's authoritative guidance stating that the specificity test is meant to screen-out only those programs that "truly are broadly available and widely used throughout an economy." SAA at 929, 1994 U.S.C.C.A.N. 4040, 4242.

# ARGUMENT

## I. Standard Of Review

This Court upholds Commerce's determination unless it is unsupported by substantial record evidence, or otherwise unlawful. *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies . . . are conclusive unless unsupported by substantial evidence."). Although this amounts to repeating the trial court's work, this Court has stated that it "will not ignore the informed opinion of the {trial court}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and quotation marks omitted). Likewise, the Court has recognized "Commerce's special expertise" in administering the trade remedy statutes. *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001); *see also* 28 U.S.C. § 2639(a)(1) (Commerce determination "is presumed to be correct").

Substantial evidence connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence.

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). The Court may not overturn a determination "simply because {it} would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted). Hence, a party disputing Commerce's determination as unsupported by substantial evidence "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains a determination if it is reasonable and supported by the record as a whole, including detracting evidence. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The Court first determines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent. *Id.* at 842-43. If the statute does not answer the issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In such circumstances, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable

resolution of language that is ambiguous." *Eurodif II*, 555 U.S. at 316 (citations omitted). Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Id.*

Finally, this Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In such circumstances, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.* Indeed, this Court recognizes that the trade remedy statutes reveal "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement the statutes' dictates. *PSC VSMPO-Avisma Corp. v. United States,* 688 F.3d 751, 764 (Fed. Cir. 2012) (citation omitted).

## II. Commerce Lawfully Determined Not To Revise Marmen's Sales Denominator Based On An Auditor's Adjustment That Commerce Determined Was Unverified And Unreliable

To derive the sales denominator for its subsidy calculations, Commerce was required to calculate Marmen's total sales figure less its intercompany sales. In its final determination, Commerce calculated Marmen's total sales relying upon the sales information for Marmen Inc. and Marmen Énergie that Marmen recorded in

its own general ledgers. Appx116. Commerce explained that this was necessary because it had found Marmen's auditor adjustment to convert U.S. dollar (USD)-denominated sales to Canadian dollars (CAD) unverified and unreliable based on multiple errors affecting the adjustment identified through verification. Appx113-117. Contrary to appellants' claims, Commerce's determination is supported by substantial evidence and lawful. *See* Appx14-19 (sustaining determination).

### A. Commerce Reasonably Determined That The Auditor's Adjustment Was Unreliable Based On Errors Identified Through Verification

The CVD statute directs Commerce to "verify all information relied upon in making . . . a final determination in an investigation{.}" 19 U.S.C. § 1677m(i). The statute also directs Commerce to use the "facts otherwise available" to reach its determination if a party provides information that cannot be verified. 19 U.S.C. § 1677e(a)(2)(D). This Court correspondingly has explained that "{v}erification represents a point of no return. The purpose of verification is to test information provided by a party for accuracy and completeness." *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) (citations and quotation marks omitted). Thus, as Commerce explained in its verification agenda in this case, "verification is not intended to be an opportunity for the submission of new factual information." Appx8543.

When conducting verification, "Commerce enjoys 'broad discretion' to promulgate and enforce its procedural rules." *Goodluck*, 11 F.4th at 1344 (citation

omitted). As Commerce's verification agenda explained, "{i}t is the responsibility of the respondent to be fully prepared for this verification." Appx8543. Relevant for purposes of this case, the verification agenda also directed Marmen to "review the total sales, total export sales, and total U.S. export sales reported in {Marmen's supplemental questionnaire responses} . . . and reconcile (tie) those sales values from these exhibits to the overall sales values in the applicable company's general ledger, relevant trial balance, and relevant financial statements." Appx8549.

Notably, Marmen did not include an auditor's adjustment when reporting its sales in its initial questionnaire responses, nor provide any explanation about its sales being reported in mixed currencies. As Commerce explained, in response to Commerce's initial questionnaire, "Marmen submitted Marmen Inc.'s and Marmen Énergie's 'Total Sales' figures for 2007-2018, along with a break-down of these figures into several sales categories." Appx113. The "'Total Sales' figures and intercompany sales figures were consistent, apart from insignificant rounding errors, with the figures previously reported." Appx113-114. For the preliminary determination, Commerce used these sales figures, based on Marmen's reporting, as the sales denominators in Commerce's calculations. Appx8392 (discussing Appx8421, Appx8428).

Following the preliminary determination, Marmen submitted a ministerial error allegation asserting that an "an adjustment to the sales denominator used in

the preliminary determination is required," despite acknowledging that the "sales value used in the preliminary determination corresponds with the total {free-on-board} sales revenue (net of intercompany transactions) recorded in Marmen Inc.'s and Marmen Énergie's general ledgers ('GL')." Appx114; Appx8435. In support of this allegation, Marmen cited a line item that it had included for the first time in sales reconciliation exhibits that it had submitted when responding to a request in Commerce's third supplemental questionnaire, in which Commerce asked for a reconciliation of Marmen's sales figures. Appx114. The line item was listed as "Year End auditor adjustment in GL 40000 for Gain(loss) exchange rate," and Marmen did not explain it in submitting the questionnaire response and related reconciliation exhibits. *Id.* Indeed, there was no discussion of the line item in the questionnaire response, and the exhibits contained only the line-item name with no explanation about the reason for the adjustment. Appx8092, Appx8118.

Then, in its ministerial error allegation, Marmen alleged that the line item represented a necessary adjustment to "translate all sales revenue recorded in the GL to Canadian dollars." Appx114; Appx8435. Essentially, Marmen stated that it had recorded USD-denominated sales in its general ledger without converting them to Canadian dollars. Hence, according to Marmen, an adjustment was needed. *Id.* Commerce found that it had not made a ministerial error because there was no "error in addition, subtraction, or other arithmetic function, clerical error resulting

from inaccurate copying, duplication or the like," and thus did not change the preliminary determination. Appx8452-8453.

Commerce then sought to examine the auditor's adjustment at verification. Specifically, as we explained above, Commerce's verification agenda directed Marmen to reconcile the sales figures reported in its supplemental questionnaire responses with the values recorded in Marmen's general ledgers and financial statements. Appx8549. Then, at verification, Commerce retrieved sales listed in several of Marmen Inc.'s general ledger accounts and filtered them by currency to confirm that Marmen had correctly identified its USD-denominated sales in connection with the auditor's adjustment. Appx8679 (listing accounts).

In doing so, as Commerce detailed in its verification report, it identified multiple errors affecting the auditor's adjustment. Marmen personnel explained that the auditor's adjustment was necessary to convert USD sales to CAD because sales were recorded in mixed currencies on a one-to-one basis in the company's general ledger for the years 2016 to 2018. Appx8676; Appx115.[2] Notwithstanding this explanation, Commerce found that certain sales Marmen reported as needing to be converted from USD to CAD were coded in Marmen's general ledger as paid in Euro. Appx8677, Appx8679. Further, after asking Marmen to retrieve the

[2] Company officials stated that they had similarly recorded sales in mixed currencies for previous years, but had not applied an adjustment to those years because exchange rates were almost equivalent. Appx115 (citing Appx8676).

original documentation for these four sales, Commerce found that two were *actually* paid in CAD, while two others were indeed paid in Euro, despite all being identified as USD sales needing conversion in the adjustment. Appx8679-8680. Thus, although the USD to CAD conversion was applied to each of these sales, none were paid in USD, and two were already in CAD.

A second account Commerce examined likewise included a misclassified sale that Marmen included among the USD sales needing conversion, but which was actually invoiced in Euro. Appx8680. In short, of the five Marmen, Inc. sales accounts that Commerce checked at verification, two contained errors affecting the reliability of the auditor's adjustment, and the errors were of two separate kinds: (1) sales treated as paid in USD but recorded as paid in Euro, and (2) sales treated as USD and recorded as Euro that were actually paid in CAD.

When Commerce asked company officials about the misclassifications, they explained that they submitted their general ledger to the auditor, Deloitte, and relied on the classification that Deloitte performed. Appx8680. Further, company personnel attributed the misclassification of a sale coded as being paid in Euro, but actually paid in CAD, to an internal coding mistake. *Id.* Commerce also stated that it had confirmed that there were no additional Euro coded sales in the accounts it reviewed, but (contrary to appellants' claims) it *did not* make any findings that the remainder of the auditor's adjustment was free from errors. *Id.*

Relatedly, Commerce's verification report discussed Marmen's need to restate Marmen Inc.'s and Marmen Énergie's audited financial statements due to foreign exchange-related errors. Appx115-116; Appx8668-8671. Commerce explained that "an error in the presentation of exchange gains and losses in the audited financial statements" had prompted an additional review by the auditor of the financial statements. Appx8668. Specifically, "Deloitte personnel explained that Marmen reached out to Deloitte when Marmen was asked in a Commerce antidumping questionnaire to reconcile their USD currency transactions. It was found that in the information that Marmen was trying to explain, one item was not converted into USD. That question prompted Marmen to look at its foreign exchange gains and losses." *Id.* As a result of Deloitte's review, Marmen was required to issue restated audited financial statements in December 2019 (*i.e.*, after it submitted the adjustment that Commerce was attempting to verify). Appx8669.

Commerce outlined these facts in its final determination, and ultimately concluded that the errors identified through verification undermined the accuracy and reliability of the auditor's adjustment. In doing so, Commerce supported its determination with substantial evidence. Commerce explained that it had "found multiple improperly identified and improperly converted euro and CAD values in the calculation of the auditor's adjustment at verification{.}" Appx116. This reflected that Commerce had "found that Marmen's auditor's adjustment included

sales denominated in non-USD foreign currencies, as well as CAD-denominated sales which were recorded as USD sales." Appx115. These sales "would have been erroneously converted by the auditor's adjustment using the single annual average USD-CAD exchange rate." *Id.* (citing Appx8679-8680; Appx8589-8618, Appx8621-8639). Commerce elaborated that it "reviewed the calculation of the auditor's adjustment, finding five sales treated as USD sales that were recorded as euro sales in Marmen's general ledger sales accounts," and that reviewing the underlying documents for these "euro" sales had revealed that two of them were actually in CAD. *Id.* Further, in some cases, "the errors came from Marmen's general ledger sales accounts in Marmen's electronic financial accounting system themselves, as these sales accounts contained sales for which the currency of the sale was wrongly identified." *Id.*

Additionally, Commerce explained that "Marmen's 2007-2015 total sales figures and Marmen's 2007-2015 net-of-intercompany sales figures were also reported in mixed currencies" and that "Marmen made no accounting adjustments in the reporting of Marmen's audited financial statements to account for the un-converted foreign currencies recorded in the companies' general ledger sales accounts for those years." Appx115 (citing Appx8676)). Thus, although the figures for those years reflect the effect of mixed currencies, they are consistent with Marmen's audited financial statements for those years. *Id.*

The statute at 19 U.S.C. § 1677e(a)(2)(D) directs Commerce to use "the facts otherwise available" if an interested party provides information that Commerce has requested but the information "cannot be verified as provided in {19 U.S.C. § 1677m(i)}." In this case, based on the errors Commerce identified at verification, Commerce reasonably determined that the auditor's adjustment was unverified and unreliable. *See* Appx116. Commerce explained that the purpose of its verification was to "sample and spot check the transactions in Marmen's books and records to determine whether Marmen's auditor's adjustment was accurate and reliable{.}" *Id.*; *see* Appx115 ("Commerce officials discovered these currency identification and conversion errors as a result of spot-checking Marmen's records during verification." (citations omitted)). This is significant because errors identified in a spot-check undermine data's reliability more broadly.

At the same time, Commerce further explained that "the vast majority of the sales-related and other tests Commerce performed throughout the verification uncovered no other errors." Appx116. Therefore, Commerce found that it could rely on Marmen's reported information without the auditor's adjustment, as facts available under 19 U.S.C. § 1677e(a)(2)(D). Commerce thus relied on the sales values that Marmen originally reported for its calculations. Because Commerce identified legitimate concerns regarding the auditor's adjustment, Commerce's determination is supported by substantial evidence and lawful.

### B. Commerce's Determination Is Consistent With, And Supported By, The Facts Detailed In The Verification Report

Appellants contend that Commerce's decision not to rely on the auditor's adjustment is unsupported by substantial evidence because, in appellants' view, Commerce's verification report contradicts Commerce's decision. App. Br. 31-37. Relatedly, appellants claim that Commerce rejected the auditor's adjustment "based on a false premise: that Commerce verifiers 'discovered' five Euro-coded sales through 'spot-checking.'" *Id.* at 32. These arguments are meritless because they are based on a misunderstanding of the basis for Commerce's decision.

To be clear, Commerce declined to include the auditor's adjustment in Marmen's sales denominator because the multiple errors identified through the verification process called the adjustment's overall reliability into question. *See* Appx116. Regardless of who first "discovered" the errors—and we do not concede that Marmen "discovered" them merely because the documentation it compiled for verification (at Commerce's direction) reflected that some of the purported USD sales were recorded in Euro[3]—they indicate that the adjustment that Marmen reported, and is still advocating that Commerce be required to use, is *not accurate*. As the trial court explained, "{t}he fact that the Euro-coded errors

[3] Indeed, according to the verification report, Commerce identified the Euro-coded sales when it "entered {Marmen's} accounting system" for certain general ledger accounts and "exported these records to excel and filtered by currency to confirm that Marmen Inc. correctly identified its U.S. sales." Appx8679.

were identified is a sufficient basis for Commerce's determination that other USD-coded sales proposed to be converted might also be in error. Even if the Euro-coded errors have been comprehensively accounted for, the causes of those errors have not." Appx18 n.11. Nor can appellants claim to have alerted Commerce to the second type of error—sales included as USD in the adjustment and recorded in Marmen's ledger as Euro that were *actually* in CAD, which Commerce identified when it spot-checked documentation for the Euro-coded sales. *See* Appx8679-8680. Thus, as the trial court held, "Commerce was not unreasonable to conclude that the proposed adjustments may include transactions denominated in the general ledger in a currency different than that in which they were actually transacted or other errors not identified by the auditor." Appx18-19 n.11.

Nonetheless, appellants assert that Commerce's determination is improper because "Marmen self-identified the five Euro-coded sales Commerce claims to have discovered through spot-checking (*i.e.*, random selection of individual sales)." App. Br. 33 (emphasis omitted). But this misses the point. Commerce's efforts to check the auditor's adjustment through verification revealed that the adjustment contained errors, impugning its reliability. Commerce was also clear that it "lacks the ability to check each sale at verification, and so performs these checks in order to test the broader reliability of reported information." Appx116 ("the purpose of these checks was to sample and spot check the transactions in

Marmen's books and records to determine whether Marmen's auditor's adjustment was accurate and reliable"). Commerce did not attempt to verify that every transaction that Marmen included in the adjustment was actually in USD, but found at least five instances across two different accounts in which they were not. Appx115-116; Appx8679-8680. Commerce's determination was not based on who "discovered" the errors, but that the errors render the adjustment unreliable. *Cf. Goodluck*, 11 F.4th at 1343-44 (sustaining rejection of revised information at verification). Regardless of who discovered the errors, the errors rendered the adjustment unverified and unreliable, and Commerce properly did not rely on it.

Crucially, moreover, it was the supporting documentation Commerce spot-checked for the Euro-coded sales that showed that they were not paid in USD—not merely that they were coded as Euro sales in Marmen's ledgers. And in that regard, it is significant that the underlying documentation showed that two sales were not made in Euro at all, but in CAD (despite being included in the adjustment as USD sales and in Marmen's books as Euro sales). *See* Appx115 ("Such CAD-denominated sales recorded as USD sales would have been erroneously converted by the auditor's adjustment using the single annual average USD-CAD exchange rate."). The verification process thus showed that Marmen's coding of its sales did not always correspond to the transaction currency. *See* Appx8680 (recording that Marmen officials attributed CAD sale coded as Euro to coding error).

Appellants also emphasize that the errors Commerce identified covered less than 0.2 percent of the total value of the auditor's adjustment for Marmen Inc. in 2018. App. Br. 33-34. As the trial court explained, however, "{w}hile the impact of the discovered errors, taken alone, on the proposed foreign currency adjustment may be small, Commerce could reasonably infer that there may remain other errors." Appx18-19; *cf. Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285, 1292-93 (Ct. Int'l Trade 2014), *aff'd*, 802 F.3d 1339, 1357 (Fed. Cir. 2015) (party's misrepresentation about allegedly "immaterial" matter "may reasonably be inferred to pervade the data in the record beyond that which Commerce has positively confirmed as misrepresented").

Appellants next inaccurately suggest that Commerce confirmed that the remainder of the auditor's adjustment was reliable, merely because Commerce stated that it had "confirmed there were no additional Euro coded sales" and that the additional invoices it spot-checked were paid in USD. App. Br. 34 (citing Appx8680, Appx8685). This ignores that the payment documentation Commerce retrieved for the Euro-coded sales *did show* a currency different from the one in which two of the sales were recorded. More fundamentally, this fails to establish that the auditor's adjustment was reliable overall. *See* Appx116 (explaining that Commerce cannot check each sale at verification). That Commerce confirmed that there were no additional Euro-coded sales in the sales accounts does not mean that

Commerce confirmed that there were no additional errors. Indeed, given that some of the errors "came from Marmen's general ledger sales accounts . . . themselves" due to Marmen's inaccurate currency recording, Marmen's argument does not alter that there may be other sales for which the currency is different from what Marmen recorded in its ledger, or further errors. Appx115. Likewise, because Marmen was unable to identify how the Euro-coded sales were misclassified, there is nothing to indicate that the errors are confined to Euro-coded sales. *See* Appx8680.

Appellants additionally assert that Commerce's determination based on the errors in the auditor's adjustment is unreasonable because of procedural aspects of the verification report. Specifically, they argue that the errors could not have been significant because Commerce completed verification early without expressing dissatisfaction with Marmen or directly interviewing Deloitte about the adjustment. App. Br. 34-35. Similarly, they argue that Commerce's verifiers did not identify the errors in the auditor's adjustment as an issue in the verification report's "Summary of Findings." *Id.* at 35-36.

Regarding the timing and conduct of Commerce's verification, Commerce has "broad discretion" to fashion verification procedures as it deems appropriate. *Goodluck*, 11 F.4th at 1343-44 (citation omitted). Having identified the errors and obtained Marmen's explanations for the misclassifications, Commerce was not obligated to question Marmen for a specified length of time. *See* Appx8679-8680.

Regarding whether Commerce officials expressed dissatisfaction with Marmen's responses or identified the issue in the "Summary of Findings," appellants mistake the nature of the verification report. Commerce's verification report specifically explains that its summary of findings is "an illustrative list of issues and factual observations that arose during the course of our verification, which may require further consideration by Commerce." Appx8655. Correspondingly, because it is a summary of *factual* findings, Commerce does not reach conclusions regarding such findings in the verification report. Moreover, the verification report specifically states that "this list is not all inclusive, as all items included within this report are subject to comment and further consideration." *Id.* A review of the discussion of the sales reconciliation within the verification report reveals that Commerce did describe the errors it relied upon in the final results in finding the auditor's adjustment unverifiable. *See* Appx8677, Appx8679-8680.

Consequently, appellants' arguments based on substantive and procedural aspects of the verification report lack merit. Appellants' cite to *Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019), is inapposite because Commerce's determination that the auditor's adjustment was unreliable is consistent with the verification report. Commerce's determination is reasonable and should be sustained under the substantial evidence standard.

### C. Commerce's Determination Is Consistent With Its Practice And Regulations Because Commerce Has An Obligation To Verify Reported Information

Appellants argue that Commerce's rejection of the auditor's adjustment is "inconsistent with its longstanding practice and statutory obligation." App. Br. 37. They assert in this regard that Commerce has a "longstanding practice . . . to rely on audited financial statements to verify a respondent's reported information." *Id.* The argument lacks merit because it fails to account for Commerce's statutory obligation to verify information, and the fact that Commerce independently found the auditor's adjustment unreliable due to the multiple errors it contained.

Contrary to appellants' claim that Commerce's verification of the auditor's adjustment was extraordinary and "turned {its} practice on its head," App. Br. 38-39, Commerce's verification of the auditor's adjustment was reasonable given the record. As we showed above, Marmen neither included an auditor's adjustment when reporting its sales in its initial questionnaire responses, nor provided any details or explanation about its sales being reported in mixed currencies.[4] Even when Marmen included the adjustment in the reconciliation exhibits accompanying its third supplemental questionnaire response, Marmen provided no explanation of

[4] Nor does this line item appear in the actual financial statements, which already include a separate item for "(Loss) gain on exchange rate." Appx2698. Further, Marmen indicated that it had not included any such adjustment in its financial statements for multiple previous years, despite also recording sales in mixed currencies for those years. *See* Appx115 (citing Appx8676).

the nature or reason for the adjustment, or of how it was determined. Appx114. Rather, Marmen first raised it substantively as an alleged ministerial error in the preliminary results, claiming that "the sales denominator used in the subsidy rate calculation must incorporate the auditor's exchange rate adjustment, so that the denominator is expressed entirely in Canadian dollars{.}" Appx8435. Under these circumstances, Commerce's verification of the adjustment was reasonable.

Appellants' corresponding reliance on *SeAH Steel VINA Corp. v. United States*, 269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017), is misplaced. App. Br. 39-40. Appellants fail to acknowledge that *SeAH Steel* is dissimilar because it concerned Commerce's selection of *surrogate* financial statements. *See* 269 F. Supp. 3d at 1349-52. Specifically, in *SeAH Steel* the Court sustained Commerce's selection of one set of surrogate financial statements over another, in part, because the selected set "included an audit opinion and provided the auditor's name with a registration number," while the other did not. *Id.* at 1351-52. Notably, neither set of financial statements belonged to the respondent. *Id.* The distinction is important because, when selecting surrogate financial statements, Commerce uses the best available information, and *SeAH Steel* even acknowledged that "Commerce faced imperfect options, and 'no superior options.'" *Id.* at 1350. In addition to these constraints, the surrogate company is not a party to the proceeding and Commerce does not

necessarily have access to company books and records, nor does it conduct verification of a surrogate company under 19 U.S.C. § 1677m(i).

In this case, by contrast, Commerce examined Marmen's books and records in detail, and had an independent obligation to verify the information with Marmen pursuant to 19 U.S.C. § 1677m(i). Moreover, unlike *SeAH Steel*—and as the trial court observed in rejecting appellants' arguments—there is evidence on the record specifically impugning the accuracy of the auditor's adjustment. *See* Appx18. Indeed, as Commerce observed in its determination, some of the errors affecting the auditor's adjustment stemmed from Marmen's inaccurate recording of currencies rather than auditor issues. *See* Appx115. Thus, Commerce's general respect for the expertise of auditors does not render its determination based on the facts of this case unreasonable.

The only other proceeding appellants cite to establish Commerce's alleged practice regarding auditor reports is an administrative review concerning certain stainless steel butt-weld pipe fittings from Taiwan referenced in *SeAH Steel*. *See* App. Br. 39. In that review, Commerce accepted the respondent's audited financial statements as reliable in the face of allegations from the petitioner that the respondent had failed to disclose certain affiliations. Two points are significant. First, the petitioner's allegation in that proceeding concerned the alleged failure to disclose certain affiliations. Commerce explained that "in the context of assessing

disclosures of affiliated parties in a financial statement prepared in accordance with financial accounting standards, a judgment as to whether or not a relationship should have been disclosed does not depend upon a factual finding, but rather opinions as to whether the auditors' decisions about disclosure were reasonable." *Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 71 Fed. Reg. 67,098 (Dep't of Commerce Nov. 20, 2006), at IDM Cmt. 1. Accordingly, the nature of the issue involved some level of judgment from the independent auditor, unlike this case, in which the auditor's adjustment is a calculation to convert currencies.

Second, in the butt-weld pipe fittings proceeding, Commerce found no evidence undermining the independent auditor's conclusions. *See id.* ("Petitioners have not shown that information relevant to our analysis was excluded from either TCI's or the consolidated financial statements."); *see also Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 73 Fed. Reg. 1,202 (Dep't of Commerce Jan. 7, 2008), at IDM Cmt. 1 ("{Commerce} notes that there has been little or no evidence of transactions between Ta Chen and those entities alleged by petitioners to be undisclosed affiliates."). In this case, by contrast, Commerce identified specific errors affecting the auditor's adjustment as applied to Marmen's sales information. *See* Appx115-116; *see also* Appx18 (observing that "{the butt-weld record} is in sharp contrast to the present case, where the auditor's adjustments were shown to be at least partially in error"). Accordingly, the trial court correctly

held that Marmen "has not established that Commerce acted contrary to law or past practice when it rejected the auditor's adjustment without compelling evidence that the auditor was not in good standing." Appx18.

Indeed, the Court of International Trade has recognized that "citing isolated investigations does not prove the existence of past practices; it just proves that Commerce thought differently on different facts at different times." *CP Kelco US, Inc. v. United States*, No. 13-00288, 2015 WL 1544714, at *10 (Ct. Int'l Trade Mar. 31, 2015). Likewise, the court has explained repeatedly that "two prior determinations are not enough to constitute an agency practice that is binding on Commerce." *E.g.*, *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1312 (Ct. Int'l Trade 2017) (citation omitted).

Moreover, even if the cases that appellants cite established Commerce's practice, they would not supersede Commerce's independent statutory obligations to verify information, pursuant to 19 U.S.C. § 1677m(i), and to rely on the facts otherwise available when information cannot be verified, pursuant to 19 U.S.C. § 1677e(a). *See* Appx17. Therefore, because Commerce determined, based on substantial record evidence, that Marmen's auditor's adjustment could not be verified, Commerce's reliance on Marmen's originally submitted sales information as the facts otherwise available is lawful.

## III. The Trial Court Lawfully Sustained Commerce's Determination That The Additional Depreciation For Certain Class 1 Assets Program Conferred A Countervailable Benefit And Financial Contribution

### A. Commerce's Determination That The Additional Depreciation For Class 1 Assets Program Conferred A Countervailable Benefit Is Supported By Substantial Evidence

Commerce reasonably determined that the Government of Canada's and the Government of Québec's provision of additional depreciation for certain "Class 1" assets under their respective tax systems confers countervailable benefits in the form of forgone revenue. Appx92-99. Contrary to appellants' claims that this program does not confer a benefit or financial contribution because it merely reflects appropriate depreciation, Commerce explained that the program provides a departure from the standard Class 1 depreciation rate Marmen would otherwise receive, and therefore does amount to a financial contribution conferring a countervailable benefit. *Id.*

Commerce explained that, under Canada's tax system, the standard depreciation rate for Class 1 assets is four percent. Appx95, Appx97 (citing Appx8018, Appx8027-8049; Appx1905). Indeed, in the government of Canada's own words, "{c}lass 1 assets include most buildings acquired after 1987 (unless they specifically belong in another class" and "{p}ursuant to subparagraph 1100(1)(a)(i) of the {Income Tax Regulations (ITR)}, buildings that are classified as assets under Class 1 . . . are normally depreciated at a {depreciation} rate of 4%

({*i.e.*}, basic rate)." Appx97 (quoting Appx8018). Similarly, the Government of Québec stated that "{t}he applicable {capital cost allowance} rate for buildings in Class 1 is 4% (the basic rate)." Appx1905.

Notwithstanding this "normal" depreciation rate, however, a certain subset of Class 1 assets, eligible non-residential buildings acquired after March 18, 2007, "qualify for an additional allowance of six percent (for a total of ten percent) if at least 90 percent of the floor space of the eligible non-residential building is used for manufacturing and processing operations."[5] Appx95, Appx97 (citing Appx8018-8019, Appx8027-8049; Appx1905). Notably, a taxpayer must elect to receive the additional deduction. The Government of Canada explained: "*If the taxpayer files an election*, paragraph 1100(1)(a.1) of the ITR provides that an *additional* 6% {capital cost allowance} may be deducted (for a total {capital cost allowance} rate of 10%) if at least 90% of the floor space of the eligible non-residential building is used at the end of a taxation year for the manufacturing or processing in Canada of goods for sale or lease." Appx8018-8019 (emphasis added); *see also* Appx9548 ("*If you do not file an election* to put it in a separate class, the 4% rate will apply.") (emphasis added). There is no dispute that Marmen

[5] The chart that appellants provide at page 16 of their brief inaccurately portrays how Class 1 in structured. For a more accurate portrayal, *see* the GOC's "CCA Classes" and "Classes of depreciable property" websites included in the record at Appx9539-9564.

used the accelerated depreciation under this program to reduce its taxable income during the investigation period. Appx96.

The manner in which the additional depreciation program functions matches Commerce's CVD regulations. Section 351.509(a)(1) of Commerce's regulations states that, "{i}n the case of a program that provides for a full or partial exemption or remission of a direct tax (e.g., an income tax), or a reduction in the base used to calculate a direct tax, a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." 19 C.F.R. § 351.509(a)(1) ("Identification and Measurement of Countervailable Subsidies"). That provision applies in this case because, absent the additional depreciation for certain Class 1 assets, Marmen would have paid more taxes using the normal four percent depreciation rate. Appx98.

Thus, the Additional Depreciation for Certain Class 1 Assets program provides a countervailable benefit because it affords "a tax reduction in the amount of the difference between the tax the company paid and the tax the company would have paid absent the tax reduction, as provided in 19 CFR § 351.509(a)(1)." Appx97. As Commerce explained, "taxpayers qualify for the additional deduction for a certain Class 1 asset (*i.e.*, an 'eligible non-residential building') that is: (1) included in Class 1 and used for manufacturing and processing operations within the meaning of the {Income Tax Regulations} or (2) included in Class 1 and used

for non-residential use." Appx98. Indeed, as we established above, a taxpayer must file an election to qualify for the additional deduction, and otherwise pays the standard four percent rate generally applicable to all Class 1 assets. Appx9548. Commerce consequently found that, "{b}ecause Marmen was able to pay less than the tax it would have paid due to the additional {depreciation rate} in place, the appropriate benefit for Commerce to measure is the tax savings of the difference between the deduction calculated using the basic rate of depreciation and the deduction calculated using the total depreciation rate, including the additional {depreciation} rate, that Marmen used." Appx98.

Accordingly, the trial court correctly sustained Commerce's determination as supported by substantial evidence and otherwise lawful. Specifically, the trial court held that "the evidence supports a comparison between the Class 1 depreciation rate and the otherwise applicable rate: first, because the Class 1 depreciation provision is additional to the existing tax scheme; second, because {the Government of Canada's} own budget plan recognizes a default depreciation rate . . . ; and third, because taxpayers are required to file an election to receive the additional depreciation." Appx34.

### B. Commerce Reasonably Evaluated The Nature And Structure Of The Additional Depreciation For Certain Class 1 Assets Program

Appellants assert that Commerce's determination is flawed because "Commerce disregarded the nature of the different kinds of buildings making up

the subclasses within Class 1{.}" App. Br. 42. In particular, appellants argue that "Commerce refused to accept as relevant the critical fact that the different rates apply to *different kinds* of buildings with *different characteristics and uses*, and consequently, a *different average useful life.*" *Id.* (emphasis in original).

These arguments lack merit because they fail to account for the way in which the additional depreciation program functions as an exception to the otherwise applicable tax rate for certain assets. As Commerce explained, "the record shows that among all taxpayers, only those that meet the eligibility for certain Class 1 assets, stipulated in the {Income Tax Regulations}, can file for, and subsequently receive, the additional {depreciation}. Otherwise, the normal rate for Class 1 assets is four percent in accordance with the Schedule II of the {Income Tax Regulations}." Appx98. Thus, absent the additional depreciation rate under this program, Marmen would apply the standard depreciation rate of four percent, irrespective of the actual useful life of its buildings. This constitutes a benefit stemming from the "tax reduction in the amount of the difference between the tax the company paid and the tax the company would have paid absent the tax reduction, as provided in 19 CFR § 351.509(a)(1)." Appx97.

Appellants assert that Commerce's logic is flawed because, "if the Canadian tax regulations were structured so that manufacturing buildings with a 10 percent depreciation rate were placed in a different CCA class, Commerce would not have

found a benefit." App. Br. 43. The argument relies on a hypothetical that does not exist. The evidence shows that such buildings *are* Class 1 assets, and that the base depreciation for such assets is four percent. Appx95, Appx97; Appx8018-8019l Appx9539, Appx9546-9549. Taxpayers—even if they own eligible buildings—do not receive a different rate unless they file an election under the program. Appx98. But even if the assets were listed in a different numerical class, the benefit would still be calculated by comparison to the Class 1 four percent rate, if the Class 1 rate would apply absent the additional depreciation program. Accordingly, Commerce properly considered the additional depreciation beyond the four percent base as a financial contribution stemming from forgone revenue. Appx98-99.

Next, appellants argue that Commerce's consideration of the manner in which the benefit was claimed, *i.e.*, through election on the Schedule 8 form, is immaterial. App. Br. 44. Contrary to that argument, Commerce's consideration of the manner in which a taxpayer claims additional depreciation is material because it demonstrates that, absent an affirmative election to claim the additional benefit, the base four percent depreciation rate would apply. As Commerce explained, "in order to receive an additional deduction, a taxpayer needs to file an election by using a Schedule 8 form with its income tax return. Otherwise, they would not receive the additional six percent deduction and instead receive the basic four percent . . . ." Appx98. Appellants also argue that the use of the Schedule 8 form

is immaterial because "*all* depreciation deductions for *all* CCA classes are claimed on the same Schedule 8 form" such that "there is nothing special or unique about Schedule 8{.}" App Br. 44. The focus of Commerce's analysis, however, was not on whether the Schedule 8 form was unique to the program, but whether a taxpayer needed to file an election to receive the additional depreciation. Appx98.

Hence, as the trial court correctly held, "the evidence supports a comparison between the Class 1 depreciation rate and the otherwise applicable rate . . . because taxpayers are required to file an election to receive the additional depreciation." Appx34. This understanding is consistent with the GOC's own description of the program. *See* Appx8018-8019, Appx9548. Indeed, in the GOC's own words: "To be eligible for one of the additional allowances, you must elect to put a building in a separate class. To make the election, attach a letter to your return for the tax year in which you acquired the building. *If you do not file an election to put it in a separate class, the 4% rate will apply.*" Appx9548 (emphasis added).

Next, appellants assert that Commerce incorrectly focused on eligibility requirements for the program, conflating the separate statutory requirements of specificity and benefit. App. Br. 45. Commerce's regulations are clear, however, that, for such tax programs, "a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." 19 C.F.R. § 351.509(a)(1). Thus, Commerce's

consideration of what a firm would pay in the absence of the program is relevant to its benefit analysis. Moreover, appellants do not challenge Commerce's specificity determination for the program, and it is undisputed that Marmen was eligible for and claimed the additional depreciation, thus benefitting from a lower tax burden.

### C. Commerce Lawfully Interpreted And Applied Its Direct Tax Benefit Regulation

Appellants additionally claim that Commerce misinterpreted its direct tax benefit regulation because Commerce does not treat depreciation deductions as countervailable solely because they reduce taxes. App. Br. 46-47. Appellants concede, however, that "Commerce has only found a countervailable benefit from a depreciation deduction when the program provided an advantage to the taxpayer, over and above what the country's *normal* depreciation rules would otherwise permit." *Id.* That is precisely the situation here. The GOC's own description explains that Class 1 assets "are *normally* depreciated at a CCA rate of 4% (i.e., basic rate)." Appx8018 (emphasis added). Therefore, the additional depreciation under the program provides a depreciation deduction "over and above what the country's *normal* depreciation rules would otherwise permit." App. Br. 46.

Appellants' related argument that Commerce should have engaged with a Statistics Canada study purportedly demonstrating that "manufacturing buildings actually do depreciate at a 10 percent rate" is also meritless. App. Br. 47. The study appellants reference may be relevant to analyzing the actual depreciation rate

for certain Class 1 assets, but that analysis is not necessary for Commerce to determine the depreciation rate that would have applied under the relevant tax system absent the additional depreciation program. As the trial court held, "where a taxpayer can opt-in to more favorable treatment, it is reasonable for Commerce to confine its analysis to the comparisons provided for by law, even if the more favorable treatment better reflects economic reality." Appx35.

Appellants further argue that, in sustaining Commerce's application of its regulations, the trial court improperly applied a *Chevron* rather than *Auer* analysis. App. Br. 48-49 (citing *Auer v. Robbins*, 519 U.S. 452 (1997)). The trial court's citation to *Chevron*, however, was in the context of "both the statutory financial contribution definition and the 'Direct Taxes' benefit regulation." Appx33. The court's citation of *Chevron* was thus appropriate in the context of Commerce's interpretation of the CVD statute. Regarding Commerce's interpretation of its regulations in comparing the basic four percent depreciation rate to the accelerated rate, the trial court specifically held that the evidence supports such a comparison. Appx34 ("{T}he evidence supports a comparison between the Class 1 depreciation rate and the otherwise applicable rate{.}"). Consistent with this statement, the issue is not really about differences in interpreting the regulation, but appellants' disagreement with Commerce's evaluation of the record evidence as to what constitutes the "normal" depreciation rate for Class 1 assets.

### D. Commerce's Determination That The Additional Depreciation For Class 1 Assets Program Provided A Financial Contribution Is Supported By Substantial Evidence And Otherwise Lawful

Commerce explained with respect to the financial contribution CVD factor that "Marmen's tax savings from the . . . difference between {the deduction calculated using the basic rate of depreciation and the deduction calculated using the total depreciation rate} represents the forgoing of revenue otherwise owed," and therefore provides a financial contribution under 19 U.S.C. § 1677(5)(D)(ii). Appx98-99. Appellants argue that this finding is flawed because the additional depreciation did not result in a government authority forgoing revenue otherwise due, and because Commerce "ignored the *StatCan Study*, which contradicted Commerce's conclusion that the CCA at a 10 percent depreciation rate provided a financial contribution." App. Br. 49. These arguments fail for similar reasons to appellants' arguments concerning Commerce's benefit finding.

First, appellants assert that Commerce "must take a country's tax system as it finds it, and only deductions that constitute deviations from the norms of a country's tax system can be considered foregoing revenue that is otherwise due." App. Br. 51-53. In this instance, however, Commerce explained that the additional depreciation program is a deviation from the depreciation that otherwise applies. Appx98. Regarding appellants' contention that Commerce did not "consider{} whether depreciation rates are lower for other CCA classes" (App. Br. 52),

Commerce explained that under the Income Tax Regulations "an eligible non-residential building 'means a taxpayer's building . . . that is located in Canada, that is *included in Class 1*{.}" Appx97 (quoting Appx8046) (emphasis by Commerce). In other words, the record establishes that the relevant class is Class 1, and the accelerated depreciation Marmen received for its Class 1 assets is in addition to the base rate that applies to other Class 1 assets.

Next, appellants argue that the Additional Depreciation for Class 1 Assets program does not deviate from the norms of Canada's tax system. App. Br. 53-54. Specifically, they say that "the prevailing norm in Canada is to allow depreciation deductions based on the rates at which the assets depreciate in value." *Id.* This argument sidesteps the crux of Commerce's determination: Marmen had certain Class 1 assets for which the base depreciation rate is four percent. Because of the additional depreciation program, Marmen was able to claim an additional six percent depreciation. The deduction Marmen claimed was thus a deviation from the depreciation that Marmen otherwise could have claimed for its assets.

Appellants again argue that Commerce failed to engage with the StatCan study in determining whether the additional depreciation program provided a financial contribution. App. Br. 54-56. Although Commerce did not cite the study explicitly, it addressed appellants' corresponding argument that the accelerated depreciation program "accurately reflects the shorter useful life of the underlying

assets." Appx94 (summarizing argument); Appx98 (addressing argument); *see* Appx34-35 (recognizing same). As Commerce explained, "the record shows that among all taxpayers, only those that meet the eligibility for certain Class 1 assets, stipulated in the ITR, can file for, and subsequently receive, the additional CCA. Otherwise, the normal rate for Class 1 assets is four percent in accordance with the Schedule II of the ITR." Appx98.

Appellants relatedly argue that both Commerce and the trial court failed to appreciate the StatCan study's relevance to Commerce's financial contribution determination because Commerce's discussion of the difference in tax treatments relates solely to its benefit analysis. App. Br. 55-56. Contrary to this claim, Commerce stated that the tax savings from the "*difference between the two calculated deductions* represents the forgoing of revenue otherwise owed{.}" Appx99. Thus, Commerce's comparison of the tax treatments within Class 1 was part of Commerce's financial contribution finding. Under the structure of the additional depreciation program, the GOC and GOQ are taking assets that would be subject to the basic four percent depreciation rate and instead granting them a 10 percent depreciation rate. Appx98. Indeed, the beneficial rate is not automatic; companies with eligible facilities who do not file an election for the additional depreciation receive the lower rate. *Id.* The GOC and GOQ are thus forgoing tax

revenue that they would otherwise receive if Marmen were required to use the standard depreciation rate in the program's absence.

Ultimately, Commerce's regulations do not direct it to consider whether a tax program's benefit to a respondent is outweighed or otherwise offset by other costs to the company, *e.g.*, in the form of actual depreciation. Instead, Commerce reasonably determined based on the record that, in the absence of the program, Marmen would have been able to claim depreciation on its manufacturing buildings at the base rate of four percent. With a smaller deduction for depreciation, Marmen would have paid more taxes. Consequently, Commerce's determination is supported by substantial evidence and otherwise lawful.

## IV. Commerce's Determination Of The Benefit Under The GASPÉTC Program Is Supported By Substantial Evidence And Otherwise Lawful

### A. Commerce's Decision Not To Offset The GASPÉTC Program's Benefit With A Previous Year's Tax Liability Is Consistent With The Governing Authorities And Commerce's Practice

Marmen received an income tax credit under the GASPÉTC program for the 2017 tax year, which, pursuant to 19 C.F.R. § 351.509(b)(1), provided a benefit during the 2018 period of investigation when Marmen filed its tax return claiming the credit. Appx125. Appellants do not dispute that this program constitutes a countervailable subsidy. The GASPÉTC tax credit, however, is itself considered taxable income, and thus results in additional taxable income for the year it is received, which is then reflected in the tax returns filed the following year. *Id.*

Therefore, the benefit that a company receives during the period of investigation will result in additional taxable income for that year, with the resulting increase in income tax owed reflected on its following year's tax return. *Id.*

Marmen, however, also received a tax credit under the GASPÉTC program for the *previous* 2016 tax year, which, as taxable income, resulted in an increased income tax burden reflected on its tax return filed for 2017 and paid in 2018. *Id.* Consistent with its regulations and practice indicating that "{i}n calculating the amount of a benefit, the Secretary will not consider the tax consequences of the benefit," 19 C.F.R. § 351.503(e), Commerce found that the program's benefit to Marmen for the 2018 period of investigation was the full amount of the tax credit subsidy that Marmen received in 2018, and the trial court sustained Commerce's determination. *Id.*; Appx29-31; *see also* 19 U.S.C. § 1677(6) (limiting subsidy offsets that Commerce may recognize to specific circumstances).

Nonetheless, appellants assert that Commerce should have determined the GASPÉTC program's benefit for 2018 by offsetting the benefit by the income tax Marmen had to pay on the previous year's benefit, and thereby calculating a net benefit across the multiple years in which Marmen claimed the tax credit. App. Br. 57-62. In other words, despite the fact that any payments resulting from prior years are not a component or a consequence of the credit Marmen received in the 2018 investigation period, appellants argue that Commerce should reduce its

benefit calculation because Marmen also paid income taxes in 2018 resulting from the tax credit it received in 2017 on its 2016 taxable income. Because Commerce's determination not to do so is consistent with Commerce's practice, regulations, and the CVD statute, appellants' arguments lack merit.

First, appellants do not dispute that Commerce appropriately considered the year in which Marmen received the tax credit benefit from the GASPÉTC program under 19 C.F.R. § 351.509(b)(1) to be 2018. *See* Appx125 ("Under 19 CFR 351.509(b)(1), this credit provides a benefit in the {period of investigation}, the year in which Marmen otherwise would have had to pay the income taxes exempted or remitted by the GASPÉTC program."). Moreover, pursuant to its regulations, Commerce appropriately expensed the benefit in the year of receipt. 19 C.F.R § 351.509(c) ("{Commerce} normally will allocate (expense) the benefit of a full or partial exemption, remission, or deferral of a direct tax to the year in which the benefit is considered to have been received under {§ 351.509(b)}."). This was not an instance in which Commerce allocated the benefit across multiple years or periods of review. Therefore, any benefits or payments from prior years are "not a component" of the tax credit benefit received in 2018. Appx125.

Second, Commerce's determination is consistent with Commerce's regulations and the countervailing duty statute. Commerce's regulations at 19 C.F.R. § 351.503(e) state, "In calculating the amount of a benefit, {Commerce}

*will not consider the tax consequences of the benefit*." Appx126 (citing section 351.503(e) (emphasis added)). This regulation squarely addresses the issue that appellants raise (and, as we discuss below, reflects Commerce's established policy and practice). Appellants nonetheless argue that calculation of the benefit for tax programs is not governed by section 351.503(e), but by 19 C.F.R. § 351.509(a)(1), which states that a benefit exists "to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." App. Br. 58-59. Appellants maintain that section 351.503(e) does not apply because Commerce's regulations explain that, if there is a specific rule for measuring a program's benefit, Commerce will measure the benefit as provided in that specific rule. *Id.* at 59. According to appellants, 19 C.F.R. § 351.509(a)(1) is such a specific rule governing the benefit for tax programs. *Id.*

Appellants' arguments misapply Commerce's regulations because they overstate the nature of 19 C.F.R. § 351.509(a)(1) and their interpretation would contravene the statute. Regarding appellants' reliance on section 351.509(a)(1), the regulation lacks the specificity that appellants posit with respect to requiring inclusion of a subsidy's secondary tax effects. The section 351.503(e) prohibition on Commerce considering the "tax consequences of the benefit" Marmen received squarely applies in this case. By contrast, as the trial court explained, the concept of reduced "tax paid by a firm as a result of the program" under section 351.509(a)

"does not necessarily mean that tax *liabilities* from a previous year's use of the program are a component 'result of the program.'" Appx30 (emphasis added). Notwithstanding appellants' efforts to read such a requirement into section 351.509(a)(1), it does not address that issue. As Commerce explained, section 351.509(a)(1) "simply provides direction in assessing how the program results in a benefit in the year at issue . . . with no regard to any consequences from the prior year's benefit." Appx127. The two provisions are easily read harmoniously, as Commerce applied them, to capture the full benefit that Marmen received under the GASPÉTC program without regard to secondary tax consequences of the subsidy, particularly those from previous years. *See* Appx125-127.

Moreover, appellants' position is contrary to the governing statute. What appellants advocate—reducing the period of investigation benefit by income tax associated with a benefit received in a prior year—constitutes an offset to the gross countervailable subsidy. Commerce explained, however, that "the treatment of income taxes resulting from countervailable tax programs is governed by {19 U.S.C. § 1677(6)}, which limits the subsidy offsets that Commerce may recognize to specific circumstances{.}" Appx126. Specifically, 19 U.S.C. § 1677(6) states,

> (6) Net countervailable subsidy
>
> For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of—

> (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,
>
> (B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and
>
> (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

None of the listed items authorizes an offset for the income tax consequences of a subsidy. Both Congress and this Court have confirmed that the adjustments in section 1677(6) are the *only* permissible offsets. S. Rep. No. 249, 96th Cong., 1st Sess., at 86 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 472 ("The list is narrowly drawn and is all inclusive."); *Kajaria Iron Castings Pvt. Ltd*, *v. United States*, 156 F.3d 1163, 1174 (Fed. Cir. 1998) (observing that "19 U.S.C. § 1677(6) provides the exclusive list of permissible offsets"); *see also Geneva Steel v. United States*, 914 F. Supp. 563, 609-10 (Ct. Int'l Trade 1996) (section 1677(6) contains "an exclusive list of offsets that may be deducted from the amount of a gross subsidy"). Therefore, the statute does not permit the offset appellants seek.

Third, Commerce's determination is consistent with its well-established policy and practice. Commerce stated in enacting its CVD regulations that its policy is *not* to account for the "secondary tax consequences" of subsidies (without distinguishing particular kinds of subsidies). *Countervailing Duties*, 63 Fed. Reg.

65,348, 65,362 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*).[6] This Court has recognized that "{t}his means that when a producer receives a grant and must pay taxes on the grant Commerce will countervail the *full amount of the grant, despite the net benefit to the producer being the amount of the grant minus the tax paid on the grant*." *Kajaria*, 156 F.3d at 1175 (emphasis added); *see also Kiswok Indus. Pvt. Ltd. v. U.S.*, 28 C.I.T. 774, 782-83 (2004) (discussing *Kajaria* and explaining that "ITA is not required to take into account the secondary tax effect of subsidies, despite the net benefit's being the amount of the subsidy minus the taxes paid on it"). Although the *CVD Preamble* and regulations state that Commerce will not rely on section 351.503 when a specific rule for measurement of a benefit applies (App. Br. 59), sections 351.509(a)(1) and 351.503(e) are complementary.

Indeed, as appellants concede, grant programs, like direct tax programs, have a specific regulatory section describing how to calculate their benefit, 19 C.F.R. § 351.504, but section 351.503(e) nevertheless informs whether Commerce will consider the tax consequences of grant programs. *See Kajaria*, 156 F.3d at

---

[6] Appellants claim that the income tax paid on a prior year's benefit is not a "secondary" tax consequence because the GASPÉTC program itself involves a tax credit is unpersuasive. App. Br. 61. Irrespective of the program's nature, income tax paid on a previous year's benefit is not a direct consequence of the benefit being provided during the investigation period, and it falls squarely within section 351.503(e)'s direction not to consider "the tax consequences of the benefit." As we discuss below, if Commerce had intended to exclude tax programs from this mandate (uniquely among all program types), it would have done so explicitly.

1174-75; App. Br. 59, 61. If Commerce had intended to depart from its stated policy and understanding of the governing statute solely for tax subsidies, it would have done so explicitly. *See CVD Preamble*, 63 Fed. Reg. at 65,362.

Moreover, Commerce's determination is consistent with its practice. Despite the prevalence of tax credit programs, we are not aware of an instance in which Commerce has taken the offsetting approach appellants advocate. To the contrary, in *Supercalendered Paper From Canada*, 82 Fed. Reg. 18,896 (Dep't Commerce Apr. 24, 2017), at IDM Cmt. 33 (*Supercalendered Paper*), the foreign respondent argued that "the Department must take into account additional taxes that {the respondent} may have paid as a result of utilizing" a tax credit subsidy program. Commerce determined that this was asking it "to consider a secondary effect" of the tax credit program, and that doing so was improper under 19 C.F.R. § 351.503(e) and 19 U.S.C. § 1677(6). *Id.*

Other similar proceedings also demonstrate that Commerce does not offset tax exemption or remission benefits by tax burdens that arise from those benefits. For example, Korea's Special Rural Development Tax arises as a tax burden for respondents only when they receive the benefit of exemption from certain other taxes. *See, e.g.*, *Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 86 Fed. Reg. 60,797 (Dep't of Commerce Nov. 4, 2021), at PDM n.59. Nonetheless—and despite the regulatory language appellants cite—Commerce has

determined that "the Special Rural Development Tax does not meet the statutory requirement to be recognized as an offset because the Special Rural Development Tax is a consequence of the exemption of acquisition or registration taxes, *i.e.*, the obligation arises only when the exemption is granted." *Id.* Further, Commerce reaffirmed that it "does not consider the tax consequences of the benefit when calculating the amount of benefit conferred from a countervailable subsidy program." *Id.* (citation omitted); *see* Appx30-31 (discussing Commerce practice).

Therefore, Commerce's determination not to reduce the tax credit by offsetting it with income tax liability rooted in previous years is consistent with Commerce's prior determinations. Because Commerce has reasonably interpreted the CVD statute and its regulations, and has consistently applied this interpretation, Commerce's determination is supported by substantial evidence and lawful.

### B. Appellants' Claims Based On 19 C.F.R. § 351.509(a)(1) Lack Merit

Appellants sidestep these contrary authorities by arguing that Commerce's interpretation is contrary to the plain meaning of 19 C.F.R. § 351.509(a)(1). They contend that, "{i}f the language of an agency's regulation is unambiguous, then the agency's interpretation is not entitled to deference" (which the Court otherwise would afford to Commerce's interpretation of its own regulation). App. Br. 58.

Appellants fail to establish, however, that the language of Commerce's regulations is unambiguously contrary to Commerce's interpretation and practice.

The regulations address how Commerce should calculate a tax program's benefit—not whether that benefit should be offset by downstream tax consequences of that overall program. *See* 19 C.F.R. § 351.509(a)(1). Conversely, tax *consequences* of a program are addressed specifically by 19 C.F.R. § 351.503(e). Commerce's approach, which calculates the program's benefit pursuant to section 351.509(a)(1) but does not consider secondary tax consequences pursuant to section 351.503(e), reads the provisions harmoniously, whereas the appellants' preferred interpretation would, as the trial court explained, "create an island where Commerce considers income tax effects in an ocean where it does not." Appx31.

Rather than demonstrate that Commerce has interpreted its regulations contrary to their plain meaning, appellants simply advocate their preferred interpretation. For example, appellants contend that the "regulation could have said that, for direct tax programs, the benefit is the amount of the tax credit, or the benefit is the amount of the remission of the tax." App. Br. 59. Further, despite no corresponding language, appellants attempt to insert a "but for" test for calculating the benefit into section 351.509(a). *Id.* at 59-60. These arguments are meritless.

The fact that the regulations state that a benefit exists to the extent the tax paid as a result of the program is less than the tax a firm would have paid, rather than that the benefit is the amount of the tax credit or remission, is reasonable because the provision is addressing "a program that provides for a full or partial

exemption or remission of a direct tax (*e.g.*, an income tax), or a reduction in the base used to calculate a direct tax." 19 C.F.R. § 351.509(a)(1). Therefore, because the benefit could be for tax credits *or tax deductions*, for which the benefit would not simply be the amount of the deduction, it makes sense that regulations would describe the benefit as the amount that the tax paid is less than the tax the firm would have paid. It does not—contrary to appellants' assertions—require that Commerce make a net calculation by offsetting for increased income tax liability, which section 351.503(e) *specifically instructs Commerce not to consider*.

Additionally, the regulations do not establish the overly broad "but for" test appellants propose, which would require Commerce to consider tax consequences from benefits from a prior year. Application of such a "but for" test would lead to absurd results. For example, a tax credit could free up capital for a firm to make additional sales and therefore increase its taxable income. Under appellants' broad "but for" test, this could constitute increased taxes "as a result" of the program to offset its benefit. Moreover, because appellants advocate that Commerce deduct the tax consequences of the benefit from the prior year despite not contesting that the benefit was appropriately allocated in the year of receipt, this could result in the exact same tax credit resulting in different benefit amounts based on whether the tax credit was claimed in other periods of review. For instance, a firm might claim the tax credit every other year, and therefore the increase in income taxes paid

would not fall in a year in which the firm received a credit. Appellants would have Commerce ignore the tax consequences in that scenario, but take them into account for a firm that claims the tax credit every year merely because the increased income tax liability from the prior year appears on the same tax return. These absurd outcomes underscore that the regulation does not unambiguously require Commerce to calculate benefits as appellants advocate.

Finally, appellants object to Commerce's reliance on 19 U.S.C. § 1677(6), which provides the full list of permissible offsets when calculating the net benefit. App. Br. 61-62. Essentially, appellants argue that accounting for the increased income tax liability is not determining the net benefit, but should be considered part of determining whether a benefit exists. *Id.* Once again, appellants merely provide an alternative interpretation, rather than demonstrate that their preferred interpretation is correct. Appellants assert that Commerce should calculate the GASPÉTC program's benefit by reducing the tax credit by the increased income tax liability from a prior year's benefit—this is the essence of determining a *net* benefit. Accordingly, Commerce's determination that offsetting the benefit in this way is impermissible under 19 U.S.C. § 1677(6) is reasonable.

## V. The Trial Court Lawfully Sustained Commerce's Determination That Québec's Tax Credit For On-The-Job Training Is *De Facto* Specific

### A. Commerce Reasonably Determined That Québec's Tax Credit For On-The-Job Training Is *De Facto* Specific By Comparing The Actual Recipients To The Overall Number Of Tax Filers

Commerce will find a countervailable subsidy when an "authority" provides a "financial contribution" that results in a "benefit conferred" and the subsidy is "specific." 19 U.S.C. § 1677(5). A domestic subsidy satisfies the specificity requirement when it is specific either in law (*de jure*) or in fact (*de facto*). *Id.* § 1677(5A)(D). The *de facto* specificity requirement is satisfied when, among other factors, "{t}he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number." *Id.* § 1677(5A)(D)(iii)(I). Commerce "is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy," 19 C.F.R. § 351.502(b), but reviews only whether they are, in fact, "limited in number." 19 U.S.C. § 1677(5A)(D)(iii).

Section 1677(5A)(D)(iii) embodies the "*de facto* specificity" test, as separate statutory provisions address *de jure* specificity. 19 U.S.C. § 1677(5A)(D)(i)-(iii). The SAA, as the authoritative expression of the United States, states that, when Commerce applies this test, "the weight accorded to particular factors will vary from case to case." SAA at 931, 1994 U.S.C.C.A.N. 4040, 4243. Commerce's regulations also provide that, in *de facto* specificity analyses, Commerce "will

examine the factors contained in section {1677(5A)(D)(iii)} sequentially in order of their appearance. If a single factor warrants a finding of specificity, {Commerce} will not undertake further analysis." 19 C.F.R. § 351.502(a).

Courts have long recognized that Commerce's *de facto* specificity analysis is fact intensive and case-specific. *See,* e.g., *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335-36 (Fed. Cir. 2006) (citing *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) (Commerce's *de facto* specificity determinations "are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case.")). Consequently, the relevant authorities establish that Commerce is vested with broad discretion in determining *de facto* specificity. Indeed, this Court has stated under an older version of the statute that Commerce's specificity decision must be upheld unless Commerce's interpretation "is effectively precluded by the statute." *PPG Indus., Inc. v. United States*, 928 F.2d 1568, 1573 (Fed. Cir. 1991); *see Geneva Steel*, 914 F. Supp. at 599 (observing, in *de facto* specificity context, that "Commerce enjoys considerable deference in erecting methodologies and procedures for implementing the CVD laws," and may not be overruled "so long as the test as applied is reasonable and conforms to Congressional intent").

In this case, Commerce found that Québec's Tax Credit for On-The-Job Training subsidy is *de facto* specific because its recipients were limited in number

under 19 U.S.C. § 1677(5A)(D)(iii)(I). Appx127-129. Commerce described the program as allowing a "corporation that hires a student or an apprentice who is enrolled in a qualified training program {to} claim a tax credit at a rate of 24 percent for: (1) the salary or wages paid to the student or apprentice; and/or (2) the salary or wages paid to an employee for the hours they devote to supervision of the students and apprentices." Appx8400 (citing Appx1969-1988). Individuals engaged in business activities "can also claim the tax credit but the tax credit rates for individuals are reduced by 50 percent{.}" *Id.* Commerce explained that the "figures, reported by the GOQ, indicate that the actual number of recipients that benefited from the tax credit during the {period of investigation} . . . are limited in number on an enterprise basis." Appx129. Commerce further explained that, in making this determination, "{g}iven the nature of this tax program, it is reasonable to compare the actual number of companies that received the tax credit in 2018 to the total number of tax filers, inclusive of corporations and individuals in business, within Québec for 2018{.}" *Id.* Hence, Commerce lawfully compared the actual recipients of the tax credit in 2018 to the total number of tax filers within Québec for 2018, inclusive of corporations and individuals in business.

Commerce's conclusion that the actual recipients were limited in number is reasonable. Specifically, the number of companies receiving the tax credit was 4,930 for tax year 2018, among 387,949 companies filing tax returns that year.

Appx1982, Appx2173. Thus, the trial court concluded that, "{a}lthough the court has the authority to consider the reasonableness of Commerce's determination, in this case, where only 2% of taxpayers received the disputed benefit, it cannot be said (without more) that Commerce's identification of a limited benefit, and thus of a *de facto* specific subsidy, is unreasonable." Appx28.[7]

Commerce's approach comparing the number of recipients to the number of taxpayers is also consistent with the SAA's guidance concerning the CVD statute and Commerce's practice. The SAA states that "in determining whether the number of industries using a subsidy is small or large, Commerce {can} take account of the number of industries in the economy in question." SAA at 931, 1994 U.S.C.C.A.N. 4040, 4243. The SAA also explains that the specificity test "is to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used *throughout an economy*." *Id.* at 929, 1994 U.S.C.C.A.N. 4040, 4242 (emphasis added). Further, "{t}he specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy." *Id.* at 930, 1994 U.S.C.C.A.N. 4040, 4242 (emphasis in original).

[7] Based on the numbers above, the percentage of just corporate tax filers for 2018 was actually closer to 1 percent. *See* Appx1982, Appx2173. It would be even lower if one included individual tax filers.

Accordingly, Commerce has consistently determined whether the actual recipients of a subsidy are limited by considering the number of enterprises in the economy in question. *See, e.g.*, *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,946 (Dep't of Commerce July 29, 2016), at IDM Cmt. 13; *Certain Softwood Lumber Products From Canada*, 85 Fed. Reg. 77,163 (Dep't of Commerce Dec. 1, 2020), at IDM Cmts. 89, 95 (two programs *de facto* specific when one had "tens of thousands" of users and other used by 31,950 and 33,420 of 2.2 million tax filers). Commerce applied that approach in this case.

### B. Appellants Both Failed To Exhaust And Waived Their Argument That The Statute Requires The *De Jure* Specificity Analysis To Inform The *De Facto* Specificity Analysis

Appellants assert that Commerce's *de jure* specificity analysis must inform its *de facto* specificity analysis. App. Br. 64-68. Although appellants disputed Commerce's *de facto* analysis before Commerce and the trial court, they failed to argue before Commerce that the *de jure* analysis must inform the *de facto* analysis. Because appellants failed to raise this argument during administrative proceedings, they failed to exhaust their administrative remedies. Appx8710-8723 (GOQ case brief, disputing *de facto* specificity but not making argument); Appx8725-8736 (GOC case brief, not disputing *de facto* specificity for program); Appx8738-8768 (Marmen case brief, not disputing *de facto* specificity for program). Additionally, appellants waived this argument because they raised it at the trial court for the first

time in response to oral argument questions and in a post-argument submission. Appx9449-9452; Appx9582-9584. Accordingly, under the exhaustion and waiver doctrines, this Court should decline to consider appellants' argument on appeal.

Relevant to the exhaustion/waiver analysis, Commerce provided notice that it had preliminarily found the on-the-job training program *de facto* specific "{b}ecause the actual recipients, which benefited from this tax credit, relative to the total number of tax filers, inclusive of corporations and individuals in business, during the {period of investigation}, are limited in number on an enterprise basis," such that it is "*de facto* specific, in accordance with section {1677(5A)(D)(iii)(I)}." Appx8400. Notably, Commerce's finding did not reference the *de jure* specificity analysis, meaning that appellants had notice that Commerce did not rely on *de jure* specificity analysis to inform its *de facto* analysis. *Id.* Despite this, appellants did not argue before Commerce, as they do now, that the *de jure* analysis must inform the *de facto* analysis, depriving Commerce of the opportunity to address that claim.

Pursuant to 28 U.S.C. § 2637(d), the Court of International Trade "shall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's CVD determinations. This statutory mandate "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Adherence to the exhaustion doctrine protects administrative agency authority and promotes judicial efficiency. *Id.* Hence, courts generally take a "strict view" of the exhaustion requirement. *Id.*; *JBF*, 790 F.3d at 1366 (citations omitted).

"Simple fairness," moreover, "requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (emphasis added by this Court)). Hence, a party's obligation to exhaust administrative remedies applies equally to overall issues and to individual arguments. *E.g.*, *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 256 F. Supp. 3d 1346, 1355-56 (Ct. Int'l Trade 2017) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed.Cir.1990) (holding that party failed to exhaust argument characterized as "simply another angle to an issue")); *see also* 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant . . ."). By failing to make their *de jure* argument before Commerce, appellants deprived Commerce of the opportunity to address it in the first instance—precisely why Congress and the courts require exhaustion. *See Corus Staal*, 502 F.3d at 1379-80 (describing underlying policies); *Woodford*

*v. Ngo*, 548 U.S. 81, 90 (2006) (exhaustion requirements are designed "to give the agency a fair and full opportunity to adjudicate {parties'} claims").

In addition, none of the limited exceptions to the exhaustion requirement apply. *See Corus Staal BV v. United States*, 30 C.I.T. 1040, 1050 n.11 (2006) (identifying exceptions for pure legal questions, futility, denial of access to confidential record, and intervening judicial interpretation), *aff'd*, 502 F.3d 1370. The issue is not a pure legal question because it entails Commerce's *methodology* for determining *de facto* specificity in addition to the reasonableness of its interpretation of the CVD statute.

Equally, appellants have waived their *de jure* argument because they raised it in the trial court for the first time in responding to oral argument questions, and did not raise it in *either* their opening or reply briefs before the trial court. It is well established that parties must preserve arguments by raising them in their principal trial court briefs (even raising an argument for the first time on reply does not suffice). *See*, *e.g., Novosteel SA v. United States*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002). Thus, appellants failed to preserve their argument by not raising it in their trial court briefs. *See Apex Frozen Foods Priv. Ltd. v. United States*, 37 F. Supp. 3d 1286, 1298 (Ct. Int'l Trade 2014), *aff'd*, 862 F.3d 1322 (Fed. Cir. 2017) (party waived argument raised for first time at oral argument).

### C. In Any Event, Appellants' Argument That The *De Jure* Specificity Analysis Must Inform The *De Facto* Specificity Analysis Lacks Merit

Even if appellants had properly raised their *de jure* argument, it lacks merit because the *de jure* and *de facto* specificity analyses comprise distinct inquiries, covered by separate provisions, involving separate requirements.

Appellants claim that Commerce erred by using the total number of tax filers to evaluate *de facto* specificity "instead of the number of potential users of the tax program based on the eligibility criteria Commerce itself found were not *de jure* specific." App. Br. 64. Although Commerce was deprived of the opportunity to address this argument in this case, Commerce has addressed a similar argument by the Government of Québec in another proceeding. Commerce explained:

> Under the Act, *de facto* specificity is separate and distinct from *de jure* specificity. The *de jure* analysis does not inform the *de facto* analysis, given that the statute states different requirements for each analysis. The *de facto* analysis does not rely on a *de jure* finding of which enterprises or industries are potential recipients of the subsidy based on eligibility requirements. A *de facto* specificity determination does not build upon the program's eligibility requirements or access as described by relevant laws and regulations governing the programs—*i.e.*, the criteria and conditions identified in the *de jure* prong of the specificity test.

*Certain Softwood Lumber Products from Canada*, 87 Fed. Reg. 48,455 (Dep't of Commerce Aug. 9, 2022), at IDM Cmt. 2 (*Lumber from Canada*). Thus, Commerce's established practice is to apply the *de facto* test independently from

the *de jure* analysis, and it has provided its reasoning for doing so.

Commerce's explanation makes sense. The statute lacks language making the *de facto* specificity analysis dependent on the *de jure* analysis. Nor has this Court applied such a principle in its *de facto* specificity jurisprudence. *See*, *e.g.*, *Royal Thai Gov't*, 436 F.3d at 1335-36 (discussing *de facto* specificity test without limiting it by *de jure* test). Contrary to appellants' claims, the mere fact that the provisions setting forth the *de jure* specificity test precede those addressing the *de facto* specificity test in the statute does not mean that the "text and structure of the statute" require Commerce to limit its *de facto* specificity analysis to only those entities satisfying the *de jure* criteria. App. Br. 68. Appellants' position that the statute, despite lacking any such language, requires Commerce to determine *de facto* specificity by looking at only entities identified as eligible for the program under a *de jure* analysis is tautological, and would invariably result in findings of non-specificity, because it would require Commerce to look at only entities likely to use the program as the comparator in determining whether the number of entities using the program is limited. That is not a sensible test to screen out "only those foreign subsidies which truly are broadly available and widely used throughout an economy." SAA at 929, 1994 U.S.C.C.A.N. 4040, 4242.

Appellants relatedly argue that Commerce's methodology for its analysis contradicts the SAA. App. Br. 66-68. But appellants' support for this argument is

that the SAA contemplates a sequential analysis of *de jure* specificity and then *de facto* specificity. The sequential consideration of *de jure* specificity followed by *de facto* specificity does not mean that the *de jure* specificity analysis must *inform* the *de facto* analysis. To the contrary, as Commerce has explained, the CVD statute sets forth the *de jure* and *de facto* specificity tests separately, and nothing in the statutory text indicates any overlap in the analyses. *See Lumber from Canada*, 87 Fed. Reg. 48,455, at IDM Cmt. 2.

Moreover, the SAA does not support appellants' assertion that Commerce must consider the entities that are eligible for a program in analyzing whether it is *de facto* specific because the recipients are limited in number. To the contrary, the SAA states that Commerce for specificity purposes considers whether a subsidy program is subject to "widespread availability and use" such that it is "spread" or "widely used" "throughout an economy." SAA at 929, 930, 1994 U.S.C.C.A.N. 4040, 4242. Therefore, Commerce lawfully considers the number of enterprises in the economy when determining whether the recipients of the subsidy are limited. *See, e.g.*, Appx129; *Lumber from Canada*, 87 Fed. Reg. 48,455, at IDM Cmt. 2.

Appellants further argue that United States international obligations require that Commerce's *de jure* specificity analysis inform its *de facto* specificity analysis under the *Charming Betsy* canon. App. Br. 68-71. The canon provides that, absent contrary indications in statutory language or legislative history, statutes should be

interpreted consistent with international obligations. *Id.* at 68 (citations omitted). According to appellants, the canon applies because Article 2 of the World Trade Organization (WTO) Agreement on Subsidies and Countervailing Measures (SCM Agreement) and a WTO Appellate Body decision require that Commerce must, in making its determination, "take into consideration the potential recipients, *i.e.*, those meeting the neutral criteria or conditions governing the eligibility of the subsidy." App. Br. 69-70 (citing SCM Agreement Article 2.1 and Appellate Body Report, *United States – Measures Affecting Trade in Large Civil Aircraft (Second Complaint), Recourse to Article 21.5 of the DSU by the European Union*, WTO Doc. WT/DS353/AB/RW ¶ 5.240 (adopted Apr. 12, 2019) (*Aircraft*)).

There are several flaws in this argument. First, contrary to appellants' approach, it is well-established that WTO agreements and appellate body rulings lack domestic effect in the United States, and do not trump the statutory text (which in this case does not support appellants' position). Specifically, 19 U.S.C. § 3512(a) states that "{n}o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect." Likewise, this Court has explained that "{n}either the GATT nor any enabling international agreement outlining compliance therewith . . . trumps domestic legislation; if U.S. statutory provisions are inconsistent with the GATT or an enabling agreement, it is

strictly a matter for Congress." *Corus Staal BV v. Dep't of Comm.*, 395 F.3d 1343, 1348 (Fed. Cir. 2005). Further, "WTO decisions are not binding on the United States, much less this court." *Id.* (citation omitted).

Appellants' *Charming Betsy* argument is also misplaced because Commerce's interpretation does not conflict with an international obligation. Article 2.1 of the SCM Agreement provides a standard similar to the CVD statute. In particular, Article 2.1(c) provides that, if a program is not specific pursuant to the paragraphs outlining *de jure* specificity, "*other* factors may be considered," such as "use of a subsidy programme by a limited number of certain enterprises." Agreement on Subsidies and Countervailing Measures, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14, at Art. 2.1 (Apr. 15, 1994) (emphasis added). Like the CVD statute, the SCM Agreement sets forth the *de facto* factors separately, and they do not otherwise reference the *de jure* standard from the preceding paragraphs.

Appellants' reliance on the *Aircraft* decision is similarly misplaced. They cite *Aircraft* for the propositions that Commerce employs a sequential analysis of *de jure* followed by *de facto* specificity, such that "where a panel's assessment proceeds from Article 2.1(a) and (b) to Article 2.1(c), the panel's analysis under subparagraph (c) would normally build upon the relevant legislative framework examined under Article 2.1(a) and (b)" and proceed "in light of these eligibility

criteria." App. Br. 70 (quoting WTO Doc. WT/DS353/AB/RW ¶¶ 5.181, 5.240). Although Commerce agrees that the analytical sequence is first to examine *de jure* and then *de facto* specificity, *Lumber from Canada*, 87 Fed. Reg. 48,455, at IDM Cmt. 2, it is well established that specificity determinations are fact-intensive and case-specific. *See Royal Thai Gov't*, 436 F.3d at 1335-36. In this regard, *Aircraft* examined a very different program in a different economic context. WTO Doc. WT/DS353/AB/RW ¶ 5.241 (citing program's "onerous" eligibility requirements).

Moreover, *Aircraft* did not mandate a particular methodology, while recognizing that "{t}he aim of the inquiry under Article 2.1(c) {the *de facto* specificity provision} is to identify evidence of allocation or use of a subsidy that supports a finding of specificity, *notwithstanding* any appearance of non-specificity that might arise from a review of {the *de jure* factors concerning} the relevant legislation or the express acts of a granting authority." *Aircraft*, WTO Doc. WT/DS353/AB/RW ¶ 5.177 (emphasis added). Notably, the Appellate Body also recognized that "the universe of enterprises relevant for the purpose of this assessment depends on the characteristics of the measure and the circumstances of the case{.}" *Id.* ¶ 5.181. Commerce examined the facts relating to the program in this case, including its eligibility criteria, and reasonably found the program to be *de facto* specific. In any event, as we established, a WTO decision is not binding and does not trump the statute and authoritative SAA language indicating that the

specificity test is intended to screen-out widely used subsidies (which Commerce determined was not the case). Thus, the *Charming Betsy* canon does not require this Court to displace Commerce's methodology.

Finally, appellants' position is meritless because Commerce's methodology comparing the number of actual recipients to members of the broader economy is consistent with the statute's stated purpose: to identify whether a subsidy program is widely used throughout an economy. *See* SAA at 929, 1994 U.S.C.C.A.N. 4040, 4242. An analysis that only compares actual to eligible recipients contravenes this purpose. Under that approach, a subsidy that objectively limits eligibility to a small number of enterprises that all claim the subsidy could not be found *de facto* specific regardless of how limited the number of recipients is relative to the economy. This absurd result underscores why Commerce's approach is reasonable, while appellants' approach is inconsistent with the statute and SAA.

### D. Appellants Mischaracterize Commerce's Determination In Claiming That Commerce Found The On-The-Job Training Program *De Facto* Specific Based On Lack Of "Near Universal Application And Use"

Appellants claim, inaccurately, that Commerce's approach is based on an erroneous interpretation that "would require near universal availability and use of a tax program" before a tax measure could be found non-specific. App. Br. 71-73. This hyperbole is not a basis to overturn Commerce's determination.

Although Commerce does not use rigid thresholds for its specificity analysis, it has *not* adopted an interpretation requiring near-universal application and use for a program to be non-specific. Instead, as explained above, Commerce's specificity determinations are fact intensive and case-specific. In this case, Commerce did not find Québec's tax credit for on-the-job training program *de facto* specific based on a standard that the program was used by less than all of Québec's tax filers. Instead, Commerce found the program *de facto* specific based on the limited number of recipients, which, as the trial court observed, accounted for *less than two percent* of corporate tax filers in Québec. *See* Appx28; Appx129; *see also* Appx27 ("it was reasonable to think that a comparison to corporate tax filers would be instructive in determining whether the subsidy is widely spread throughout the economy or limited to a small number of enterprises").

Appellants cite the SAA and the dictionary definition of "limited" to argue that "an analysis of whether the users of a program are 'limited in number' must be based on whether the group of users is large or small." App. Br. 72. This ignores that "large" and "small" are not objective measures and instead vary by context. Therefore, the SAA does not support appellants' assertion that "there must be a restriction to a distinctly identifiable, narrowly defined subset of the economy." *See id.* As we demonstrated above, the specificity test is intended to screen-out subsidies that are "widely used throughout the economy," SAA at 929, 1994

U.S.C.C.A.N. 4040, 4242, whereas appellant's preferred methodology would treat a subsidy as non-specific solely based on the absolute number of recipients. Moreover, the 1999 *AK Steel* decision that appellants cite concerns an inquiry into "disproportionate or dominant benefit" under an earlier version of the statute. *See* 192 F.3d at 1383-84; App. Br. 73. But the "limited in number" factor is distinct from the other *de facto* specificity factors concerning whether an enterprise or industry is a predominant user or receives a disproportionate amount of a subsidy. 19 U.S.C. § 1677(5A)(D)(iii)(II)-(III). This is apparent from the fact that "{i}f a single factor warrants a finding of specificity, {Commerce} will not undertake further analysis." 19 C.F.R. § 351.502(a); *Preamble*, 63 Fed. Reg. at 65,355.

Appellants' next argument that Commerce's interpretation of the statute as allowing a percentage test in analyzing whether users of a subsidy are limited in number is inconsistent with Congressional intent fails for similar reasons. App. Br. 73-76. Appellants claim that Commerce may not consider whether recipients are limited in number on a relative basis because the CVD statute separately authorizes analysis of predominant or disproportionately large usage and does not mention "relativity or proportionality under the limited-in-number provision." App. Br. 74. Given this scheme, appellants claim, Congress has clearly spoken to the issue. *Id.*

Contrary to that claim, as the trial court observed, "{i}t is instructive that Congress provided this factor for Commerce to consider without specifying how

Commerce should consider the factor." Appx28. Appellants' own interpretation of the statute does not constitute Congressional intent. Given the absence of any defined thresholds or methodological guidance, Congress left it to Commerce to decide how best to determine whether the actual recipients of a subsidy are limited in number. *See Avisma*, 688 F.3d at 764 (discussing "tremendous deference" to such methodological determinations). There is nothing in the statute that precludes Commerce from making this determination with reference to the members of the broader economy to give context to whether the number of recipients should be considered limited. *See* 19 U.S.C. § 1677(5A)(D)(iii).

Relatedly, appellants' portrayal of Commerce's methodology in this case as a departure from Commerce's practice based on dated decisions is unpersuasive, both because the decisions are not on point and because Commerce's determination reflects its established practice. App. Br. 75-76. The trial court explained in rejecting these comparisons that the *Bethlehem Steel*, *AK Steel*, and *Royal Thai Government* cases that appellants cite involved different facts and procedural postures, such that they "offer weak evidence that the court here should second-guess Commerce's exercise of its expertise." Appx27-28.

Equally, contrary to appellants' comparisons, Commerce's approach in this case implements its practice. We cited as an example above Commerce's 2020 determination in *Certain Softwood Lumber Products From Canada*, in which

Commerce found two separate programs *de facto* specific when one had "tens of thousands" of users and the other was used by 31,950 and 33,420 of 2.2 million tax filers. 85 Fed. Reg. 77,163, at IDM Cmts. 89, 95; *see also* Appx28. Likewise, in *Phosphate Fertilizers from the Kingdom of Morocco*, Commerce explained that, "{w}hen analyzing *de facto* specificity for tax programs in prior cases, Commerce has compared the number of companies that used the program with the total number of tax filers" and that "Commerce has rejected {respondent's} argument that *de facto* specificity should be assessed by including only the number of companies eligible for a subsidy program in past cases." 86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021), at IDM Cmt. 22 (citations omitted). Notably, in *Phosphate Fertilizers*, Commerce found the tax program at issue to be *de facto* specific under section 1677(5A)(D)(iii)(I) "because evidence on the record shows that 8,761 companies obtained reductions in tax fines and penalties under {the program} out of a total of 262,165 corporate income taxpayers during the {period of investigation}." *Id.* These numbers compare favorably to those in this case.

Further, the Court of International Trade has previously upheld Commerce's approach. In *Changzhou Trina Solar Energy Co., Ltd. v. United States*, No. 17-00198, 2019 WL 5856438 (Ct. Int'l Trade Nov. 8, 2019), the court sustained Commerce's finding that the provision of aluminum extrusions for less than adequate remuneration was *de facto* specific because the actual users of aluminum

extrusions were limited in number. Commerce found that, although aluminum extrusions are used by many different Chinese industries, the actual usage within those industries is limited on an enterprise basis. *Id.* at *5-6; *see also* 19 U.S.C. § 1677(5A)(D)(iii)(I) (limited-in-number test applies "whether considered on an *enterprise or industry basis*" (emphasis added)). Similarly, in this case, despite plaintiffs' arguments that users of the program are in various different industries or economic sector groupings, *see* App. Br. 77, Commerce reasonably determined that the actual users of the subsidy were limited.

Finally, appellants' claims that "no program could successfully pass muster of Commerce's *de facto* specificity test" and thus that "Commerce's methodology reads out of the statute the specificity prong of the subsidy analysis" are inaccurate. App. Br. 77-78. Consistent with the SAA, a program is deemed non-specific under Commerce's methodology if it is "truly { } broadly available and widely used throughout an economy," SAA at 929, 1994 U.S.C.C.A.N. 4040, 4242, whereas a mere 1 to 2 percent of taxpayers received the on-the-job training tax credit. *See* Appx28 (observing limited use).

Therefore, notwithstanding appellants' claims to the contrary, Commerce's methodology and its analysis are within the bounds of its statutory authority and should be sustained.

## CONCLUSION

For these reasons, we respectfully request that this Court affirm the judgment of the trial court.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

/s/ Joshua E. Kurland
JOSHUA E. KURLAND
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Email: Joshua.E.Kurland@usdoj.gov

*Attorneys for Defendant-Appellee*

OF COUNSEL:
PAUL KEITH
Senior Attorney
Department of Commerce
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

December 9, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Circuit Rule 32(b) and the Court's word-limit order of September 30, 2022, the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 17,947 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

/s/ Joshua E. Kurland