2022-1807

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

THE GOVERNMENT OF QUÉBEC, MARMEN INC.,
MARMEN ÉNERGIE INC., MARMEN ENERGY CO.,
THE GOVERNMENT OF CANADA,

Plaintiffs-Appellants

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendants-Appellees

THE GOVERNMENT OF ONTARIO,

Defendant

---

Appeal from the United States Court of International Trade
in Nos. 1:20-CV-00168-GSK, 1:20-CV-00170-GSK, and 1:20-CV-00172-GSK,
Judge Gary S. Katzmann

---

### REPLY BRIEF OF PLAINTIFFS-APPELLANTS
### THE GOVERNMENT OF QUÉBEC, MARMEN INC.,
### MARMEN ÉNERGIE INC., MARMEN ENERGY CO.,
### AND THE GOVERNMENT OF CANADA

### NON-CONFIDENTIAL VERSION

Matthew J. Clark
ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC 20006
(202) 857-6000
Counsel to the
Government of Québec

Jay C. Campbell
White & Case LLP
701 13th Street NW
Washington, DC 20005
(202) 626-3600
Counsel to Marmen

Joanne E. Osendarp
McDermott Will & Emery
LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8349
Counsel to the Government of
Canada

February 1, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1807

**Short Case Caption** Government of Québec v. US

**Filing Party/Entity** Government of Québec

---

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/01/2023

Signature: /s/ Nancy A. Noonan

Name: Nancy A. Noonan

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Government of Québec | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☑  Additional pages attached

| | | |
|---|---|---|
| Aman Kakar | Terminated: 08/24/2022 | |
| Leah N. Scarpelli | | |
| John A. Gurtunca | Terminated: 8/24/2022 | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| Natan Pinchas Lyons Tubman | | |
| | | |
| | | |

**FORM 9. Certificate of Interest**                                    **Form 9 (p. 1)**
                                                                       **July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2022-1807 |
| **Short Case Caption** | Government of Quebec v. US |
| **Filing Party/Entity** | Government of Canada |

---

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: <u>2/1/2023</u>

Signature:     <u>/s/ Joanne Osendarp</u>

Name:          <u>Joanne Osendarp</u>

**FORM 9. Certificate of Interest**

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Government of Canada | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Conor Gilligan | McDermott Will & Emery, LLP | Did not appear in the originating Court, but is appearing in this Court |
| Timothy Hruby | McDermott Will & Emery, LLP | Terminated 8/19/2022 |
| Tyler Kimberly | McDermott Will & Emery, LLP | Did not appear in the originating Court, but is appearing in this Court |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1807

**Short Case Caption** Government of Quebec v. US

**Filing Party/Entity** Marmen Inc., Marmen Energie Inc., and Marmen Energy Co.

---

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 2/1/2023

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Marmen Inc. | | |
| Marmen Energie Inc. | | |
| Marmen Energy Co. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| White & Case LLP | Jay Charles Campbell | |
| Ron Kendler | Allison J.G. Kepkay | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted in footnote 2 of page 6 identifies the value of exchange rate adjustments.

# TABLE OF CONTENTS

INTRODUCTION ............................................................1

ARGUMENT ................................................................1

I.   COMMERCE'S DECISION TO EXCLUDE THE AUDITOR'S EXCHANGE RATE ADJUSTMENT FROM THE SALES DENOMINATOR SHOULD NOT BE SUSTAINED .............................1

  A.   Appellees Fail To Identify Substantial Evidence Supporting Commerce's Decision ......................................1

  B.   Appellees Fail To Demonstrate that Commerce's Decision Is Consistent with Its Longstanding Practice and Statutory Duty ........................................................6

II.  THE 10% CLASS 1 DEPRECIATION RATE FOR MANUFACTURING BUILDINGS IS NOT COUNTERVAILABLE ............................................9

  A.   The Capital Cost Allowance for Class 1 Assets Does Not Confer a Benefit .........................................10

  B.   The CCA for Class 1 Assets Does Not Provide a Financial Contribution ...........................................14

III. IN CALCULATING THE BENEFIT FROM THE GASPÉTC PROGRAM, THE REGULATION REQUIRED COMMERCE TO INCLUDE BOTH THE AMOUNT OF THE TAX CREDIT AND THE ADDITIONAL TAXES PAID AS A RESULT OF THE PROGRAM ...........................................16

IV.  COMMERCE'S *DE FACTO* SPECIFICITY DETERMINATION REGARDING THE ON-THE-JOB-TRAINING TAX CREDIT IS UNLAWFUL AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE ..............................................21

A.  The Canadian Parties Exhausted Their Administrative Remedy and Did Not Waive Their *De Jure* Specificity Argument Relating to the *De Facto* Analysis ................................ 21

B.  The Government Misinterprets the Statute, Which Requires the *De Jure* Analysis to Precede and Inform the "Limited in Number" *De Facto* Analysis .......................................................... 25

C.  Commerce's Interpretation of "Limited in Number" in the *De Facto* Statutory Provision as Requiring a Comparison to All Tax Filers Is Contrary to Law and Unsupported by Substantial Evidence Regardless of Whether the *De Jure* Prong of the Statute Is Considered ..................................................................... 28

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .............................. 33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States*,
367 F.3d 1339 (Fed. Cir. 2004) ............................................................28

*Apex Frozen Foods Priv. Ltd. v. United States*,
208 F. Supp. 3d 1398 (Ct. Int'l Trade 2017) ..............................22, 23

*Bethlehem Steel Corp. v. United States*,
590 F. Supp. 1237 (Ct. Int'l Trade 1984) ..........................................15

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)......................................................................13, 15

*Gerber Food (Yunnan) Co. v. United States*,
601 F. Supp. 2d 1370 (Ct. Int'l Trade 2009) ....................................22

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)........................................................................17

*Luigi Bormioli Corp. v. United States*,
304 F.3d 1362 (Fed. Cir. 2002) ..........................................................28

*Ningbo Dafa Chem. Fiber Co. v. United States*,
580 F.3d 1247 (Fed. Cir. 2009) ..........................................................23

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ..........................................................15

*NMB Singapore Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009) ..........................................................13

*NSK Ltd. v. United States*,
390 F.3d 1352 (Fed. Cir. 2004) ..........................................................12

*POSCO v. United States*,
296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ......................................8

*Solvay Solexis S.p.A. v. United States*,
637 F. Supp. 2d 1306 (Ct. Int'l Trade 2009) ....................................22

*Timken U.S. Corp. v. United States*,
   434 F.3d 1345 (Fed. Cir. 2006) ............................................................8

*Trust Chem. Co. v. United States*,
   791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011) ......................................22

*Wilmar Trading Pte Ltd. v. United States*,
   466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) ......................................16

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013) ............................................................3

## STATUTES AND REGULATIONS

19 U.S.C. § 1677(5) ....................................................................................21

19 U.S.C. § 1677(5)(B) ..............................................................................16

19 U.S.C. § 1677(5A)(D)(i) ..................................................................25, 26

19 U.S.C. § 1677(5A)(D)(ii) ......................................................22, 25, 26, 31

19 U.S.C. § 1677(5A)(D)(iii)(I) ................................................................28

19 U.S.C. § 1677(5A)(D)(iii)(II) ..............................................................30

19 U.S.C. § 1677(5A)(D)(iii)(III) ............................................................30

19 U.S.C. § 1677(6) ..............................................................................17, 20

19 U.S.C. § § 1677(5A)(D)(iii)(IV) ..........................................................30

28 U.S.C. § 2637(d) ....................................................................................22

19 C.F.R. § 351.307(c) ................................................................................5

19 C.F.R. § 351.504(a) ..............................................................................20

19 C.F.R. § 351.509(a)(1) ....................................................................passim

# LEGISLATIVE MATERIALS

*Statement of Administrative Action accompanying the Uruguay Round*
*Agreements Act*,
H.R. Rep. No. 103-316, at 930 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 4040 ..................................................26, 29, 30

# ADMINISTRATIVE DETERMINATIONS

*Certain Corrosion-Resistant Steel Products From the Republic of*
*Korea*,
85 Fed. Reg. 15112 (Dep't Commerce Mar. 17, 2020),
and accompanying Issues & Decision Memorandum ......................................27

*Certain Fabricated Structural Steel From Mexico*,
85 Fed. Reg. 5381 (Dep't Commerce Jan. 30, 2020),
and accompanying Issues & Decision Memorandum ......................................27

*Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*,
71 Fed. Reg. 67098 (Dep't Commerce Nov. 20, 2006),
and accompanying Issues & Decision Memorandum ........................................7

*Countervailing Duties*,
63 Fed. Reg. 65348 (Dept. Commerce Nov. 25, 1998)....................................20

*Forged Steel Fluid End Blocks From the Federal Republic of*
*Germany*,
85 Fed. Reg. 80011 (Dep't Commerce Dec. 11, 2020),
and accompanying Issues & Decision Memorandum ......................................27

*Non-Oriented Electrical Steel from Taiwan*,
79 Fed. Reg. 61602 (Dept. Commerce Oct. 14, 2014),
and accompanying Issues & Decision Memorandum ................................26, 27

*Utility Scale Wind Towers from Canada*,
85 Fed. Reg. 40245 (July 6, 2020)
and accompanying Issues & Decision Memorandum ..................................1, 27

# MISCELLANEOUS

*Accelerated Depreciation: What Is It, How to Calculate It*,
*Investopedia*, https://www.investopedia.com/
terms/a/accelerateddepreciation.asp (last updated Oct. 28, 2020) ....................11

*Accelerated Depreciation*,
  CAMBRIDGE DICTIONARY,
  https://dictionary.cambridge.org/us/dictionary/english/accelerated-
  depreciation (last visited Jan. 29, 2023) ........................................................... 10

*Accelerated Depreciation*,
  COLLINS DICTIONARY,
   https://www.collinsdictionary.com/dictionary/english/ accelerated-
  depreciation (last visited Jan. 29, 2023) ............................................................ 11

## **INTRODUCTION**

The Government of Québec, Marmen Inc., Marmen Énergie Inc., Marmen Energy Co., and the Government of Canada (collectively, "Canadian Parties" or "Appellants") reply to the response briefs submitted by Defendant-Appellees the United States ("Gov. Br.") (ECF 44) and the Wind Tower Trade Coalition ("Coalition") ("Coalition Br.") (ECF 41).  As discussed below, the Government and Coalition fail to demonstrate that the challenged aspects of the Department of Commerce's ("Commerce") final countervailing duty ("CVD") determination in *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40245 (July 6, 2020); Appx147-149, are supported by substantial evidence and otherwise in accordance with law.  For consistency, we refer to underlying documents from the administrative record using the abbreviated document names set forth in the Canadian Parties' initial brief (ECF 32) ("Appellants Br.").

## **ARGUMENT**

**I.     COMMERCE'S DECISION TO EXCLUDE THE AUDITOR'S EXCHANGE RATE ADJUSTMENT FROM THE SALES DENOMINATOR SHOULD NOT BE SUSTAINED**

### **A.     Appellees Fail To Identify Substantial Evidence Supporting Commerce's Decision**

Appellees fail to demonstrate that Commerce's extraordinary decision to reject an independent auditor's exchange rate adjustment is supported by substantial evidence.  Appellees reiterate Commerce's mischaracterization – belied by the

Verification Report – that its verifiers discovered errors in the auditor's calculation through spot-checking. Moreover, neither identifies substantial evidence supporting Commerce's speculation that there might be other errors in the calculation. At bottom, Commerce's decision to reject the auditor's adjustment is inconsistent with its Verification Report and therefore unsupported by substantial evidence.

Appellees fail to support Commerce's claim to have discovered the five Euro-coded sales through spot-checking. *See* Gov. Br. at 21; Coalition. Br. at 19. In a spot check, verifiers randomly select sales from a larger universe for review. Here, however, Commerce's verifiers did not discover the five Euro-coded sales through random sampling. Rather, as confirmed by the Verification Report, the five Euro-coded sales were isolated and flagged (as recorded in Euro) in the U.S. dollar ("USD") sales listings prepared by Marmen in advance of verification. *See* Appx8592-8593, Appx8621-8622. In fact, four of the five Euro-coded sales were the only transactions booked in the relevant account, meaning that all four transactions included in the USD-sales listing for this account were identified as recorded in Euro – leaving nothing for Commerce's verifiers to find. *See* Appx8593. Commerce grounded its decision to reject outright the auditor's exchange rate adjustment on spot-checking. *See* Appx115-116. Because that premise is false, Commerce's decision is unsupported by substantial evidence.

Nor does substantial evidence support Commerce's inference that there might be additional errors in the USD-coded sales included in the auditor's adjustment. According to the Government, "{r}egardless of who first 'discovered' the errors," their existence provided "a sufficient basis for Commerce's determination that other USD-coded sales proposed to be converted {to Canadian dollars ("CAD")} might also be in error." Gov. Br. at 23-24, 26; Coalition Br. at 20. To the contrary, the Verification Report shows that the verifiers spot-checked twelve invoices recorded as USD sales, and confirmed that each was paid in USD. *See* Appx8679-8680, Appx8685. This includes the USD-coded sales made by Marmen Inc.'s affiliate, Marmen Énergie, for which Commerce rejected the auditor's exchange rate adjustment without finding a single discrepancy. *See* Appx8685. Like Commerce below, Appellees ignore the spot-checking the verifiers actually performed. Having found no other erroneously USD-coded sales beyond the handful identified in Marmen's USD-sales listings, it was unreasonable for Commerce to infer that additional errors were likely.[1] *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (Commerce may not base conclusions on "mere conjecture or supposition").

---

[1] The Government also emphasizes that two of the Euro-coded sales were actually denominated in CAD. *See* Gov. Br. at 24. Notwithstanding, the salient fact remains that Commerce's spot-checking did not reveal any currency discrepancies beyond the five Euro-coded sales identified in Marmen's USD-sales listings prepared for verification.

Moreover, the Verification Report indicates that Commerce's verifiers were satisfied and did not consider the five Euro-coded sales – which accounted for less than 0.2% of the auditor's exchange rate adjustment for Marmen Inc. alone – to be an issue. First, Commerce's verification team concluded early on the fourth day of verification without any suggestion that Marmen had failed to address a question raised during the proceeding. *Compare* Appx8654 *with* Appx8542. In response, the Government argues that, "{h}aving identified the errors and obtained Marmen's explanations for the misclassifications, Commerce was not obligated to question Marmen for a specified length of time." Gov. Br. at 27; *see also* Coalition Br. at 22. This explanation is unreasonable and unsupported by the record. *After* reviewing the five Euro-coded sales identified in the USD-sales listings Marmen prepared for verification, the verifiers spot-checked USD-coded sales in the listings and confirmed that each was paid in USD. *See* Appx8680, Appx8685. These circumstances permit only one reasonable conclusion: Commerce's verifiers finished early because they did not consider the auditor's exchange rate adjustment to be an issue.

Second, and more importantly, the Verification Report's Summary of Findings does not identify the auditor's exchange rate adjustment as an issue, despite noting other minor errors in reported sales values. *See* Appx8655-8657. To the contrary, the Summary of Findings indicates that the auditor's adjustment ***was***

*necessary* to convert Marmen's USD sales to CAD for the sales denominator, *see* Appx8655-8656 (stating that Marmen's reported sales "included certain U.S. Dollar (USD) sales values which were not converted to Canadian Dollars (CAD)" and that "{t}he currency adjustments required to convert USD sales to CAD values were made in the" auditor's exchange rate adjustment) – *a fact Appellees ignore*. Instead, Appellees resort to citing boilerplate, such as that the Summary of Findings "is not all inclusive" and that "Commerce does not reach conclusions regarding such findings in the verification report." Gov. Br. at 28; Coalition Br. at 21. By regulation, however, the verification report must address the "results of a verification" before Commerce issues its final determination. 19 C.F.R. § 351.307(c). Moreover, the Verification Report states that the Summary of Findings is provided "as a convenience in order to better aide the parties' preparation of comments before Commerce." Appx8655. It should be dispositive that Commerce's verification team not only refrained from identifying the auditor's exchange rate adjustment as an issue in the Summary of Findings, but also indicated that the adjustment was "required" to convert Marmen's USD sales to CAD values.

Because Commerce's decision to reject the auditor's exchange rate adjustment is contradicted by the Verification Report, Commerce's decision is unsupported by substantial evidence.[2]

### B.     Appellees Fail To Demonstrate that Commerce's Decision Is Consistent with Its Longstanding Practice and Statutory Duty

Appellees fail to demonstrate that Commerce's decision to reject the auditor's exchange rate adjustment is in accordance with law.  Appellees ignore Commerce's longstanding practice to verify a respondent's reported information by reference to its audited financial statements.  Furthermore, neither party could reconcile Commerce's decision to reject the auditor's adjustment with its statutory obligation to calculate countervailable subsidy rates as accurately as possible.

The Canadian Parties have explained that Commerce's longstanding practice is to verify the accuracy of reported information by reconciling that information with the respondent's audited financial statements.  *See* Appellants Br. at 38.  Neither Appellee disputes that this is Commerce's practice.  *See* Gov. Br. at 29-33; Coalition Br. at 22-23.  Instead, the Government attempts (and fails) to distinguish the one trade remedy proceeding (of which we are aware) in which the reliability of a

---

[2] The Government wrongly suggests that the restatement of Marmen's year-2018 audited financial statements was related to the exchange rate adjustment.  *See* Gov. Br. at 20; *see also* Coalition Br. at 4-5.  This is incorrect.  As shown in the verification exhibits, the auditor's exchange rate adjustments in 2018 remained CAD [Adjustment Value] for Marmen Inc. and CAD [Adjustment Value] for Marmen Énergie before and after the restatements.  *See* Appx8590, Appx8642.

respondent's audited financial statements was even questioned: *Butt-Weld Pipe Fittings*.[3] That the reliability of an auditor's opinion has been questioned in only one proceeding proves the point: It would be extraordinary for Commerce to reject an independent auditor's opinion and the agency would need "compelling evidence" to do so. Here, contrary to its longstanding practice to rely on audited financial statements, Commerce rejected the auditor's exchange rate adjustment in its entirety without "compelling evidence."

The Government also suggests that Commerce's decision to reject the auditor's exchange rate adjustment was reasonable because "Marmen first raised it substantively as an alleged ministerial error in the preliminary results . . . ." Gov. Br. at 29-30. This fails to justify disregarding an independent auditor's adjustment. Marmen clarified its sales reporting and explained the auditor's adjustment on December 18, 2019, well before verification, which commenced on February 17,

---

[3] Here, the Government asserts that "the nature of the issue {in *Butt-Weld Pipe Fittings*} involved some level of judgment from the independent auditor, unlike this case, in which the auditor's adjustment is a calculation to convert currencies." Gov. Br. at 32. In *Butt-Weld Pipe Fittings*, Commerce stated that, "to reject the independent auditor's opinion and discredit the financial statements it would need to have compelling evidence to the contrary" – without limiting this principle to questions of judgment. *See Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 71 Fed. Reg. 67098 (Dep't Commerce Nov. 20, 2006), and accompanying I&D Memo at Comment 1. In any event, by rejecting the auditor's currency adjustment, Commerce unreasonably discredited the auditor's judgment that Marmen Inc.'s "financial statements present fairly, ***in all material respects***, the financial position of the Company . . . ." Appx2696 (emphasis added).

2020.  *See* Appx8434-8436; Appx8654.   Consequently, Commerce lacked any grounds to reject the auditor's adjustment based on untimeliness.  *See Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006) ("Commerce is free to correct any type of importer error – clerical, methodology, substantive, or one in judgment – . . . provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections.").

Lastly, Appellees fail to demonstrate that Commerce's decision to reject the auditor's adjustment was consistent with its statutory obligation to determine CVD rates as accurately as possible.  *See POSCO v. United States*, 296 F. Supp. 3d 1320, 1340 n.31 (Ct. Int'l Trade 2018) (citation omitted).  Commerce verified that Marmen recorded USD sales values in its general ledger without converting them to CAD, *see* Appx8655, yet knowingly used those understated values in Marmen's sales denominator – transforming what would have been a negative CVD determination into an affirmative one.   Commerce compounded the distortion by arbitrarily ***accepting*** the auditor's currency adjustment to the extent it ***reduced*** Marmen's sales denominator (*i.e.*, Commerce accepted the conversion of Marmen Inc.'s and Marmen Énergie's USD-denominated sales to CAD for purposes of the intercompany sales deduction).  *See* Appx121-122.  Notably, the Government did not attempt to argue that Commerce's decision resulted in an accurate final CVD determination.  *See* Gov. Br. at 29-33.

## II.    THE    10%    CLASS    1    DEPRECIATION    RATE    FOR MANUFACTURING BUILDINGS IS NOT COUNTERVAILABLE

It is now clear that only one question divides the parties:  whether the requirement that a taxpayer must affirmatively choose the 10% depreciation rate for manufacturing buildings – lest it otherwise receive the 4% rate – means that the 10% rate is a financial contribution conferring a benefit.[4]  The answer to that question is plainly "no," given the Appellees' apparent acceptance of five key points:

- Canada's tax system, like the United States', allows taxpayers to take annual deductions from taxable income equal to a pro rata percentage of the acquisition cost of depreciable assets.

- Assets are assigned to classes, which describe the assets in that class and their allowable annual depreciation.  A depreciation deduction for income tax purposes (in Canada, called a Capital Cost Allowance, or "CCA") is generally based on the useful life of the asset being depreciated.

- Class 1, covering most buildings acquired after March 18, 2007, includes three different building categories with different characteristics and different depreciation rates, determined based on actual empirical evidence – residential buildings (4%);  non-residential buildings in which 90% of the floor space is used for manufacturing or processing (10%); and other buildings in which 90% of the floor space is used for another non-residential purpose (6%).

---

[4] The Coalition also repeatedly states that eligibility for the 10% rate excludes certain industries.  *See, e.g.*, Coalition Br. at 24, 31, 34.  This is not true – any enterprise in any industry that has a building in which manufacturing occurs can claim the 10% deduction.  Appx8037–8038.  Nor is that argument relevant, because which industries can claim a deduction goes to specificity – an issue not raised here for Class 1.

- To obtain *any* depreciation deduction, for tax purposes, a Canadian corporate taxpayer must specifically claim that deduction on the Schedule 8 form.

- Commerce does not countervail tax deductions for depreciation unless the deduction allows taxpayers to claim a depreciation rate exceeding the rate at which the asset actually depreciates.

As shown below, given these points, Appellees have failed to demonstrate that Commerce's decision should be upheld.

A.    **The Capital Cost Allowance for Class 1 Assets Does Not Confer a Benefit**

Appellees argue that the Court should sustain Commerce's benefit finding with respect to the 10% rate for two reasons: (1) the 10% rate is "accelerated," or a departure from the norms of Canada's tax system; and (2) the 4% rate automatically applies if the 10% rate is not elected. Neither argument has merit.

First, in support of Commerce's finding that the 10% rate conferred a benefit equal to the difference between the 4% and 10% rates, *see* Appx95–99, Appellees contend that the 10% rate for manufacturing buildings is accelerated or in addition to the 4% rate that applies to residential buildings, *see, e.g.*, Gov. Br. at 34, 41; Coalition Br. 25–26. Appellees fundamentally misconstrue the concept of accelerated depreciation.

"Accelerated" deprecation refers to a method by which a taxpayer can claim a deduction amount for an asset in a taxable year *before the asset has actually depreciated by that amount*. *See Accelerated Depreciation*, CAMBRIDGE

DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/accelerated-depreciation (last visited Jan. 29, 2023); *Accelerated Depreciation*, COLLINS DICTIONARY, https://www.collinsdictionary.com/dictionary/english/ accelerated-depreciation (last visited Jan. 29, 2023); *Accelerated Depreciation: What Is It, How to Calculate It*, INVESTOPEDIA, https://www.investopedia.com/ terms/a/accelerateddepreciation.asp (last updated Oct. 28, 2020).  The 10% CCA rate is **equal** to the rate at which the asset – a manufacturing building – depreciates; it is not faster than the actual depreciation rate.

While Canada's questionnaire response referred to the 4% rate as the deduction "normally" taken for Class 1 assets, *see* Appx8018, this does not mean that the 10% rate is **not** normal for manufacturing buildings, or is accelerated "over and above what the country's *normal* depreciation rules would otherwise permit," Gov. Br. at 41 (emphasis in original); Coalition Br. at 27–28.  Different buildings within Class 1 (distinguished by characteristics, use, and average useful life) have different depreciation rates that a taxpayer may take, each based on the actual depreciation rate of the asset.[5]  Appx8037–8038.  The normal depreciation rate for

---

[5] The Government alleges that Appellants' chart of Class 1 depreciation rates for Class 1 was "inaccurate{}." Gov. Br. at 35 n.5.  However, it never specifies **why** the chart is inaccurate, or how that purported inaccuracy is relevant.  The Government also contends that the different characteristics of Class 1 assets and their depreciation rates are irrelevant because only taxpayers meeting the eligibility criteria for the 10% rate can claim the 10% rate.  *Id.* at 38–39.  This is mere tautology: of course, only taxpayers eligible for any particular deduction can claim the deduction.

manufacturing buildings is 10%.  Appx2514, Appx2550.  The 10% rate is ***not*** a deduction that confers a benefit.  It simply reflects a manufacturing building's actual depreciation rate.  *See* Appellants Br. at 46–47; 19 C.F.R. § 351.509(a)(1).

Similarly, Appellees argue that the 10% depreciation rate confers a benefit "because it affords 'a tax reduction in the amount of the difference between the tax the company paid and the tax the company would have paid absent the reduction.'" Gov. Br. at 36 (quoting Appx97); *see also* Coalition Br. at 28.  But the same could be said of the 4% "standard" rate, or any other depreciation rate.  *See* Appellants Br. at 46–47.  Commerce did ***not*** take the position that the 4% rate conferred a benefit or assert that all depreciation deductions confer countervailable benefits.  The 10% rate for manufacturing buildings is no different.  Commerce's disparate treatment of two similar CCA rates – the 4% rate and the 10% rate – elevates form over their substance, and thus, its finding is arbitrary.  *Cf. NSK Ltd. v. United States*, 390 F.3d 1352, 1357 (Fed. Cir. 2004) (finding that Commerce cannot treat two similar expenses differently when calculating a constructed export price).

Further, Appellees' arguments do not support Commerce's failure to address the substance of the *StatCan Study* (*Economic Depreciation and Retirement of Canadian Assets: A Comprehensive Empirical Study*).  *See generally* Appx2522–2582.  The Government argues that the *StatCan Study* is irrelevant and, thus, Commerce was not required to address it. Gov. Br. at 41–42. **Commerce,** however,

did not claim that the *StatCan Study* was irrelevant – Commerce did not address the study at all. The Government's argument is, thus, impermissible *post hoc* reasoning. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (a court may only sustain the agency's decision "on the same basis articulated in the order by the agency itself"). Similar is the Coalition's claim that "{Commerce} found Appellants' reliance on {the *StatCan Study*} unconvincing, given that {Canada} chose not to apply the 10% rate recommended by the studies to all manufacturing buildings." Coalition Br. at 30–31.[6] Canada did not choose to apply StatCan's recommendation to only some buildings that the *StatCan Study* recommended; the *StatCan Study* recommended applying the 10% rate to manufacturing buildings, and Canada adopted that recommendation in full. Appx2550; Appx2514. Further, even if there were a difference between the *StatCan Study*'s recommendation and Canada's response – and there was not – **Commerce** did not identify such alleged difference as a reason to reject the study. Thus, the Coalition's argument is *post hoc* reasoning. *Burlington*, 371 U.S. at 168–69. Nor is it "apparent" that Commerce found the *StatCan Study* "unconvincing" because, again, Commerce never addressed it. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce's reasoning must be reasonably discernible to a reviewing court.").

---

[6] *See also supra*, footnote 4.

Second, Appellees emphasize that the 10% rate for manufacturing buildings must be claimed on form Schedule 8 and argue that the requirement to elect the 10% rate demonstrates that it is a deviation from Canada's tax system.  Gov. Br. at 36–37; Coalition Br. at 29–30.  This fails to recognize that the 4% rate for residential buildings also must be claimed on the Schedule 8 form.  Appx8051.[7]  Had Marmen failed to file a Schedule 8 form or otherwise not claimed depreciation, it would not have received *any* depreciation deduction.

### B.     The CCA for Class 1 Assets Does Not Provide a Financial Contribution

Appellees' attempts to salvage Commerce's financial contribution finding also fail.  First, Appellees argue that the 10% rate is a deviation from the norms of Canada's tax system because it is "accelerated" or "additional" compared to the 4% rate.  Gov. Br. at 43–44; Coalition Br. at 33.  As demonstrated above, the 10% rate is not "accelerated" or "additional" because it is the actual rate at which the relevant assets – manufacturing buildings – depreciate in value.  Also, by Appellees' logic, *any* change to existing tax rules that might reduce a taxpayer's liability, regardless of reason, would provide a financial contribution.  Commerce has not taken that position, however, because a reduction in tax liability must be "selective" to be

---

[7]  The corresponding provincial tax credit is claimed on Form CO-130.A. Appx1948–1954.

countervailable. *Bethlehem Steel Corp. v. United States*, 590 F. Supp. 1237, 1245–46 (Ct. Int'l Trade 1984); Appellants Br. at 51.

Second, Appellees contend that Commerce's failure to address the *StatCan Study* in finding a financial contribution should be excused. According to the Government, Commerce's failure to address explicitly the *StatCan Study* is excusable because Commerce rejected arguments made by Canada based on the *Study* in the following statement: "only those {taxpayers} that meet the eligibility for certain Class 1 assets . . . can file for, and subsequently receive the {10% rate}." Gov. Br. at 45 (quoting Appx98). The Government's argument, and Commerce's conclusion, have no connection to the *StatCan Study*, which discusses the rate at which assets depreciate – not the criteria for claiming the deduction. Moreover, a conclusory statement is not the same as analyzing evidence. Commerce must "disclose the basis" of its finding and "give clear indication" that it considered evidence detracting from its conclusion. *Burlington*, 371 U.S. at 168–69; *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003).

Similarly, Appellees assert that Commerce's perfunctory financial contribution finding is sufficient because "the factual bases for both the benefit and contribution analyses are inextricably entwined." Coalition Br. at 34; *see also* Gov. Br. at 45 (arguing that Commerce sufficiently addressed the *StatCan Study* by finding that Marmen realized "tax saving from the 'difference between the two

calculated deductions'") (emphasis omitted) (quoting Appx99). But that does not allow Commerce to conduct a single analysis of two separate statutory factors. *See* 19 U.S.C. § 1677(5)(B); *Wilmar Trading Pte Ltd. v. United States*, 466 F. Supp. 3d 1334, 1355–56 (Ct. Int'l Trade 2020) ("Commerce must make distinct findings as to the elements of financial contribution and benefit."). Moreover, Commerce's benefit finding in this case cannot support a financial contribution finding because it is unsupported by substantial evidence. Appellants Br. at 42–49. In summary, Commerce's benefit finding is unsupported by substantial evidence, and Commerce provided no reasoning for its financial contribution finding. The Court should thus remand both issues for analyses based in law and that take all facts into account.

## III. IN CALCULATING THE BENEFIT FROM THE GASPÉTC PROGRAM, THE REGULATION REQUIRED COMMERCE TO INCLUDE BOTH THE AMOUNT OF THE TAX CREDIT AND THE ADDITIONAL TAXES PAID AS A RESULT OF THE PROGRAM

In response to the Canadian Parties' arguments concerning Commerce's benefit calculation for the Tax Credit Promoting Employment in Gaspésie and Certain Maritime Regions of Québec ("GASPÉTC") program, the Government misinterprets the regulations and statute in a manner contrary to law. The plain meaning of the direct taxes benefit regulation, 19 C.F.R. § 351.509(a)(1), required Commerce to consider the total effect of the tax program in calculating the benefit. Section 351.503(e), which addresses the "tax consequences of the benefit," is not applicable because the regulations direct Commerce to calculate the benefit of a tax

program in a specific way, as set forth in § 351.509(a)(1), and therefore Appellants are not arguing for the secondary tax effects to be considered. Finally, the Government and the Coalition erroneously rely on 19 U.S.C. § 1677(6) (net countervailable subsidy). *See* Gov. Br. at 50-51; Coalition Br. at 38. Section 1677(6) does not apply because that provision is reached only after there is a determination of a subsidy, including calculation of the benefit.

Commerce's regulations include a specific rule for how to calculate the "benefit" for a direct tax program, and Commerce is required to calculate the benefit according to that specific rule. Section 351.503(a) states, "{i}n the case of a government program for which a specific rule for the measurement of a benefit is contained in this subpart E, the Secretary will measure the extent to which a financial contribution (or income or price support) confers a benefit as provided in that rule." For direct tax programs, § 351.509(a)(1) provides that "a benefit exists to the extent that the tax paid by a firm *as a result of the program* is less than the tax the firm would have paid *in the absence of the program*." (Emphasis added.) Section 351.509(a)(1) is unambiguous and requires the total tax effect of a tax program to be considered in calculating the benefit. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("{I}f the law gives an answer – if there is only one reasonable construction of a regulation – then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense."). Consequently, in

accordance with the plain language of the direct taxes benefit regulation, Commerce was required to calculate the GASPÉTC benefit using both the amount of the tax credit Marmen Énergie claimed in the year-2017 tax return and the additional taxes Marmen Énergie paid on the income received from the GASPÉTC as reported in the same tax return.  Otherwise, Commerce would fail to measure Marmen Énergie's tax savings "as a result of the program" (*i.e.*, the difference between the tax Marmen Énergie paid under the program and the tax the company would have paid in the absence of the program), contrary to the regulation.  The Government's argument that the additional taxes owed for the GASPÉTC relate to 2016, not the tax credit received during the investigation period, *see* Gov. Br. at 47 and 48, is inconsistent with the plain instruction of § 351.509(a)(1), which defines the "benefit" as the tax savings arising as a result of "the program" – rather than defining the "benefit" as the amount of the tax credit.

Further, the Government wrongly takes exception to the Canadian Parties' characterization of the direct taxes regulation as establishing a "but for" test, and claims that applying such a test would lead to "absurd results."  Gov. Br. at 56; *see also* Coalition Br. at 49.  First, the plain language of the regulation requires a determination of the tax paid as a result of "the program" compared to what would have been paid without "the program."  This is a classic example of a "but for" analysis – but for the program, meaning in the absence of the program, what taxes

would have been paid?  Second, the Government's hypotheticals with their allegedly absurd results are distinguishable from the GASPÉTC program.  The exact amount of the prior year's GASPÉTC tax credit is reported as "miscellaneous other additions to income" on the federal tax return and as "taxable credits" on the Québec tax return, so the figures are completely traceable to the prior year's credit from the program.  Appx2882-2896.  This is completely different from the Government's hypothetical of a tax credit freeing up capital to make additional sales resulting in additional taxable income, *see* Gov. Br. at 56, because that scenario does not involve the same tax program providing both a direct tax credit and a direct tax liability.  It is also different from the hypothetical of a tax credit claimed in every other year, which would mean no liability is reported on the same tax return on which the credit is reported.  *See id.* at 57.

Next, the Government claims that § 351.509(a) does not specifically include "a subsidy's secondary tax effects," Gov. Br. at 49, *see also* Coalition Br. at 37 (using the term offset), and that § 351.503(e) requires that Commerce "not consider the tax consequences of ***the benefit***" in calculating the benefit (emphasis added).  Both arguments ignore the plain language of the direct taxes regulation, which defines the "benefit" in relation to the tax amount that "would have been paid in the absence of the program."  19 C.F.R. § 351.509(a)(1).  Appellants are not arguing for

the secondary "tax consequences of the benefit{,}" in violation of § 351.503(e), but rather for the proper calculation of the "benefit" according to § 351.509(a)(1).

By contrast, the applicability of § 351.503(e) in calculating the benefit from a grant program, for example, is consistent with the specific rule for grants, which provides, "{i}n the case of a grant, a benefit exists in the amount of the grant." 19 C.F.R. § 351.504(a). The direct taxes regulation does not have language comparable to the grants rule, such as saying that for tax programs the benefit is the amount of the tax credit, or the benefit is the amount of the remission of the tax. *See* Appellants Br. at 59. Because the grant program is not itself a tax program, the secondary tax effect of receiving a grant is not included in the benefit calculation pursuant to § 351.503(e); *see also Countervailing Duties*, 63 Fed. Reg. 65348, 65362 (Dept. Commerce Nov. 25, 1998) (final rule).

Finally, the Government erroneously characterizes Appellants' argument on the proper benefit calculation under the direct taxes regulation as an argument to offset the gross countervailable subsidy in contravention of 19 U.S.C. § 1677(6). *See* Gov. Br. at 50-51. The statutory offset provision in § 1677(6) instructs Commerce how to determine the ***net*** countervailable subsidy once it has determined the ***gross*** countervailable subsidy. According to the statute's text and structure, the "net countervailable subsidy" provision at § 1677(6) is not reached until Commerce has made its determination regarding whether a countervailable subsidy exists under

19 U.S.C. § 1677(5), which includes the determination of whether a benefit was conferred under § 1677(5)(E).  Here, because Commerce's calculation of the "benefit" of the GASPÉTC program under § 351.509(a)(1) precedes any consideration of the "net countervailable subsidy" under § 1677(5)(D), the statutory offset provision is irrelevant.

## IV.     COMMERCE'S *DE FACTO* SPECIFICITY DETERMINATION REGARDING THE ON-THE-JOB-TRAINING TAX CREDIT IS UNLAWFUL AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A.     The Canadian Parties Exhausted Their Administrative Remedy and Did Not Waive Their *De Jure* Specificity Argument Relating to the *De Facto* Analysis

The Government argues that the Canadian Parties did not properly raise their argument that the *de jure* specificity analysis informs the *de facto* specificity analysis before Commerce, such that the administrative remedy has not been exhausted, and also did not properly raise it before the CIT, such that the argument has been waived.  Gov. Br. at 62.  The Government's claims are without merit.  The Canadian Parties' argument is, and always has been, that Commerce's determination that Québec's On-the-Job-Training Tax Credit is *de facto* specific based on comparing the thousands of users of the credit with the number of tax filers in Québec is unsupported by substantial evidence and not in accordance with law.  *See, e.g.*, Appx8714-8720.  That argument has always been that it is unreasonable and unlawful for Commerce to assume every tax filer could claim the tax credit.  *See*

21

Appx8719 ("The Department's comparison with the total number of corporate and individual tax filers in Québec is incorrect because it assumes that every tax filer claims, or could claim, the tax credit.").  Whether a tax filer can claim the tax credit depends on the program's eligibility requirements, and the *de jure* specificity statutory provision addresses when eligibility is not specific as a matter of law.  *See* 19 U.S.C. § 1677(5A)(D)(ii).  Consequently, Commerce's *de jure* specificity analysis must inform its *de facto* specificity analysis of whether the recipients of a subsidy are limited in number.  Québec fully exhausted its administrative remedy on this issue.  At most, Québec's arguments on appeal are mere extensions of those it had raised previously and are legal in nature.

The exhaustion doctrine requires parties to give agencies the opportunity to respond to arguments before raising them on appeal.  *See* 28 U.S.C. § 2637(d); *see also Gerber Food (Yunnan) Co.  v. United States,* 601 F. Supp. 2d 1370, 1370 (Ct. Int'l Trade 2009).  The CIT has stated that the "determinative question is whether {the agency} was put on notice of the issue." *Trust Chem. Co.  v. United States*, 791 F. Supp. 2d 1257, 1268 n.27 (Ct. Int'l Trade 2011).  On appeal, parties may provide extensions or further examples of arguments previously raised.  *See Solvay Solexis S.p.A. v. United States*, 637 F. Supp. 2d 1306, 1309 n.2 (Ct. Int'l Trade 2009); *see also Apex Frozen Foods Priv. Ltd. v. United States*, 208 F. Supp. 3d 1398, 1409 n.12 (Ct. Int'l Trade 2017).  Exhaustion requirements are satisfied so long as parties have

presented the "thrust" of each argument before Commerce such that the agency had an opportunity to respond. *Apex*, 208 F. Supp. 3d at 1409 n.12; *see also Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1259 (Fed. Cir. 2009) (finding exhaustion where the record contains "a suggestion of the argument").

In its Case Brief to Commerce, Québec argued:

> {I}t is clear that the specificity analysis for the "limited number of certain enterprises" factor must build upon the program's legislative framework and, therefore, requires that the enterprises that benefited from the program be compared not against all enterprises within the jurisdiction of the granting authority, which is what the Department did by comparing the recipients with total number of tax filers in Québec, but rather against the universe of enterprises eligible to receive the subsidy – i.e. the enterprises that have fulfilled the conditions of eligibility for the program.

Appx8718 (footnotes deleted). Québec also discussed the analytical framework outlined by the World Trade Organization ("WTO") Appellate Body for assessing if a subsidy has been granted to a "limited number of certain enterprises" under Article 2.1(c) of the Agreement on Subsidies and Countervailing Measures ("SCM Agreement"), an article analogous to § 1677(5A)(D)(iii). Appx8717-8718. As explained in Québec's Case Brief, the framework:

> {R}equires a panel to examine the reasons as to why the actual allocation or use of the subsidy differs from an allocation or use that would be expected if the subsidy were administered in accordance with the conditions of eligibility for that subsidy." Thus, it is clear that the specificity analysis for the "limited number of certain enterprises" factor must build upon the program's legislative framework and, therefore, requires that the enterprises that benefited from the program be compared not against all enterprises within the jurisdiction of the

> granting authority, which is what the Department did by comparing the recipients with total number of tax filers in Québec, but rather against the universe of enterprises eligible to receive the subsidy – i.e. the enterprises that have fulfilled the conditions of eligibility for the program.

Appx8718 (footnote deleted).  Commerce declined to respond to the argument related to its methodology not being consistent with the analytical framework outlined by the WTO Appellate Body.  *See* Appx129.  The thrust of Appellants' argument below (that a program's eligibility requirements must be considered in making a *de facto* determination of "limited in number") is consistent with their argument before this Court that the statute's *de jure* provision – which addresses when eligibility criteria are neutral – must inform Commerce's "limited in number" determination.

Similarly, Québec raised the argument in its initial brief filed at the CIT, asserting:

> Thus, the specificity analysis for the "limited number of certain enterprises" factor must build upon the program's eligibility requirements and, therefore, requires that the enterprises that benefited from the program be compared not against all enterprises within the jurisdiction of granting authority, which is what Commerce did by comparing the recipients with total number of tax filers in Québec, but rather against the universe of enterprises eligible to receive the subsidy – i.e., the enterprises that have fulfilled the conditions of eligibility for the program.

Appx9022.  Further, in Québec's Response to Questions for Oral Argument, Québec explained that "making a de facto determination requires an analysis that builds upon

the program's eligibility requirements—*i.e.* the criteria and conditions identified in the de jure prong of the specificity test under 19 U.S.C. § 1677(5A)(D)(i)-(ii)." Appx9450-9451.  The Government did not raise this exhaustion or waiver argument at oral argument or in its November 23, 2021 Post-Argument Submission.  *See* Appx9574-9580.

The Government itself acknowledges exceptions to exhaustion, such as pure legal questions.  Gov. Br. at 65.  The question of whether the *de jure* prong informs the *de facto* prong of the specificity analysis is a pure legal question.  Whether the structure of the statute – which starts the analysis of "whether a subsidy . . . is a specific subsidy, in law or in fact," § 1677(5A)(D), with *de jure* criteria, § 1677(5A)(D)(i) and (ii), and then proceeds to *de facto* criteria, § 1677(5A)(D)(iii) – requires the *de jure* analysis to inform a *de facto* analysis is a pure legal question appropriate for judicial review.

### B.    The Government Misinterprets the Statute, Which Requires the *De Jure* Analysis to Precede and Inform the "Limited in Number" *De Facto* Analysis

The Government argues that Appellants' "*de jure* argument . . .  lacks merit because the *de jure* and *de facto* specificity analyses comprise distinct inquiries, covered by separate provisions, involving separate requirements."  Gov. Br. at 66; *see also* Coalition Br. at 45.  This argument ignores the statutory structure, which starts the analysis of "whether a subsidy . . . is a specific subsidy, in law or in fact,"

§ 1677(5A)(D), with *de jure* criteria, § 1677(5A)(D)(i) and (ii), before proceeding to *de facto* criteria, § 1677(5A)(D)(iii).

The Statement of Administrative Action provides:

> Although it has long been established that intent to target benefits is not a prerequisite for a countervailable subsidy, the *de jure* prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, ***further inquiry into the actual use of the subsidy is unnecessary***.

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Rep. No. 103-316, at 930 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 ("SAA") (emphasis added).  In other words, Commerce need not conduct a *de facto* specificity analysis if it determines the program is *de jure* specific.

Further, Commerce routinely first addresses whether a program is *de jure* specific before addressing whether it is *de facto* specific, consistent with the statutory framework.  For example, in *Non-Oriented Electrical Steel from Taiwan* ("*NOES*"), a decision cited in the underlying Issues & Decision Memo on Wind Towers, Appx88 (footnote 80), Commerce stated:

> We determine that the Act for Industrial Innovation and Regulations Governing the Application of Investment Tax Credits . . . indicates that benefits are not expressly limited to any industry, geographical location or other criteria, and thus is not *de jure* specific under section 771(5A)(D)(i) of the Act. Further, we determine that the usage information . . . indicates that this program has been applied broadly across numerous industries . . . . Thus, we determine that this program is not *de facto* specific under section 771(5A)(D)(iii) of the Act.

*NOES*, 79 Fed. Reg. 61602 (Dept. Commerce Oct. 14, 2014) (final CVD determ.), and accompanying I&D Memo at 21; Appx90-91 (*Wind Towers* I&D Memo at 17-18 (discussing various other decisions in which Commerce made a negative *de jure* specificity determination on a tax program and then proceeded to examine whether the programs were *de facto* specific)); *Forged Steel Fluid End Blocks From the Federal Republic of Germany*, 85 Fed. Reg. 80011 (Dep't Commerce Dec. 11, 2020) (final CVD determ.), and accompanying I&D Memo at 39-45 (analyzing separate sections of the Energy Tax Act to determine whether such sections were *de jure* specific and, if not, *de facto* specific); *Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 85 Fed. Reg. 15112 (Dep't Commerce Mar. 17, 2020) (final CVD results), and accompanying I&D Memo at 22 (examining the number of recipients of a tax incentive "other than those determined to be either regionally specific or *de jure* specific"); *Certain Fabricated Structural Steel From Mexico*, 85 Fed. Reg. 5381 (Dep't Commerce Jan. 30, 2020) (final CVD determ.), and accompanying I&D Memo at 23-25 (addressing first Commerce's *de jure* specificity analysis and then its *de facto* specificity analysis).

The specificity provisions are in the same section of the statute and cannot be applied in a vacuum isolated from each other. That Commerce has not previously understood the statutory structure and SAA as requiring its *de jure* specificity determination, even if implicit, to inform its *de facto* specificity determination as a

matter of law is exactly why this issue has been appealed. Commerce's actions are also inconsistent with the United States' international obligations, as explained in the Appellants' initial brief. *See* Appellants Br. at 68-71. Appellants are not arguing that WTO decisions are binding on U.S. courts, but rather that statutes "must be interpreted to be consistent with international obligations, absent contrary indications in the statutory language or its legislative history." *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348 (Fed. Cir. 2004) (alteration accepted) (quoting *Luigi Bormioli Corp. v. United States*, 304 F.3d 1362, 1368 (Fed. Cir. 2002)). Bringing Commerce's actions into compliance with the statute will also bring the U.S. into compliance with international obligations.

## C. Commerce's Interpretation of "Limited in Number" in the *De Facto* Statutory Provision as Requiring a Comparison to All Tax Filers Is Contrary to Law and Unsupported by Substantial Evidence Regardless of Whether the *De Jure* Prong of the Statute Is Considered

Regardless of whether the Court determines that the *de jure* provision does not apply or that the *de jure* argument was not properly raised, Commerce's finding of specificity under § 1677(5A)(D)(iii)(I) that simply compares the number of users of the On-The-Job Tax Credit to the total number of tax filers – the latter of which exceeds the number of potential recipients determined based on neutral eligibility criteria for the program – is contrary to Congress's intent and not in accordance with law. The specificity test is meant "to function as a rule of reason and to avoid the

imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy." SAA at 930, 1994 U.S.C.C.A.N. at 4242.

Commerce must take into consideration the potential recipients (*i.e.*, those meeting the neutral criteria or conditions governing eligibility) regardless of whether the *de jure* provision of the statute is considered. To do otherwise would convert the provision that "{t}he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number" to a near universal use test. *See* Gov. Br. at 72 (quoting 19 U.S.C. § 1677(5A)(D)(iii)(I) and objecting to characterizing the test as requiring near universal usage). There is simply no other way to read Commerce's determination that 4,930 users of the program for tax year 2018 – encompassing nine broad economic sector groupings, each of which represents dozens of industries, including agriculture, mining, manufacturing, construction, transportation and storage, wholesale trade, retail trade, finance and insurance, food and beverage, education, and health, Appx2173 – are "limited in number." Further, Commerce's current interpretation of the *de facto* statutory provision, in addition to reading into the statute an unreasonable percentage test, means that Commerce would disregard the statute's three other provisions addressing the *de facto* specificity analysis and that the SAA instructs Commerce to consider:

(II) An enterprise or industry is a predominant user of the subsidy.

(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii)(II), (III), and (IV); SAA at 931, 1994 U.S.C.C.A.N. at 4243.

Appellants' argument would not "invariably result in findings of non-specificity, because it would require Commerce to look at only entities likely to use the program as a comparator in determining whether the number of entities using the program is limited." Gov. Br. at 67. First, where eligibility for a program would be limited to a few enterprises or industries as a practical matter, the "limited in number" *de facto* provision would be satisfied. Second, the three other statutory provisions that can result in *de facto* specificity could result in an affirmative determination. A simple hypothetical and variations on that hypothetical illustrate the flaws of Commerce's "limited in number" *de facto* specificity determinations, as shown below.

The Government of Country X, which has a population of 10,000,000, wants to address the problem of severe unemployment plaguing a particular minority group of the society: disabled persons. Disabled persons represent 1% (100,000 people) of the population of Country X. The country's legislature adopts a bill providing for a tax credit for enterprises hiring a disabled person. The program's eligibility

requirement (*i.e.*, hiring a disabled person) is neutral and does not favor one enterprise or industry over another and the program is therefore not *de jure* specific within the meaning of § 1677(5A)(D)(ii). There are 500,000 corporate tax filers within the jurisdiction. The maximum usage rate for the program is therefore 20% (100,000/500,000), and that number would be reached if 100,000 different companies hired the 100,000 disabled persons of Country X. Would such usage warrant a finding that users of this tax credit are "limited in number" when compared to all tax filers? If a program with at most 100,000 users of a program is not *de jure* specific, how can it be that Commerce could assess *de facto* specificity by looking at a much larger number of tax filers, the large majority of whom could not have used the program?

What if only half (*i.e.*, 50,000) of the disabled persons are of working age and that a large corporation could hire more than one disabled person and claim the credit with respect to every hire (while still being counted only once in the usage statistics of the tax credit by company)? What if 30,000 companies employ one disabled person and claim the tax credit (*i.e.*, 6% of the total corporate tax filers within the jurisdiction, but 60% of the potential 50,000 users)? Would this lead to a finding that this tax credit is specific because the users are limited in number?

As shown by the hypothetical above and also considering that it is possible not all tax filers who employ disabled persons actually apply for the tax credit,

including all tax filers as the comparison (denominator) is distortive.  It fails to take into account entities that do not pay taxes, such as not-for-profit enterprises, and are unable to use the program under the program's eligibility criteria.  Further, it assumes every tax filer qualifying for the deduction would use it every single year. Contrary to the Coalition's claims, all tax filers are not the proper pool of those eligible for the tax credit.  *See* Coalition Br. at 42.

Thus, Commerce erred in determining that the On-the-Job-Training Tax Credit is *de facto* specific because it did not conduct a proper analysis of whether the credit was "limited in number."  Under a proper legal analysis, Commerce would have determined that the On-the-Job-Training Tax Credit was not *de facto* specific, considering the number of actual users and industries, as well as the pool of eligible companies.

## <u>CONCLUSION AND STATEMENT OF RELIEF SOUGHT</u>

For the foregoing reasons, Commerce's conclusions in the final CVD determination in *Utility Scale Wind Towers from Canada* regarding Marmen's sales denominator, the CCA for Class 1 manufacturing buildings, the GASPÉTC program, Québec's On-The-Job-Training Tax Credit Program, and the CIT's decision sustaining Commerce's conclusions, are unsupported by substantial evidence on the record and otherwise not in accordance with law. The Canadian Parties respectfully request that the Court reverse the CIT's decisions on these issues, and remand to Commerce with instructions to issue a revised determination, consistent with the Court's opinion.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
Ron Kendler
Allison Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co.

/s/ Joanne E. Osendarp
Joanne E. Osendarp
Alan G. Kashdan
Conor Gilligan
Tyler Kimberly

McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
Tel: (202) 756-8349

Counsel for Government of Canada

/s/ Matthew J. Clark
Matthew J. Clark
Nancy A. Noonan
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 857-6000

Counsel for Government of Québec

February 1, 2023

(Form 19)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

### CAFC Court No. 2022-1807
### <u>Gov't of Québec v. US</u>

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☐  the filing has been prepared using a proportionally-spaced typeface and includes _____ words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☑  the filing contains 7,834 words, which does not exceed the maximum authorized by this court's order (ECF No. 47).

Date: February 1, 2023          Signature:  _____ /s/ Jay C. Campbell _____

                                Name:  _____ Jay C. Campbell _____

(Form 31)

## CERTIFICATE OF CONFIDENTIAL MATERIAL

### CAFC Court No. 2022-1807
### <u>Gov't of Québec v. US</u>

The foregoing document contains 2 unique words (including numbers) marked confidential.

□ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

□ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: February 1, 2023

Signature:     <u>/s/ Jay C. Campbell</u>

Name:     <u>Jay C. Campbell</u>

## CERTIFICATE OF SERVICE

### <u>Gov't of Québec v. US</u>
### CAFC Court No. 2022-1807

I hereby certify that on February 1, 2023 the non-confidential version of Plaintiffs - Appellants' reply brief was served upon all parties by operation of the Court's electronic filing system.

Date: February 1, 2023        <u>/s/ Jay C. Campbell    </u>
                                        Jay C. Campbell
                                        WHITE & CASE LLP
                                        701 Thirteenth Street, NW
                                        Washington, DC 20005
                                        (202) 626-3600