BLANK**ROME**

1825 Eye Street NW |Washington, D.C. 20006
blankrome.com

**Joanne E. Osendarp**
Partner
joanne.osendarp@BlankRome.com
202-420-2587

December 12, 2023

**<u>VIA ELECTRONIC FILING</u>**

Jerrett B. Perlow
Clerk of Court
United States Court of Appeals
For the Federal Circuit
717 Madison Place, NW
Washington, DC 20439

Re:    **<u>Government of Québec v. United States, CAFC Case No.
22-1807</u>: <u>Submission of Supplemental Authority</u>**

Dear Mr. Perlow,

Pursuant to Federal Rule of Appellate Procedure 28(j), Appellants submit as

a supplemental authority the Court of International Trade's ("CIT") decision in

*Mosaic Co. v. United States*, 2023 WL 5979829 (Ct. Int'l Trade Sept. 14, 2023)

(attached).  *Mosaic* held unlawful the same Commerce methodology for assessing

*de facto* specificity that Appellants challenge in this case regarding Québec's On-

The-Job-Training tax credit.  *See* Appellants' Opening Br. at 62–78 (ECF 32); and

Appellants' Reply Br. at 25–32 (ECF 49).

Commerce's challenged *de facto* specificity methodology begins—and

ends—by calculating the number of corporate users of a tax measure as a

percentage of the total universe of corporate taxpayers in the country.  If that percentage is small, Commerce finds the measure *de facto* specific.

The program at issue in *Mosaic* allowed taxpayers to obtain relief from tax penalties.  Applying its *de facto* specificity methodology, Commerce compared the number of corporate recipients of tax penalty relief to the total number of corporate taxpayers in Morocco, and found that the resulting percentage was "limited" within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(I).  The *Mosaic* court rejected this methodology, concluding that the numerator and denominator in the calculation are "not logically comparable," making the resulting percentage "essentially meaningless."  *Id.* at *23.  Instead, *Mosaic* held, in relevant part, that Commerce should have compared the actual recipients to the universe of taxpayers actually *eligible* to use the measure—those that had incurred a penalty eligible for mitigation.  *Id*.  Commerce made the same error with respect to the Québec tax measure at issue here.

The *Mosaic* court fully engaged with and responded to the parties' arguments regarding the defects in Commerce's percentage methodology.  In doing so, the court attempted to distinguish the *Government of Québec* decision at issue here, but the CIT's cursory review of Appellants' *de facto* argument in *Government of Québec* stands in sharp contrast to *Mosaic*'s thorough statutory interpretation analysis.  *Cf.* Appx000051–Appx000053.  Appellants urge this Court

to consider the persuasiveness of *Mosaic*'s reasoning when reviewing the CIT's decision to affirm Commerce's treatment of the Québec tax credit as *de facto* specific.

Respectfully submitted,

*/s/ Jay C. Campbell*
Jay C. Campbell
Ron Kendler
Allison Kepkay
**WHITE & CASE LLP**
*Counsel to Plaintiffs-Appellants*
*Marmen Inc., Marmen Energie Inc.,*
*and Marmen Energy Co.*

*/s/ Matthew J. Clark*
Matthew J. Clark
Nancy A. Noonan
Jessica R. DiPietro
**ARENTFOX SCHIFF LLP**
*Counsel to the Government*
*of Québec*

*/s/ Joanne E. Osendarp*
Joanne E. Osendarp
Alan G. Kashdan
Conor Gilligan
Tyler Kimberly
**BLANK ROME LLP**
*Counsel for Government of Canada*

2023 WL 5979829
Only the Westlaw citation is currently available.
United States Court of International Trade.

The MOSAIC COMPANY, Plaintiff,

v.

UNITED STATES, Defendant,

and

OCP S.A., Defendant-Intervenor.

Slip Op. No. 23-134
|
Consol. Court No. 21-00116
|
September 14, 2023

**Synopsis**
**Background:** Moroccan producer of phosphate fertilizer and United States producer of phosphate fertilizer brought separate actions against United States to challenge Department of Commerce's final determination in a countervailing-duty (CVD) investigation of phosphate fertilizer from the Kingdom of Morocco. After the actions were consolidated, each plaintiff moved for judgment on the agency record.

**Holdings:** The Court of International Trade, Timothy C. Stanceu, J., held that:

[1] Commerce complied with statutory requirement to consider views of United States "producers and workers" in determining that there was support in the domestic phosphate-fertilizer industry for the investigation;

[2] Commerce impermissibly excluded Moroccan producer's selling, general, and administrative (SG&A) expenses in determining producer's cost-of-production buildup, and therefore improperly calculated producer's profit;

[3] Commerce did not act unreasonably in using producer's overall profit rate, rather than profit data from a Jordanian phosphate-mining company, in determining producer's profit rate for inclusion in its cost-of-production buildup;

[4] Commerce would be required on remand to reconsider its methodology for calculating producer's profit rate, which it did not adequately explain;

[5] Commerce did not err in determining the world-price benchmark for phosphate rock;

[6] Commerce reasonably determined that a value-added-tax (VAT) refund program and certain VAT exemptions granted to producer were not countervailable; but

[7] Commerce erred in finding that Moroccan government's reductions of certain tax fines and penalties for producer were made under a program that was de facto specific and were therefore countervailable.

Moroccan producer's motion granted in part and denied in part; United States producer's motion denied; remanded with instructions.

**Procedural Posture(s):** Review of Administrative Decision; Motion for Judgment on Administrative Record.

West Headnotes (15)

**[1]    Customs Duties**  🔑  Proceedings

Department of Commerce complied with statutory requirement that it consider views of United States "producers and workers" in determining, in conducting countervailing-duty investigation of Moroccan phosphate-fertilizer production, that there was support in the domestic phosphate-fertilizer industry for the investigation, even though certain domestic fertilizer wholesalers expressed generic opposition to the petition for investigation, where the wholesalers did not even allege that they engaged in any production of phosphate fertilizer, the party that petitioned for the investigation was a United States producer of phosphate fertilizer, that party identified all known producers of domestic phosphate fertilizer, and no other producer commented in support of or opposition to the petition. Tariff Act of 1930 § 702, 19 U.S.C.A. §§ 1671a(c)(4)(A), 1671a(c)(4)(E), 1671a(c)(5).

**[2]    Customs Duties**  🔑  Proceedings

The burden of record creation in a countervailing-duty investigation lies in general with the parties, not the Department of Commerce.

---

**[3]**    **Customs Duties** 🔑 Proceedings

Department of Commerce complied with statutory requirements for assessing the amount of domestic-industry support for its countervailing-duty investigation of Moroccan phosphate-fertilizer production, even though it excluded from the calculation of total industry production certain fertilizer products, namely nitrogen, phosphorus, and potassium (NPK) fertilizers in which the ingredients were blended in bulk, where Commerce described the scope of the investigation, both when initiating it and in its final determination, as including only NPK fertilizers in which the ingredients were chemically bonded, granulated, or compounded, a scope that did not include products that were merely mixtures or blends of different fertilizers, and Commerce's scope language had not been challenged. Tariff Act of 1930 § 702, 19 U.S.C.A. § 1671a(c)(4)(A).

---

**[4]**    **Customs Duties** 🔑 Proceedings

Failure of Department of Commerce to poll participants in the domestic phosphate-fertilizer industry before initiating, in response to petition by domestic phosphate-fertilizer producer, countervailing-duty investigation of Moroccan phosphate-fertilizer production did not violate statutory requirements for assessing the amount of domestic-industry support for the investigation, where the petition, on its face, established sufficient industry support for the petition given Commerce's definition of the scope of the industry and its consideration of support from petitioner, the only domestic phosphate-fertilizer producer that commented in support of or opposition to the petition. Tariff Act of 1930 § 702, 19 U.S.C.A. § 1671a(c)(4)(D).

---

**[5]**    **Customs Duties** 🔑 Foreign market value, fair value, and adjustment

In determining Moroccan phosphate-fertilizer producer's cost-of-production buildup for purposes of countervailing-duty investigation into phosphate fertilizer from Kingdom of Morocco, Department of Commerce impermissibly excluded producer's selling, general, and administrative (SG&A) expenses, and therefore improperly calculated producer's profit for purposes of assigning a value to the Moroccan government's provision of mining rights to producer, where producer provided documentation demonstrating that its SG&A expenses included costs attributable to its phosphate-mining operations, producer had allocated SG&A expenses to its mining operation in proportion to that operation's share of total direct expenses, and Commerce did not show that the allocation method was unreasonable. Tariff Act of 1930 § 771, 19 U.S.C.A. §§ 1677(5), 1677(5A); 19 C.F.R. § 351.511(a)(2).

---

**[6]**    **Customs Duties** 🔑 Foreign market value, fair value, and adjustment

Department of Commerce did not act unreasonably, in determining Moroccan phosphate-fertilizer producer's profit rate for inclusion in producer's cost-of-production buildup for purposes of countervailing-duty investigation into phosphate fertilizer from Kingdom of Morocco, by relying on producer's overall corporate profit rate, rather than on a surrogate rate derived from profit data of a phosphate-mining company operating in Jordan, not Morocco, where the record included data allowing Commerce to calculate Moroccan producer's overall corporate profit rate from its financial statements. Tariff Act of 1930 § 771, 19 U.S.C.A. § 1677(5)(E).

---

**[7]**    **Customs Duties** 🔑 Determination, Judgment, and Relief;  Summary Judgment

Department of Commerce improperly calculated Moroccan phosphate-fertilizer producer's profit

rate for inclusion in producer's cost-of-production buildup for purposes of countervailing-duty investigation into phosphate fertilizer from Kingdom of Morocco, and Commerce would be required on remand to reconsider its methodology for calculating producer's profit rate, where Commerce had wrongly excluded producer's selling, general, and administrative (SG&A) expenses when determining its cost-of-production buildup, this exclusion created an apparent inconsistency in Commerce's profit calculations, and Commerce did not adequately explain the reasonableness of its methodology for calculating producer's profit rate.

**[8]**    **Customs Duties** 🔑 Foreign market value, fair value, and adjustment

In determining the world-price benchmark for phosphate rock for purposes of assigning a value to the Moroccan government's provision of mining rights to Moroccan phosphate-fertilizer producer in countervailing-duty investigation into phosphate fertilizer from Morocco, Department of Commerce did not err in including North African price for phosphate rock, a price representing prices from Morocco and Tunisia, even though use of North African price arguably created circularity by including the Moroccan activity being investigated, where Commerce determined that the North African price included Tunisian prices and constituted an export price, meaning a market price that reflected commercial realities in the world market, because the price was defined by sales to Europe, India, and Brazil. Tariff Act of 1930 § 771, 19 U.S.C.A. §§ 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(2)(iii).

**[9]**    **Customs Duties** 🔑 Foreign market value, fair value, and adjustment

In determining the world-price benchmark for phosphate rock for purposes of assigning a value to the Moroccan government's provision of mining rights to Moroccan phosphate-fertilizer producer in countervailing-

duty investigation into phosphate fertilizer from Morocco, Department of Commerce did not err in including price for Egyptian phosphate rock, where Commerce found that Egyptian phosphate rock contained bone phosphate of lime (BPL) in similar proportions as phosphate rock from Moroccan producer, the BPL content of phosphate rock was the industry's own metric for comparing phosphate rock from different producers, and record evidence of the low quality of Egyptian phosphate rock was properly regarded by Commerce as having little probative value. Tariff Act of 1930 § 771, 19 U.S.C.A. §§ 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(2)(iii).

**[10]**    **Customs Duties** 🔑 Foreign market value, fair value, and adjustment

Department of Commerce properly declined to make adjustments for international delivery charges in determining the world-price benchmark for phosphate rock for purposes of assigning a value to the Moroccan government's provision of mining rights to Moroccan phosphate-fertilizer producer in countervailing-duty investigation into phosphate fertilizer from Morocco, where Commerce's determination was not made under a tier-one or tier-two analysis, each of which required Commerce to use "delivered prices," but rather under a tier-three analysis, to which the delivered-price limitation was inapplicable, and the price data used by Commerce was derived from free-on-board (FOB), not delivered, prices, such that adding estimated delivery charges would not have made the data more accurate. Tariff Act of 1930 § 771, 19 U.S.C.A. §§ 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(2)(1), (a)(ii), (a)(iv).

**[11]**    **Customs Duties** 🔑 Bounties or grants

Department of Commerce reasonably determined in countervailing-duty investigation into Moroccan phosphate fertilizer that a value-added-tax (VAT) refund program was not countervailable, where evidence showed that VAT credits under the program were intended to balance a system that shifted the

VAT tax burden onto the ultimate consumer, maintaining VAT neutrality for parties such as the Moroccan phosphate-fertilizer producer that was the respondent in Commerce's investigation, and the timeline for payment to producer of the refunds, which were paid outside of the ordinary three-month period for refunds under a factoring agreement entered into by the Moroccan government because it lacked treasury funds to make the refunds, did not diminish the program's normal operation.

[12]    **Customs Duties** 🔑 Bounties or grants

Department of Commerce reasonably determined in countervailing-duty investigation into Moroccan phosphate fertilizer that certain value-added-tax (VAT) exemptions granted by Moroccan government to Moroccan fertilizer producer for purchases of capital goods, machinery, and equipment were not countervailable, where Commerce found that the VAT exemptions did not reduce producer's tax burden but rather decreased the amount of credits that the producer would eventually obtain, and the VAT exemptions accordingly did not provide a benefit to producer and were not countervailable. Tariff Act of 1930 § 771, 19 U.S.C.A. §§ 1677(5)(E)(iv); 19 C.F.R. § 351.510(a).

[13]    **Customs Duties** 🔑 Bounties or grants

Department of Commerce did not act ultra vires in asking Moroccan phosphate-fertilizer producer, in countervailing-duty investigation into Moroccan phosphate fertilizer, about whether producer received "any other forms of assistance" from the Moroccan government apart from those specifically identified in Commerce's questionnaire to producer, where there were no statutory limits on the means or methods by which Commerce could discover a practice "which appears to be a countervailable subsidy," and Commerce was expressly authorized to discover such practices in the course of a countervailing-duty investigation. Tariff Act of 1930 § 775, 19 U.S.C.A. § 1677d.

[14]    **Customs Duties** 🔑 Bounties or grants

Substantial evidence did not support Department of Commerce's finding, in countervailing-duty investigation into Moroccan phosphate fertilizer, that Moroccan government's reductions of certain tax fines and penalties for Moroccan phosphate-fertilizer producer, the respondent, were made under a program that was de facto specific and were therefore countervailable, where the program itself was available to both corporate and individual taxpayers, yet Commerce's finding of de facto specificity was based only on figures about program's use by corporate taxpayers, those figures were used to make faulty calculations of the share of corporate taxpayers who obtained relief, and evidence showed program was an ordinary tax-administration program for mitigation of penalties. Tariff Act of 1930 § 771, 19 U.S.C.A. § 1677(5A)(D)(iii)(I).

[15]    **Customs Duties** 🔑 Parties

Moroccan phosphate-fertilizer producer, the respondent in a countervailing-duty investigation, lacked Article III standing to challenge Department of Commerce's consideration, during that investigation, of whether a phosphogypsum disposal program allegedly offered by the Moroccan government was countervailable, where Commerce ultimately determined that the alleged disposal program was not in use during the relevant period of investigation, Commerce's determination was a ruling in producer's favor, and producer thus suffered no legally cognizable harm from consideration of the disposal program and, in asking that the disposal program's investigation be stricken from the record, was effectively seeking an advisory opinion. U.S. Const. art. 3, § 2, cl. 1.

**Attorneys and Law Firms**

David J. Ross, Wilmer, Cutler, Pickering, Hale and Dorr, LLP, of Washington, D.C., for plaintiff and defendant-intervenor The Mosaic Company. With him on the briefs were Stephanie E. Hartmann and Natan P.L. Tubman.

William R. Isasi, Covington & Burling LLP, of Washington, D.C., for plaintiff and defendant-intervenor OCP S.A. With him on the briefs were Alexander D. Chinoy, Micaela R. H. McMurrough, Cynthia C. Galvez, and Jordan B. Bakst.

Ann C. Motto, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director. Of counsel on the brief was Mykhaylo A. Gryzlov, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

## OPINION AND ORDER

Stanceu, Judge:

**\*1**  In this consolidated action, plaintiffs contest the final affirmative determination of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in a countervailing duty ("CVD") investigation of phosphate fertilizers from the Kingdom of Morocco ("Morocco") and the resulting countervailing duty order. Before the court are the motions of plaintiffs The Mosaic Company ("Mosaic") and OCP S.A. ("OCP") for judgment on the agency record, submitted under USCIT Rule 56.2. The court remands the final affirmative countervailing duty determination to Commerce with instructions pertaining to certain of the claims brought in this litigation.

## I.BACKGROUND

### A. The Parties to this Consolidated Action

There are two plaintiffs in this consolidated action.[1] Mosaic, a domestic mining company that also produces and sells phosphate fertilizers, was the petitioner in the CVD investigation and is a defendant-intervenor. Compl. ¶ 3 (May 12, 2021), ECF No. 12. OCP, a Moroccan mining company and the country's only known phosphate fertilizer producer, is a plaintiff as well as a defendant-intervenor and was a mandatory respondent in the investigation. *Id.* ¶ 7. Defendant is the United States.

### B. The Countervailing Duty Investigation and the Department's Determinations

#### 1. Mosaic's Petition and Initiation of the CVD Investigation

In June 2020, Mosaic filed a petition (the "Petition") seeking countervailing duties on imports of phosphate fertilizer (the "subject merchandise") from the Kingdom of Morocco and the Russian Federation. *Countervailing Duty Petitions Regarding Phosphate Fertilizers From Morocco and Russia* (June 26, 2020), P.R. Docs. 1–8 ("*Petition*").[2] In the Petition, Mosaic requested that Commerce initiate an investigation into phosphate fertilizers from Morocco and Russia pursuant to its authority under section 702(c)(4) of the Tariff Act of 1930 (the "Tariff Act"), *as amended*, 19 U.S.C. § 1671a(c)(4).[3] *Petition* at I-5–I-6.

Commerce initiated the CVD investigation on July 16, 2020 ("Initiation Notice"). *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Initiation of Countervailing Duty Investigations*, 85 Fed. Reg. 44,505 (Int'l Trade Admin. July 23, 2020) ("*Initiation Notice*"). The Initiation Notice incorporated by reference an "Initiation Checklist." *Countervailing Duty Investigation Initiation Checklist* (Int'l Trade Admin. July 16, 2020), P.R. Docs. 54–58 ("*Initiation Checklist*"). Commerce selected OCP as the sole mandatory respondent in the investigation with respect to subject merchandise imports from Morocco, for a period of investigation ("POI") of January 1, 2019 through December 31, 2019. *Initiation Notice*, 85 Fed. Reg. at 44,505, 44,508.

#### 2. The Preliminary Determination

**\*2**  Following initiation of the investigation, Commerce issued questionnaires to, among others, the Government of Morocco ("GOM") and OCP. Commerce published its "Preliminary Determination" in late 2020, *Phosphate Fertilizers From the Kingdom of Morocco: Preliminary*

*Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 76,522 (Int'l Trade Admin. Nov. 30, 2020) ("*Prelim. Determination*"), and an "Amended Preliminary Determination" shortly thereafter, *Phosphate Fertilizers From the Kingdom of Morocco: Amended Preliminary Determination of Countervailing Duty Investigation*, 85 Fed. Reg. 85,585 (Int'l Trade Admin. Dec. 29, 2020) ("*Amended Prelim. Determination*"). The Preliminary Determination incorporated by reference a "Preliminary Decision Memorandum." *Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco* (Int'l Trade Admin. Nov. 23, 2020), P.R. Doc. 386 ("*Prelim. Decision Mem.*").

In the Preliminary Determination, Commerce determined for OCP a total countervailable subsidy rate of 23.46% *ad valorem. Prelim. Determination*, 85 Fed. Reg. at 76,523. Commerce determined preliminary *ad valorem* subsidy rates for several programs that it believed benefited OCP: (1) OCP's bond program, 0.29%; (2) government loan guarantees, 6.64%; (3) provision of phosphate mining rights for less than adequate remuneration, 12.66%; and (4) tax incentives for export operations, 3.87%. *Id.*; *Prelim. Decision Mem.* at 7–12. Commerce subsequently amended the preliminary subsidy rate to 16.88% upon addressing a ministerial error that had inflated the calculation of OCP's benefit under the loan guarantee program. *Amended Prelim. Determination*, 85 Fed. Reg. at 85,585.

### 3. The Post-Preliminary Determination

Mosaic submitted a "New Subsidy Allegation" following initiation of the investigation but prior to the publication of the Preliminary Determination. *Phosphate Fertilizers from Morocco: New Subsidy Allegations* (Oct. 14, 2020), P.R. Doc. 227 ("*New Subsidy Allegation*"). In response, Commerce initiated investigations into several additional programs not investigated in the Preliminary Determination. *Countervailing Duty Investigation of Phosphate Fertilizers from Morocco: New Subsidy Allegations* (Int'l Trade Admin. Nov. 3, 2020), P.R. Doc. 332 ("*New Subsidy Allegation Mem.*"). This culminated in the issuance of the Department's "Post-Preliminary Determination." *Post-Preliminary Determination of Countervailing Duty Investigation: Phosphate Fertilizers from the Kingdom of Morocco* (Int'l Trade Admin. Jan. 6, 2021), P.R. Doc. 441 ("*Post-Prelim. Determination*"). Mosaic in its New Subsidy

Allegation asserted that OCP benefited from five additional programs not previously investigated by Commerce. *New Subsidy Allegation* at 2. Commerce determined that three of these programs were countervailable: (1) reductions in tax fines and penalties, 0.05%; (2) revenue exclusions from minimum tax contributions, 0.08%; and (3) custom duty exemptions for capital goods, machinery, and equipment, 0.11%; these additions increased, from 16.88% to 17.12%, the subsidy rate preliminary calculated for OCP. *Post-Prelim. Determination* at 4–8.

### 4. The Final Determination

In response to the publication of the Amended Preliminary Determination and Post-Preliminary Determination, Mosaic and OCP submitted case briefs to Commerce. *Phosphate Fertilizers from Morocco: Petitioner's Case Brief* (Jan. 13, 2021), P.R. Doc. 448 ("*Mosaic's Case Br.*"); *Phosphate Fertilizers from the Kingdom of Morocco: OCP's Case Brief & Request for a Closed Hearing* (Jan. 13, 2021), P.R. Doc. 450 ("*OCP's Case Br.*"). Addressing the comments raised in those briefs, Commerce published its affirmative "Final Determination" in February 2021, *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Int'l Trade Admin. Feb. 16, 2021) ("*Final Determination*"), which incorporated by reference a "Final Issues and Decision Memorandum," *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco* (Int'l Trade Admin. Feb. 8, 2021), P.R. Doc. 473 ("*Final I&D Mem.*"). Commerce notified the International Trade Commission ("Commission" or the "ITC") of its affirmative Final Determination, and the ITC issued an affirmative injury determination. *Phosphate Fertilizers From Morocco and Russia*, 86 Fed. Reg. 17,642 (Int'l Trade Comm'n Apr. 5, 2021). Commerce published a countervailing duty order (the "Order") shortly thereafter. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Int'l Trade Admin. Apr. 7, 2021) ("*Order*").

**\*3** In the Final Determination, Commerce determined a total countervailable subsidy rate for OCP of 19.97%, calculated as the sum of the subsidy rates for six countervailable programs that Commerce identified. *Final Determination*, 86 Fed. Reg. at 9,483; *Order*, 86 Fed. Reg. at 18,038; *Final I&D Mem.* at 5–6. These six programs and rates were: (1) government

loan guarantees, 0.06%; (2) provision of phosphate mining rights for less than adequate remuneration, 18.42%; (3) tax incentives for export operations, 1.27%; (4) reductions in OCP's tax fines and penalties, 0.05%; (5) revenue exclusions for minimum tax contributions, 0.07%; and (6) customs duty exemptions for capital goods, machinery, and equipment, 0.10%. *Final I&D Mem.* at 5–6.

### C. Proceedings Before the Court

Mosaic and OCP commenced their actions in 2021. Amended Summons (Apr. 12, 2021), ECF No. 10; Compl.; Summons (May 6, 2021), Ct. No. 21-00218, ECF No. 1; Compl. (June 4, 2021), Ct. No. 21-00218, ECF No. 8. Before the court are Mosaic's and OCP's motions for judgment on the agency record under USCIT Rule 56.2. Pl. The Mosaic Co.'s Rule 56.2 Mot. for J. on the Agency R. (Oct. 15, 2021), ECF No. 51; Rule 56.2 Mot. for J. on the Agency R. of OCP S.A. (Oct. 15, 2021), ECF Nos. 53 (conf.), 54 (public).

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act, 19 U.S.C. § 1516a, including an action contesting a final determination that Commerce issues to conclude a countervailing duty investigation.

In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

### B. Countervailing Duties under the Tariff Act

When certain conditions are met, the Tariff Act provides for a "countervailing duty" to be assessed on imported merchandise to remedy the effect of a subsidy provided by the government of the exporting country. Section 701(a) of the Tariff Act, 19 U.S.C. § 1671(a), provides for the imposition of a countervailing duty if: (1) Commerce determines that an "authority," defined as either the government of a country or a public entity within the territory of the country, *id.* § 1677(5)(B), "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States"; and (2) the Commission determines that an industry in the United States is materially injured or threatened with material injury by reason of the subsidized imports.

A "countervailable subsidy" exists, generally, where an authority provides a financial contribution to a person and a benefit is thereby conferred, and the subsidy meets the requirement of "specificity," as determined according to various rules set forth in the statute. *Id.* §§ 1677(5), (5A). When a subsidy involves the provision of goods or services rather than the provision of monies directly, a benefit is conferred if those goods or services are provided by the authority for less than adequate remuneration ("LTAR"). *Id.* § 1677(5)(E)(iv).

### C. Summary of Claims in this Consolidated Action

**\*4** OCP claims, first, that the CVD investigation was initiated unlawfully because the Petition lacked sufficient support from the domestic industry. It claims, further, that even if the initiation was lawful, the Department's determination that the Moroccan government's provision of phosphate mining rights conferred a benefit to OCP was unsupported by substantial evidence because of flaws in the methodology Commerce used to assess the adequacy of remuneration. OCP claims, third, that the Department's investigating three programs (reduction in tax fines and penalties, revenue exclusions for minimum tax contributions, and customs duty exemptions for capital goods, machinery, and equipment) was unlawful because Commerce lacked authority to investigate these three programs. Fourth, OCP claims that, even if the investigation into the reduction in tax fines and penalties was lawful, Commerce erred in finding the program to be *de facto* specific. Finally, OCP claims that Commerce unlawfully investigated the provision of phosphogypsum byproduct disposal services (a government

program Commerce ultimately determined OCP did not use during the POI), arguing that the Petition inadequately alleged elements of a countervailable subsidy.

Mosaic claims that the Department's benefit calculation for the Moroccan government's provision of mining rights was affected by errors that understated the benefit. Mosaic claims, second, that Commerce incorrectly found that two programs under the government's value-added tax ("VAT") regime conferred no benefit to OCP.

### D. The Initiation of the CVD Investigation

OCP's first claim is that Commerce unlawfully initiated an investigation of phosphate fertilizers from Morocco, having erroneously determined that the Petition demonstrated adequate industry support. Mem. in Supp. of Consol. Pl. and Def.-Int. OCP S.A.'s Rule 56.2 Mot. for J. on the Agency R. 14 (Oct. 15, 2021), ECF Nos. 53 (conf.), 54 (public) ("OCP's Br."). OCP argues that because certain fertilizer products, namely nitrogen, phosphorus, and potassium ("NPK") fertilizers, are subject merchandise, Commerce was required to include all domestic producers of NPK fertilizers in the domestic industry when assessing whether the domestic industry supported the Petition. *Id.* According to OCP, the domestic producers of the like product must include "bulk blenders," domestic producers who do not manufacture an individual granulated or compounded fertilizer with a phosphate component but instead blend fertilizers produced by others into specific formulations. OCP takes the position that the Department's unwarranted exclusion of bulk blenders from the domestic industry resulted in an unlawful decision that the Petition had the requisite support of the domestic industry.

OCP's claim arose due to the structure of the scope language used by Commerce in the investigation and, ultimately, the Order. In initiating the investigation, Commerce determined that "there is a single domestic like product, coexistive with the scope" of the investigation. *Initiation Checklist* at Attachment II, at 12; *see also* Initiation Notice, 85 Fed. Reg. at 44,506. For the investigation and the Order, Commerce employed identical scope language, covering "phosphate fertilizers in all physical forms." *Initiation Checklist* at Attachment I; *Order*, 86 Fed. Reg. at 18,038. The third paragraph of the scope language provides that the scope includes certain fertilizers that contain phosphate but also contain other plant nutrient components, as follows:

> The covered merchandise also includes other fertilizer formulations incorporating phosphorous and non-phosphorous plant nutrient components, whether chemically-bonded, granulated (*e.g.*, when multiple components are incorporated into granules through, *e.g.*, a slurry process), or compounded (*e.g.*, when multiple components are compacted together under high pressure), including ... nitrogen, phosphorous, potassium (NPK) fertilizers.

*Id.* A plain-meaning reading of this scope language limits these additional products to those that are not merely mixtures or "blends" of different fertilizers. Instead, the finished product must be "chemically-bonded, granulated ... or compounded" in order to be included within the scope. *Id.*

**\*5** The fourth paragraph of the scope language, which gave rise to OCP's claim, addresses mixtures and blends in which the finished product, in the condition in which it is imported, is not itself "chemically-blended, granulated, or compounded" and is not, in and of itself, merchandise that is subject to the Order. The fourth paragraph provides that:

> Phosphate fertilizers that are otherwise subject to this investigation are included when commingled (*i.e.*, mixed or blended) with phosphate fertilizers from sources not subject to this investigation. Phosphate fertilizers that are otherwise subject to this investigation are included when commingled with substances other than phosphate fertilizers subject to this investigation (*e.g.*, granules containing only non-phosphate fertilizers such as potash [a potassium product] or urea [a nitrogen product]). *Only the subject component of such commingled products is*

> covered by the scope of this
> investigation.

*Id.* (emphasis added). Thus, the fourth paragraph of the scope language sweeps into the scope of the Order certain upstream products, i.e., "[p]hosphate fertilizers that are otherwise subject to this investigation" that are not the imported merchandise but instead are upstream products that were used in producing the imported merchandise. The "subject merchandise" content is limited to the aforementioned "chemically-blended, granulated, or compounded" fertilizers. *Id.* The other components of the imported merchandise present within "such commingled products" are expressly excluded from the scope by the fourth paragraph. *Id.*

Arguments can be made that the Department's inclusion of the upstream products within the scope of the Order was contrary to law. According to section 701(a) of the Tariff Act, Commerce is to impose countervailing duties upon "a class or kind of merchandise *imported*, or *sold* (or *likely to be sold*) for *importation*, into the United States" if a countervailable subsidy is provided with respect to that merchandise and the ITC finds injury or threat to a domestic industry "by reason of imports of *that merchandise* or by reason of sales (or the likelihood of sales) of *that merchandise* for *importation*." 19 U.S.C. § 1671(a) (emphasis added). Because Commerce, by operation of the fourth paragraph of the scope language, is imposing countervailing duties only upon an ingredient in the imported merchandise, not the merchandise itself that was imported or sold for importation, it can be argued that Commerce lacked statutory authority to include that paragraph within the scope language of the Order. The court does not opine in *dicta* whether such arguments would have merit but notes that OCP has not raised any such arguments in this litigation. As the court explains below, the arguments OCP puts forth are unconvincing because Commerce reasonably determined the composition of the domestic like product (and, therefore, of the corresponding domestic industry) based on the scope language, which, as unchallenged in this litigation, is presumed to have been lawful.

In challenging the Department's initiation of the investigation, OCP argues that Commerce unlawfully refused to consider opposition to the Petition by wholesalers; that, by disregarding bulk blended NPK, the Department relied on a flawed calculation of the total production of the domestic like product; and that Commerce acted contrary to statute

when it declined to poll the industry. OCP's Br. 14–38. These arguments are addressed below.

### 1. Pre-Initiation Opposition to the Petition of Domestic Wholesalers

**\*6** **[1]** Contesting the Department's determination of industry support, OCP alleges that Commerce "was required to consider" the views of "certain domestic parties," namely wholesalers, who "notified Commerce of their opposition to the Petition." *Id.* at 15 (citing American Plant Food's Letter *Re: Phosphate Fertilizer from Morocco and Russia: Opposition to Countervailing Duty Petition* at 2 (July 14, 2020), P.R. Doc. 47 ("*APF Letter*")).[4] OCP argues that "[a]cting contrary to law, Commerce refused to do so." *Id.* (citing 19 U.S.C. § 1671a(c)(4)(A)(ii) for the proposition that "[t]he law requires Commerce to consider the views of 'domestic producers and workers' who express either support for, or opposition to, the petition when evaluating industry support" and 19 U.S.C. § 1671a(c)(5) for the proposition that "domestic producers or workers" include wholesalers). This argument is unconvincing.

The statute provides that, for a petition to have industry support, "the domestic producers or workers who support the petition" must "account for at least 25 percent of the total production *of the domestic like product*" and must "account for more than 50 percent of the production *of the domestic like product* produced by that portion of the industry expressing support for or opposition to the petition." 19 U.S.C. §§ 1671a(c)(4)(A)(i)–(ii) (emphasis added). Mosaic, in the Petition, asserted that it identified all known producers of the domestic like product: itself, Nutrien/Potash Corp., Simplot, Intafos/Agrium, and Meherrin. *Petition* at I-6; *Initiation Checklist* at Attachment II, at 8 ("The petitioner identified all known producers of the domestic like product."). Among these producers, only Mosaic either supported or opposed the Petition. *Petition* at I-5 ("Petitioner is unaware of any domestic producer that opposes the Petitions."); *Initiation Checklist* at Attachment II, at 9.

Having identified a single domestic like product that is coextensive with the scope of the investigation, having determined that the "petitioner provided sufficient information to establish *all known producers of the domestic like product*," and having found that Mosaic was the only producer of the domestic like product to comment either in support of or opposition to the Petition, Commerce concluded

that "there is adequate industry support within the meaning of section 702(c)(4)(A) of the Act," 19 U.S.C. § 1671a(c)(4)(A), to initiate the investigation. *Initiation Checklist* at Attachment II, at 14--15 (emphasis added). Neither OCP nor the domestic wholesalers who opposed the Petition successfully demonstrated otherwise.

Although identifying themselves as "interested parties" eligible to comment on the issue of industry support, per 19 U.S.C. § 1671a(c)(4)(E),[5] neither wholesaler demonstrated or even alleged that they engaged in any actual "production of the domestic like product," let alone the extent to which their production activities might alter or refute the industry support calculation put forth by Mosaic in the Petition (and upon which Commerce relied when determining that sufficient industry support existed). *Initiation Checklist* at Attachment II, at 11 (stating that neither wholesaler "provided Commerce with any data."). Instead, the wholesalers provided boilerplate language articulating their opposition to the Petition only in generalized terms. *See APF Letter* at 2. One wholesaler, American Plant Food, undercut its own position when it conceded that "[i]f Mosaic is successful in their petition, it would leave the American growers with *one producer of phosphate*," implicitly conceding that Mosaic is responsible for producing at least a significant portion of the domestic like product. *Id.* (emphasis added).

 **\*7**  **[2]**  The burden of record creation lies in general with the parties, not the agency. *See SeAH Steel VINA Corporation v. United States*, 950 F.3d 833, 845 (Fed. Cir. 2020) (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citations omitted)). Here, the parties involved (petitioner Mosaic and the wholesaler opponents) were better positioned than was Commerce to provide data pertaining to total production of the domestic like product. That only the petitioner did so, and that the evidence submitted by the petitioner was sufficient to support the Department's decision to initiate the investigation, do not constitute a "refusal" by Commerce to consider wholesaler opposition to the Petition.

## 2. Exclusion of the Products of Bulk Blenders from the Total Production of the Domestic Like Product

 **[3]**  OCP argues, further, that Commerce unlawfully initiated the investigation because the Department wrongfully excluded bulk blenders from the domestic industry and wrongfully excluded "bulk blended NPK" from the calculation of total production of the domestic like product,

such that Commerce "materially underestimated production in the United States" when assessing industry support. OCP's Br. 19. This argument is also unconvincing.

As previously discussed, paragraphs three and four of the scope language, when read together, provide that NPK fertilizers are in-scope merchandise, and therefore considered to be part of the domestic like product, only if they are "chemically-bonded, granulated, or compounded." *Initiation Checklist* at Attachment I; *Order*, 86 Fed. Reg. at 18,038. Paragraph four of the scope having clarified that "only the subject component of such commingled products is covered by the scope," Commerce interpreted the scope of the investigation to conclude that the commingled products of bulk blenders are not, in and of themselves, included within the domestic like product. It could be argued that their products, had they been imported, should have been considered subject merchandise because the subject merchandise component therein would have subjected the importer to countervailing duty liability. But the inherent problem arises from the uncontested scope language itself (which may have been unlawful but was unchallenged), not with the Department's conclusion that bulk blenders do not produce the domestic like product, which Commerce defined to be coextensive with the scope of the investigation.

Because OCP has not challenged the scope language, the court must conclude that Commerce did not act contrary to record evidence in finding that "it is not appropriate to collect data from companies that perform such blending techniques and doing so could result in double-counting." *Initiation Checklist* at Attachment II, at 14; *Final I&D Mem.* at 9.

## 3. The Department's Decision Not to Poll the Domestic Industry

 **[4]**  Finally, OCP argues that "[w]here the petition fails to establish industry support for an investigation, as was the case here," Commerce was obliged to " 'poll the industry or rely on other information' to evaluate industry support." OCP's Br. 31–32 (citing 19 U.S.C. § 1671a(c)(4)(D) and *Initiation Checklist* at 3, and at Attachment II, at 10, 14–15).

This argument also fails. The relevant statutory provision requires Commerce to "poll the industry or rely on other information in order to determine if there is support for the petition" only "[i]f the petition does not establish support of domestic producers or workers accounting for more than 50

percent of the total production of the domestic like product." [19 U.S.C. § 1671a(c)(4)(D).](#) The legislative history indicates that "if the petition *on its face* does not establish that it is supported by domestic producers or workers accounting for more than 50 percent of total domestic production, Commerce will poll the industry or otherwise determine whether the support requirements have been met." [S. Rep. No. 103-412, at 36](#) (1994) (emphasis added). As defendant argues:

> **\*8** [I]t is not enough for an interested party to merely express an opposition to the petition and demand polling.... Rather, the party must proffer sufficient evidence to Commerce to demonstrate that the industry support data presented in the petition contained an error of sufficient magnitude to change the outcome of the industry support calculation.

Def.'s Opp'n to Pls.' Mots. for J. Upon the Admin. R. 36 (Feb. 22, 2022), ECF Nos. 72 (conf.), 79 (public) ("Def.'s Resp.") (citing *[PT Pindo Deli Pulp v. United States,](#)* 36 CIT [394, 414, 825 F. Supp. 2d 1310, 1328 (2012)).](#) In support of its "polling" argument, OCP relies on its contentions that Commerce unlawfully ignored opposition to the Petition by domestic wholesalers and improperly excluded bulk blended NPK from the total production of the domestic like product. Both contentions are unpersuasive for the reasons the court has put forth.

In summary, OCP has not demonstrated a right to relief on its claim that the initiation of the CVD investigation was unlawful.

### E. The Benefit Calculation for the Provision of Mining Rights for LTAR

OCP and Mosaic, for different reasons, claim that Commerce improperly determined the benefit conferred by the government of Morocco's provision of mining rights to OCP. Commerce determined that this program was countervailable at a rate of 18.42%. *Final I&D Mem.* at 5. OCP argues that, to the extent a benefit was conferred at all, the benefit found by Commerce was too large; Mosaic argues, conversely, that the benefit calculated by Commerce was too small. Both claims object to aspects of the methodology Commerce used to assess the adequacy of remuneration for the mining rights.

The Moroccan government, which owns all mineral reserves, granted OCP a monopoly to mine phosphate, including during the POI. *Prelim. Decision Mem.* at 11; *Final I&D Mem.* at 31. Commerce preliminarily determined that this exclusive provision of mining rights constituted a countervailable subsidy because it provided a financial contribution benefiting OCP via the provision of a good for less than adequate remuneration and was *de jure* specific. *Prelim. Decision Mem.* at 11–12 (citing [19 U.S.C. §§ 1677(5),](#) [(5A)).](#) To make its LTAR determination, Commerce relied on its regulation, [19 C.F.R. § 351.511(a)(2).](#)

The regulation directs Commerce to measure "adequate remuneration" pursuant to a three-tiered methodology. Finding that "there are no suitable market-determined benchmark prices for phosphate ore mining rights in Morocco," Commerce determined that it could not use a tier-one approach. *Prelim. Decision Mem.* at 12 (citing [19 C.F.R.](#) [§ 351.511(a)(2)(i)).](#) Finding also that "[t]he government is the sole provider of mining rights for phosphate ore in Morocco and, thus, there are no private, market-determined prices available for the good in question," Commerce determined that a tier-two approach also was unavailable. *Id.* (citing [19](#) [C.F.R. § 351.511(a)(2)(ii)).](#) Commerce determined it would conduct a tier-three analysis and examine "whether the government price is consistent with market principles." *Id.* (citing [19 C.F.R. § 351.511(a)(2)(iii)).](#)

Neither the statute nor the regulation provides guidance on how Commerce is to conduct a tier-three LTAR analysis or how Commerce is to calculate the government price when the "good or service" provided by the governmental authority consists of an intangible legal right (in this case, mining rights). Commerce stated that, in such situations, it may "find it appropriate to conduct a benefit analysis not on mining rights *per se*, but on the value of the underlying good conveyed via the mining rights." *Final I&D Mem.* at 23. In exercising those mining rights, Mosaic mined phosphate ore, from which it produced phosphate rock using a "beneficiation" process. *See Prelim. Decision Mem.* at 11–12. Although preferring to use unbeneficiated phosphate ore as the underlying good for the purposes of its benefit analysis, Commerce was unable to identify a global market for this good. *Id.* at 12 n.81. Commerce, instead, used "phosphate rock beneficiated in 2019 to calculate the total benefit." *Final I&D Mem.* at 29 & n.197 (citation omitted).

**\*9**   For its tier-three analysis, Commerce essentially constructed an estimated price for OCP's beneficiated phosphate rock using a cost of production ("COP") buildup, assessing OCP's production costs from OCP's questionnaire responses.[6] Commerce then compared this price with a world benchmark price, which Commerce calculated as the average of various prices for beneficiated phosphate rock selected "from among the benchmark data submitted by the petitioner and OCP." *Prelim. Decision Mem.* at 12; *see also Final I&D Mem.* at 18. Finally, to calculate the benefit conferred, Commerce "multiplied the difference between the calculated per-unit cost buildup, including the production cost of the phosphate rock and the extraction taxes paid, and the benchmark per-unit price of phosphate rock, by the total amount of phosphate rock mined and beneficiated by OCP during the POI." *Prelim. Decision Mem.* at 12; *see also Final I&D Mem.* at 29.

OCP does not challenge the general methodology Commerce used under tier three but argues that the COP buildup incorrectly failed to include OCP's selling, general, and administrative (collectively, "SG&A") expenses and that the Department's calculation of a profit component was flawed. With respect to the world benchmark, both OCP and Mosaic argue that Commerce erred in including certain prices or in failing to make certain adjustments. The court addresses these arguments below.

### 1. The Cost of Production Buildup:
### The Department's Exclusion of SG&A

 **[5]**   OCP first argues that Commerce impermissibly excluded SG&A from the cost of production buildup. OCP's Br. 39. The court agrees.

In response to the Department's questionnaires, OCP reported categories of SG&A expenses. It informed Commerce that, other than the direct costs it incurred "in the extraction, beneficiation, and transport of phosphate rock," it also "allocates a portion of two corporate-level expenses to each of its mining operations/entities: (1) headquarters ('HQ') and support expenses, and (2) cost of debt." *OCP S.A. Suppl. Questionnaire Resp. Part Three* at 7–8 (Nov. 6, 2020), P.R. Doc. 354 ("*OCP's Suppl. Questionnaire Resp. Part III*"). OCP recorded these expenses only at a corporate, company-wide level of accounting.

In its reporting to Commerce, OCP allocated corporate-level HQ and support costs to each of its various "operations/ entities," including its mining operations, "on the basis of total operating costs." *Id.* at 8 and Appendix MIN2-7. OCP's HQ and support costs covered such expenses as the "purchases of services (*e.g.*, IT [information technology] services, catering, accounting services, facility management," "external costs (*e.g.*, telecom, consulting and advertising, bank fees, insurance)," "personnel costs (the salaries, overtime, bonuses ...)," and "amortization of equipment related to headquarters and equipment that is used across functions such as IT." *Resp. to Questionnaire in Lieu of On-Site Verification* at 39–40 (Dec. 30, 2020), P.R. Doc. 436 ("*OCP's Verification Resp.*"). OCP also reported that its debt costs reflected "interest paid on various debts—bonds, loans, convertible debt, or lines of credit—that are broadly applicable or fund general corporate purposes," *id.* at 19, including "interest expenses on loans it has used to fund capital improvements associated with its mining operations," *OCP's Case Br.* at 28.

Commerce excluded the entire amount of OCP's reported SG&A expenses from the COP buildup. Commerce explained that "[a]lthough OCP itemized the expenses that constitute its HQ/support costs and cost of debt into generic categories, we do not have sufficient information on how each of these line items contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock." *Final I&D Mem.* at 24 (citation omitted). Commerce having stated that it sought to "take into consideration the *relevant production costs* associated with producing the phosphate rock from the minerals in the ground as well as *the pricing of phosphate rock*," *id.* (emphasis in original), it appears that the Department's decision not to include SG&A costs stemmed entirely from OCP's cost accounting methods.

**\*10**   OCP stated in a questionnaire response that "[h]eadquarters and support activities do not stand alone in a business. They exist to support the production operations of the larger entity. Therefore, some of those costs are properly associated with the mining activities." *OCP's Verification Resp.* at 6. Before the court, OCP argues, similarly, that "[i]t defies logic to conclude that OCP, a single company that operates several mining sites that are used to produce phosphate rock, incurs no HQ-level SG&A expenses in that production," OCP's Br. 42, and that only "a fictitious company" could operate with "zero HQ-level SG&A expenses," Reply Br. of Consol. Pl. and Def.-Int. OCP

S.A. 23 (Apr. 13, 2022), ECF Nos. 91 (conf.), 92 (public) ("OCP's Reply").

Commerce based its decision to exclude SG&A expenses from the COP buildup on a finding that *not all* of the SG&A expenses reported by OCP were necessarily directly relevant to phosphate rock production and pricing. *Final I&D Mem.* at 24. Commerce found that "to the extent that some items in OCP's HQ/support expenses in the cost build up could arguably be related to mining operations, the record does not contain sufficient evidence that would allow us to segregate and remove those costs which are considered unrelated to mining operations." *Id.*

OCP provided documentation demonstrating that its SG&A expenses included costs attributable to its phosphate mining operations. *See, e.g., OCP's Verification Resp.* at 6–7, 29; *OCP's Case Br.* at 25–26; OCP's Br. 46 n.15 (noting that HQ-level SG&A expenses included "salaries for certain personnel," including those "who perform roles directly related to mining operations."). Similarly, with respect to debt costs, OCP reported that its "financing and debt costs" included "interest expenses on loans it has used to fund capital improvements associated with its mining operations." *OCP's Case Br.* at 28 & n.83. The Department's excluding *all* SGA expenses from the COP buildup is an implied finding that OCP incurred *zero* SG&A expenses in the process of producing phosphate rock. In light of record evidence that OCP engaged in mining activities and incurred SG&A costs in doing so, the Department's exclusion of all SG&A expenses from the COP buildup was *per se* unreasonable.

The government and Mosaic attempt to defend the Department's exclusion of OCP's SG&A expenses on the basis of the state of record evidence. The government argues, for instance, that "it was OCP's responsibility to segregate mining-related from mining-unrelated costs." Def.'s Resp. 58. But as OCP explained, doing so was not possible because OCP recorded HQ and support expenses, as well as debt costs, only at a corporate level. To adjust for this, OCP allocated its SG&A expenses to each of its various operations, including mining operations, in proportion to the respective shares of total direct expenses, which it reported to Commerce. *OCP's Suppl. Questionnaire Resp. Part III* at 8. Relying on the familiar principle that the burden of creating an adequate record lies with the interested parties, the government and Mosaic argue that OCP failed to provide adequate evidence on SG&A expenses. Def.'s Resp. 63 ("OCP had the burden to either segregate the

relevant expenses from expenses unrelated to phosphate rock production or, alternatively, provide Commerce with an allocation methodology that is reasonable and non-distortive. OCP did neither."); The Mosaic Co.'s Mem. in Opp'n to OCP's Rule 56.2 Mot. for J. Upon the Agency R. 52 (Feb. 22, 2022), ECF No. 73 (conf.), 74 (public) ("Mosaic's Resp.") ("OCP had multiple opportunities to attempt to provide sufficient information demonstrating that the costs at issue are relevant to Commerce's phosphate rock cost build-up, but it squandered these opportunities.").

**\*11** Defendant's argument implying that OCP could have segregated the relevant expenses is nonsensical. OCP could not place on the record "segregated" SG&A cost data that did not exist. To perform the task of identifying SG&A expenses for its production of beneficiated phosphate rock, OCP necessarily resorted to an allocation method. And while defendant argues that OCP's method of allocation was unreasonable and distortive, it fails to substantiate that argument based on record evidence and suggests no alternative allocation method.

As Mosaic concedes, Commerce, having chosen to use a COP buildup to calculate the government price, was obligated to ensure that its methodology was reasonable and supported by substantial evidence. Mosaic's Resp. 39. The court agrees with OCP that Commerce, in excluding all SG&A expenses, failed to do so. OCP's corporate-wide SG&A costs and allocation method were, and are, present on the record for the Department's consideration. On remand, Commerce either must accept OCP's SG&A cost allocation method or must show that it is unreasonable in light of a satisfactory alternative methodology it would use instead.

### 2. The Cost of Production Buildup: Calculation of Profit

OCP argues that Commerce erred when determining the profit rate for inclusion in the COP buildup. OCP's Br. 51. In the Preliminary Determination, Commerce calculated the COP buildup without accounting for profit. *Final I&D Mem.* at 25–27. Following OCP's comments on the Preliminary Determination, *OCP's Case Br.* at 34, Commerce "agree[d] with OCP that it should add a profit component" to the COP buildup, to ensure an "apples-to-apples" comparison with "benchmark prices which are inclusive of profit." *Final I&D Mem.* at 26–27; *see also OCP's Ministerial Error Comments* (Feb. 16, 2021), P.R. Doc. 479 and *Allegations of Ministerial*

*Errors in the Final Determination* (Int'l Trade Admin. Mar. 15, 2021), P.R. Doc. 485 ("*Final Ministerial Error Mem.*").

In adding a profit component, Commerce calculated "a general profit rate based on OCP's general corporate data," OCP's Br. 54 (citing *Final I&D Mem.* at 27), and multiplied it by OCP's total cost of phosphate rock production during the POI, *OCP S.A. Calculations for the Final Determination* at 2 (Int'l Trade Admin. Feb. 8, 2021), P.R. Doc. 475 ("*Final Calculation Mem.*") (citing *OCP's Section III Questionnaire Response* at Ex. Gen-4(a)(iii) (Sept. 17, 2020), P.R. Docs. 130–142 ("*OCP's Section III Questionnaire Resp.*")). Commerce added this profit amount to the COP buildup for phosphate rock to obtain an updated, higher price inclusive of profit.

OCP argues that the Department's profit calculations were unsupported by substantial record evidence and, therefore, that the Department's determination that the Moroccan government provided mining rights to OCP at LTAR must be remanded. OCP's Br. 51–52. OCP maintains that the profit rate chosen by Commerce should have been a rate pertaining solely to phosphate rock production rather than a general corporate profit rate; in the alternative, OCP argues that the Department's profit rate suffered from calculation errors. The court addresses these arguments below.

### a. The Selection of OCP's Overall Corporate Profit Rate Over a Surrogate Profit Rate

[6]   OCP argues, first, that Commerce was obligated to "select a profit rate that is specific to the production of the good that is the subject of the COP buildup (*i.e.* in this case phosphate rock)." OCP's Br. 52–53. OCP provides no statute, regulation, or binding precedent in support of this contention but resorts to the general principle that Commerce has an overarching obligation to determine rates "as accurately as possible." *Id.* at 55 (citing *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 45 CIT ——, ——, 498 F. Supp. 3d 1345, 1353 (2021) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("[T]he basic purpose of the statute" is to ensure that Commerce determines "margins as accurately as possible."))). OCP contends, further, that "Commerce's practice" requires the use of a "surrogate profit rate" when "the investigated producer is integrated such that it not only produces the good on which the COP buildup is based, but also other (*e.g.*, downstream) products." *Id.* at 52–53 (citing several prior Commerce

determinations). For a surrogate profit rate, OCP proposed a rate based on profit data of a company operating in Jordan, not Morocco, the Jordan Phosphate Mines Company PLC ("JPMC"), whose financial statements "allowed Commerce to calculate a profit rate specific to phosphate rock production, *i.e.*, a profit rate specific to JPMC's phosphate unit." *Id.* at 55 (citing *Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco: New Factual Information* at Ex. 22, at 119–120 (Nov. 4, 2020), P.R. Docs. 333–346 ("*OCP NFI*")).

*12   The statute requires Commerce to assess adequacy of remuneration according to "prevailing market conditions" for "the good or service being provided" and "in the country which is subject to the investigation." 19 U.S.C. § 1677(5) (E). In the situation presented, the statute did not require Commerce to use a surrogate profit rate from a company not operating in Morocco. Moreover, if it is assumed, *arguendo*, that the Department has a consistent past practice of using surrogate profit rates in analogous circumstances, as OCP alleges it does, Commerce was free to deviate from that practice so long as it provided a reasoned explanation for its departure. *See, e.g.*, *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003) (citing *Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973)).

In its Final Determination, Commerce explained that it will rely on a surrogate profit rate when such a rate is "the only profit rate on the record." *Final I&D Mem.* at 27 (citing *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Issues and Decision Memorandum for the Final Determination* at 24 (Int'l Trade Admin. July 29, 2016) ("*Cold-Rolled Steel from Russia Final I&D Mem.*")). As "OCP provided the necessary information to calculate a profit rate derived from its 2019 unconsolidated financial statements," the Department determined that "there is no need to resort to surrogate information." *Id.*

OCP argues that "Commerce's selected, non-specific profit rate" (i.e. OCP's overall corporate profit rate) "is inaccurate because it includes business activities unrelated to the production of phosphate rock." OCP's Br. 56. While OCP advocates use of the JPMC surrogate profit rate based on a factor of specificity to phosphate rock production, that rate is inferior as to other factors, being derived from business conditions of a different company in a different country. Neither profit data set was perfect, but on this record OCP

has not shown that it was unreasonable for Commerce to rely upon the data set specific to OCP's own business operations.

### b. The Profit Rate Calculation Methodology

[7]  OCP argues, second, that even if the court sustains the Department's decision to use OCP's overall corporate profit rate rather than a surrogate profit rate, the court still should remand the Final Determination to Commerce with respect to the profit rate calculation methodology. OCP's Br. 56. The court agrees.

To calculate OCP's overall corporate profit rate, Commerce divided OCP's 2019 "profit before tax" by the company's "operating expenses" to determine a profit rate of 5.47%. *Final Calculation Mem.* at 2; *OCP's Section III Questionnaire Resp.* at Ex. Gen-4(a)(iii) ("*OCP's 2019 Profit and Loss Statement*").

OCP contends that Commerce introduced an error into the denominator when it "improperly *included* HQ and support costs in the denominator of the profit ratio in contradiction of its position that these very same expenses should be *excluded* in the cost buildup to which the profit rate would be applied." OCP's Br. 57. OCP observes that "Commerce could have avoided this manifest analytical inconsistency by simply including HQ, support, and debt expenses in its mining rights COP buildup." *Id.* at 58 n.23. Because the court is remanding the Final Determination with instructions to include SG&A expenses in the COP buildup, Commerce necessarily must address the claimed "inconsistency" between the Department's apparent inclusion of SG&A expenses in the operating expense figure used in the denominator of the profit rate calculation, and exclusion of the same from the COP buildup.

*\*13*  OCP also argues that the Department's calculation methodology understated the profit rate, objecting that the numerator that Commerce used, i.e. profit before tax, "is not on the same basis as the denominator, which was limited to *operating* expenses." *Id.* at 60. The court concludes that Commerce must reconsider its use of this methodology, which it has failed to demonstrate was reasonable on the record evidence.

In support of its profit rate calculation methodology, Commerce explained: "In *Cold-Rolled Steel from Russia*, Commerce calculated a profit ratio for a provision of mining rights for LTAR program by dividing a company's profit before tax by its COGS [cost of goods sold]." *Final I&D Mem.* at 27 (citing *Cold-Rolled Steel from Russia Final I&D Mem.* at Comment 4). Relying on this past practice, Commerce found it appropriate, "similar to the circumstance in *Cold-Rolled Steel from Russia*," to "calculate a profit ratio for OCP by taking OCP's 'income before taxes' (profit before tax) and dividing it by its 'operating expense' (COGS) from its 2019 unconsolidated profit and loss statement." *Id.*

In this proceeding, Commerce also explained that actual data on OCP's cost of goods sold was not available on the record. *Final Ministerial Error Mem.* at 4. Commerce used OCP's operating expense for the profit rate denominator instead, even though it acknowledged that the two metrics are not equivalent. *OCP's Ministerial Error Comments* at 4 ("[T]he Department based the denominator in its profit ratio calculation on the 'total operating expenses' listed in OCP's profit and loss ('P&L') statement contained in OCP's 2019 unconsolidated financial statements, which the Department appears to have incorrectly assumed was equivalent to COGS."). OCP argues that "COGS as a term and an accounting concept does not include HQ and support expenses." *Id.* That "the 'total operating expenses' line item demonstrably includes HQ and support expenses" therefore indicates that OCP's "operating expense" is "*not* OCP's COGS." *Id.* at 5 (citations omitted).

Commerce also acknowledged that "we did make a mistake in our IDM [Final Issues and Decision Memorandum] by inadvertently equating 'operating expenses,' which are a line item in OCP's 2019 P&L statement, to 'COGS,' which is not a line item in that statement." *Final Ministerial Error Mem.* at 4. Commerce then stated, opaquely, that "[t]his inadvertent error in the narrative does not affect our calculations because we have used the correct line item from the P&L statement in the calculations based on our stated intent." *Id.*

The record contained data disclosing OCP's operating income, which Commerce, without clear explanation, declined to use as the profit rate numerator. It is reasonable to presume that "operating income" represents net profits derived from a company's standard operations, and in this case there was record evidence that OCP's operating income included revenues from "sales of merchandise" and "sales of goods and services produced," less expenses from "purchase of consumed materials and supplies," "payroll costs," and other items. *See OCP's 2019 Profit and Loss Statement.* In contrast, OCP's Profit and Loss Statement contained

record evidence that income before taxes, the profit metric Commerce used for its profit rate numerator in the Final Determination, reflected the sum of OCP's operating income, financial income, and non-current income, the latter two of which would appear to have minimal relevance to phosphate rock production or sale (as they include such items as "revenues from equity securities," "exchange loss," "profit on disposal of fixed assets," and "net book value of transferred fixed assets"). *See id.* OCP points out that because it realized *negative* financial and non-current income in 2019, its profit before tax was lower than its operating income for that year. *See id.*; OCP's Br. 60.

**\*14** Commerce reported that it would rely on a past practice to calculate the profit rate by dividing profit before tax by COGS. Even if it is assumed, *arguendo*, that this past practice would have been reasonable in this proceeding, such methodology was not feasible as OCP's COGS was not on the record. Having chosen OCP's operating expense for the profit rate denominator instead, Commerce could no longer rely on its irrelevant past practice, and thus, Commerce was obligated to explain the reasonableness of the profit rate calculation methodology it ultimately used. Commerce did not do so, its explanations having been limited to a description of its inapplicable prior practice. *Final I&D Mem.* at 27. Moreover, Commerce has not addressed OCP's concern that the Department's profit rate calculation methodology "failed to achieve an apples-to-apples comparison internally because the numerator is not on the same basis as the denominator." OCP's Br. 60; *OCP's Ministerial Error Comments* at 7 ("[T]he profit ratio must be calculated with a numerator and denominator that are calculated on an apples-to-apples basis.").

In defending the Department's profit rate calculation, defendant engages in the same flawed reasoning as Commerce. The government argues, for instance, that "[c]onsistent with past practice in *Cold-Rolled Steel from Russia*, Commerce calculated a profit ratio by dividing OCP's profit (before tax) by its operating expenses." Def.'s Resp. 68. As discussed previously, doing so was *not* consistent with past practice, as Commerce calculated a profit rate in *Cold-Rolled Steel from Russia* by dividing profit before tax by COGS but in this investigation calculated OCP's profit rate by dividing profit before tax by operating expense.

Defendant also argues that OCP "failed to exhaust its administrative remedies," *id.*, because OCP did not raise its arguments "before the Commerce [*sic*] in its case brief,"

*id.* at 67 (citing *OCP's Case Br.* at 34–41). This argument has no basis in, and is contradicted by, the record facts. As noted above, the Preliminary Determination, on which the case brief was based, included a COP buildup without accounting for profit, a serious deficiency OCP identified in its case brief. *Final I&D Mem.* at 25–27. As OCP points out, "Commerce calculated a profit rate for the first time in the *Final Determination*, after OCP filed its case brief." OCP's Reply 41. OCP could not have been expected to object in its case brief to a profit calculation method that Commerce had not yet proposed.

On remand, Commerce must reconsider its method of determining a profit rate and explain why any method it chooses is reasonable when considered in light of the record evidence.

### 3. The World Price Benchmark for Phosphate Rock

In measuring what it considered to be a benefit conferred by the Moroccan government to OCP through the provision of mining rights at LTAR, Commerce estimated a world price benchmark for phosphate rock against which the government price could be compared. OCP and Mosaic, for different reasons, object to the Department's calculation of a world price benchmark.

To determine the benchmark, Commerce:

> [O]btained a world market price by selecting, from among the benchmark data submitted by the petitioner and OCP, data which are reported on an [*sic*] free-on-board basis, and which include information related to the "bone phosphate of lime" (BPL) level or $P_2O_5$ content of the rock, such that we could exclude data which relate to phosphate rock which does not compare to that which was mined/beneficiated by OCP during the POI.

*Prelim. Decision Mem.* at 12. From benchmark data provided by Mosaic and OCP, Commerce identified thirteen world prices for phosphate rock that were sold on a free-on-board basis and were comparable to the phosphate rock produced by

OCP, based on similarities in BPL level or $P_2O_5$ (phosphorous pentoxide) content. [7]

**\*15** The thirteen prices Commerce used were sourced from third-party market research organizations (CRU Group, Argus Media, Fertecon, and Profercy) and reflected average 2019 phosphate rock export prices from a range of countries and regions (specifically, Egypt, Jordan, Peru, Algeria, Syria, China, and North Africa). [8] *OCP Preliminary Calculation Memorandum* at 9 (Int'l Trade Admin. Nov. 25, 2020), P.R. Doc. 391 (citing *Petition* at Exs. II-23 (Argus Media report), II-24 (CRU report) and *OCP NFI* at Exs. 18 (Fertecon report), 21 (Profercy report)). Commerce preliminary used the simple average of those thirteen prices ($66.96/metric ton) for its world benchmark price. *Prelim. Decision Mem.* at 12. Commerce continued to rely on this benchmark price in the Final Determination. *Final I&D Mem.* at 18. This price was considerably higher than the price Commerce calculated from its COP buildup.

### a. The Department's Inclusion of North African Phosphate Rock Prices in the World Price Benchmark

**[8]** OCP argues that Commerce erred in including in its world price benchmark the North African price of $77.50/metric ton, which represented prices from Morocco and Tunisia and was more than $10/metric ton higher than the benchmark average. Per OCP's argument, "the record demonstrated that the North Africa prices included OCP prices." OCP's Br. 61 (citing *Petition* at Ex. II-26, at 10). OCP objects that "one group of prices that Commerce included in its benchmark price calculation was substantially influenced by the very activity that Commerce is evaluating against this benchmark." *Id.* at 62. Arguing that the Department's benefit determination "relied on a circular price comparison," i.e., a comparison of OCP's COP buildup-based government price against an export price comprised, in part, of OCP's own prices, OCP alleges that Commerce failed to "accurately measure the adequacy of remuneration for mining rights." *Id.* at 61. OCP has not demonstrated that it was improper for Commerce to use the North African price in performing an LTAR analysis according to tier three of its regulations.

In a tier-three LTAR analysis, Commerce is directed to "measure the adequacy of remuneration by assessing whether the government price is *consistent with market principles.*" 19 C.F.R. § 351.511(a)(2)(iii) (emphasis added). In including the

North Africa price in its benchmark calculation, Commerce explained that the "North Africa phosphate rock price is 'defined by sales to Europe, India and Brazil from OCP/GCT' " (where GCT is Groupe Chimique Tunisien, a Tunisian producer of phosphate rock). *Final I&D Mem.* at 19 (citing *Petition* at Ex. II-26, at 10). Therefore, the North African price "include[s] non-Moroccan prices" and, critically, constitutes "an export price ... meaning that it is a market price that would reflect commercial realities in the world market." *Id.* (citation omitted). OCP does not contest these facts. OCP's Br. 64 ("Commerce's response simply misses the point."). Instead, OCP relies on inapposite case law and prior Commerce proceedings. [9]

**\*16** While arguing that the North African price introduced "a circular price comparison" into the Department's LTAR analysis, OCP has not shown that use of this price was unreasonable as part of the Department's tier-three analysis. Moreover, OCP does not challenge, *per se*, the use of that indirect tier-three LTAR analysis for mining rights, which involved a cost buildup for OCP's production of beneficiated phosphate rock and comparison of the same with the world market price (although challenging aspects of that analysis, i.e., SG&A, estimated profit rate and market prices for the phosphate rock).

### b. The Department's Inclusion of Egyptian Phosphate Rock Prices in the World Price Benchmark

**[9]** Mosaic argues that Commerce unlawfully included two prices reflecting lower-quality Egyptian phosphate rock in the calculation of the world price benchmark. Specifically, Mosaic contests the inclusion of the $47/metric ton (from the CRU report) and $58.16/metric ton (from the Profercy report) Egyptian price points, both of which were lower than the benchmark average price of $66.96/metric ton. The Mosaic Co.'s Mem. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. 14–19 (Oct. 15, 2021), ECF Nos. 55 (conf.), 56 (public) ("Mosaic's Br.") (citing *OCP Preliminary Calculation Memorandum* at 9). Mosaic contends that the Egyptian phosphate rock is "not properly comparable to the phosphate rock OCP obtained pursuant to the mining rights provided by the GOM" and therefore that "Commerce's inclusion of Egyptian phosphate rock prices in the benchmark was unsupported by substantial evidence." Mosaic's Br. 14. The court disagrees.

In determining which prices to include in the world price benchmark, Commerce looked to the bone phosphate of lime, also known as phosphorus pentoxide, content of the rock. *Prelim. Decision Mem.* at 12; *Final I&D Mem.* at 18–19. Determining that "BPL and $P_2O_5$ levels determine OCP's phosphate rock prices," *Final I&D Mem.* at 19 (citing *Phosphate Fertilizers from the Kingdom of Morocco: OCP's Rebuttal Brief* at 12–13 (Jan. 19, 2021), P.R. Doc. 453), and further finding that Egyptian phosphate rock "has a similar BPL or $P_2O_5$ content as OCP's phosphate rock," Commerce decided it would "continue to use Egyptian phosphate rock prices in the benchmark" for the Final Determination as it did for the Preliminary Determination. *Id.* at 20. Although Mosaic disputes the precise BPL content range for Moroccan and Egyptian rock, Mosaic's Br. 18–19, Mosaic does not deny that Commerce, in calculating the benchmark, "include[d] *all* phosphate rock prices on the record—including Egyptian prices—that fall within or overlap with the BPL and $P_2O_5$ content range of OCP's rock." Def.'s Resp. 40 (citing *Data from OCP Final Calculations* (Feb. 8, 2021), P.R. Doc. 476). Nor does Mosaic deny that "phosphate content/BPL content" is "the industry's own standard ... metric of comparability" for phosphate rock. Resp. Br. of Consol. Pl. and Def.-Int. OCP S.A. 17 (Feb. 22, 2022), ECF Nos. 75 (conf.), 76 (public) ("OCP's Resp.").

Mosaic argues, instead, that "phosphate rock characteristics other than BPL content affect rock quality" and that Egyptian phosphate rock is compromised by "qualitative differences" such as "elevated levels of carbonate and iron" that render the Egyptian rock "low quality." Mosaic's Br. 17–19. Mosaic alleges that "Commerce did not engage meaningfully" with evidence of these qualitative differences, such that the Department "improperly disregarded critical evidence that undermines its reasoning and conclusions." Mosaic's Br. 14, 19; The Mosaic Co.'s Reply in Supp. of its Rule 56.2 Mot. for J. Upon the Agency R. 3–4 (Apr. 14, 2022), ECF Nos. 89 (conf.), 90 (public) ("Mosaic's Reply"). This argument is unconvincing.

**\*17** Mosaic's argument relies on record evidence that Commerce could have regarded as having little if any probativity on the issue presented. Specifically, Mosaic cites a single report for the proposition that "Egyptian rock is low-quality and mostly used in low-value applications." Mosaic's Br. 17 (quoting *Phosphate Fertilizers from Morocco: Submission of Factual Information to Rebut, Clarify, or Correct* at Ex. 1 (Nov. 16, 2020), P.R. Doc. 371 ("*CRU Article*")). That "report" is, in fact, an article published

by a commodities research firm that speculates, with respect to the operations of one Egyptian mining company (Misr Phosphate) as it "finalis[es] plans for [an] integrated phosphoric acid plant" at one of its mine sites (Abu Tartour), that "the low quality of Egyptian phosphate rock, in addition to its carbonate and iron content, *may* mean that only manufacturing low grade acid is economic." *CRU Article* at 6 (emphasis added). As OCP points out, the article does not substantiate the extent to which the carbonate or iron content in Egyptian phosphate rock renders it low quality for purposes other than manufacturing phosphoric acid, nor does the article, or other record evidence, provide "any actual analysis of the carbonate and iron levels or the end use of the Egyptian rock as compared to OCP's rock produced during the POI." OCP's Resp. 9.

The court must deny relief on Mosaic's claim that Commerce improperly included the Egyptian prices in its benchmark calculation. Mosaic has not demonstrated that Commerce improperly disregarded "critical evidence," Mosaic's Br. 19, about alleged qualitative differences between Egyptian and Moroccan phosphate rock.

### c. The Department's Decision Not to Adjust the World Price Benchmark for International Delivery Charges

**[10]** Mosaic argues that Commerce erred in the calculation of its benchmark by declining to apply upward adjustments to the benchmark price to account for international freight charges, import duties, and value added taxes (collectively, "international delivery charges") to arrive at a delivered price. Mosaic's Br. 19–26. Mosaic points to 19 C.F.R. § 351.511(a)(2)(iv), which specifies that, for tier-one and tier-two benchmarks calculated pursuant to 19 C.F.R. §§ 351.511(a)(2)(i) and (ii), Commerce is directed to use "delivered prices." *Id.* at 20–21 (citations omitted). According to Mosaic's argument, "to the extent that a tier 3 benchmark is based on world market prices," as it is here, "it would be illogical for Commerce to exclude delivery charges and deviate from the rule in 19 C.F.R. § 351.511(a)(2)(iv)." Mosaic's Br. 21. Mosaic also relies on its analysis of prior Commerce proceedings. Mosaic's Br. 23–25; Mosaic's Reply 13–20.

The court disagrees with Mosaic. On its face, what Mosaic calls the "rule in 19 C.F.R. § 351.511(a)(2)(iv)" is expressly limited to tier-one and tier-two analyses and was inapplicable in this situation, Commerce having resorted to a tier-three

analysis due to unavailability of information from which to apply tier-one or tier-two methodology. *Prelim. Decision Mem.* at 12; *Final I&D Mem.* at 32; *see Mosaic Co. v. United States*, 46 CIT ——, ——, 589 F. Supp. 3d 1298, 1315 (2022) ("It is unreasonable to rely only on a regulation pertaining to tier-one and tier-two benchmarks to adjust a tier-three benchmark price."). It must be presumed that Commerce, when promulgating the regulation, intentionally made the "delivered price" limitation inapplicable to tier three. The price data Commerce used for its benchmark were derived from actual free-on-board, not delivered, prices. *Prelim. Decision Mem.* at 12; *Final I&D Mem.* at 14. Adding estimated delivery charges to the data on actual prices would not have made the data more accurate.

## F. VAT Programs

Mosaic claims that Commerce acted unlawfully in determining that two tax programs alleged in the Petition, VAT Refunds and VAT Exemptions for Capital Goods, Machinery, and Equipment, were not countervailable. Both claims turn on the nature and functioning of the country's tax regime.

Morocco operates a value-added tax system, under which taxpayers ordinarily incur "input VAT" when they purchase inputs from suppliers and collect "output VAT" from purchasers upon sale of the goods they produce. *OCP's Section III Questionnaire Resp.* at 104. Citing prior practice with regard to "VAT regimes which operate normally," Commerce determined that the two VAT programs are not countervailable. *Final I&D Mem.* at 78–79, 81.

**\*18** In the administration of its VAT regime, the Moroccan government uses a credit invoice system, under which "the amount of input VAT that the company paid is deducted from the amount of output VAT that it collected, which results in either VAT due to the state or, if the company pays a greater amount of input VAT than the amount of output VAT it collects, it accumulates credits that can be used the following month or collected as a refund." *Id.* at 79.

The Moroccan tax code exempts exported goods from input VAT payments because the ultimate purchasers are beyond the ordinary reach of the taxing authorities. In export situations, Moroccan law provides that companies accruing VAT credits in excess of the input VAT they owe are "entitled to seek reimbursement of such credits." *OCP's Section III*

*Questionnaire Resp.* at 110. Additionally, under reforms made to the Moroccan tax code in 2017, certain companies are eligible for exemptions to the payment of input VAT on locally-purchased capital goods, equipment, and machinery in connection with investment agreements with the Moroccan government. *Id.* at 112.

In the Petition, Mosaic alleged that the two VAT programs, i.e., the payment of refunds for OCP's accumulated VAT credits and the grant of exemptions for VAT payments on capital goods, constituted countervailable subsidies. Commerce investigated both programs and determined that neither conferred a benefit to OCP. Mosaic now challenges those determinations.

### 1. VAT Refunds

**[11]** Mosaic claims that Commerce erred in not countervailing the Moroccan government's refund to OCP of 20.5 billion Moroccan dirhams in VAT tax credits. Mosaic's Br. 26. Mosaic argues that because Morocco's VAT law provides for producers to recover the difference between VAT collected from sales and VAT paid on input "only in limited circumstances and pursuant to a specific statutory mechanism," the Moroccan government conferred a benefit by refunding credits that "were effectively worthless." *Id.* at 27, 29. The record evidence is that OCP accrued the credits in question pursuant to specific provisions of the Moroccan tax code, including Article 92, which exempts exported goods and local fertilizer sales from VAT. *Phosphate Fertilizers from the Kingdom of Morocco: Supplemental Questionnaire Response of the Government of the Kingdom of Morocco* at SVI-3 (Nov. 3, 2020), P.R. Docs. 286–331 (citing Article 92 of the Moroccan tax code). Credits were also accrued pursuant to Article 94 of the Moroccan tax code, subjecting certain domestic purchases to a VAT rate of zero percent. *Id.* (citing Article 94 of the Moroccan tax code).

The Moroccan tax code authorizes refunds of accumulated VAT credits. *Phosphate Fertilizers from the Kingdom of Morocco: Questionnaire Response of the Government of the Kingdom of Morocco* at VII-6 (Sept. 17, 2020), P.R. Docs. 145–209 ("*GOM's Initial Questionnaire Resp.*") (citing Article 103 of the Moroccan tax code). There is record evidence that due to its own fiscal constraints, the government of Morocco was unable to refund from its own treasury the outstanding credits of OCP and other companies. *Id.* at VII-7. Because of this, the Moroccan government negotiated

financial agreements with the companies eligible for VAT refunds and several Moroccan banks. *Preliminary Decision Mem.* at 15 (citing *GOM's Initial Questionnaire Resp.* at Ex. VII-10). The government, the banks, and OCP reached agreements under which the government borrowed a principal amount used to refund the VAT credits. *Id.* Separate non-recourse agreements known as "factoring agreements" between OCP and the banks required OCP to pay the interest on the loans directly to the banks. *Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Supplemental Questionnaire Response, Part I* at 29 (Nov. 3, 2020), P.R. Doc. 254 and *OCP's Section III Questionnaire Resp.* at Ex. VAT-6. By doing so, OCP received the cash value of its outstanding VAT credits but also assumed liability for the interest payments to the banks.

**\*19** Mosaic points to several aspects of the VAT refund program as evidence "that the GOM acted in an *ultra vires* manner" in making the refunds. Mosaic's Br. 29. First, Mosaic rejects the notion that Moroccan law provides for refunds of VAT credits of the sort that OCP received through the factoring agreements. *Id.* at 27. In support of that argument, Mosaic points to the text of a Moroccan regulation covering VAT refunds, which states that after the taxpayer files an application "at the end of each quarter of the calendar year in respect of transactions carried out during the previous quarter or quarters ... [t]he refunds of fees ... shall be settled within a maximum period of three (3) months from the filing date of the application." Mosaic's Reply 25 (quoting *GOM's Initial Questionnaire Resp.* at Ex. VII-1). Mosaic argues that because the refunds that OCP obtained via the factoring agreements were for multiple years and not paid within the three-month period following OCP's refund request, they were outside of the law's authorization. *Id.* The three-month period is the apparent basis upon which Mosaic argues that the VAT credits were "effectively worthless."

Mosaic argues, further, that the bespoke nature of the factoring agreements also reflected *ultra vires* conduct by the government of Morocco. Mosaic suggests that the program did not arise from the legitimate functioning of Moroccan law but rather was pushed forward by a government eager to assist OCP without a valid statutory basis or even the necessary funds on hand. Mosaic's Br. 29 (citing *Phosphate Fertilizers from the Kingdom of Morocco: OCP Supplemental Questionnaire Response Part 5* at Appendix GEN2-13(d) (Nov. 10, 2020), P.R. Doc. 358).

Mosaic's arguments do not align with the record evidence, which shows that VAT credits are intended to balance a system that shifts the VAT tax burden onto the ultimate consumer, maintaining VAT neutrality for producers such as OCP. Mosaic's Br. 26–27 (citing *Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Silicon Metal From Brazil* at 18 (Int'l Trade Admin. Mar. 8, 2018)). Commerce reasonably determined from the evidence that the timeline provided in the regulations for the payment of refunds in no way diminishes the "normal" operation of the VAT system. *See Final I&D Mem.* at 79–80. In its focus on the timeline for the refunds, Mosaic does not convince the court that Commerce erred in failing to find an "*ultra vires*" scheme that improperly overlooked some defect in OCP's refund application. *GOM's Initial Questionnaire Resp.* at VII-6. Mosaic's argument that OCP was not legally entitled to the VAT refund relies on unsupported speculation rather than probative record evidence.

## 2. VAT Exemptions

**[12]** Mosaic also argues that Commerce incorrectly determined that the Moroccan government's grant of VAT exemptions to OCP's purchases of capital goods, machinery, and equipment did not confer a benefit. Mosaic's Br. 33–34. Per this exemption, OCP did not pay input VAT (and, correspondingly, did not receive output VAT or credits) on the purchases of capital goods pursuant to investment agreements with the government that related to certain infrastructure projects in Morocco. *Final I&D Mem.* at 81; *OCP's Section III Questionnaire Resp.* at 112.

In finding the VAT exemption program not countervailable, Commerce reasoned that in a normally operating VAT system such as Morocco's, input VAT exemptions do not reduce a producer's tax burden but rather decrease the amount of credits that the company eventually will obtain. *Final I&D Mem.* at 81. Commerce concluded from the evidence that any input VAT that would have been paid in the absence of the exemptions would have been offset by the credits accumulated and, therefore, that the program did not reduce actual tax liability. As Commerce explained, "the VAT exemptions obtained by OCP on its input purchases reduce the credits it accumulated, and there are no additional credits granted; therefore, it does not receive a benefit under 19 CFR 351.510(a)." *Final I&D Mem.* at 81–82.

**\*20** Mosaic argues that Commerce, consistent with agency practice in similar cases, was required to find the VAT exemptions to be a countervailable subsidy because they were obtained by OCP "contingent on the satisfaction of commitments made in investment agreements." Mosaic's Br. 34 (citing *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2016* (Int'l Trade Admin. July 26, 2019), 84 Fed. Reg. 36,051 and *Issues and Decision Memorandum for the Final Results, and Partial Rescission, of the Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar From the Republic of Turkey; 2016* (Int'l Trade Admin. July 26, 2019)). This argument is unconvincing.

Mosaic does not refute, or even directly confront, the Department's finding that "VAT exemptions received by OCP and its cross-owned affiliates on its input purchases reduce the credits they accumulated, and there are no additional credits granted; therefore, they do not receive a benefit." *Final I&D Mem.* at 82. Even were the court to presume, *arguendo*, that Commerce had a practice of countervailing VAT exemptions similar to those at issue here (a contention with which Commerce itself does not agree), the court still would reject Mosaic's argument. Regardless of any past practice, Commerce provided a sufficient explanation to justify its determination not to countervail the capital goods, machinery, and equipment program in this proceeding. *Id.*; *see, e.g.*, *Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *Allegheny Ludlum Corp. v. United States,* 346 F.3d 1368, 1373 (Fed. Cir. 2003) (citing *Atchison,* 412 U.S. at 808, 93 S.Ct. 2367) ("Commerce is permitted to deviate from this past practice, at least where it explains the reason for its departure," where the "past practice" being challenged was "not a burden imposed by statute or regulation" but was merely "a general practice of Commerce.").

### G. The Department's "Other Forms of Assistance" Question

**[13]** The initial questionnaire asked if the Moroccan government provided "any other forms of assistance to your company during [the] POI." *Investigation of Phosphate Fertilizers from Morocco: Countervailing Duty Questionnaire* at Section III, at 46 (Int'l Trade Admin. July 28, 2020), P.R. Doc. 61. OCP answered this question under protest, providing information relating to several government programs. *OCP's Section III Questionnaire Resp.* at 146–158. From OCP's responses, Mosaic included five programs in its New Subsidy Allegation, which Commerce investigated: (1) reductions in tax fines and penalties; (2) revenue exclusions from minimum tax contributions; (3) customs duty exemptions for capital goods, machinery, and equipment; (4) value-added-tax exemptions for capital goods, machinery, and equipment; and (5) rail transport services for LTAR. *New Subsidy Allegation* at 2; *New Subsidy Allegation Mem.* at 2–6. Commerce ultimately found three of these programs to be countervailable: (1) reductions in tax fines and penalties; (2) revenue exclusions from minimum tax contributions; and (3) customs duty exemptions for capital goods, machinery, and equipment. *Final I&D Mem.* at 6.

OCP, referring to the inquiry in the questionnaire as "an extra-statutory fishing expedition," would have the court "void *ab initio* Commerce's improperly initiated investigation of five programs based on unlawfully obtained information, and vacate Commerce's determination to countervail three of them." OCP's Br. 64. OCP claims that Commerce exceeded its statutory authority when it asked OCP about "any other forms of assistance" and, consequently, when it investigated the five programs and found three of them to be countervailable. *Id.* at 11, 65. The court finds no merit in this claim.

**\*21** In section 775, the Tariff Act provides investigative authority Commerce is to exercise "[i]f, in the course of a proceeding under this subtitle, the administering authority [i.e., Commerce] discovers a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in a countervailing duty petition." 19 U.S.C. § 1677d. In that event, Commerce is directed to "include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding." *Id.* § 1677d(1). OCP focuses the court's attention on the words "appears to be a countervailable subsidy," which are used twice in the statutory provision. According to OCP, the phrase "appears to be a countervailable subsidy" is "an evidentiary standard set by Congress that serves as a threshold predicate to the exercise of Commerce's investigatory powers" that was not satisfied in the circumstance by which Commerce expanded its CVD investigation. OCP's Br. 65 (citing 19 U.S.C. § 1677d).

There are two fatal flaws in OCP's interpretation of the statute. First, as to plain meaning, the provision expresses no

limitations on the means or methods by which Commerce "discovers a practice which appears to be a countervailable subsidy." 19 U.S.C. § 1677d. To the contrary, the statute expressly requires only that the discovery occur "in the course of a proceeding under this subtitle." *Id. See Changzhou Trina Solar Energy Co. v. United States,* 40 CIT ——, ——, 195 F.Supp.3d 1334, 1341 (2016). Commerce, therefore, did not act *ultra vires* in inquiring as to "any other forms of assistance" in the questionnaire it sent to OCP. Second, with respect to congressional intent, OCP is not correct that the phrase "appears to be a countervailable subsidy" is "an evidentiary standard" that precluded Commerce from proceeding in the circumstances presented here. OCP's interpretation would impose an unwarranted limitation on the investigative authority Congress intended Commerce to have. That intent is evident in section 775 of the Tariff Act, which is written as an expansion, not a limitation, on that authority. It is also evident in the larger context of the Tariff Act. Section 702, for example, broadly authorizes Commerce to self-initiate a countervailing duty investigation based on "information available to it," even in the absence of a petition. 19 U.S.C. § 1671a(a).

In support of its claim, OCP cites *Allegheny Ludlum Corp. v. United States,* 25 CIT 816, 2001 WL 1231519 (2001). OCP's Brief 66. *Allegheny Ludlum* is inapposite: the petitioner in that case claimed that Commerce erred in *failing* to initiate an investigation, arguing that 19 U.S.C. § 1677d generates an independent obligation for Commerce to investigate any subsidy that "appears" countervailable. *Allegheny Ludlum,* 25 CIT at 817. Concluding that § 1677d imposes no such limitation on the Department's broad enforcement discretion, this Court in *Allegheny Ludlum* reasoned that Commerce must be afforded "sufficient latitude to weigh and analyze both negative evidence and positive evidence." *Id.,* 25 CIT at 824.

### H. The Specificity Determination for Reduction in Tax Penalties

**[14]** OCP claims that Commerce erred in finding a government program allowing relief from tax fines and penalties to be *de facto* specific, arguing that "the agency distorted the specificity analysis by making this program artificially seem more 'limited' than it was." OCP's Br. 11. OCP asks the court to "reject Commerce's specificity finding as unsupported by substantial evidence, and otherwise not in accordance with law." *Id.* at 71. The court agrees with OCP.

After learning of the government tax program through its "other forms of assistance" question, discussed above, Commerce investigated the reduction of certain of OCP's tax fines and penalties, ultimately determined the program under which they were administered was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I) and therefore countervailable, and applied a 0.05% ad valorem rate to the program. *Final I&D Mem.* at 6, 75; *Post-Prelim. Determination* at 4.

**\*22** The Moroccan government has the authority to assess fines and penalties against taxpayers that fail to comply with Moroccan tax requirements. *Phosphate Fertilizers from the Kingdom of Morocco: Supplemental Questionnaire Response of the Government of the Kingdom of Morocco – Part 2* at Ex. S-IX-2 (Nov. 11, 2020), P.R. Docs. 359–64 ("*GOM's Suppl. Questionnaire Resp. Part 2*"). Article 236 of the Moroccan tax code provides that the Moroccan government "can grant, at the request of the taxpayer, taking account of the circumstances, a discount or a moderation of surcharges, fines and penalties provided by the legislation in force." *OCP's Section III Questionnaire Resp.* at 146 (quoting Article 236 of the Moroccan Tax Code). The waiver or reduction of penalty requires that the taxpayer settle the outstanding tax liability in full. *GOM's Suppl. Questionnaire Resp. Part 2* at S-IX-2. Undisputed record facts demonstrate that all Moroccan taxpayers, whether corporate, individual, or otherwise, were eligible to apply for penalty relief under the program. *Id.* at S-IX-17. The corporate taxpayers taking advantage of the program during the POI consisted of 8,761 companies from at least eighteen different industries. *Id.* at S-IX-13–S-IX-14.

Section 771(5A)(D)(iii) of the Tariff Act, 19 U.S.C. § 1677(5A)(D)(iii), addresses "*de facto*" specificity by providing that "[w]here there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific" if any of four factors exist. Commerce based its determination on the first of those four factors, which applies where "[t]he actual recipients of the subsidy, *whether considered on an enterprise or industry basis,* are limited in number." 19 U.S.C. § 1677(5A)(D)(iii)(I) (emphasis added). Commerce based its "*de facto* specificity" conclusion on the record fact that 8,761 companies out of 262,165 corporate taxpayers in Morocco applied for and received penalty reductions under the program during the POI. *Final I&D Mem.* at 75 (citations omitted). There is much wrong with the Department's conclusion.

First, to arrive at its conclusion, Commerce compared the number of corporate taxpaying *recipients* of penalty relief, 8,761, to the total number of corporate *taxpayers*, 262,165, not the total number of corporate taxpayers who incurred penalties. The resulting percentage (3.34%) is essentially meaningless from the standpoint of determining the "specificity" of the program because the numerator and denominator were not logically comparable. The only corporate taxpayers who could have applied for relief under the program during the POI, i.e., the "potential" recipients, were those that had incurred a tax penalty and had satisfied the requirement to pay all taxes they owed. Apparently, Commerce would have been convinced not to countervail the program only if a majority or near-majority of the corporate taxpayers in Morocco incurred penalties. Because Commerce made no attempt to compare the actual recipients to the universe or composition of the group of potential recipients, or to ascertain whether any identifiable group of taxpayers benefited disproportionately, its "specificity" methodology was not analytically sound. The "actual recipients," for purposes of 19 U.S.C. § 1677(5A)(D)(iii)(I), that happened to be corporations—8,761—can scarcely be described as "limited in number."

The Department's comparison methodology disregarded the uncontested fact that the program was available to all taxpayers, not only corporate ones. That 3.34% of corporate taxpayers benefited from penalty relief, under a program that was not limited to corporate taxpayers, does not support a conclusion that the program was not broadly available and broadly used throughout the Moroccan economy. The term "taxpayers" encompasses individuals as well as all types of juridical persons in addition to corporations; it is reasonable to conclude that it also might include such entities as partnerships and unincorporated associations. In deciding that the program was *de facto* specific, Commerce based its determination on 8,761 corporate taxpayers rather than ascertain the actual number of users of the program.

**\*23** Second, the Department's comparison of corporate taxpaying recipients with corporate taxpayers does not give full effect to the words "whether considered on an enterprise or industry basis," which modify the term "limited in number." It is axiomatic that a statutory interpretation must give effect to every word of the provision being construed. *Loughrin v. United States*, 573 U.S. 351, 358, 134 S.Ct. 2384, 189 L.Ed.2d 411 (2014) (quoting *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). The recipients of tax penalty relief under the program under consideration cannot accurately be described as limited in number "on an enterprise ... basis" because there is no record evidence that either the eligibility for the program, or the actual participation in it, had anything to do with whether the recipients were "enterprises," i.e., businesses, or any specific type of enterprise. [10] Nor was the program confined to "industries" or any members thereof. For these reasons, the Department's finding that the actual recipients were limited in number on an enterprise or industry basis, *Final I&D Mem.* at 75, is not supported by substantial record evidence.

*Royal Thai Government v. United States,* 436 F. 3d 1330 (Fed. Cir. 2006), is illustrative of the principle requiring the court to disallow the Department's affirmative specificity determination where, as here, the number of recipients is not limited when considered on an enterprise basis. *Royal Thai Government* upheld a finding of a lack of specificity where the Thai government selected 351 companies to take part in a debt restructuring program. The Court of Appeals for the Federal Circuit affirmed this Court's holding that "[g]iven the numerous and diverse industries represented on the 351 list, the Court finds that Commerce did not err in its finding that the 351 list was not limited in number based on industry or enterprise." *Royal Thai Government v. United States*, 28 CIT 1218, 1221, 341 F.Supp.2d 1315, 1319 (2004), *aff'd*, 436 F. 3d 1330 (Fed. Cir. 2006).

Third, the Department's interpretation produces an absurd result. The record evidence does not establish that the tax fines and penalties reduction program is anything other than a common, ordinary tax administration program, available to all taxpayers, under which the taxing authority may mitigate a penalty. The Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103–316, at 929 (1994) ("*SAA*"), cautions against the overreaching and indiscriminate type of specificity finding Commerce employed in this case. [11] The SAA cited approvingly the decision of this Court in *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 564 F. Supp. 834 (1983) and its reasoning, explaining that "all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results." *SAA* at 929. In its misapplication of 19 U.S.C. § 1677(5A)(D)(iii) (I), Commerce produced just such an absurd result here. The SAA quotes the following language from the *Carlisle Tire & Rubber* opinion:

Thus, included in Carlisle's category of countervailable benefits would be such things as public highways and bridges, as well as a tax credit for expenditures on capital investment even if available to all industries and sectors.... To suggest, as Carlisle implicitly does here, that almost every import entering the stream of American commerce be countervailed simply defies reason.

*SAA* at 929 (quoting *Carlisle Tire & Rubber,* 5 CIT at 233–34, 564 F. Supp. at 838). The penalty relief program at issue is available not only to "all industries and sectors" but to all types of taxpayers.

**\*24** In defending the specificity finding, Commerce and defendant relied on the SAA for the proposition that to escape a specificity finding, a program must be "broadly available and widely used throughout an economy." Def.'s Resp. 86; *Final I&D Mem.* at 75 (quoting *SAA* at 929). In relying on this language to support the Department's misguided specificity finding, they not only presume, without evidentiary support, that the program was not "widely used," but also selectively quote the SAA. The actual language is as follows:

The specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy. Conversely, the specificity test was not intended to function as a loophole through which narrowly focussed subsidies provided to or used by discrete segments of the economy could escape the purview of the CVD law.

*SAA* at 930. The Moroccan penalty relief program is described by the first sentence, not the second. It had "widespread availability" to all taxpayers, had a large number of users (as

indicated by the fact that corporate taxpayers alone accounted for 8,761 of those users), and there is no record evidence to show that it was "provided to or used by discrete segments of the economy."

That the program allowed the benefit to be granted as a matter of discretion does not support an affirmative specificity finding. The SAA also includes the following pertinent discussion:

In the Administration's view, if the actual users of the subsidy are too large in number to reasonably be considered as a specific group, and if there is no evidence of dominant or disproportionate use, the fact that a foreign authority administering a subsidy program may have exercised discretion in selecting the recipients of the subsidy is insufficient to justify a finding of *de facto* specificity.

*SAA* at 931. Here, the "actual users of the subsidy," which were comprised of all types of taxpayers (not only corporate ones), is too large and diverse "to reasonably be considered as a specific group," and "there is no evidence of dominant or disproportionate use" by any enterprise, group of enterprises, or industry.

In summary, the Department's determination that the tax fine and penalty reduction program was *de facto* specific was unsupported by the record evidence and, in the interpretation of 19 U.S.C. § 1677(5A)(D)(iii)(I), contrary to law. Commerce must reconsider its specificity determination accordingly.

### I. The Department's Initiation of an Investigation of the Phosphogypsum Byproduct Disposal Program

OCP claims that Commerce erred in initiating an investigation into, and collecting information on, an alleged phosphogypsum disposal program because of "the Petition's failure to adequately allege each of the elements of a countervailable subsidy." OCP's Br. 77. Although Commerce ultimately deemed the program not to have been used, OCP asks that the investigation into the program be "invalidated"

and that information about the program be struck from the record. *Final I&D Mem.* at 7, 85; OCP's Br. 79 n.34.

In the Petition, Mosaic alleged that the Moroccan government was providing phosphogypsum disposal services to OCP for LTAR, or, alternatively, was foregoing revenue in the form of fees waived for the dumping of phosphogypsum waste into Moroccan coastal waters. *Petition* at II-14–II-18. Rejecting the LTAR theory, Commerce initiated an investigation into the program based on a theory of revenue foregone. *Initiation Checklist* at 15–16. After collecting information related to the program on the record, Commerce determined in its preliminary and final determinations that the phosphogypsum disposal program was "not in use" during the POI. *Prelim. Decision Mem.* at 17; *Final I&D Mem.* at 7, 86.

**\*25** OCP claims that Commerce erred in initiating an investigation into the phosphogypsum disposal program under the revenue foregone theory, arguing that Mosaic failed to adequately allege any of the elements of a countervailable subsidy. OCP's Br 78. OCP also claims that Commerce impermissibly allowed Mosaic to place on the record "nearly 100 pages of material related to this rejected allegation" of byproduct disposal services for LTAR. *Id.* at 82.

**[15]** No relief can be granted on OCP's claim. Commerce's determination on the phosphogypsum disposal program was a ruling in OCP's favor. *Final I&D Mem.* at 86. Therefore, OCP suffered no legally cognizable harm that would entitle it to Article III standing before this court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 2134, 119 L.Ed.2d 351 (1992). In challenging an action where no party can claim injury in fact, OCP asks the court to issue an advisory opinion. *See Flast v. Cohen*, 392 U.S. 83, 96, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (stating that "the implicit policies embodied in Article III, and not history alone, impose the rule against advisory opinions on federal courts.").

OCP submits that unless the "investigation into the program [is] invalidated, Commerce may unlawfully request information on byproduct disposal in any future administrative review of the CVD order." OCP's Br. 79 n.34. This is a speculation of a future harm, not a showing that OCP had standing to bring its claim in this litigation. Moreover, there is no relief the court could grant that would address the speculative future harm that OCP contemplates.

## III. CONCLUSION

For the reasons discussed in the foregoing, the court remands the Final Determination to Commerce for reconsideration of the Department's decision to exclude OCP's SG&A costs, including HQ, support, and debt costs, from the cost of production buildup calculation, for reconsideration of its method of calculating OCP's profit rate for purposes of that cost of production buildup calculation, and for reconsideration of its specificity determination with regard to the program for reductions in tax fines and penalties.

Therefore, upon consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that Pl. The Mosaic Co.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 51 be, and hereby is, denied; it is further

**ORDERED** that Rule 56.2 Mot. for J. on the Agency R. of OCP S.A., ECF Nos. 53 (conf.), 54 (public) be, and hereby is, granted in part and denied in part; it is further

**ORDERED** that Commerce, consistent with this Opinion, shall issue a new determination upon remand (the "Remand Redetermination") that complies with this Opinion and Order; it is further

**ORDERED** that Commerce shall submit the Remand Redetermination to the court within 90 days of the issuance of this Opinion and Order; it is further

**ORDERED** that Mosaic and OCP shall have 30 days from the submission of the Remand Redetermination to submit to the court comments thereon; and it is further

**ORDERED** that defendant shall have 15 days from the date of the last comment submission to submit to the court its response to the comments submitted by Mosaic and OCP.

### All Citations

--- F.Supp.3d ----, 2023 WL 5979829

## Footnotes

1    Consolidated with the lead case, *The Mosaic Company v. United States*, Court No. 21-00116, is *OCP S.A. v. United States*, Court No. 21-00218. The Mosaic Company's Consent Mot. to Consolidate and to Extend Time to File Joint Status Report in Court No. 21-00116 (July 7, 2021), ECF No. 25; Order (July 8, 2021), ECF No. 26.

2    Citations to documents from the Joint Appendix (April 27, 2022), ECF Nos. 93 (conf.), 94 (public) are referenced herein as "P.R. Doc. __" for public versions. All information disclosed in this Opinion and Order is public information.

3    Citations to the United States Code herein are to the 2018 edition. Citations to the Code of Federal Regulations are to the 2020 edition.

4    Commerce also cited a letter submitted by a second wholesaler, which also commented in opposition to the Petition but requested confidential treatment of its entire letter. The overly broad claim of confidentiality is unwarranted.

5    The statute provides that "any person who would qualify as an interested party under section 1677(9) of this title if an investigation were initiated, may submit comments or information on the issue of industry support." 19 U.S.C. § 1677(9)(C), in turn, defines "interested party" to include "a manufacturer, producer, or wholesaler" of a domestic like product.

6    Commerce claimed confidential treatment for its constructed price. This calculation necessarily will change upon remand. Before deciding to claim confidential treatment for the revised constructed price it calculates on remand, Commerce must consult with OCP to determine whether public disclosure actually has the potential to cause competitive harm to OCP.

7    It is not disputed that the BPL percentage of phosphate rock is equal to 2.1852 times the $P_2O_5$ percentage. The Mosaic Co.'s Mem. in Supp. Of Rule 56.2 Mot. for J. Upon the Agency R. 18, ECF Nos. 55 (conf.), 56 (public). Thus, the two metrics readily may be interchanged through a simple calculation.

8    The thirteen prices were as follows, listed by country or region, price, and source of information: Egypt ($47/metric ton, CRU Group); Jordan ($88/metric ton, CRU Group); Peru ($75/metric ton, CRU Group); Algeria ($55/metric ton, CRU Group); Jordan ($91.75/metric ton, Argus Media); Algeria ($56.25/metric ton, Argus Media); North Africa ($77.50/metric ton, Argus Media); Peru ($62/metric ton, Fertecon); Egypt ($58.16/metric ton, Profercy); Algeria ($66.89/metric ton, Profercy); Peru ($66.97/metric ton, Profercy); Syria ($56.98/metric ton, Profercy); and China ($68.94/metric ton, Profercy). *OCP Preliminary Calculation Memorandum* at 9 (Int'l Trade Admin. Nov. 25, 2020), P.R. Doc. 391, C.R. Doc. 257.

     The price for the North Africa region was based on sales from Morocco and Tunisia. *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco* at 19 (Int'l Trade Admin. Feb. 8, 2021), P.R. Doc. 473.

     Because Commerce relied on four different sources to obtain the benchmark prices, the benchmark included multiple price points for certain countries (Egypt, Jordan, Peru, and Algeria).

9    OCP cites *U.S. Steel Corp. v. United States*, 33 CIT 1935, 2009 WL 5125921 (2009), *aff'd*, 425 F. App'x 900 (Fed. Cir. 2011) ("*U.S. Steel*") and *Countervailing Duty Investigation of Certain Softwood Lumber Products from Canada: Issues and Decision Memorandum for the Final Determination* (Int'l Trade Admin. Nov. 8, 2017)

("*Softwood Lumber from Canada*"). Mem. in Supp. Of Consol. Pl. and Def.-Int. OCP S.A.'s Rule 56.2 Mot. for J. on the Agency R. 62–63 (Oct. 15, 2021), ECF Nos. 53 (conf.), 54 (public).

*U.S. Steel* involved a tier-two benchmark in which actual world market prices were available in India, the country subject to the countervailing duty review. 33 CIT at 1945. This Court held in *U.S. Steel* that Commerce properly excluded from the tier-two benchmark NMDC prices (i.e prices charged by the National Mineral Development Corporation, a governmental authority), because those prices came from "the very government provider of the good at issue" and were "not reflective of a market-determined price for the good resulting from actual transactions in India." 33 CIT at 1944–45. That "the comparison of NMDC to NMDC prices would be a meaningless measure of the adequacy of remuneration" was a secondary concern to the fact that the NMDC prices were not viable for a tier-two benchmark in the first place. *See U.S. Steel*, 33 CIT at 1945.

In *Softwood Lumber from Canada*, Commerce evaluated whether BC Hydro, a government authority, provided a benefit by purchasing electricity at more than adequate remuneration. For that investigation, Commerce utilized a "benefit-to-the-recipient" methodology, articulated in 19 C.F.R. § 351.503(b), to determine whether the government paid a higher price in purchasing electricity from respondents, than it received in selling electricity. For this reason, Commerce rejected a proposed benchmark based on the prices that BC Hydro paid to companies other than respondents for the purchase of electricity. Commerce explained that such a benchmark would not comport with its benefit-to-the-recipient methodology, as such prices simply would compare the prices at which the government purchased electricity from some companies against the prices at which the government purchased electricity from others. That "the comparison would be circular insofar as it would result in a comparison of an alleged subsidy with itself" was a secondary concern.

In contrast, Commerce relied here on a tier-three approach, not a tier-two benchmark, to measure whether a good was provided at LTAR and used a benchmark that consisted of market-determined export prices.

10    *Government of Quebec v. United States*, 46 CIT ——, 567 F. Supp. 3d 1273 (2022) is distinguishable from this case in upholding an affirmative specificity finding for a program that limited availability to enterprises.

11    The Statement of Administrative Action "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements Act] in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.