# United States Court of Appeals for the Federal Circuit

---

**THE GOVERNMENT OF QUEBEC, MARMEN INC., MARMEN ENERGIE INC., MARMEN ENERGY CO., THE GOVERNMENT OF CANADA,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, WIND TOWER TRADE COALITION,**
*Defendants-Appellees*

**THE GOVERNMENT OF ONTARIO,**
*Defendant*

---

2022-1807

---

Appeal from the United States Court of International Trade in Nos. 1:20-cv-00168-GSK, 1:20-cv-00170-GSK, 1:20-cv-00172-GSK, Judge Gary S. Katzmann.

---

Decided: June 21, 2024

---

NANCY NOONAN, ArentFox Schiff LLP, Washington, DC, argued for plaintiff-appellant Government of Quebec. Also represented by MATTHEW CLARK, JESSICA R. DiPIETRO.

JAY CHARLES CAMPBELL, White & Case LLP, Washington, DC, argued for plaintiffs-appellants Marmen Inc.,

Marmen Energie Inc., Marmen Energy Co., Government of Canada. Marmen Inc., Marmen Energie Inc., and Marmen Energy Co. also represented by RON KENDLER, ALLISON KEPKAY.

JOANNE OSENDARP, Blank Rome LLP, for plaintiff-appellant Government of Canada. Also represented by CONOR GILLIGAN, ALAN KASHDAN, TYLER J. KIMBERLY.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by REGINALD THOMAS BLADES, JR., BRIAN M. BOYNTON, ROBERT R. KIEPURA, PATRICIA M. MCCARTHY; ALEXANDER FRIED, United States Department of Commerce, Washington, DC.

MAUREEN E. THORSON, Wiley Rein, LLP, Washington, DC, argued for defendant-appellee Wind Tower Trade Coalition. Also represented by THEODORE PAUL BRACKEMYRE, TESSA V. CAPELOTO, ROBERT E. DEFRANCESCO, III, LAURA EL-SABAAWI, DERICK HOLT, ELIZABETH S. LEE, ALAN H. PRICE, JOHN ALLEN RIGGINS.

_____

Before LOURIE, PROST, and REYNA, *Circuit Judges*.

REYNA, *Circuit Judge*.

Marmen Inc., Marmen Énergie Inc., Marmen Energy Co., the Government of Québec, and the Government of Canada appeal from a decision of the U.S. Court of International Trade, which sustained the final affirmative determination of the U.S. Department of Commerce in a countervailing duty investigation concerning imports of certain utility scale wind towers from Canada. We affirm the judgment of the U.S. Court of International Trade.

BACKGROUND

The Tariff Act of 1930, as amended, authorizes the U.S. Department of Commerce ("Commerce") to impose countervailing duties on imports that benefited from illegal subsidies provided by a foreign government. *See* 19 U.S.C. § 1671(a). Such duties form trade relief to U.S. domestic industries injured by the subsidized imports. *E.g.*, *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1355 (Fed. Cir. 2023). If Commerce determines that a countervailable subsidy exists and the U.S. International Trade Commission ("ITC") determines that a domestic industry is materially injured or is threatened with material injury by virtue of the subsidized imports, Commerce may impose countervailing duties on the subject imports equal to the amount of the net countervailable subsidy. *See* 19 U.S.C. § 1671(a).

The trade statute provides that a countervailable subsidy exists if: (1) a foreign government provides a "financial contribution;" (2) a "benefit" is thereby conferred upon a recipient in connection with the manufacture or export of the subject merchandise; and (3) the subsidy is "specific" to a foreign enterprise or industry, or a group of such enterprises or industries. *See id.* §§ 1677(5), (5A). To calculate a subsidy rate, Commerce divides "the amount of the benefit allocated to the period of investigation" by the "sales value" of the subject merchandise during the same period, the latter referred to as the sales denominator. 19 C.F.R. § 351.525(a). The larger the sales denominator, the lower the subsidy rate.

This case involves (1) Commerce's final determination that the Government of Canada and the Government of Québec provided countervailable subsidies to producers

and exporters of utility scale wind towers[1] imported from Canada to the United States, and (2) Commerce's calculation of the subsidy rate of 1.18% ad valorem.[2] Generally, a subsidy rate of less than 1% is considered *de minimis*, which Commerce will disregard, and no countervailing duties are assessed. 19 U.S.C. § 1671b(b)(4). Appellants argue that Commerce erred in its assessment of three of the investigated programs and its computation of the sales denominator used to calculate the subsidy rate. According to Appellants, the subsidy rate should have been *de minimis*.

I.   The Investigation and Commerce's Determination

In July 2019, Appellee Wind Tower Trade Coalition ("WTTC") petitioned Commerce to initiate a countervailing duty investigation of certain imports of utility scale wind towers from Canada. *See Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 84 Fed. Reg. 38216, 38216 (Aug. 6, 2019). WTTC contended that imports of the subject merchandise, the merchandise under investigation, received countervailable subsidies from the Government of Québec and the Government of Canada through various government programs. *See id.*

Commerce initiated a countervailing duty investigation, the period of investigation covering January 1, 2018–December 31, 2018. *Id.* at 38217. Commerce selected, as

---

[1]   Generally, wind towers are steel towers with wind turbines that are used to convert the kinetic energy from wind to electrical power. *See Gov't of Québec v. United States*, 567 F. Supp. 3d 1273, 1277 (Ct. Int'l Trade 2022).

[2]   The 1.18% rate represents the aggregate subsidy rate calculated based on eight of the investigated programs that Commerce found countervailable. As noted *infra*, this rate was subsequently reduced to 1.13% to account for ministerial errors not at issue here.

mandatory respondents,[3] Marmen Inc. and Marmen Éner-
gie Inc. (collectively, "Marmen"), the two largest and
cross-owned Canadian exporters of the subject merchan-
dise during the period of investigation. During the inves-
tigation, Commerce issued initial countervailing duty
questionnaires and supplemental questionnaires, to which
Marmen, the Government of Québec, and the Government
of Canada submitted responses. *See* J.A. 8387.

In December 2019, Commerce reached a preliminary
affirmative determination that countervailable subsidies
were being provided to Canadian producers of wind towers
through eight of the investigated programs. *Utility Scale
Wind Towers from Canada: Preliminary Affirmative Coun-
tervailing Duty Determination, and Alignment of Final De-
termination with Final Antidumping Duty Determination*,
84 Fed. Reg. 68126, 68126 (Dec. 13, 2019) ("*Preliminary Af-
firmative Determination*"); J.A. 8386–8408 (decision mem-
orandum for the *Preliminary Affirmative Determination*).

---

[3]    In countervailing duty investigations, if a large
number of exporters or producers are involved, Commerce
may select, and limit the investigation to, a small number
of mandatory respondents. 19 U.S.C. § 1677f-1(e)(2). Man-
datory respondents are compelled to participate in the in-
vestigation. Other exporters or producers of the subject
merchandise may volunteer to participate in the investiga-
tion, and Commerce may accept voluntary respondents at
its discretion. *Id.* § 1677m(a); 19 C.F.R. § 351.204(d).
Mandatory respondents' failure to properly cooperate in
the investigation may adversely affect the countervailing
duty rates assessed for them. *See* 19 U.S.C. § 1677e(b).
The calculated subsidy rates for the mandatory respond-
ents may determine the countervailing duty rates applica-
ble to other exporters and producers that are not
individually investigated during the investigation.
19 U.S.C. §§ 1671d(c)(5), 1677f-1(e)(2).

For the eight countervailable programs, Commerce calculated a total countervailable subsidy rate of 1.09% ad valorem. *Preliminary Affirmative Determination*, 84 Fed. Reg. at 68127. In calculating the subsidy rate, Commerce used the 2018 "Applicable Sales Value" Marmen reported as the sales denominator. *See* J.A. 8428; J.A. 2907.

After Commerce issued the *Preliminary Affirmative Determination*, Marmen submitted a "ministerial error" comment,[4] alleging that Commerce erred in not adjusting the sales denominator to include a year-end "exchange rate adjustment" that Marmen's auditor made. J.A. 8434–35; J.A. 8436 (citing line item "Year-end auditor adjustment to General Ledger (revenue) for exchange rate gain(loss)"). According to Marmen, this adjustment was to translate all foreign-currency sales recorded in its general ledger to Canadian dollars ("CAD"). J.A. 8434–35. Using the "correct[ed] sales denominator" that includes this adjustment, according to Marmen, would change the preliminarily calculated subsidy rate from above *de minimis* (1.09%) to below *de minimis* (0.95%). J.A. 8436. Commerce declined to amend its *Preliminary Affirmative Determination* based on Marmen's allegation because the record information did not support that the alleged error was "ministerial" as defined in the regulations. J.A. 8453; *see* 19 C.F.R. § 351.224(f).

———————————

[4] Generally, after Commerce discloses its calculations in its preliminary determinations, a party to the proceeding may submit comments concerning "ministerial errors" contained in Commerce's calculations. 19 C.F.R. § 351.224(c). Commerce will analyze such comments and make corrections where appropriate. *Id.* § 351.224(e). According to the regulations, a "*ministerial error* means an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like." *Id.* § 351.224(f).

In February 2020, Commerce conducted a verification of the information Marmen submitted during the investigation. *See Verification of Questionnaire Responses of Marmen Inc., Marmen Énergie Inc., and Gestion Marmen*, J.A. 8654–8708 ("*Verification Report*"). Verification refers to the process by which Commerce "verif[ies] the accuracy and completeness" of factual information submitted by interested parties, before Commerce makes a final countervailing duty determination. 19 C.F.R § 351.307(d). If the submitted information "cannot be verified," Commerce may make determinations based on "the facts otherwise available" on the record. 19 U.S.C. § 1677e(a)(2)(D); 19 C.F.R. § 351.308(a).

At verification, relevant to the auditor's adjustment, Commerce discussed with Marmen the U.S. dollars ("USD") sales Marmen identified as needing to be converted to CAD and reviewed the underlying sales records. J.A. 8679–80. This process revealed several discrepancies in the requested adjustment. Specifically, Commerce found that the adjustment included sales classified as USD sales but recorded in European currency, the EURO, in Marmen's general ledger. *Id.* Upon reviewing the underlying records, Commerce discovered that two of the EURO-coded sales in the general ledger were shown in the original sales documentation as transacted in CAD. *Id.* These sales were thus inappropriately included in the USD-CAD conversion as part of the auditor's adjustment.

In June 2020, Commerce reached a final affirmative countervailing duty determination. *Utility Scale Wind Towers from Canada: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 85 Fed. Reg. 40245, 40245 (July 6, 2020) ("*Final Affirmative Determination*"). In the *Final Affirmative Determination*, Commerce maintained its determination that eight of the investigated programs were countervailable. *Issues and Decision Memorandum for the Final Determination of the Countervailing Duty*

*Investigation of Utility Scale Wind Towers from Canada*, J.A. 74–130.

Based on the eight countervailable programs, Commerce calculated an aggregate countervailable subsidy rate of 1.18% ad valorem for Marmen and assigned the same rate for all other producers. *Final Affirmative Determination*, 85 Fed. Reg. at 40246. In calculating the subsidy rate, Commerce again did not include Marmen's auditor's adjustment in the sales denominator. J.A. 116. Because "Commerce found multiple improperly identified and improperly converted [sales] values in the calculation of the auditor's adjustment at verification," Commerce determined the adjustment to be "unverified and unreliable." *Id.* Commerce explained that it lacked the ability to check each sale, and instead, the checks it performed at verification were to "test the broader reliability of reported information." *Id.* Commerce thus relied on Marmen's reported sales information excluding the unverified auditor's adjustment. *Id.*; *see* 19 U.S.C. § 1677e(a)(2)(D).

Along with five other programs, Commerce determined that the following three programs provided countervailable subsidies, each contributing to the ultimately assessed aggregate subsidy rate of 1.18%. *See* J.A. 78–80. We provide an overview of each of the three programs below. As noted above, to be countervailable, a subsidy must satisfy three criteria: (1) a program provides a financial contribution; (2) a benefit is thereby conferred on a recipient; and (3) the subsidy is specific to a foreign enterprise or industry, or a group thereof. By finding the three programs at issue countervailable, Commerce found they each satisfy all three criteria. For each program, Appellants challenge Commerce's assessment of one or two criteria. Consequently, in the overview below, we focus on the criteria that the parties dispute in this appeal.

i.   Additional Depreciation for Certain Class 1 Assets

The Canadian tax regulations provide property depreciation deductions from taxable income, called the Capital Cost Allowance ("CCA").  J.A. 8037–38; J.A. 2513.  Under the CCA program, assets are divided into different classes, each assigned a respective deduction rate.  For Class 1 assets, a generally applicable CCA rate is 4%, but taxpayers can claim a higher rate for certain subsets of Class 1 assets acquired after March 2007.  As relevant here, taxpayers can claim an additional 6% (for a total of 10%) if at least 90% of an eligible building's floor space is used for manufacturing.  J.A. 2514.  Similarly, an additional 2% (for a total of 6%) may be claimed for other non-residential buildings.  *Id.*  The additional allowances are intended to reflect the shorter useful life of buildings used for manufacturing or other non-residential purposes.  *Id.*; *see* J.A. 2522–82 ("*Economic Depreciation and Retirement of Canadian Assets: A Comprehensive Empirical Study*") ("*StatCan Study*").

To be eligible for the additional allowances, "a building will be required to be placed into a separate class." J.A. 2514.  "If the taxpayer forgoes the separate class," the standard 4% rate applies.  *Id.*; J.A. 8037.  Marmen, for certain buildings, elected to claim the 10% depreciation deduction, which reduced its taxable income during the period of investigation.

Commerce determined that the additional allowance provided a countervailable subsidy and calculated a subsidy rate of 0.07% ad valorem.  J.A. 79.  As relevant here, Commerce determined that the additional allowance provided a financial contribution and that it conferred a benefit equal to the resulting tax savings.    J.A. 97–98.  Commerce reasoned that absent the additional allowance, Marmen would have paid more taxes under the 4% standard rate.  J.A. 98.  The appropriate benefit, Commerce concluded, was the "tax savings of the difference between the

deduction calculated using the basic rate" and the deduction "using the total depreciation rate" that Marmen claimed.  J.A. 98–99.

### ii.    GASPÉTC Tax Credit

The GASPÉTC program provides a tax credit to promote employment in certain regions in Gaspésie and certain maritime regions of Québec.  J.A. 2182.  This program allows employers to claim a 15% tax credit for total wages paid to eligible employees.  *Id.*  An employer can claim the credit when filing tax returns for the previous year.  At the same time, the previous year's credit is considered taxable income, which the employer must then pay taxes on in the following year.  In 2018, Marmen claimed the GASPÉTC tax credit on its year-2017 tax return and paid taxes for the GASPÉTC credit it received for year-2016.  J.A. 2871.

Commerce determined that the GASPÉTC credit provided a countervailable subsidy and calculated a subsidy rate of 0.78% ad valorem.  J.A. 80.  As relevant here, in quantifying the benefit conferred under this program, Commerce used the amount of credit Marmen received for 2017.  J.A. 126–27.  Commerce declined to reduce that amount by the taxes Marmen paid for the credit it received for 2016.  *Id.*  In doing so, Commerce cited the regulatory directive under 19 C.F.R. § 351.503(e): "[i]n calculating the amount of a benefit, [Commerce] will not consider the tax consequences of the benefit."  J.A. 126.  Commerce also explained that its calculation here was consistent with its past "treatment of other tax credits which ha[d] similar consequences."  *Id.*

### iii.    On-the-Job Training Tax Credit

The on-the-job training program encourages businesses to hire trainees, such as students or apprentices.  J.A. 1970.  The program allows businesses to claim a tax credit for 24% of wages paid to trainees, and a higher percentage if the trainee is a person with a disability or is an

immigrant. *Id.* To be eligible for this credit, an employer must satisfy several criteria, including, among others, engaging in a qualified business and having received the required certification. J.A. 1976–77.

Commerce determined that the on-the-job training credit provided a countervailable subsidy and calculated a subsidy rate of 0.01% ad valorem. J.A. 79–80. As relevant here, Commerce found that this program provided a subsidy that is de facto (as a matter of fact) specific. J.A. 129. Commerce determined that, during the period of investigation, the actual number of recipients that benefited from this program was "limited in number on an enterprise basis." *Id.* In reaching this determination, Commerce compared "the actual number of companies that received the tax credit in 2018 to the total number of tax filers, inclusive of corporations and individuals in business, within Québec for 2018." *Id.*

After Commerce issued the *Final Affirmative Determination*, the ITC reached a final affirmative determination that a domestic industry was materially injured by the subsidized wind towers imported from Canada. *Utility Scale Wind Towers from Canada, Indonesia, Korea, and Vietnam*, Inv. Nos. 701-TA-627-629, 731-TA-1458–1461 USITC Pub. 5101 (Aug. 2020) (Final). Based on these two affirmative determinations, Commerce issued a countervailing duty order imposing countervailing duties on the imports of wind towers from Canada. *Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Orders*, 85 Fed. Reg. 52543, 52543 (Aug. 26, 2020). The 1.18% subsidy rate assessed in the *Final Affirmative Determination* was subsequently reduced to 1.13%, to account for ministerial errors not at issue here. *See id.* at 52544.

II.  Appeal to the U.S. Court of International Trade

In September 2020, the Government of Québec filed suit in the U.S. Court of International Trade, challenging various aspects of Commerce's *Final Affirmative Determination*.  *Gov't of Québec v. United States*, 567 F. Supp. 3d 1273, 1280 (Ct. Int'l Trade 2022) ("*CIT Decision*").  The Government of Canada joined as plaintiff-intervenor and WTTC joined as defendant-intervenor.  *Id.*  Marmen and WTTC subsequently filed separate appeals.  *Id.*  The appeals were consolidated.  *Id.*  The Government of Québec, the Government of Canada, Marmen, and WTTC each moved for judgment on the agency record.  *Id.*

The Court of International Trade sustained Commerce's *Final Affirmative Determination*, finding that the *Final Affirmative Determination* was in accordance with law and supported by substantial evidence.  Relevant here are the court's affirmances of (1) Commerce's computation of the sales denominator used to calculate the subsidy rate, and (2) Commerce's assessment concerning the additional depreciation allowance, GASPÉTC tax credit, and the on-the-job training credit.

Regarding the sales denominator, the Court of International Trade concluded that Commerce properly excluded Marmen's requested auditor adjustment as unreliable after identifying multiple errors at verification.  *Id.* at 1285.  In reaching this conclusion, the court rejected Marmen's contention requiring Commerce to identify compelling evidence before rejecting the auditor's report, finding such a contention lacked support in law.  *Id.*  The errors identified through verification, the court reasoned, undermined the broader reliability of the requested adjustment and supported Commerce's determination to exclude the adjustment as unreliable.  *Id.* at 1286.

As to the assessment of the three subsidy programs at issue here, the Court of International Trade affirmed Commerce's determination in all challenged aspects.  We

provide below an overview of the Court of International Trade's decision, focusing on the challenged aspects at issue here.

### i.  Additional Depreciation for Certain Class 1 Assets

As to the additional depreciation for certain Class 1 manufacturing buildings, the Court of International Trade affirmed Commerce's determination that the additional 6% allowance provided a financial contribution conferring a benefit. *Id.* at 1293. The court rejected the Canadian parties' argument that the additional allowance reflected the actual shorter useful life of manufacturing buildings so it constituted neither a "financial contribution" or "benefit." *Id.* at 1294–95. The court concluded that Commerce's determination was in accordance with the statutory definition of "financial contribution"[5] and the pertinent regulations on "Direct Taxes" benefits.[6] *Id.* The Court of International Trade also rejected the argument that Commerce erred by declining to directly engage with the *StatCan Study*, an empirical analysis on building depreciation the Canadian parties relied on. *Id.* at 1295–96. According to the court, "where a taxpayer can opt-in to more favorable treatment, it is reasonable for Commerce to confine its analysis to the comparisons provided for by law,

---

[5]  Under 19 U.S.C. § 1677(5)(D), "financial contribution" includes "(i) the direct transfer of funds, such as grants, loans, and equity infusions," and as relevant here, "(ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income."

[6]  Regarding benefits provided through direct taxes, 19 C.F.R. § 351.509(a)(1) ("Exemption or remission of taxes") provides that "a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program."

even if the more favorable treatment better reflects economic reality." *Id.* at 1296.

### ii.     GASPÉTC Tax Credit

Regarding the GASPÉTC tax credit, the Court of International Trade affirmed Commerce's determination to exclude increased tax liabilities in calculating the benefit Marmen received under the program. *Id.* at 1292–93. The court found unpersuasive the Government of Québec and Marmen's assertion that 19 C.F.R. § 351.509(a)(1) directed Commerce to consider and exclude the previous year's tax liabilities from the benefit calculation. *Id.*; *see also* 19 C.F.R. § 351.509(a)(1) ("[A] benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program."). The regulations, the court reasoned, did not require treating "tax liabilities from a previous year's use of the program [as] a component" of the "result of the program." *CIT Decision*, 567 F. Supp. 3d at 1293. The court added that Commerce's determination was consistent with its uniform past practice of disregarding tax consequences when assessing benefits provided through direct taxes. *Id.*

### iii.     On-the-Job Training Tax Credit

The Court of International Trade also sustained Commerce's determination that the on-the-job training tax credit provided a de facto subsidy. *Id.* at 1291. The Government of Québec and the Government of Canada argued that Commerce's specificity determination violated the statutory requirements and that its comparison was "methodologically unsound." *See id.* at 1290. The court disagreed. First, the court explained Commerce's approach assessed both whether "the actual recipients of the subsidy" were "limited in number," 19 U.S.C. § 1677(5A)(D)(iii)(I), and whether the subsidy is "truly . . . broadly available and widely used throughout [the] economy." *Id.* at 1291. The court concluded that Commerce's approach was in accordance with the statute and

the aims of the specificity test as set out in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA").[7] *Id.* (citing SAA, H.R. Doc. No. 103-316, at 929 (1994), reprinted in 1994 U.S.C.C.A.N. 4040). Second, the court determined that Commerce did not err in using all corporate tax filers as the comparator group in assessing specificity. *Id.* The court explained that it was "reasonable to think that [such] a comparison" would be "instructive" in assessing whether the subsidy was widely used. *Id.*

Accordingly, the Court of International Trade sustained in full Commerce's *Final Affirmative Determination*. Marmen Inc., Marmen Énergie Inc., Marmen Energy Co., the Government of Québec, and the Government of Canada appeal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review de novo the Court of International Trade's decisions involving Commerce's countervailing duty determinations, reapplying the same substantial evidence review standard applied by the Court of International Trade. *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348, 1352 (Fed. Cir. 2021). We uphold Commerce's determination unless it is unsupported by substantial evidence or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means such relevant evidence that a reasonable mind may accept as adequate to support a conclusion.

---

[7] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreement Act] in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

*Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). In conducting our review, we "will not ignore the informed opinion of the Court of International Trade," which often serves as a starting point of our analysis. *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994); *see Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

DISCUSSION

Appellants raise two categories of challenges to Commerce's *Final Affirmative Determination.* First, as to the subsidy rate calculation, Appellants challenge Commerce's exclusion of Marmen's auditor's adjustment from the sales denominator. Second, Appellants challenge Commerce's assessment concerning the three programs at issue, specifically: (1) Commerce's finding that the additional depreciation deduction for certain Class 1 assets constituted a financial contribution conferring a benefit; (2) Commerce's determination to exclude increased tax liabilities when calculating the benefit conferred under the GASPÉTC program; and (3) Commerce's finding that the on-the-job training tax credit provided a de facto specific subsidy. Because Commerce's determinations are supported by substantial evidence and in accordance with law, we affirm.

I.    The Sales Denominator

We first address Commerce's determination not to adopt Marmen's auditor's adjustment in computing the sales denominator. Appellants argue that Commerce "unreasonabl[y]" determined that the auditor's adjustment was "unverified and unreliable." Appellants Br. 25. Appellants further argue that Commerce's determination contravenes its past practice and its obligation to accurately calculate subsidy rates. *Id.* We disagree.

Based on errors identified through verification, Commerce reasonably determined that Marmen's auditor's adjustment was unreliable. Marmen claimed that the

adjustment was to convert USD sales recorded in its general ledger to CAD, and the auditor used a single annual average USD-CAD exchange rate.  J.A. 8676–77.  Commerce's verification revealed that the auditor's adjustment erroneously included sales denominated in a non-USD foreign currency (the EURO) in the general ledger, and two of these sales were transacted in CAD and thus erroneously coded.  J.A. 8679–80.  Based on these "improperly identified and improperly converted" sales, it was reasonable for Commerce to determine that "the auditor's adjustment was not accurate or reliable."  J.A. 116.

Appellants take issue with Commerce's statement that Commerce "discovered" the five EURO-coded sales through "spot-checking."  Appellants Br. 32.  Appellants contend that Marmen *self-identified* these sales to Commerce because, in the USD-sales listings Marmen prepared, these EURO-coded sales were listed as such and were thus flagged for Commerce.[8]  *E.g.*, *id.* at 33.  These errors, Appellants claim, account for less than 0.2% of the total requested adjustment and Commerce's spot-checking beyond these errors did not reveal additional "EURO-coded sales."  *Id.* at 34, 36.  According to Appellants, because Commerce found no additional errors and concluded the verification early, it was "unreasonable for Commerce to infer that additional errors were likely."  *Id.* at 34–35.

-----

[8]    Countering Appellants' argument, the United States contends that Marmen never alerted Commerce to the "second type of error—sales included as USD in the adjustment and recorded in Marmen's ledger as Euro that were *actually* in CAD."  United States Br. 24.  According to Appellees, it was Commerce that identified this "second type of error" when "it spot-checked documentation for the Euro-coded sales."  *Id.*; WTTC Br. 25; *see Verification Report*, J.A. 8579–80.

Regardless of whether Commerce completely *independently* discovered those problematic sales or used Marmen's submitted listings as a clue, these errors undeniably exist and undermine the reliability of the adjustment. When Commerce inquired about the errors relating to the EURO-coded sales, Marmen attributed them to its accounting firm's "sales classification" or its "internal coding mistake." J.A. 8680. The fact that Commerce's verification did not reveal *additional EURO-coded sales* does not compel a conclusion that the auditor's adjustment contains *no other errors*. Marmen's explanation for the identified errors does not support that *all* errors are fully accounted for by the identified EURO-coded sales, whether attributed to "sales classification," "coding mistake[s]," or other causes. This evidence supports Commerce's reasonable inference that the auditor's adjustment may contain other errors. *See CIT Decision*, 567 F. Supp. 3d at 1286 n.11. As Commerce explained, it lacked the ability to verify each sale and exhaustively examine all underlying sales documentation. J.A. 116. Here, the verification demonstrated that the requested adjustment contained errors, which undermined "[its] broader reliability." *Id.* We agree with the Court of International Trade that "[w]hile the impact of the discovered errors, taken alone, on the proposed foreign currency adjustment may be small, Commerce could reasonably infer that there may remain other errors." *CIT Decision*, 567 F. Supp. 3d at 1286.

We also find unpersuasive Appellants' assertion that Commerce's action here contradicts its past practice or its legal obligations. *See* Appellants Br. 37. Appellants contend that, by conducting verification of "an independent auditor's" analysis, Commerce took an erroneous "extraordinary" action departing from its past practice and the law. *Id.* at 39–40.

Verifying the parties' submission and rejecting inaccurate and unverifiable information is consistent with, and required by, Commerce's statutory obligation to calculate

subsidy rates "as accurately as possible." *See id.* at 41; *see also* 19 U.S.C. § 1677m(i). Marmen requested the auditor's adjustment in a ministerial error allegation *after* Commerce reached the *Preliminary Affirmative Determination* based on the sales value Marmen itself reported. J.A. 114. To support its allegation, Marmen pointed to a line item "Year End auditor adjustment in [General Ledger] 40000 for Gain(loss) exchange rate," which had little accompanying explanation. *See id.*; J.A. 8436; J.A. 8092; J.A. 8118. Given the timing and nature of Marmen's request and the lack of corroborating explanation in the record, it was reasonable for Commerce to decide to investigate the accuracy of the requested adjustment.

Lastly, we reject Appellants' argument that Commerce should have, but failed to, "cite compelling evidence" to disregard the auditor's adjustment. Appellants Br. 40. To support its proposition, Appellants cite *SeAH*, a decision by the Court of International Trade in an unrelated proceeding, and certain statements in a previous administrative proceeding referenced in *SeAH*. *Id.* at 39 (citing *SeAH Steel VINA Corp. v. United States*, 269 F. Supp. 3d 1335, 1352 (Ct. Int'l Trade 2017)); *see also id.* (citing statements from memo accompanying *Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 71 Fed. Reg. 67098 (Nov. 20, 2006)). Appellants' arguments lack merit.

*SeAH* involves Commerce's evaluation and selection of one set of surrogate financial statements over the other, where Commerce "had reason to trust the reliability" of the one it selected and explained its "basis for rejecting" the other. *SeAH*, 269 F. Supp. 3d at 1351–52. One of the reasons supporting Commerce's selection was that the selected set contained an auditor's opinion and registration information, while the other did not. *Id.* In that context, the Court of International Trade observed that Commerce *can* "accept the independent auditor's report as reliable unless 'compelling evidence' exists that the auditor is not in 'good standing.'" *Id.* at 1352. This observation does not

stand for Appellants' proposed rule requiring Commerce to provide "compelling evidence to set aside information provided by an auditor." *See CIT Decision*, 567 F. Supp. 3d at 1285. Further, as the Court of International Trade noted, the facts here are readily distinguishable from those in *SeAH*. *See id.* In *SeAH*, no evidence "contradicted the independent auditor's conclusions" accompanying the selected surrogate statements; here, in contrast, Marmen's own auditor's adjustment was "shown to be at least partially in error." *Id.* Appellants' reliance on the out-of-context statements from the *Butt-Weld Pipe Fittings* proceeding fails for similar reasons. *See id.* (explaining the differences between the determination involved in *Butt-Weld Pipe Fittings* and Commerce's evaluation here).

Accordingly, we agree with the Court of International Trade that Commerce's exclusion of Marmen's requested auditor adjustment was supported by substantial evidence and in accordance with law.

## II.    Program Assessment

### i.    Additional Depreciation for Certain Class 1 Assets

Appellants challenge Commerce's determination that the additional 6% depreciation Marmen claimed for certain Class 1 assets provided a countervailable subsidy. Appellants contend that the additional depreciation does not provide a "benefit" nor result in a "financial contribution" in the form of foregone revenue. Appellants Br. 42, 49. According to Appellants, the additional depreciation merely reflects the actual shorter useful life of manufacturing buildings and the normal rate at which they depreciate. *E.g.*, *id.* at 42–43, 53–54. We are unpersuaded.

To find a countervailable subsidy, there must be a governmental "financial contribution" that conferred a "benefit." *See* 19 U.S.C. § 1677(5). As relevant here, financial contribution includes "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or

deductions    from    taxable    income."    19    U.S.C.
§ 1677(5)(D)(ii).  And in cases involving direct taxes, "a ben-
efit exists to the extent that the tax paid by a firm *as a
result of the program is less than the tax the firm would
have paid* in the absence of the program."   19 C.F.R.
§ 351.509(a) (emphasis added).

In accordance with the governing statute and regula-
tions, Commerce reached a determination that is sup-
ported by substantial evidence in the record, including the
Canadian tax regulations themselves.  Before the Cana-
dian tax regulations implemented additional allowances
for certain subsets of Class 1 assets, a single standard or
default 4% rate applied for all Class 1 assets.  J.A. 2514.
Around 2007, the Canadian tax regulations added addi-
tional allowances for two subsets of Class 1 assets, includ-
ing as relevant here, "an additional allowance of 6% (total
10%)" for certain eligible buildings acquired after March
2007 and used for manufacturing.  *Id.*  To be eligible for
this additional allowance, "a building will be required to be
placed into a separate class," and "elections have to be
filed."  *Id.*; J.A. 9539; *see also* J.A. 9548 ("If you do not file
an election to put it in a separate class, the 4% rate will
apply.").  Marmen filed its election to claim this additional
allowance (of 6%) and thereby further reduced its taxable
income during the 2018 period of investigation.

Absent the additional allowance, the generally applica-
ble 4% standard rate would have applied.  Marmen would
have paid more taxes and the Canadian governments
would have collected more revenue.  The additional 6% al-
lowance claimed and received by Marmen thus represents
revenue that the Canadian governments could have col-
lected but forewent, which constitutes a "financial contri-
bution."   19  U.S.C.  § 1677(5)(D)(ii);  *see*  J.A. 99.   And
because of this additional 6% allowance, "a benefit exists"
as "the tax paid by [Marmen] as a result of the program is
less than the tax [Marmen] would have paid in the absence
of the program."  19 C.F.R. § 351.509(a)(1); *see* J.A. 97–99.

We find unpersuasive Appellants' contention that Commerce committed a "fundamental error" by failing to consider that "the depreciation rate is based on the average useful life of a particular asset." Appellants Br. 47, 49. Commerce based its determination on how the Canadian tax regulations explicitly structured the additional depreciation allowance, applying the explicit definitions of "benefit" and "financial contribution" provided in the governing statute and regulations. *See* J.A. 97–99. The governing statutory and regulatory provisions do not require Commerce to base its determination on whether a program at issue accurately aligns with the economic reality of building depreciation. 19 U.S.C. § 1677(5)(D)(ii); 19 C.F.R. § 351.509(a)(1); *see CIT Decision*, 567 F. Supp. 3d at 1295. We thus agree with the Court of International Trade that Commerce's determinations are in accordance with law and supported by the tax regulations themselves. *See CIT Decision*, 567 F. Supp. 3d at 1294–96.

Relatedly, we reject Appellants' contention that Commerce ignored or failed to adequately address the *StatCan Study*. *See* Appellants Br. 47, 49. Appellants relied on the *StatCan Study* to support their characterization that the additional depreciation allowance reflected the economic reality. *See* J.A. 93–94. As discussed above, Commerce based its assessment on a comparison of the different depreciation deduction rates provided in the Canadian tax regulations. *See CIT Decision*, 567 F. Supp. 3d at 1296. In doing so, Commerce rejected Appellants' contrary contention that would require Commerce to compare the deduction rate(s) to what would be justified by the economic reality. *See* J.A. 98. By rejecting that overarching contention, Commerce adequately engaged with the *StatCan Study* evidence Appellants cited to support their underlying characterization of the depreciation allowance.

### ii.    GASPÉTC Tax Credit

Appellants next challenge Commerce's benefit assessment under the GASPÉTC tax credit program.  In calculating the benefit Marmen received under this program in 2018, Commerce used the tax credit Marmen claimed for 2017 without offsetting it by the income tax Marmen paid for the credit it received in 2016.  Appellants contend that the regulations require Commerce to consider the "total tax effect of the program" that, in Appellants' view, requires a reduction by the tax Marmen paid for the prior year's credit.  Appellants Br. 57.  We are not persuaded.

Under 19 C.F.R. § 351.509(a)(1), in cases involving "[e]xemption or remission of taxes," "a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program."  In excluding the tax Marmen paid as a result of the prior year's credit from its benefit assessment, Commerce followed the directive under 19 C.F.R. § 351.503(e).  Section 351.503 is the "Benefit" section under "Subpart E—Identification and Measurement of Countervailable Subsidies," and it contains various subsections on benefit assessment.  Subsection (e) instructs that "[i]n calculating the amount of a benefit, [Commerce] *will not consider the tax consequences of the benefit.*"  19 C.F.R. § 351.503(e) (emphasis added).

Appellants argue that 19 C.F.R. § 351.503(e) is inapplicable because, in their view, it provides a general rule whose application would contravene the "specific rule" provided in 19 C.F.R. § 351.509(a)(1).  *See* Appellants Br. 60–61.  We discern no contravention.  Section 351.509(a)(1) directs Commerce to calculate the benefit received under a program in the year at issue, here the 2018 period of investigation.  The regulatory language does not address taxes resulting from prior year(s)' credit, let alone instruct that such resulting taxes be subtracted from the benefit

received in the year at issue. This section thus does not contradict the instruction contained in 19 C.F.R. § 351.503(e).

Additionally, further supporting Commerce's determination are the statutory limitations on the circumstances where offsets are applied. *See* 19 U.S.C. § 1677(6). Specifically, section 1677(6) explicitly lists a narrow range of scenarios where Commerce may apply offsets in calculating countervailable subsidies. *Id.* These include, among other scenarios, cases involving fees paid to receive a subsidy and "loss in the value" of the subsidy due to delayed receipt. *Id.* The enumerated scenarios do not include, as relevant here, tax consequences from prior year's benefit. *Id.*; *see Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1174 (Fed. Cir. 1998) (discussing permissible offsets under § 1677(6)).

Accordingly, we agree with the Court of International Trade that Commerce acted in accordance with law when it excluded taxes incurred from the previous year's credit in computing the benefit Marmen received under the GASPÉTC program.

### iii.    On-the-Job-Training Tax Credit

Lastly, Appellants challenge Commerce's determination that the Québec on-the-job training tax credit was de facto specific under 19 U.S.C. § 1677(5A)(D)(iii). Appellants Br. 62. As noted *supra*, to be countervailable, a subsidy must be "specific" to a foreign enterprise or industry, or a group of foreign enterprises or industries. 19 U.S.C. § 1677(5)(A). Specificity can be de jure (as a matter of law), or de facto. *Id.* § 1677(5A)(D). As relevant here, a subsidy is de facto specific if Commerce finds "one or more of the following factors":

(I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.

(II) An enterprise or industry is a predominant user of the subsidy.

(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

*Id.* § 1677(5A)(D)(iii). In assessing de facto specificity, Commerce examines the factors enumerated in 19 U.S.C. § 1677(5A)(D)(iii) sequentially. 19 C.F.R. § 351.502. "If a single factor warrants a finding of specificity, [Commerce] will not undertake further analysis." *Id.* § 351.502(a). Here, Commerce found the on-the-job training tax credit to be de facto specific based on factor (I), namely the actual number of recipients was "limited in number" on an enterprise basis. J.A. 129.

Appellants raise two primary challenges to Commerce's specificity determination. Appellants first contend that Commerce erred in not conducting a de jure specificity analysis, which Appellants argue should inform the de facto analysis. Appellants Br. 64. Appellants also argue that Commerce's comparison approach in its "limited in number" analysis was methodologically unsound and contravened the SAA's directive regarding the purpose of the specificity determination. *Id.* at 71–78. We disagree.

First, contrary to Appellants' contention, the statute does not make a de jure analysis a prerequisite inquiry for a de facto analysis. Rather, the statutory language is clear that specificity can be *either* de jure *or* de facto. 19 U.S.C. § 1677(5A)(D)(ii)–(iii). The de jure specificity inquiry is separate from the de facto inquiry and the two are based on different factors. *Id.* Commerce thus did not err in finding specificity based on its de facto analysis without a separate de jure analysis.

Second, Commerce did not err in using the total corporate tax filers as a comparator in assessing whether the credit recipients are limited in number.  The governing statute and the implementing regulations do not prescribe any mandatory method that Commerce must employ in assessing de facto specificity or analyzing the listed factors.  *See* 19 U.S.C. § 1677(5A)(D)(iii); 19 C.F.R. § 351.502.  Rather, it is a fact-intensive and case-specific inquiry, where the factors involved and the weight accorded to them vary from case to case.  *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335–36 (Fed. Cir. 2006); *see* SAA, H.R. Doc. No. 103-316, at 929.  In conducting this inquiry, Commerce exercises the necessary latitude afforded it in choosing the appropriate approach.

We agree with the Court of International Trade that Commerce did not exceed that latitude here.  In assessing specificity, Commerce considered that the on-the-job training program is to encourage businesses to take on trainees.  J.A. 8400.  Both corporations and individuals engaging in business activities can avail themselves of this program and claim the tax credit.  *Id.*  The Government of Québec reported that during the 2018 period of investigation, 4,930 of 387,949 corporate entities, roughly 1.27%,[9] received the on-the-job training credit.  J.A. 1982; J.A. 2173.  Commerce thus concluded that the credit recipients were "limited in number" on an "enterprise" basis.  J.A. 129.  As the Court of International Trade pointed out, Commerce has taken similar comparison approaches to assess specificity of tax credit programs in past investigations.  *CIT Decision*, 567

---

[9]    This percentage is based on a comparison of the number of credit recipients to the number of *corporate* tax filers, J.A. 1982, excluding *individual* tax filers engaging in business.  The United States contends that this percentage would be even smaller if such individual tax filers were included.  United States Br. 60–61, 61 n.7.

F. Supp. 3d at 1291–92; *see also* United States Br. 76–77. While the facts in other cases may call for different approaches or considerations, the nature of the program and the small percentage of recipients here support Commerce's "limited in number" assessment.[10] *See CIT Decision*, 567 F. Supp. 3d at 1292.

Contrary to Appellants' assertion, Commerce's approach does not conflict with the SAA's directive regarding the purpose of the specificity determination. *See, e.g.*, Appellants Br. 72, 74. As stated in the SAA, the specificity determination serves to "winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy." SAA, H.R. Doc. No. 103-316, at 929. It ensures that countervailing duties are not improperly levied against subsidies that are generally available and widely used across the economy, such as certain public infrastructure-related programs. *Id.* at 929–30. Commerce's comparison of the on-the-job training credit recipients to corporate tax filers aligns with this intended purpose of the specificity determination. As the Court of International Trade noted, Commerce's comparison is "instructive in determining whether the subsidy is widely spread throughout the economy." *CIT Decision*, 567 F. Supp. 3d at 1291. Given the nature of the program, the

---

[10] For similar reasons, we find unpersuasive Appellants' reliance on *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023), which Appellants submitted as a supplemental authority. In *Mosaic*, the Court of International Trade rejected Commerce's de facto specificity analysis concerning a different and unrelated penalty relief program. *Mosaic*, 659 F. Supp. 3d at 1314. As the Court of International Trade itself explained in *Mosaic*, the program at issue there was "distinguishable" from the on-the-job training program we are evaluating in this case. *Id.* at 1315 n.10.

limited number of recipients (about 1.27% of corporate entities) demonstrates that the on-the-job credit is not one of widespread availability and use throughout the economy.

Accordingly, we agree with the Court of International Trade that Commerce's de facto specificity determination of the on-the-job training credit is supported by substantial evidence and is otherwise in accordance with law.

## CONCLUSION

We have considered Appellants' remaining arguments and find them unpersuasive. For the reasons set forth above, we conclude that Commerce's *Final Affirmative Determination* is supported by substantial evidence and in accordance with law. Accordingly, the Court of International Trade's decision sustaining Commerce's *Final Affirmative Determination* is affirmed.

**AFFIRMED**

## COSTS

Costs against Appellants.