# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

THE GOVERNMENT OF QUÉBEC, MARMEN INC.,
MARMEN ÉNERGIE INC., MARMEN ENERGY CO.,
AND THE GOVERNMENT OF CANADA

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

Appeal from the United States Court of International Trade
in Nos. 1:20-CV-00168-GSK, 1:20-CV-00170-GSK, and 1:20-CV-00172-GSK,
Judge Gary S. Katzmann

## COMBINED PETITION FOR REHEARING AND REHEARING EN BANC FOR PLAINTIFFS-APPELLANTS THE GOVERNMENT OF QUÉBEC, MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., AND THE GOVERNMENT OF CANADA

Nancy A. Noonan
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6000
Counsel to the
Government of Québec

Jay C. Campbell
White & Case LLP
701 13th Street NW
Washington, DC 20005
(202) 626-3600
Counsel to Marmen

Joanne E. Osendarp
Blank Rome LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2587
Counsel to the
Government of Canada

August 5, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2022-1807 |
| **Short Case Caption** | Government of Québec v. US |
| **Filing Party/Entity** | Government of Québec v. US |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/05/2024

Signature: /s/ Nancy A. Noonan

Name: Nancy A. Noonan

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Government of Québec | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Aman Kakar<br>Terminated: 8/24/2022 | Natan Pinchas Lyons Tubman<br>Terminated: 6/24/2021 | |
| Leah N. Scarpelli | Matthew J. Clark<br>Terminated: 8/5/2024 | |
| John A. Gurtunca<br>Terminated: 8/24/2022 | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)   ☑ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2022-1807 |
| **Short Case Caption** | Government of Quebec v. US |
| **Filing Party/Entity** | Marmen Inc., Marmen Energie Inc., and Marmen Energy Co. |

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/05/2024

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Marmen Inc. | | |
| Marmen Energie Inc. | | |
| Marmen Energy Co. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| White & Case LLP | Jay Charles Campbell | |
| Ron Kendler | Allison J.G. Kepkay | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2022-1807 |
| **Short Case Caption** | Government of Quebec v. US |
| **Filing Party/Entity** | Government of Canada |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/05/2024

Signature: /s/ Joanne Osendarp

Name: Joanne Osendarp

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Government of Canada | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Conor Gilligan | Blank Rome LLP | Terminated 8/05/2024 |
| Timothy Hruby | McDermott Will & Emery LLP | Terminated 8/19/2022 |
| Tyler Kimberly | Blank Rome LLP | Did not appear in the originating court, but is appearing in this Court |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)    ☑ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

RULE 35(B) STATEMENT ........................................................................1

INTRODUCTION AND POINTS OF LAW AND FACT OVERLOOKED
AND MISAPPREHENDED ......................................................................2

ARGUMENT ...........................................................................................4

I.      THE COURT'S DISREGARD OF ECONOMIC REALITY AS
        IRRELEVANT TO DETERMINING COUNTERVAILABILITY
        IS INCONSISTENT WITH THE SUBSTANTIAL EVIDENCE
        STANDARD OF REVIEW.....................................................................4

        A.      Background ........................................................................4

        B.      The Court Did Not Correctly Apply the Substantial Evidence
                Standard of Review to Commerce's Analysis of the
                Depreciation of Class 1 Assets............................................6

        C.      In Disregarding Economic Reality, the Court Allowed
                Commerce to Elevate Form Over Substance ..................11

CONCLUSION AND REQUEST FOR REHEARING OR REHEARING
EN BANC ...............................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    791 F. Supp. 2d 1327 (Ct. Int'l Trade 2011) .......................................9

*Allegheny Ludlum Corp. v. United States,*
    112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ..................................9, 10

*Atlantic Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ...........................................................9

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962).........................................................................11

*Gov't of Quebec v. United States,*
    105 F.4th 1359 (Fed. Cir. 2024) ...............................................passim

*Mitsubishi Materials Corp. v. United States,*
    820 F. Supp. 608 (Ct. Int'l Trade 1993) ............................................9

*Tcherepnin v. Knight,*
    389 U.S. 332 (1967).........................................................................12

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009)..........................................................3, 11, 12, 14

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951).................................................................8, 9, 10

## STATUTES AND REGULATIONS

19 U.S.C. § 1677(5) .................................................................................6

## ADMINISTRATIVE DETERMINATIONS

*Certain Fabricated Structural Steel from Mexico* (final CVD det.)
    85 Fed. Reg. 5,381 (Dep't Commerce Jan. 23, 2020),
    and accompanying Issues and Decision Memorandum......................13

## **RULE 35(B) STATEMENT**

Based on my professional judgment, I, Jay C. Campbell, Nancy A. Noonan, and Joanne E. Osendarp believe this appeal requires an answer to one or more precedent-setting questions of exceptional importance:

(1) Is the Court's decision that "economic reality" is not relevant to the determination of financial contribution and benefit under U.S. countervailing duty law in conflict with prior Supreme Court decisions regarding the substantial evidence standard of review and consideration of economic reality?

| /s/ Nancy A. Noonan | /s/ Jay C. Campbell | /s/ Joanne E. Osendarp |
|---|---|---|
| Nancy A. Noonan | Jay C. Campbell | Joanne E. Osendarp |
| ArentFox Schiff LLP | White & Case LLP | Blank Rome LLP |
| 1717 K Street, NW | 701 13th Street NW | 1825 Eye Street, NW |
| Washington, DC 20006 | Washington, DC 20005 | Washington, DC 20006 |
| (202) 857-6000 | (202) 626-3600 | (202) 420-2587 |
| Counsel to the | Counsel to Marmen | Counsel to the |
| Government of Québec | | Government of Canada |

## INTRODUCTION AND POINTS OF LAW AND FACT OVERLOOKED AND MISAPPREHENDED

Plaintiffs-Appellants Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, "Marmen"), the Government of Québec, and the Government of Canada respectfully submit that the Court's decision in *Gov't of Quebec v. United States*, 105 F.4th 1359 (Fed. Cir. 2024) misapplied the substantial evidence standard of review and erroneously permitted Commerce to ignore "economic reality," elevating form over substance.

The Court concluded that the U.S. Department of Commerce ("Commerce") was not required to consider economic reality in determining whether a tax program – Canada's and Québec's depreciation rate for manufacturing facilities – was a countervailable subsidy under U.S. countervailing duty ("CVD") law. *See Gov't of Quebec*, 105 F.4th at 1372. In doing so, the Court allowed Commerce to ignore significant contradictory evidence submitted by the Government of Canada demonstrating that the depreciation rate for manufacturing facilities is ***not*** countervailable, contrary to the substantial evidence standard of review. The Court also ***assumed*** that Commerce considered the contradictory evidence submitted by the Government of Canada, even though Commerce neither discussed nor mentioned the evidence in its final determination. In doing so, the Court failed to follow the well-established rule that an agency's determination can only be sustained based on the reasoning articulated by the agency itself.

Moreover, in permitting Commerce to disregard the economic reality supporting the depreciation schedule prescribed by Canada's tax regulations, the Court elevated form over substance. Consequently, the Court failed to follow the Supreme Court's decision in *United States v. Eurodif S.A.*, 555 U.S. 305 (2009), which directs that, "in reading regulatory and taxation statutes, 'form should be disregarded for substance and the emphasis should be on economic reality.'" 555 U.S. at 317–18 (citations omitted).

Rehearing or rehearing *en banc* is therefore required to correct application of the substantial evidence standard of review with respect to Commerce's finding that Canada's (and Québec's) depreciation rate for manufacturing facilities is countervailable under U.S. CVD law.

## ARGUMENT

## I. THE COURT'S DISREGARD OF ECONOMIC REALITY AS IRRELEVANT TO DETERMINING COUNTERVAILABILITY IS INCONSISTENT WITH THE SUBSTANTIAL EVIDENCE STANDARD OF REVIEW

In sustaining Commerce's determination that the 10 percent depreciation rate for manufacturing facilities is countervailable, the Court did not correctly apply the substantial evidence standard of review. The Court's holding that Commerce was not required to consider the economic support for the depreciation rate violated the well-established rule that, for an agency's determination to be supported by substantial evidence, the agency must account for significant contradictory evidence. Moreover, in sustaining Commerce's reliance on the face of Canada's tax regulations to support its finding of countervailability, the Court improperly elevated form (different depreciation rates for different Class 1 assets) over substance (the actual depreciation rates of those assets).

### A. Background

Under Canada's and Québec's tax regimes, the capital cost allowance ("CCA") for Class 1 assets provides different depreciation rates for three physically distinct categories of buildings, each reflecting the rate at which the specific type of building decreases in value over time. Under the Canadian federal tax regulations,[1]

---

[1] Québec's CCA for Class 1 assets is structured in the same way as the federal CCA for Class 1 assets. *See* Appx95-96; Appx1905. Accordingly, Plaintiffs-Appellants'

residential buildings are depreciated at a rate of 4 percent; manufacturing facilities are depreciated at a rate of 10 percent; and commercial buildings are depreciated at a rate of 6 percent. *See* Appx2514.

The Canadian Government reorganized Class 1 into these three categories (residential buildings, manufacturing facilities, and commercial buildings) in accordance with its 2007 Budget Plan, which found that "{a}vailable evidence on the useful lives of buildings suggests that the *current provisions do not reflect the useful life of manufacturing or processing buildings* and other non-residential buildings." Appx2514 (emphasis added). Accordingly, the Budget Plan proposed that "the CCA {(depreciation)} rate for buildings used for manufacturing or processing in Canada . . . be increased to 10 per cent, and that the CCA rate for other non-residential buildings be increased to 6 per cent." Appx2514.

The 2007 Budget Plan's proposed depreciation rates were supported by an empirical study conducted by Canada's statistics agency, Statistics Canada, entitled *Economic Depreciation and Retirement of Canadian Assets: A Comprehensive Empirical Study*. The study concluded that "{t}he proposed geometric depreciation rates for buildings are, on average, almost triple the {previous} official rates used by {Statistics Canada}. The increases are across the board with Office Buildings and

---

arguments apply equally to Marmen's CCAs for Class 1a assets on its federal tax returns and the CCAs for Class 1a assets on its Québec tax returns.

Shopping Centres depreciating close to 6.0% per year and Manufacturing Plants depreciating at 10.0%." Appx2550.

Marmen and the Canadian and Québec Governments cited all this evidence to demonstrate that the 10 percent depreciation rate was not an *accelerated* rate, and, thus, not a financial contribution conferring a benefit under 19 U.S.C. § 1677(5). *See* Appx8721-8722; Appx8731-8732; Appx8759. Commerce, however, concluded that the depreciation of manufacturing facilities at a 10 percent rate was a countervailable subsidy, reasoning that the "difference between the {four percent depreciation rate for residential buildings and 10 percent depreciation rate for manufacturing facilities} represents the forgoing of revenue otherwise owed," that confers a countervailable benefit. Appx99. In doing so, Commerce failed to address or even mention the 2007 Budget Plan and the Statistics Canada study presented by Marmen and the Governments of Canada and Québec.

### B. The Court Did Not Correctly Apply the Substantial Evidence Standard of Review to Commerce's Analysis of the Depreciation of Class 1 Assets

The Court's decision to sustain Commerce's finding of countervailable subsidy for Class 1 depreciation erroneously permits Commerce to disregard "economic reality." The Court's reasoning should be reconsidered because (1) it violates the substantial evidence standard of review and (2) assumes without support that Commerce reviewed all relevant evidence.

6

Commerce's decision that depreciation for Class 1 assets is countervailable was based on a mistaken belief that the depreciation rates for particular assets within Class 1 were "in addition" to a "standard" rate. Appx98. Commerce summarily concluded that the "difference between the {four percent and 10 percent} deductions represents the forgoing of revenue otherwise owed." Appx99. This decision ignored the economic reality supporting Canada's depreciation schedule (and the supporting evidence provided by the Canadian Government), which subdivided Class 1 into three subclasses to reflect accurately the average useful lives of three distinct types of buildings. The 4 percent rate applied to residential buildings, while the 10 percent rate applied to manufacturing facilities – two entirely different kinds of assets (despite both being classified as "Class 1"). The classification of both assets under Class 1 is merely an artifact of Canada's original Class 1 category, which was updated to correct the depreciation rate for manufacturing facilities (as well as for commercial buildings) to reflect the actual depreciation rate. *See* Appx2514.

In sustaining Commerce's decision, the Court determined that "{t}he governing statutory and regulatory provisions do not require Commerce to base its determination on whether a program at issue accurately aligns with the economic reality of building depreciation." *Gov't of Quebec*, 105 F.4th at 1372. That is, because "Commerce based its assessment on a comparison of the {four percent and 10 percent} depreciation deduction rates provided in the Canadian tax

regulations{,}" the Court concluded that Commerce permissibly rejected evidence demonstrating that those regulations reflected the economic reality of different assets' actual rates of depreciation. *Id.*

The Court's reasoning that "economic reality" is legally irrelevant to the determination of whether a financial contribution exists under the statute is erroneous on its face. Nothing in the statute permits Commerce to ignore economic reality when analyzing financial contribution. To the contrary, economic reality – when supported by the record evidence – is relevant to any question of financial contribution. Moreover, the economic reality of Canada's depreciation rates for different Class 1 assets is an evidentiary question – not a legal one. The issue for the Court was whether Commerce's disregard of economic reality could be sustained under the substantial evidence standard. It cannot.

The proper substantial evidence standard of review to be applied to Commerce's determination is clear based on decades of precedent from the Supreme Court of the United States, this Court, as well as the Court of International Trade. In particular, the Supreme Court has emphasized the importance of an agency's consideration of evidence contradicting its conclusion. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951) (explaining that the reviewing court "cannot uphold a decision . . . merely on the basis of evidence which in and of itself justifies it, without taking into account contradictory evidence or evidence from which

conflicting inferences could be drawn . . . ."); *see also Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (requiring Commerce to consider "whatever fairly detracts from the substantiality of the evidence"). For a decision to be based on substantial evidence, Commerce must consider the "record in its entirety," including "the body of evidence opposed to the {agency's} view." *Universal Camera Corp.*, 340 U.S. at 488. Moreover, Commerce "cannot simply ignore significant contradictory evidence and assert that nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States,* 820 F. Supp. 608, 624 (Ct. Int'l Trade 1993).[2] Thus, Commerce cannot escape the clear requirement to consider and engage with contradictory evidence.

The Court's conclusion that "economic reality" is legally irrelevant permits Commerce to ignore record evidence contradicting its finding that the Class 1 depreciation rate for manufacturing facilities was countervailable. Consequently, the Court's conclusion undermines the substantial evidence standard of review

---

[2] *See also Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011) ("Because Commerce failed to take into account record evidence that fairly detracts from the weight of the evidence supporting its . . . determinations, these determinations are not supported by substantial evidence."); *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000) ("Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence.").

described above, which requires Commerce to consider significant opposing evidence in its analysis. In Commerce's final determination, there is no indication that it considered or understood the nature of Canada's 2007 Budget Plan or the Statistics Canada study. Indeed, Commerce cited Marmen's use of the 10 percent depreciation rate for manufacturing facilities as both "accelerated depreciation" and an "additional deduction" – both of which are wrong. Appx96, Appx98. Where a depreciation rate reflects the actual useful life of the asset, it is not possible for this to be characterized as "accelerated" or "additional." Because Commerce disregarded the evidence that the change in Canadian tax law was to update and correct depreciation rates for particular types of assets (including manufacturing facilities), Commerce's finding of a financial contribution is unsupported by substantial evidence. *See Universal Camera Corp.*, 340 U.S. at 487; *Allegheny Ludlum Corp.*, 112 F. Supp. 2d at 1165.

The Court also held that Commerce "adequately" engaged with the Statistics Canada study by "rejecting {the} overarching contention" that the economic reality behind the 10 percent Class 1 depreciation rate for manufacturing facilities was even relevant. *Gov't of Quebec*, 105 F.4th at 1372. Here, however, the Court assumed without any indication in Commerce's final determination that the agency considered the underlying evidence. In doing so, the Court violated the well-established rule that an agency's decision may only be sustained "on the same basis

articulated in the order by the agency itself." *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

For these reasons, the Court's dismissal of economic reality as irrelevant to Commerce's determination of countervailability conflicts with Supreme Court precedent on the application of the substantial evidence standard of review.

### C. In Disregarding Economic Reality, the Court Allowed Commerce to Elevate Form Over Substance

Commerce's finding of countervailability was based on a superficial comparison of the different depreciation rates for different assets under Class 1. Appx99 (finding that the "difference between the {four percent and 10 percent} deductions represents the forgoing of revenue otherwise owed"). In sustaining Commerce's determination, the Court improperly elevated form over substance, contrary to the Supreme Court's decision in *United States v. Eurodif S.A.*, 555 U.S. 305 (2009).

The Court determined that "Commerce based its assessment on a comparison of the different depreciation deduction rates provided in the Canadian tax regulations." *Gov't of Quebec*, 105 F.4th at 1372. In doing so, the Court reasoned, Commerce rejected Appellants' "contrary contention that would require Commerce to compare the deduction rate(s) to what would be justified by the economic reality." *Id.*

By accepting a comparison of two different rates (for two distinct types of assets) as the basis for finding financial contribution and benefit, Commerce and the Court impermissibly elevated form over substance. The Supreme Court has made clear that, in reviewing regulatory and tax laws, "***form should be disregarded for substance and the emphasis should be on economic reality***." *Eurodif S.A.*, 555 U.S. at 317–18 (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)) (emphasis added).[3]

Importantly, the depreciation rates established by Canada's tax regulations ***are designed to reflect economic reality***. The updated Class 1 categories reflect the different useful lives for three distinct types of buildings within Class 1 (4%, 6%, 10%). *See* Appx2514. The deduction of depreciation cost for an asset with a long useful life (residential building) cannot reasonably be compared to the deduction of depreciation cost for an asset with an empirically demonstrated shorter useful life (manufacturing plant) – rendering Commerce's finding of countervailability unsupported by substantial evidence. Canada is not forgoing revenue or providing

---

[3] In *Eurodif S.A.*, the Supreme Court held that Commerce properly focused on the substance and economic reality of the evidence under consideration – contracts for the sale of services – over the form of the evidence, to find that the contracts reflected the sale of goods. *See* 555 U.S. at 317-322. In contrast, in this case Commerce focused on the form of the Canadian tax regulations – the existence of two different depreciation rates under Class 1 – rather than the substance of the regulations (*i.e.*, the different depreciation rates reflect the economic reality of the useful lives of each subclass of assets under Class 1).

a countervailable benefit by allowing a taxpayer to deduct depreciation costs for two different assets based on their actual depreciation rates.[4] To the contrary, Canada revised the Class 1 depreciation rates to avoid **over**-collecting tax revenue from companies that owned manufacturing facilities. Because it ignored this economic reality, Commerce's finding of a financial contribution conferring a benefit was based on a fundamental misunderstanding of the Canadian tax regulations.

To our knowledge, Commerce has never countervailed depreciation deductions by comparing the depreciation rates of *different kinds* of assets. For example, Commerce did not compare any of the Class 1 depreciation rates to other asset classes under Canadian tax regulations, presumably because those are *different kinds* of assets. Rather, Commerce previously has countervailed the depreciation of assets only where an accelerated rate is offered for the **same kind** of asset. *See* Appx8733-8734 (outlining cases where Commerce found *accelerated* depreciation rates to be countervailable, where the accelerated depreciation was provided on top of the standard depreciation rate for the *same asset).*[5]

---

[4] Importantly, Commerce has not challenged the fact that the three types of buildings under Class 1 are fundamentally different from one another.

[5] For example, in the underlying investigation, Commerce found an accelerated depreciation rate to be countervailable based on a comparison of the accelerated depreciation rate for manufacturing and processing assets and the standard depreciate rate for **those same assets**. *See* Appx8394; *see also, e.g.*, *Certain Fabricated Structural Steel from Mexico* (final CVD det.) 85 Fed. Reg. 5,381 (Dep't Commerce Jan. 23, 2020), and accompanying Issues and Decision Memorandum at 30-31 (countervailing a program that allowed "companies to depreciate, in one year,

Here, Commerce's finding of financial contribution (and benefit) is based solely on Canada's creation of asset subclasses for three distinct categories of buildings (*i.e.*, manufacturing, commercial, and residential) – each with its own depreciation rate based on that particular category of building's actual useful life – *within* a single asset class. Appx98-99. Based on Commerce's superficial approach, had Canada instead created separate classes for each building category, Commerce would not have found a financial contribution or benefit. This is a distinction without a difference, simultaneously ignoring the substance of the regulations as well as economic reality, contrary to the Supreme Court's admonition that economic reality matters when interpreting tax provisions. *See Eurodif S.A.*, 555 U.S. at 317–18.

Ultimately, the Court and Commerce elevated form over substance, which cannot form the basis of substantial evidence given the significant contradictory evidence showing that the Class 1 depreciation rate for manufacturing facilities reflects economic reality (*i.e.*, the actual depreciation rate of such buildings).

---

100 percent of their investments in machinery and equipment for the generation of energy from renewable energy or from efficient systems").

## CONCLUSION AND REQUEST FOR REHEARING
## OR REHEARING EN BANC

For the foregoing reasons, Plaintiffs-Appellants respectfully request that the Court reconsider its conclusions with respect to the CCA for Class 1 assets, grant rehearing or rehearing *en banc*, and correct its application of the substantial evidence standard of review.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
Ron Kendler
Allison Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co.

/s/ Joanne E. Osendarp
Joanne E. Osendarp
Alan G. Kashdan
Tyler Kimberly

Blank Rome LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2587

Counsel for the Government of Canada

/s/ Nancy A. Noonan
Nancy A. Noonan
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC 20006
(202) 857-6000

Counsel for the Government of Québec

August 5, 2024

ADDENDUM

**Addendum Table of Contents**

| Addendum No. | Description |
|:---:|:---|
| 1 | *Government of Quebec v. United States*, 105 F.4th 1359 (2024) and Judgment |
| 2 | 19 U.S.C. § 1677(5) |

*Government of Quebec v. United States*,
105 F.4th 1359 (2024) and Judgment

105 F.4th 1359
United States Court of Appeals, Federal Circuit.

The GOVERNMENT OF QUEBEC, Marmen
Inc., Marmen Energie Inc., Marmen Energy Co.,
the Government of Canada, Plaintiffs-Appellants

v.

UNITED STATES, Wind Tower
Trade Coalition, Defendants-Appellees
The Government of Ontario, Defendant

2022-1807
|
Decided: June 21, 2024

**Synopsis**
**Background:** Government of Québec brought action
challenging United States Department of Commerce's
final determination following countervailing duty (CVD)
investigation into allegation that subsidies were being
provided to producers and exporters of utility wind
towers from Canada in derogation of United States fair
trade laws. Government of Canada intervened as plaintiff,
and trade coalition intervened as defendant. Canadian
exporters and trade coalition initiated separate appeals of
Commerce's determination, which were consolidated with
Québec's action. Government of Ontario joined as defendant-
intervenor. Governments of Québec and Canada, exporter,
and trade coalition moved for judgment on the agency record.
The Court of International Trade, Gary S. Katzmann, J., 567
F.Supp.3d 1273, sustained Commerce's final administrative
determination. Exporters and governments of Québec and
Canada appealed.

**Holdings:** The Court of Appeals, Reyna, Circuit Judge, held
that:

Commerce reasonably determined auditor's adjustment was
unreliable;

Commerce's decision to conduct verification of auditor's
adjustment was reasonable;

Commerce reasonably determined that additional
depreciation allowance for manufacturing buildings was
financial contribution that conferred benefit upon exporter;

Commerce properly excluded tax consequences from prior
year's tax credit in computing benefit from later year's tax
credit;

Commerce was not required to analyze de jure specificity of
subsidy before analyzing de facto specificity; and

Commerce did not abuse its discretion by analyzing de facto
specificity of tax credit using total corporate tax filers as
comparator.

Affirmed.

**Procedural Posture(s):** Review of Administrative Decision;
On Appeal.

**\*1361** Appeal from the United States Court of International
Trade in Nos. 1:20-cv-00168-GSK, 1:20-cv-00170-GSK,
1:20-cv-00172-GSK, Judge Gary S. Katzmann.

**Attorneys and Law Firms**

Nancy Noonan, ArentFox Schiff LLP, Washington, DC,
argued for plaintiff-appellant Government of Quebec. Also
represented by Matthew Clark, Jessica R. DiPietro.

Jay Charles Campbell, White & Case LLP, Washington,
DC, argued for plaintiffs-appellants Marmen Inc., Marmen
Energie Inc., Marmen Energy Co., Government of Canada.
Marmen Inc., Marmen Energie Inc., and Marmen Energy Co.
also represented by Ron Kendler, Allison Kepkay.

Joanne Osendarp, Blank Rome LLP, for plaintiff-appellant
Government of Canada. Also represented by Conor Gilligan,
Alan Kashdan, Tyler J. Kimberly.

Joshua E. Kurland, Commercial Litigation Branch, Civil
Division, United States Department of Justice, Washington,
DC, argued for defendant-appellee United States. Also
represented by Reginald Thomas Blades, Jr., Brian M.
Boynton, Robert R. Kiepura, Patricia M. McCarthy;
Alexander Fried, United States Department of Commerce,
Washington, DC.

Maureen E. Thorson, Wiley Rein, LLP, Washington, DC,
argued for defendant-appellee Wind Tower Trade Coalition.
Also represented by Theodore Paul Brackemyre, Tessa V.
Capeloto, Robert E. DeFrancesco, III, Laura El-Sabaawi,
Derick Holt, Elizabeth S. Lee, Alan H. Price, John Allen
Riggins.

Before Lourie, Prost, and Reyna, Circuit Judges.

**Opinion**

Reyna, Circuit Judge.

 **\*1362** Marmen Inc., Marmen Énergie Inc., Marmen Energy Co., the Government of Québec, and the Government of Canada appeal from a decision of the U.S. Court of International Trade, which sustained the final affirmative determination of the U.S. Department of Commerce in a countervailing duty investigation concerning imports of certain utility scale wind towers from Canada. We affirm the judgment of the U.S. Court of International Trade.

BACKGROUND

The Tariff Act of 1930, as amended, authorizes the U.S. Department of Commerce ("Commerce") to impose countervailing duties on imports that benefited from illegal subsidies provided by a foreign government. See 19 U.S.C. § 1671(a). Such duties form trade relief to U.S. domestic industries injured by the subsidized imports. E.g., Al Ghurair Iron & Steel LLC v. United States, 65 F.4th 1351, 1355 (Fed. Cir. 2023). If Commerce determines that a countervailable subsidy exists and the U.S. International Trade Commission ("ITC") determines that a domestic industry is materially injured or is threatened with material injury by virtue of the subsidized imports, Commerce may impose countervailing duties on the subject imports equal to the amount of the net countervailable subsidy. See 19 U.S.C. § 1671(a).

The trade statute provides that a countervailable subsidy exists if: (1) a foreign government provides a "financial contribution;" (2) a "benefit" is thereby conferred upon a recipient in connection with the manufacture or export of the subject merchandise; and (3) the subsidy is "specific" to a foreign enterprise or industry, or a group of such enterprises or industries. See id. §§ 1677(5), (5A). To calculate a subsidy rate, Commerce divides "the amount of the benefit allocated to the period of investigation" by the "sales value" of the subject merchandise during the same period, the latter referred to as the sales denominator. 19 C.F.R. § 351.525(a). The larger the sales denominator, the lower the subsidy rate.

This case involves (1) Commerce's final determination that the Government of **\*1363** Canada and the Government of Québec provided countervailable subsidies to producers and exporters of utility scale wind towers [1] imported from Canada to the United States, and (2) Commerce's calculation of the subsidy rate of 1.18% ad valorem. [2] Generally, a subsidy rate of less than 1% is considered *de minimis*, which Commerce will disregard, and no countervailing duties are assessed. 19 U.S.C. § 1671b(b)(4). Appellants argue that Commerce erred in its assessment of three of the investigated programs and its computation of the sales denominator used to calculate the subsidy rate. According to Appellants, the subsidy rate should have been *de minimis*.

I. The Investigation and Commerce's Determination

In July 2019, Appellee Wind Tower Trade Coalition ("WTTC") petitioned Commerce to initiate a countervailing duty investigation of certain imports of utility scale wind towers from Canada. See *Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 84 Fed. Reg. 38216, 38216 (Aug. 6, 2019). WTTC contended that imports of the subject merchandise, the merchandise under investigation, received countervailable subsidies from the Government of Québec and the Government of Canada through various government programs. See *id.*

Commerce initiated a countervailing duty investigation, the period of investigation covering January 1, 2018–December 31, 2018. *Id.* at 38217. Commerce selected, as mandatory respondents, [3] Marmen Inc. and Marmen Énergie Inc. (collectively, "Marmen"), the two largest and cross-owned Canadian exporters of the subject merchandise during the period of investigation. During the investigation, Commerce issued initial countervailing duty questionnaires and supplemental questionnaires, to which Marmen, the Government of Québec, and the Government of Canada submitted responses. See J.A. 8387.

In December 2019, Commerce reached a preliminary affirmative determination that countervailable subsidies were being provided to Canadian producers of wind towers through eight of the investigated programs. *Utility Scale Wind Towers from Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 Fed. Reg. 68126, 68126 (Dec. 13, 2019) ("*Preliminary Affirmative Determination*"); **\*1364** J.A. 8386–8408 (decision memorandum for the *Preliminary Affirmative*

*Determination*"). For the eight countervailable programs, Commerce calculated a total countervailable subsidy rate of 1.09% ad valorem. *Preliminary Affirmative Determination,* 84 Fed. Reg. at 68127. In calculating the subsidy rate, Commerce used the 2018 "Applicable Sales Value" Marmen reported as the sales denominator. *See* J.A. 8428; J.A. 2907.

After Commerce issued the *Preliminary Affirmative Determination,* Marmen submitted a "ministerial error" comment,[4] alleging that Commerce erred in not adjusting the sales denominator to include a year-end "exchange rate adjustment" that Marmen's auditor made. *See* J.A. 8434–35; J.A. 8436 (citing line item "Year-end auditor adjustment to General Ledger (revenue) for exchange rate gain(loss)"). According to Marmen, this adjustment was to translate all foreign-currency sales recorded in its general ledger to Canadian dollars ("CAD"). J.A. 8434–35. Using the "correct[ed] sales denominator" that includes this adjustment, according to Marmen, would change the preliminarily calculated subsidy rate from above *de minimis* (1.09%) to below *de minimis* (0.95%). J.A. 8436. Commerce declined to amend its *Preliminary Affirmative Determination* based on Marmen's allegation because the record information did not support that the alleged error was "ministerial" as defined in the regulations. J.A. 8453; *see* 19 C.F.R. § 351.224(f).

In February 2020, Commerce conducted a verification of the information Marmen submitted during the investigation. *See Verification of Questionnaire Responses of Marmen Inc., Marmen Énergie Inc., and Gestion Marmen,* J.A. 8654–8708 ("*Verification Report*"). Verification refers to the process by which Commerce "verif[ies] the accuracy and completeness" of factual information submitted by interested parties, before Commerce makes a final countervailing duty determination. 19 C.F.R § 351.307(d). If the submitted information "cannot be verified," Commerce may make determinations based on "the facts otherwise available" on the record. 19 U.S.C. § 1677e(a)(2)(D); 19 C.F.R. § 351.308(a).

At verification, relevant to the auditor's adjustment, Commerce discussed with Marmen the U.S. dollars ("USD") sales Marmen identified as needing to be converted to CAD and reviewed the underlying sales records. J.A. 8679–80. This process revealed several discrepancies in the requested adjustment. Specifically, Commerce found that the adjustment included sales classified as USD sales but recorded in European currency, the EURO, in Marmen's general ledger. *Id.* Upon reviewing the underlying records, Commerce discovered that two of the EURO-coded sales

in the general ledger were shown in the original sales documentation as transacted in CAD. *Id.* These sales were thus inappropriately included in the USD-CAD conversion as part of the auditor's adjustment.

In June 2020, Commerce reached a final affirmative countervailing duty determination. *Utility Scale Wind Towers from Canada: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances,* 85 Fed. Reg. 40245, 40245 (July 6, 2020) **\*1365** ("*Final Affirmative Determination*"). In the *Final Affirmative Determination,* Commerce maintained its determination that eight of the investigated programs were countervailable. *Issues and Decision Memorandum for the Final Determination of the Countervailing Duty Investigation of Utility Scale Wind Towers from Canada,* J.A. 74–130.

Based on the eight countervailable programs, Commerce calculated an aggregate countervailable subsidy rate of 1.18% ad valorem for Marmen and assigned the same rate for all other producers. *Final Affirmative Determination,* 85 Fed. Reg. at 40246. In calculating the subsidy rate, Commerce again did not include Marmen's auditor's adjustment in the sales denominator. J.A. 116. Because "Commerce found multiple improperly identified and improperly converted [sales] values in the calculation of the auditor's adjustment at verification," Commerce determined the adjustment to be "unverified and unreliable." *Id.* Commerce explained that it lacked the ability to check each sale, and instead, the checks it performed at verification were to "test the broader reliability of reported information." *Id.* Commerce thus relied on Marmen's reported sales information excluding the unverified auditor's adjustment. *Id.*; *see* 19 U.S.C. § 1677e(a)(2)(D).

Along with five other programs, Commerce determined that the following three programs provided countervailable subsidies, each contributing to the ultimately assessed aggregate subsidy rate of 1.18%. *See* J.A. 78–80. We provide an overview of each of the three programs below. As noted above, to be countervailable, a subsidy must satisfy three criteria: (1) a program provides a financial contribution; (2) a benefit is thereby conferred on a recipient; and (3) the subsidy is specific to a foreign enterprise or industry, or a group thereof. By finding the three programs at issue countervailable, Commerce found they each satisfy all three criteria. For each program, Appellants challenge Commerce's assessment of one or two criteria. Consequently, in the

overview below, we focus on the criteria that the parties dispute in this appeal.

### i. Additional Depreciation for Certain Class 1 Assets

The Canadian tax regulations provide property depreciation deductions from taxable income, called the Capital Cost Allowance ("CCA"). J.A. 8037–38; J.A. 2513. Under the CCA program, assets are divided into different classes, each assigned a respective deduction rate. For Class 1 assets, a generally applicable CCA rate is 4%, but taxpayers can claim a higher rate for certain subsets of Class 1 assets acquired after March 2007. As relevant here, taxpayers can claim an additional 6% (for a total of 10%) if at least 90% of an eligible building's floor space is used for manufacturing. J.A. 2514. Similarly, an additional 2% (for a total of 6%) may be claimed for other non-residential buildings. *Id.* The additional allowances are intended to reflect the shorter useful life of buildings used for manufacturing or other non-residential purposes. *Id.*; *see* J.A. 2522–82 ("*Economic Depreciation and Retirement of Canadian Assets: A Comprehensive Empirical Study*") ("*StatCan Study*").

To be eligible for the additional allowances, "a building will be required to be placed into a separate class." J.A. 2514. "If the taxpayer forgoes the separate class," the standard 4% rate applies. *Id.*; J.A. 8037. Marmen, for certain buildings, elected to claim the 10% depreciation deduction, which reduced its taxable income during the period of investigation.

Commerce determined that the additional allowance provided a countervailable **\*1366** subsidy and calculated a subsidy rate of 0.07% ad valorem. J.A. 79. As relevant here, Commerce determined that the additional allowance provided a financial contribution and that it conferred a benefit equal to the resulting tax savings. J.A. 97–98. Commerce reasoned that absent the additional allowance, Marmen would have paid more taxes under the 4% standard rate. J.A. 98. The appropriate benefit, Commerce concluded, was the "tax savings of the difference between the deduction calculated using the basic rate" and the deduction "using the total depreciation rate" that Marmen claimed. J.A. 98–99.

### ii. GASPÉTC Tax Credit

The GASPÉTC program provides a tax credit to promote employment in certain regions in Gaspésie and certain

maritime regions of Québec. J.A. 2182. This program allows employers to claim a 15% tax credit for total wages paid to eligible employees. *Id.* An employer can claim the credit when filing tax returns for the previous year. At the same time, the previous year's credit is considered taxable income, which the employer must then pay taxes on in the following year. In 2018, Marmen claimed the GASPÉTC tax credit on its year-2017 tax return and paid taxes for the GASPÉTC credit it received for year-2016. J.A. 2871.

Commerce determined that the GASPÉTC credit provided a countervailable subsidy and calculated a subsidy rate of 0.78% ad valorem. J.A. 80. As relevant here, in quantifying the benefit conferred under this program, Commerce used the amount of credit Marmen received for 2017. J.A. 126–27. Commerce declined to reduce that amount by the taxes Marmen paid for the credit it received for 2016. *Id.* In doing so, Commerce cited the regulatory directive under 19 C.F.R. § 351.503(e): "[i]n calculating the amount of a benefit, [Commerce] will not consider the tax consequences of the benefit." J.A. 126. Commerce also explained that its calculation here was consistent with its past "treatment of other tax credits which ha[d] similar consequences." *Id.*

### iii. On-the-Job Training Tax Credit

The on-the-job training program encourages businesses to hire trainees, such as students or apprentices. J.A. 1970. The program allows businesses to claim a tax credit for 24% of wages paid to trainees, and a higher percentage if the trainee is a person with a disability or is an immigrant. *Id.* To be eligible for this credit, an employer must satisfy several criteria, including, among others, engaging in a qualified business and having received the required certification. J.A. 1976–77.

Commerce determined that the on-the-job training credit provided a countervailable subsidy and calculated a subsidy rate of 0.01% ad valorem. J.A. 79–80. As relevant here, Commerce found that this program provided a subsidy that is de facto (as a matter of fact) specific. J.A. 129. Commerce determined that, during the period of investigation, the actual number of recipients that benefited from this program was "limited in number on an enterprise basis." *Id.* In reaching this determination, Commerce compared "the actual number of companies that received the tax credit in 2018 to the total number of tax filers, inclusive of corporations and individuals in business, within Québec for 2018." *Id.*

After Commerce issued the *Final Affirmative Determination*, the ITC reached a final affirmative determination that a domestic industry was materially injured by the subsidized wind towers imported from Canada. *Utility Scale Wind Towers from Canada, Indonesia, Korea, and Vietnam*, Inv. Nos. 701-TA-627-629, 731-TA-1458–1461 USITC Pub. 5101 (Aug. 2020) (Final). Based on these two affirmative determinations, Commerce issued a countervailing **\*1367** duty order imposing countervailing duties on the imports of wind towers from Canada. *Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Orders*, 85 Fed. Reg. 52543, 52543 (Aug. 26, 2020). The 1.18% subsidy rate assessed in the *Final Affirmative Determination* was subsequently reduced to 1.13%, to account for ministerial errors not at issue here. *See id.* at 52544.

## II. Appeal to the U.S. Court of International Trade

In September 2020, the Government of Québec filed suit in the U.S. Court of International Trade, challenging aspects of Commerce's *Final Affirmative Determination*. *Gov't of Québec v. United States*, 567 F. Supp. 3d 1273, 1280 (Ct. Int'l Trade 2022) ("*CIT Decision*"). The Government of Canada joined as plaintiff-intervenor and WTTC joined as defendant-intervenor. *Id.* Marmen and WTTC subsequently filed separate appeals. *Id.* The appeals were consolidated. *Id.* The Government of Québec, the Government of Canada, Marmen, and WTTC each moved for judgment on the agency record. *Id.*

The Court of International Trade sustained Commerce's *Final Affirmative Determination*, finding that the *Final Affirmative Determination* was in accordance with law and supported by substantial evidence. Relevant here are the court's affirmances of (1) Commerce's computation of the sales denominator used to calculate the subsidy rate, and (2) Commerce's assessment concerning the additional depreciation allowance, GASPÉTC tax credit, and the on-the-job training credit.

Regarding the sales denominator, the Court of International Trade concluded that Commerce properly excluded Marmen's requested auditor adjustment as unreliable after identifying multiple errors at verification. *Id.* at 1285. In reaching this conclusion, the court rejected Marmen's contention requiring Commerce to identify compelling evidence before rejecting the auditor's report, finding such a contention lacked support

in law. *Id.* The errors identified through verification, the court reasoned, undermined the broader reliability of the requested adjustment and supported Commerce's determination to exclude the adjustment as unreliable. *Id.* at 1286.

As to the assessment of the three subsidy programs at issue here, the Court of International Trade affirmed Commerce's determination in all challenged aspects. We provide below an overview of the Court of International Trade's decision, focusing on the challenged aspects at issue here.

### i. Additional Depreciation for Certain Class 1 Assets

As to the additional depreciation for certain Class 1 manufacturing buildings, the Court of International Trade affirmed Commerce's determination that the additional 6% allowance provided a financial contribution conferring a benefit. *Id.* at 1293. The court rejected the Canadian parties' argument that the additional allowance reflected the actual shorter useful life of manufacturing buildings so it constituted neither a "financial contribution" or "benefit." *Id.* at 1294–95. The court concluded that Commerce's determination was in accordance with the statutory definition of "financial contribution"[5] and the pertinent **\*1368** regulations on "Direct Taxes" benefits.[6] *Id.* The Court of International Trade also rejected the argument that Commerce erred by declining to directly engage with the *StatCan Study*, an empirical analysis on building depreciation the Canadian parties relied on. *Id.* at 1295–96. According to the court, "where a taxpayer can opt-in to more favorable treatment, it is reasonable for Commerce to confine its analysis to the comparisons provided for by law, even if the more favorable treatment better reflects economic reality." *Id.* at 1296.

### ii. GASPÉTC Tax Credit

Regarding the GASPÉTC tax credit, the Court of International Trade affirmed Commerce's determination to exclude increased tax liabilities in calculating the benefit Marmen received under the program. *Id.* at 1292–93. The court found unpersuasive the Government of Québec and Marmen's assertion that 19 C.F.R. § 351.509(a)(1) directed Commerce to consider and exclude the previous year's tax liabilities from the benefit calculation. *Id.*; *see also* 19 C.F.R. § 351.509(a)(1) ("[A] benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax

the firm would have paid in the absence of the program."). The regulations, the court reasoned, did not require treating "tax liabilities from a previous year's use of the program [as] a component" of the "result of the program." *CIT Decision, 567 F. Supp. 3d at 1293.* The court added that Commerce's determination was consistent with its uniform past practice of disregarding tax consequences when assessing benefits provided through direct taxes. *Id.*

### iii. On-the-Job Training Tax Credit

The Court of International Trade also sustained Commerce's determination that the on-the-job training tax credit provided a de facto subsidy. *Id.* at 1291. The Government of Québec and the Government of Canada argued that Commerce's specificity determination violated the statutory requirements and that its comparison was "methodologically unsound." *See id.* at 1290. The court disagreed. First, the court explained Commerce's approach assessed both whether "the actual recipients of the subsidy" were "limited in number," *19 U.S.C. § 1677(5A)(D)(iii)(I),* and whether the subsidy is "truly ... broadly available and widely used throughout [the] economy." *Id.* at 1291. The court concluded that Commerce's approach was in accordance with the statute and the aims of the specificity test as set out in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"). [7] *Id.* (citing SAA, H.R. Doc. No. 103-316, at 929 (1994), reprinted in 1994 U.S.C.C.A.N. 4040). Second, the court determined that Commerce did not err in using all corporate tax filers as the comparator group in assessing specificity. *Id.* The court explained that it was "reasonable to think that [such] a comparison" would be "instructive" in assessing whether the subsidy was widely used. *Id.*

Accordingly, the Court of International Trade sustained in full Commerce's *Final Affirmative Determination.* Marmen Inc., **\*1369** Marmen Énergie Inc., Marmen Energy Co., the Government of Québec, and the Government of Canada appeal to this court. We have jurisdiction pursuant to *28 U.S.C. § 1295(a)(5).*

### STANDARD OF REVIEW

We review de novo the Court of International Trade's decisions involving Commerce's countervailing duty determinations, reapplying the same substantial evidence review standard applied by the Court of International Trade. *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,* 992 F.3d 1348, 1352 (Fed. Cir. 2021). We uphold Commerce's determination unless it is unsupported by substantial evidence or is otherwise not in accordance with law. *19 U.S.C. § 1516a(b)(1)(B)(i).* Substantial evidence means such relevant evidence that a reasonable mind may accept as adequate to support a conclusion. *Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). In conducting our review, we "will not ignore the informed opinion of the Court of International Trade," which often serves as a starting point of our analysis. *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978, 983 (Fed. Cir. 1994); *see Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1351 (Fed. Cir. 2006).

### DISCUSSION

Appellants raise two categories of challenges to Commerce's *Final Affirmative Determination.* First, as to the subsidy rate calculation, Appellants challenge Commerce's exclusion of Marmen's auditor's adjustment from the sales denominator. Second, Appellants challenge Commerce's assessment concerning the three programs at issue, specifically: (1) Commerce's finding that the additional depreciation deduction for certain Class 1 assets constituted a financial contribution conferring a benefit; (2) Commerce's determination to exclude increased tax liabilities when calculating the benefit conferred under the GASPÉTC program; and (3) Commerce's finding that the on-the-job training tax credit provided a de facto specific subsidy. Because Commerce's determinations are supported by substantial evidence and in accordance with law, we affirm.

### I. The Sales Denominator

We first address Commerce's determination not to adopt Marmen's auditor's adjustment in computing the sales denominator. Appellants argue that Commerce "unreasonabl[y]" determined that the auditor's adjustment was "unverified and unreliable." Appellants Br. 25. Appellants further argue that Commerce's determination contravenes its past practice and its obligation to accurately calculate subsidy rates. Id. We disagree.

Based on errors identified through verification, Commerce reasonably determined that Marmen's auditor's adjustment

was unreliable. Marmen claimed that the adjustment was to convert USD sales recorded in its general ledger to CAD, and the auditor used a single annual average USD-CAD exchange rate. J.A. 8676–77. Commerce's verification revealed that the auditor's adjustment erroneously included sales denominated in a non-USD foreign currency (the EURO) in the general ledger, and two of these sales were transacted in CAD and thus erroneously coded. J.A. 8679–80. Based on these "improperly identified and improperly converted" sales, it was reasonable for Commerce to determine that "the auditor's adjustment was not accurate or reliable." J.A. 116.

Appellants take issue with Commerce's statement that Commerce "discovered" the five EURO-coded sales through "spot-checking." Appellants Br. 32. Appellants contend that Marmen *self-identified* these **\*1370** sales to Commerce because, in the USD-sales listings Marmen prepared, these EURO-coded sales were listed as such and were thus flagged for Commerce. [8] *E.g.*, *id.* at 33. These errors, Appellants claim, account for less than 0.2% of the total requested adjustment and Commerce's spot-checking beyond these errors did not reveal additional "EURO-coded sales." *Id.* at 34, 36. According to Appellants, because Commerce found no additional errors and concluded the verification early, it was "unreasonable for Commerce to infer that additional errors were likely." *Id.* at 34–35.

Regardless of whether Commerce completely *independently* discovered those problematic sales or used Marmen's submitted listings as a clue, these errors undeniably exist and undermine the reliability of the adjustment. When Commerce inquired about the errors relating to the EURO-coded sales, Marmen attributed them to its accounting firm's "sales classification" or its "internal coding mistake." J.A. 8680. The fact that Commerce's verification did not reveal *additional EURO-coded sales* does not compel a conclusion that the auditor's adjustment contains *no other errors*. Marmen's explanation for the identified errors does not support that *all* errors are fully accounted for by the identified EURO-coded sales, whether attributed to "sales classification," "coding mistake[s]," or other causes. This evidence supports Commerce's reasonable inference that the auditor's adjustment may contain other errors. *See CIT Decision*, 567 F. Supp. 3d at 1286 n.11. As Commerce explained, it lacked the ability to verify each sale and exhaustively examine all underlying sales documentation. J.A. 116. Here, the verification demonstrated that the requested adjustment contained errors, which undermined "[its] broader reliability." *Id.* We agree with the Court of

International Trade that "[w]hile the impact of the discovered errors, taken alone, on the proposed foreign currency adjustment may be small, Commerce could reasonably infer that there may remain other errors." *CIT Decision*, 567 F. Supp. 3d at 1286.

We also find unpersuasive Appellants' assertion that Commerce's action here contradicts its past practice or its legal obligations. *See* Appellants Br. 37. Appellants contend that, by conducting verification of "an independent auditor's" analysis, Commerce took an erroneous "extraordinary" action departing from its past practice and the law. *Id.* at 39–40.

Verifying the parties' submission and rejecting inaccurate and unverifiable information is consistent with, and required by, Commerce's statutory obligation to calculate subsidy rates "as accurately as possible." *See id.* at 41; *see also* 19 U.S.C. § 1677m(i). Marmen requested the auditor's adjustment in a ministerial error allegation *after* Commerce reached the *Preliminary Affirmative Determination* based on the sales value Marmen itself reported. J.A. 114. To support its allegation, Marmen pointed to a line item "Year End auditor adjustment in [General Ledger] 40000 for Gain(loss) exchange rate," which had little accompanying explanation. *See id.*; J.A. 8436; J.A. 8092; J.A. 8118. Given the timing and nature of Marmen's request and the lack of corroborating explanation in the record, it was reasonable for Commerce to decide to investigate the accuracy of the requested adjustment.

**\*1371** Lastly, we reject Appellants' argument that Commerce should have, but failed to, "cite compelling evidence" to disregard the auditor's adjustment. Appellants Br. 40. To support its proposition, Appellants cite *SeAH*, a decision by the Court of International Trade in an unrelated proceeding, and certain statements in a previous administrative proceeding referenced in *SeAH*. *Id.* at 39 (citing *SeAH Steel VINA Corp. v. United States*, 269 F. Supp. 3d 1335, 1352 (Ct. Int'l Trade 2017)); *see also id.* (citing statements from memo accompanying *Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 71 Fed. Reg. 67098 (Nov. 20, 2006)). Appellants' arguments lack merit.

*SeAH* involves Commerce's evaluation and selection of one set of surrogate financial statements over the other, where Commerce "had reason to trust the reliability" of the one it selected and explained its "basis for rejecting" the other. *SeAH*, 269 F. Supp. 3d at 1351–52. One of the reasons supporting Commerce's selection was that the

selected set contained an auditor's opinion and registration information, while the other did not. *Id.* In that context, the Court of International Trade observed that Commerce *can* "accept the independent auditor's report as reliable unless 'compelling evidence' exists that the auditor is not in 'good standing.' " *Id.* at 1352. This observation does not stand for Appellants' proposed rule requiring Commerce to provide "compelling evidence to set aside information provided by an auditor." *See CIT Decision,* 567 F. Supp. 3d at 1285. Further, as the Court of International Trade noted, the facts here are readily distinguishable from those in *SeAH. See id.* In *SeAH,* no evidence "contradicted the independent auditor's conclusions" accompanying the selected surrogate statements; here, in contrast, Marmen's own auditor's adjustment was "shown to be at least partially in error." *Id.* Appellants' reliance on the out-of-context statements from the *Butt-Weld Pipe Fittings* proceeding fails for similar reasons. *See id.* (explaining the differences between the determination involved in *Butt-Weld Pipe Fittings* and Commerce's evaluation here).

Accordingly, we agree with the Court of International Trade that Commerce's exclusion of Marmen's requested auditor adjustment was supported by substantial evidence and in accordance with law.

## II. Program Assessment

### i. Additional Depreciation for Certain Class 1 Assets

Appellants challenge Commerce's determination that the additional 6% depreciation Marmen claimed for certain Class 1 assets provided a countervailable subsidy. Appellants contend that the additional depreciation does not provide a "benefit" nor result in a "financial contribution" in the form of foregone revenue. Appellants Br. 42, 49. According to Appellants, the additional depreciation merely reflects the actual shorter useful life of manufacturing buildings and the normal rate at which they depreciate. *E.g., id.* at 42–43, 53–54. We are unpersuaded.

To find a countervailable subsidy, there must be a governmental "financial contribution" that conferred a "benefit." *See* 19 U.S.C. § 1677(5). As relevant here, financial contribution includes "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income." 19 U.S.C. § 1677(5)(D)(ii). And in cases involving direct taxes, "a benefit exists to the

extent that the tax paid by a firm *as a result of the program is less than the tax the firm would have paid* in the absence of the program." 19 C.F.R. § 351.509(a) (emphasis added).

In accordance with the governing statute and regulations, Commerce **\*1372** reached a determination that is supported by substantial evidence in the record, including the Canadian tax regulations themselves. Before the Canadian tax regulations implemented additional allowances for certain subsets of Class 1 assets, a single standard or default 4% rate applied for all Class 1 assets. J.A. 2514. Around 2007, the Canadian tax regulations added additional allowances for two subsets of Class 1 assets, including as relevant here, "an additional allowance of 6% (total 10%)" for certain eligible buildings acquired after March 2007 and used for manufacturing. *Id.* To be eligible for this additional allowance, "a building will be required to be placed into a separate class," and "elections have to be filed." *Id.*; J.A. 9539; *see also* J.A. 9548 ("If you do not file an election to put it in a separate class, the 4% rate will apply."). Marmen filed its election to claim this additional allowance (of 6%) and thereby further reduced its taxable income during the 2018 period of investigation.

Absent the additional allowance, the generally applicable 4% standard rate would have applied. Marmen would have paid more taxes and the Canadian governments would have collected more revenue. The additional 6% allowance claimed and received by Marmen thus represents revenue that the Canadian governments could have collected but forewent, which constitutes a "financial contribution." 19 U.S.C. § 1677(5)(D)(ii); *see* J.A. 99. And because of this additional 6% allowance, "a benefit exists" as "the tax paid by [Marmen] as a result of the program is less than the tax [Marmen] would have paid in the absence of the program." 19 C.F.R. § 351.509(a) (1); *see* J.A. 97–99.

We find unpersuasive Appellants' contention that Commerce committed a "fundamental error" by failing to consider that "the depreciation rate is based on the average useful life of a particular asset." Appellants Br. 47, 49. Commerce based its determination on how the Canadian tax regulations explicitly structured the additional depreciation allowance, applying the explicit definitions of "benefit" and "financial contribution" provided in the governing statute and regulations. *See* J.A. 97–99. The governing statutory and regulatory provisions do not require Commerce to base its determination on whether a program at issue accurately aligns with the economic reality of building depreciation. 19 U.S.C. § 1677(5)(D)(ii); 19

C.F.R. § 351.509(a)(1); *see CIT Decision*, 567 F. Supp. 3d at 1295. We thus agree with the Court of International Trade that Commerce's determinations are in accordance with law and supported by the tax regulations themselves. *See CIT Decision*, 567 F. Supp. 3d at 1294–96.

Relatedly, we reject Appellants' contention that Commerce ignored or failed to adequately address the *StatCan Study*. *See* Appellants Br. 47, 49. Appellants relied on the *StatCan Study* to support their characterization that the additional depreciation allowance reflected the economic reality. *See* J.A. 93–94. As discussed above, Commerce based its assessment on a comparison of the different depreciation deduction rates provided in the Canadian tax regulations. *See CIT Decision*, 567 F. Supp. 3d at 1296. In doing so, Commerce rejected Appellants' contrary contention that would require Commerce to compare the deduction rate(s) to what would be justified by the economic reality. *See* J.A. 98. By rejecting that overarching contention, Commerce adequately engaged with the *StatCan Study* evidence Appellants cited to support their underlying characterization of the depreciation allowance.

### ii. GASPÉTC Tax Credit

Appellants next challenge Commerce's benefit assessment under the **\*1373** GASPÉTC tax credit program. In calculating the benefit Marmen received under this program in 2018, Commerce used the tax credit Marmen claimed for 2017 without offsetting it by the income tax Marmen paid for the credit it received in 2016. Appellants contend that the regulations require Commerce to consider the "total tax effect of the program" that, in Appellants' view, requires a reduction by the tax Marmen paid for the prior year's credit. Appellants Br. 57. We are not persuaded.

Under 19 C.F.R. § 351.509(a)(1), in cases involving "[e]xemption or remission of taxes," "a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." In excluding the tax Marmen paid as a result of the prior year's credit from its benefit assessment, Commerce followed the directive under 19 C.F.R. § 351.503(e). Section 351.503 is the "Benefit" section under "Subpart E—Identification and Measurement of Countervailable Subsidies," and it contains various subsections on benefit assessment. Subsection (e) instructs that "[i]n calculating the amount of a benefit, [Commerce]

*will not consider the tax consequences of the benefit.*" 19 C.F.R. § 351.503(e) (emphasis added).

Appellants argue that 19 C.F.R. § 351.503(e) is inapplicable because, in their view, it provides a general rule whose application would contravene the "specific rule" provided in 19 C.F.R. § 351.509(a)(1). *See* Appellants Br. 60–61. We discern no contravention. Section 351.509(a)(1) directs Commerce to calculate the benefit received under a program in the year at issue, here the 2018 period of investigation. The regulatory language does not address taxes resulting from prior year(s)' credit, let alone instruct that such resulting taxes be subtracted from the benefit received in the year at issue. This section thus does not contradict the instruction contained in 19 C.F.R. § 351.503(e).

Additionally, further supporting Commerce's determination are the statutory limitations on the circumstances where offsets are applied. *See* 19 U.S.C. § 1677(6). Specifically, section 1677(6) explicitly lists a narrow range of scenarios where Commerce may apply offsets in calculating countervailable subsidies. *Id.* These include, among other scenarios, cases involving fees paid to receive a subsidy and "loss in the value" of the subsidy due to delayed receipt. *Id.* The enumerated scenarios do not include, as relevant here, tax consequences from prior year's benefit. *Id.*; *see Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1174 (Fed. Cir. 1998) (discussing permissible offsets under § 1677(6)).

Accordingly, we agree with the Court of International Trade that Commerce acted in accordance with law when it excluded taxes incurred from the previous year's credit in computing the benefit Marmen received under the GASPÉTC program.

### iii. On-the-Job-Training Tax Credit

Lastly, Appellants challenge Commerce's determination that the Québec on-the-job training tax credit was de facto specific under 19 U.S.C. § 1677(5A)(D)(iii). Appellants Br. 62. As noted *supra*, to be countervailable, a subsidy must be "specific" to a foreign enterprise or industry, or a group of foreign enterprises or industries. 19 U.S.C. § 1677(5)(A). Specificity can be de jure (as a matter of law), or de facto. *Id.* § 1677(5A)(D). As relevant here, a subsidy is de facto specific if Commerce finds "one or more of the following factors":

(I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.

(II) An enterprise or industry is a predominant user of the subsidy.

**\*1374** (III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

*Id.* § 1677(5A)(D)(iii). In assessing de facto specificity, Commerce examines the factors enumerated in 19 U.S.C. § 1677(5A)(D)(iii) sequentially. 19 C.F.R. § 351.502. "If a single factor warrants a finding of specificity, [Commerce] will not undertake further analysis." *Id.* § 351.502(a). Here, Commerce found the on-the-job training tax credit to be de facto specific based on factor (I), namely the actual number of recipients was "limited in number" on an enterprise basis. J.A. 129.

Appellants raise two primary challenges to Commerce's specificity determination. Appellants first contend that Commerce erred in not conducting a de jure specificity analysis, which Appellants argue should inform the de facto analysis. Appellants Br. 64. Appellants also argue that Commerce's comparison approach in its "limited in number" analysis was methodologically unsound and contravened the SAA's directive regarding the purpose of the specificity determination. *Id.* at 71–78. We disagree.

First, contrary to Appellants' contention, the statute does not make a de jure analysis a prerequisite inquiry for a de facto analysis. Rather, the statutory language is clear that specificity can be *either* de jure *or* de facto. 19 U.S.C. § 1677(5A)(D)(ii)–(iii). The de jure specificity inquiry is separate from the de facto inquiry and the two are based on different factors. *Id.* Commerce thus did not err in finding specificity based on its de facto analysis without a separate de jure analysis.

Second, Commerce did not err in using the total corporate tax filers as a comparator in assessing whether the credit recipients are limited in number. The governing statute and the implementing regulations do not prescribe any mandatory method that Commerce must employ in assessing de facto specificity or analyzing the listed factors. *See* 19 U.S.C. § 1677(5A)(D)(iii); 19 C.F.R. § 351.502. Rather, it is a fact-intensive and case-specific inquiry, where the factors involved and the weight accorded to them vary from case to

case. *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335–36 (Fed. Cir. 2006); *see* SAA, H.R. Doc. No. 103-316, at 929. In conducting this inquiry, Commerce exercises the necessary latitude afforded it in choosing the appropriate approach.

We agree with the Court of International Trade that Commerce did not exceed that latitude here. In assessing specificity, Commerce considered that the on-the-job training program is to encourage businesses to take on trainees. J.A. 8400. Both corporations and individuals engaging in business activities can avail themselves of this program and claim the tax credit. *Id.* The Government of Québec reported that during the 2018 period of investigation, 4,930 of 387,949 corporate entities, roughly 1.27%, [9] received the on-the-job training credit. J.A. 1982; J.A. 2173. Commerce thus concluded that the credit recipients were "limited in number" on an "enterprise" basis. J.A. 129. As the Court of International Trade pointed out, Commerce has taken similar comparison approaches **\*1375** to assess specificity of tax credit programs in past investigations. *CIT Decision*, 567 F. Supp. 3d at 1291–92; *see also* United States Br. 76–77. While the facts in other cases may call for different approaches or considerations, the nature of the program and the small percentage of recipients here support Commerce's "limited in number" assessment. [10] *See CIT Decision*, 567 F. Supp. 3d at 1292.

Contrary to Appellants' assertion, Commerce's approach does not conflict with the SAA's directive regarding the purpose of the specificity determination. *See, e.g.*, Appellants Br. 72, 74. As stated in the SAA, the specificity determination serves to "winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy." SAA, H.R. Doc. No. 103-316, at 929. It ensures that countervailing duties are not improperly levied against subsidies that are generally available and widely used across the economy, such as certain public infrastructure-related programs. *Id.* at 929–30. Commerce's comparison of the on-the-job training credit recipients to corporate tax filers aligns with this intended purpose of the specificity determination. As the Court of International Trade noted, Commerce's comparison is "instructive in determining whether the subsidy is widely spread throughout the economy." *CIT Decision*, 567 F. Supp. 3d at 1291. Given the nature of the program, the limited number of recipients (about 1.27% of corporate entities) demonstrates that the on-the-job credit is not one of widespread availability and use throughout the economy.

Accordingly, we agree with the Court of International Trade that Commerce's de facto specificity determination of the on-the-job training credit is supported by substantial evidence and is otherwise in accordance with law.

sustaining Commerce's *Final Affirmative Determination* is affirmed.

**AFFIRMED**

CONCLUSION

We have considered Appellants' remaining arguments and find them unpersuasive. For the reasons set forth above, we conclude that Commerce's *Final Affirmative Determination* is supported by substantial evidence and in accordance with law. Accordingly, the Court of International Trade's decision

COSTS

Costs against Appellants.

**All Citations**

105 F.4th 1359

**Footnotes**

1    Generally, wind towers are steel towers with wind turbines that are used to convert the kinetic energy from wind to electrical power. *See Gov't of Québec v. United States*, 567 F. Supp. 3d 1273, 1277 (Ct. Int'l Trade 2022).

2    The 1.18% rate represents the aggregate subsidy rate calculated based on eight of the investigated programs that Commerce found countervailable. As noted *infra*, this rate was subsequently reduced to 1.13% to account for ministerial errors not at issue here.

3    In countervailing duty investigations, if a large number of exporters or producers are involved, Commerce may select, and limit the investigation to, a small number of mandatory respondents. 19 U.S.C. § 1677f-1(e)(2). Mandatory respondents are compelled to participate in the investigation. Other exporters or producers of the subject merchandise may volunteer to participate in the investigation, and Commerce may accept voluntary respondents at its discretion. *Id.* § 1677m(a); 19 C.F.R. § 351.204(d). Mandatory respondents' failure to properly cooperate in the investigation may adversely affect the countervailing duty rates assessed for them. *See* 19 U.S.C. § 1677e(b). The calculated subsidy rates for the mandatory respondents may determine the countervailing duty rates applicable to other exporters and producers that are not individually investigated during the investigation. 19 U.S.C. §§ 1671d(c)(5), 1677f-1(e)(2).

4    Generally, after Commerce discloses its calculations in its preliminary determinations, a party to the proceeding may submit comments concerning "ministerial errors" contained in Commerce's calculations. 19 C.F.R. § 351.224(c). Commerce will analyze such comments and make corrections where appropriate. *Id.* § 351.224(e). According to the regulations, a "*ministerial error* means an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like." *Id.* § 351.224(f).

5    Under 19 U.S.C. § 1677(5)(D), "financial contribution" includes "(i) the direct transfer of funds, such as grants, loans, and equity infusions," and as relevant here, "(ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income."

6    Regarding benefits provided through direct taxes, 19 C.F.R. § 351.509(a)(1) ("Exemption or remission of taxes") provides that "a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program."

7    The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreement Act] in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

8    Countering Appellants' argument, the United States contends that Marmen never alerted Commerce to the "second type of error—sales included as USD in the adjustment and recorded in Marmen's ledger as Euro that were *actually* in CAD." United States Br. 24. According to Appellees, it was Commerce that identified this "second type of error" when "it spot-checked documentation for the Euro-coded sales." *Id.*; WTTC Br. 25; *see Verification Report*, J.A. 8579–80.

9    This percentage is based on a comparison of the number of credit recipients to the number of *corporate* tax filers, J.A. 1982, excluding *individual* tax filers engaging in business. The United States contends that this percentage would be even smaller if such individual tax filers were included. United States Br. 60–61, 61 n.7.

10    For similar reasons, we find unpersuasive Appellants' reliance on *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023), which Appellants submitted as a supplemental authority. In *Mosaic*, the Court of International Trade rejected Commerce's de facto specificity analysis concerning a different and unrelated penalty relief program. *Mosaic*, 659 F. Supp. 3d at 1314. As the Court of International Trade itself explained in *Mosaic*, the program at issue there was "distinguishable" from the on-the-job training program we are evaluating in this case. *Id.* at 1315 n.10.

---

End of Document        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# United States Court of Appeals for the Federal Circuit

---

**THE GOVERNMENT OF QUEBEC, MARMEN INC., MARMEN ENERGIE INC., MARMEN ENERGY CO., THE GOVERNMENT OF CANADA,**
*Plaintiffs-Appellants*

v.

**UNITED STATES, WIND TOWER TRADE COALITION,**
*Defendants-Appellees*

**THE GOVERNMENT OF ONTARIO,**
*Defendant*

---

2022-1807

---

Appeal from the United States Court of International Trade in No. 1:20-cv-00168-GSK, 1:20-cv-00170-GSK, 1:20-cv-00172-GSK, Judge Gary S. Katzmann.

---

**JUDGMENT**

---

THIS CAUSE having been considered, it is

ORDERED AND ADJUDGED:

**AFFIRMED**

FOR THE COURT

June 21, 2024
Date

Jarrett B. Perlow
Clerk of Court

13

19 U.S.C. § 1677(5)

(II) if added market value is taken into account, consider whether the value of the raw agricultural product constitutes a significant percentage of the value of the processed agricultural product.

**(iv) Raw agricultural product**

For purposes of this subparagraph, the term "raw agricultural product" means any farm or fishery product.

**(v) Termination of this subparagraph**

This subparagraph shall cease to have effect if the United States Trade Representative notifies the administering authority and the Commission that the application of this subparagraph is inconsistent with the international obligations of the United States.

**(5) Countervailable subsidy**

**(A) In general**

Except as provided in paragraph (5B), a countervailable subsidy is a subsidy described in this paragraph which is specific as described in paragraph (5A).

**(B) Subsidy described**

A subsidy is described in this paragraph in the case in which an authority—

    (i) provides a financial contribution,

    (ii) provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or

    (iii) makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments,

to a person and a benefit is thereby conferred. For purposes of this paragraph and paragraphs (5A) and (5B), the term "authority" means a government of a country or any public entity within the territory of the country.

**(C) Other factors**

The determination of whether a subsidy exists shall be made without regard to whether the recipient of the subsidy is publicly or privately owned and without regard to whether the subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise. The administering authority is not required to consider the effect of the subsidy in determining whether a subsidy exists under this paragraph.

**(D) Financial contribution**

The term "financial contribution" means—

    (i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

    (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

    (iii) providing goods or services, other than general infrastructure, or

    (iv) purchasing goods.

**(E) Benefit conferred**

A benefit shall normally be treated as conferred where there is a benefit to the recipient, including—

    (i) in the case of an equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made,

    (ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market,

    (iii) in the case of a loan guarantee, if there is a difference, after adjusting for any difference in guarantee fees, between the amount the recipient of the guarantee pays on the guaranteed loan and the amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, and

    (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

**(F) Change in ownership**

A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by the administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change in ownership is accomplished through an arm's length transaction.

**(5A) Specificity**

**(A) In general**

A subsidy is specific if it is an export subsidy described in subparagraph (B) or an import substitution subsidy described in subparagraph (C), or if it is determined to be specific pursuant to subparagraph (D).

**(B) Export subsidy**

An export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions.

**(C) Import substitution subsidy**

An import substitution subsidy is a subsidy that is contingent upon the use of do-

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court No. 2022-1807
## Gov't of Québec v. US

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 3,031 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: August 5, 2024                    Signature: _____ /s/ Jay C. Campbell ____

                                                    Name: _____ Jay C. Campbell ____

# CERTIFICATE OF SERVICE

## Gov't of Québec v. US
## CAFC Court No. 2022-1807

I certify that I served a copy of the foregoing filing on August 5, 2024 by E-mail on the below individuals at the following locations.

| Person Served | Service Location (E-mail) |
|---|---|
| Nancy Noonan | nancy.noonan@afslaw.com |
| Jessica R. DiPietro, | jessica.dipietro@afslaw.com |
| Joanne Osendarp, - | joanne.osendarp@blankrome.com |
| Alan Kashdan | alan.kashdan@blankrome.com |
| Tyler J. Kimberly, Attorney | tyler.kimberly@blankrome.com |
| Robert R. Kiepura, | robert.kiepura@usdoj.gov |
| Reginald Thomas Blades | reginald.blades@usdoj.gov |
| Alexander Fried, Attorney Advisor | alexander.fried@trade.gov |
| Joshua E. Kurland, Attorney | Joshua.E.Kurland@usdoj.gov |
| Patricia M. McCarthy, Assistant Director | patricia.mccarthy@usdoj.gov |
| Alan H. Price, - | aprice@wiley.law |
| Theodore Paul Brackemyre, - | tbrackemyre@wiley.law |
| Tessa V. Capeloto | tcapeloto@wiley.law |
| Robert E. DeFrancesco, III, - | rdefrancesco@wiley.law |
| Laura El-Sabaawi, Esq. | lel-sabaawi@wiley.law |
| Derick Holt | dholt@wiley.law |
| Elizabeth S. Lee, Esq., - | elee@wiley.law |
| John Allen Riggins, Esq., - | jriggins@wiley.law |
| Maureen E. Thorson | mthorson@wiley.law |

Date: August 5, 2024

/s/ Jay C. Campbell
Jay C. Campbell
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600